1              IN THE UNITED STATES DISTRICT COURT

2                     DISTRICT OF ARIZONA

3

4   United States of America        CR-15-976-TUC-CKJ(BGM)

5   vs.

6   Ramon Ramos-Zepeda,                 February 19, 2016
                                              3:05 p.m.
7                 Defendant.           Tucson, Arizona
   _____

8

9            PARTIAL TRANSCRIPT OF PROCEEDINGS

10         TESTIMONY OF AGENT JORGE BORREGO

11      BEFORE THE HONORABLE BRUCE G. MACDONALD
              UNITED STATES MAGISTRATE JUDGE

12

13             A P P E A R A N C E S

14   For the Government:

15       Kathryn Furtado
         Liza Granoff
16       United State's Attorney's Office
         405 West Congress
17       Tucson, Arizona 85701

18

19   For the Defendant:

20       Juan L. Rocha
         Law Office of Juan L. Rocha
21       PO Box 5965
         Mesa, Arizona 85211

22

23         PROCEEDINGS WERE DIGITALLY RECORDED

24     TRANSCRIBED BY:  ERICA R. McQUILLEN, RDR, CRR
             405 West Congress, Suite 1500
25                Tucson, Arizona 85701
                    (520) 205-4267

1                        EXAMINATION INDEX

2    JORGE BORREGO
            DIRECT BY MS. FURTADO . . . . . . . . . .    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          JORGE BORREGO, WITNESS, SWORN

3          THE WITNESS:  My name is Jorge Borrego.

4    My last name is B-o-r-r-e-g-o.

5          THE COURT:  Thank you.

6          Ms. Furtado?

7          MS. FURTADO:  Thank you.

8                   DIRECT EXAMINATION

9    BY MS. FURTADO:

10   Q.   Sir, can you tell us where you work.

11   A.   The U.S. Border Patrol.

12   Q.   And how long have you worked there?

13   A.   Been there just over eight years.

14   Q.   Does it take special training to become a

15   border patrol agent?

16   A.   Yes.

17   Q.   Can you tell us about that special training

18   and what you had to do.

19   A.   I went to a -- the academy in Artesia, New

20   Mexico, and there we received training.  We learned

21   immigration law, criminal law, firearms, defensive

22   tactics, flying watch duties, patrol -- how to

23   patrol the border.

24   Q.   Okay.  When you finish basic training, do you

25   have to go to field training?

1  A.   Yes.

2  Q.   Is there a portion of basic training where you

3  can learn Spanish?

4  A.   Yes.

5  Q.   Did you have to do that portion?

6  A.   No.

7  Q.   Is that -- why is that?

8  A.   I was able to test out of speaking -- of the

9  Spanish course.

10 Q.   Did you grow up speaking Spanish?

11 A.   Yes.

12 Q.   Okay.  Once you finished -- did you

13 successfully complete your basic training?

14 A.   Yes.

15 Q.   Did you then go to field training?

16 A.   Yes.

17 Q.   Where did you do your field training?

18 A.   I received my field training in my duty

19 station, which is Sonoita, Arizona.

20 Q.   And how long did you have to do field

21 training?

22 A.   It was approximately 12 weeks.

23 Q.   And what types of things did you do while on

24 field training?

25 A.   We did -- we interacted with people trying to

1  attempt to enter the country illegally or smuggle

2  contraband.  We learned this under supervision of

3  another agent.

4  Q.   Do you have to be -- do you have to

5  successfully complete your field training to be let

6  out to be a border patrol agent on your own?

7  A.   Yes.

8  Q.   Do you have to do post-academy training as

9  well?

10  A.   Yes.

11  Q.   What is that?

12  A.   It's -- we received our training -- it's

13  online, a series of tests and exams, and you have

14  to pass those exams.

15  Q.   Were you able to pass those?

16  A.   Yes.

17  Q.   So were you able to then successfully complete

18  basic field and post-academy training?

19  A.   Yes.

20  Q.   After that did you receive specialty training?

21  A.   Yes.

22  Q.   Or specialty assignments?

23  A.   Yes.

24  Q.   Okay.  Can you take us through what specialty

25  assignments you've had.

1  A.   I did a detail in Tucson, Arizona, as a

2  processing agent, so I did various processing,

3  notice to appears, ERs, expedited removals,

4  reinstatements of prior order of removals.

5       And I've also done prosecutions, and that was

6  also in Tucson, and there I was -- worked as a case

7  agent.

8  Q.   All right.  Let's talk about your time process

9  -- in the processing assignment.  How did you

10 generally do your processing?  I mean, how is it

11 generally laid out, from what you have experienced?

12 A.   Somebody -- somebody gets apprehended, and

13 then they get brought back to where they're going

14 to get processed, and most -- in my case I did it

15 both in Sonoita and Tucson.

16      And they get fingerprinted.  They'll get a --

17 before they get fingerprinted, they'll get -- it's

18 called a field I-826, and that's where they'll take

19 biographical information from an individual.

20 Q.   Who's "they?"

21 A.   Agents in the field.  And after they get --

22 after they get their biographical information,

23 they're taken to the station and fingerprint --

24 they'll run the fingerprints and take a photograph

25 of the individual.

1  Q.   That field 826, is that something that you

2  would get as a processing agent?

3  A.   Yes.

4  Q.   And what kind of information does it have on

5  it?

6  A.   It'll have all the information, biographical

7  information of the individual.

8  Q.   Okay.  And do you look at that information as

9  a processing agent?

10  A.   Yes.

11  Q.   Do you look at the form for other information

12  that might be provided on there?

13  A.   Yes.  If there's -- it'll help you determine

14  what kind of -- what kind of file to do on the

15  individual, how to -- how you're going to proceed

16  with the individual.

17  Q.   What kinds of things are you taking into

18  consideration when you're deciding how to process

19  an individual that you're presented with?

20  A.   Once they're -- once they're fingerprinted and

21  rolled, we'll take a look at their criminal history

22  and their immigration history, and in addition to

23  that, if somebody states -- has some kind of claim

24  to being admissible to the U.S. also.

25  Q.   Those are things that you would take into

1  consideration?

2  A.   Yes.

3  Q.   Is that what you're saying?  Okay.

4       When you're processing, what types of

5  questions are you asking?

6  A.   It's -- it's biographical information, and --

7  and if you -- sorry.  Repeat the question.

8  Q.   Well, maybe I'll ask a better question.

9       You said there's biographical information

10 provided on the field 826.

11 A.   Yes.

12 Q.   When you process a person, so they come with

13 their 826, what types of questions are you asking

14 that person?

15 A.   I'm determining to make sure to see if they're

16 admissible or inadmissible, so I will take a sworn

17 statement if I determine they're inadmissible.

18 Q.   Okay.  The first steps though, you said, with

19 processing are what?  You get the field 826; is

20 that correct?

21 A.   Yes.

22 Q.   All right.  From there, would you run their

23 criminal history?

24 A.   After we fingerprint.  With the fingerprints

25 and the picture being taken, we'll -- that will get

1  run through our databases, and it'll tell us their

2  -- reveal their criminal or immigration history.

3  Q.   Okay.  Once you have that information, do --

4  do you use a computer system then to process the

5  person before you?

6  A.   Yes.

7  Q.   Okay.

8  A.   It's called the E3.  That's where we input all

9  our information.

10  Q.   And what types of steps do you have to go

11  through when you're using the E3?

12  A.   I'll bring the individual up to me with their

13  826, and I'll have them standing in front of me,

14  and I'll go through each page with the individual.

15  Q.   Each page of?

16  A.   An E3, the pages that you go through.

17  Q.   The field 826, when they come with that, is

18  there a photo of the person on the field 826?

19  A.   No.

20  Q.   Okay.  Where would the photo -- you said

21  there's a photo taken.  Where would the photo of

22  the person be?

23  A.   That's something I would do if I'm taking the

24  fingerprints and the photo.

25  Q.   And do you always take the fingerprints and

 1  the photo when you're processing someone?

 2  A.   Not always.

 3  Q.   Is it -- is it information that you get at

 4  some point during your processing?

 5  A.   Yes.

 6  Q.   Okay.  And when you're processing, do you ask

 7  again biographical information?

 8  A.   Yes.  I'll verify with the name or the -- and

 9  the date of birth to make sure the correct person

10  is standing in front of me.

11  Q.   Okay.  So help me to understand.  Are you

12  asking the person in front of you their date of

13  birth and their name?

14  A.   With the 826, just to make sure it's that

15  person.

16  Q.   Okay.  Do you also look at the photo that's

17  been provided to see if that's the person in front

18  of you as well?

19  A.   Yes.

20  Q.   Before you begin processing, do you consider

21  the criminal history and the immigration history of

22  the person before you?

23  A.   Yes.

24  Q.   Okay.  Does that information factor into the

25  decisions you make in terms of how you're going to

 1  process?

 2  A.   Yes.

 3  Q.   Now, what type of biographical information do

 4  you ask a person as you're processing them?

 5  A.   I'll verify the information off the 826, and

 6  then if the person has no credible fear or they're

 7  -- they have some kind of claim of being

 8  inadmissible into the U.S., I'll be asking these

 9  questions.

10  Q.   Okay.  One second.

11       Do you fill out a form when you're doing

12  processing, the I-213 form?

13  A.   Yes.

14            MS. FURTADO:  Judge, may I approach the

15  witness?

16            THE COURT:  Sure.

17            MS. FURTADO:  Thank you.

18  BY MS. FURTADO:

19  Q.   I'm going to show you this document, and I

20  would ask you to take a look at it and see if you

21  recognize it.

22  A.   Vaguely.

23  Q.   Okay.  Is it an I-213 form?

24  A.   Yes.

25  Q.   Is that the form you would use when you

 1    process a person?

 2    A.    Yes.

 3    Q.    Does it include the questions that you would

 4    ask a person while processing them?

 5    A.    Yes.

 6    Q.    Okay.  Are you familiar with this type of

 7    form?

 8    A.    Yes.

 9    Q.    Okay.  Are you familiar with the layout of

10    this form?

11    A.    Yes.

12    Q.    And is that an accurate reflection of the

13    layout of an I-213 form?

14    A.    Yes.

15    Q.    So when doing a processing of an alien and

16    you're filling out I-213 form, what are the types

17    of biographical questions that you might ask a

18    person?

19    A.    Their -- I'll ask them -- I'll verify their

20    name, date of birth.  I'll ask them their address,

21    if they have any children.  I will ask them their

22    parent -- verify their parents' name.

23    Q.    Are you asking to -- about their parents in

24    terms of where their parents were born or where

25    their parents live?

1    A.   Both.

2    Q.   Okay.  Why do you ask the question about

3    children?

4    A.   If they are able to -- if they have a claim, I

5    can do a different kind of file.  If it's -- in

6    this case it was an expedited removal, but if it

7    was -- if he had United States children, I would do

8    a different kind of file.

9    Q.   Does United -- does having United States

10   children affect your decision on how you process a

11   person?

12   A.   Yes.

13   Q.   Okay.  Are you noting -- when you are filling

14   out the I-213 form, are you noting the responses

15   that a person you're processing is giving you?

16   A.   Yes.

17   Q.   How are you noting those responses?

18   A.   So this individual is standing in front of me,

19   and I'm going -- in the computer there

20   is page-by-page.  I'm inputting his information as

21   I'm asking him.

22   Q.   Is it a verbatim documentation of what they're

23   saying to you?

24   A.   Yes.

25   Q.   If a person tells you they're not going to

1  answer a question, what is your process for

2  documenting that response?

3  A.   "Failed to respond," something like that.

4  Q.   Why are you asking questions about where a

5  person's parents live?

6  A.   Because if they can get citizenship from their

7  parents, it would be a different file also.

8  Q.   And their responses to where their parents

9  live, is that something you're documenting in the

10  I-213 form?

11  A.   I -- I ask them their name and then their

12  nationality, but in the sworn statement I take from

13  them, I'll get more information from them.

14  Q.   You're asking their name.  Does that mean

15  you're asking the person that you're processing,

16  you ask their parents' name and their parents'

17  nationality?

18  A.   Yeah, I'll ask them what their parents' names

19  are.

20  Q.   Okay.  Does the I-213 form have a photo on it?

21  A.   Yes.

22  Q.   And is that the photo that you are comparing

23  to the person you are processing?

24  A.   Yes.

25  Q.   Okay.  Do -- does the person you're processing

 1  give you sort of height and weight information?

 2  A.   We take that from them.  We have a scale and

 3  height measurement.

 4  Q.   Okay.  Does the -- do you ask the person when

 5  you're completing the I-213 form during the

 6  processing where that person's country of

 7  citizenship is?

 8  A.   Yes.

 9  Q.   Okay.  Do you ask them if they have a United

10  States address?

11  A.   Yes.

12  Q.   Do you ask them about their entry into the

13  United States, if they are not from the United

14  States?

15  A.   Yes.

16  Q.   And is that something you document on the 213

17  form?

18  A.   Yes.  In this instance --

19  Q.   Hold on.  We'll get there.

20  A.   Okay.

21  Q.   We'll get there.  Okay.  All right.

22       How long does it generally take you to do the

23  processing for the I-213 form?

24  A.   Typically the 214 (sic) -- I'm not -- I don't

25  -- I'm not sure.  Maybe -- maybe 20 minutes.  I

 1   mean, like, this is an expedited removal.  It takes
 2   -- I do it from start to finish, so that's
 3   typically like an hour.  So the 213 is maybe --
 4   maybe around 20 minutes, around that time.
 5   Q.   Okay.  During that time are you making
 6   observations about the person you're processing?
 7   A.   Yes.
 8   Q.   Are you -- are you noting if they have any
 9   injuries?
10   A.   Yes.
11   Q.   Have you ever had somebody tell you they were
12   afraid when you were doing processing?
13   A.   Yes.
14   Q.   And when they tell you that, what do you do
15   with that information?
16   A.   I will notate it in the 213.
17   Q.   Does that cause an alternative process to have
18   to happen?
19   A.   There is an additional form that gets
20   generated, and it's a credible fear form.
21   Q.   So I'm going to ask you, then, about an
22   expedited removal.  Do you recall doing an
23   expedited removal on January 9th, 2009?
24   A.   With this report, yes.
25   Q.   Okay.  And did that process refer to a Ramon

1  Ramos-Zepeda?

2  A.   Yes.

3  Q.   And did you make contact with Mr. Zepeda and

4  were you the -- well, let me -- let me back up.

5      Were you the person that did all the

6  processing for Mr. Zepeda on the 12th of January,

7  2009?

8  A.   Yes.

9  Q.   Now, when you began the processing with

10  Mr. Zepeda, what information did you have?  Were

11  you given any forms?

12  A.   The I-826, the -- that's the form that the

13  agent provides when he brings it individually.

14  Q.   Is that the field 826, the field processing

15  form?

16  A.   Yes, the field 826.

17  Q.   Now, on January 9th, 2009, do you recall if

18  you took the picture of Mr. Ramos-Zepeda?

19  A.   I do not.

20  Q.   Do you recall looking at the photo that you

21  were provided and comparing it to the person in

22  front of you?

23  A.   Yes, I do.

24  Q.   And did the photo and the person before you,

25  did that match?

1    A.   Yes.

2    Q.   Okay.  Now, when you do this I-213 process,

3    did you follow the same process we've talked about?

4    Did you ask Mr. Zepeda questions, biographical

5    questions?

6    A.   Yes.

7    Q.   And let's talk about those.

8    A.   Okay.

9    Q.   What information did he -- did Mr. Zepeda give

10   you in terms of his nationality?

11   A.   His nationality was Mexico.

12   Q.   Okay.  And I see that you're referring to the

13   report, the I-213.

14   A.   Yes.

15   Q.   Is that helping you to refresh your memory on

16   this event?

17   A.   Yes.

18   Q.   Okay.  Now, did he tell you about a place and

19   time of entering into the United States?

20   A.   Yes.

21   Q.   And what did he tell you?

22   A.   He entered January 12th, approximately -- I

23   take that back.  January 9th of 2009, and it was

24   near Naco, Arizona.

25   Q.   Okay.  About what time on January 9th?

1  A.   0800, eight o'clock in the morning.

2  Q.   Okay.  So did you do the processing on the

3  12th of January?

4  A.   Yes.

5  Q.   Okay.  And so the information you were

6  provided as the date and time of the defendant's

7  entry was the 9th of January?

8  A.   He answered on the 9th and he was apprehended

9  on the 12th.

10  Q.   Okay.  The information about time and place of

11  entry and -- was that provided by Mr. Ramos-Zepeda

12  to you?

13  A.   I double-checked, but it is also on the field

14  826.

15  Q.   By "double-check," does that mean you asked

16  Mr. Ramos --

17  A.   Yes.

18  Q.   -- Zepeda?

19  A.   I do.

20  Q.   And the information that you're referring to

21  on your report, was that something that you would

22  have obtained from Mr. Ramos-Zepeda himself?

23  A.   Yes.

24  Q.   Now, did you ask Mr. Ramos-Zepeda about his

25  parents?

1    A.   Yes.

2    Q.   Did you ask him where -- the nationality of

3    his mother and father?

4    A.   Yes.

5    Q.   What did he tell you about their nationality?

6    A.   They were nationals of Mexico.

7    Q.   Okay.  Would that response have triggered you

8    to think that there was any form of relief

9    available to Mr. Ramos-Zepeda?

10   A.   No.

11   Q.   Did you ask Mr. Ramos-Zepeda about children

12   that he might have?

13   A.   Yes.

14   Q.   And what was his response?

15   A.   He claimed none.

16   Q.   Okay.  If he had claimed United States citizen

17   children, would that have affected your processing

18   of Mr. Ramos-Zepeda?

19   A.   Yes.

20   Q.   Would -- what would you have done had he had

21   United States or indicated to you that he had

22   United States citizen children?

23   A.   I might have -- I might have -- so we take it

24   to the supervisor, and I would have asked him if he

25   was -- if I should do a notice to appear on the

1    individual.

2    Q.   Okay.  But since there were none claimed, did

3    that mean you didn't take this information to the

4    supervisor?

5    A.   I still take it just to make sure that he --

6    the expedited removal was okay.

7    Q.   Okay.  And were you advised that the expedited

8    removal would be okay?

9    A.   Yes.

10   Q.   Okay.  Now, when you began -- began this

11   process, did you -- had Mr. Ramos-Zepeda's

12   fingerprints been taken?

13   A.   Yes.

14   Q.   And did you receive results of his -- from his

15   fingerprints being run?

16   A.   Yes, yes.

17   Q.   And did you receive criminal history with

18   regard to Mr. Ramos-Zepeda?

19   A.   Yes.

20   Q.   What information did you receive regarding

21   Mr. Ramos-Zepeda's criminal history?

22   A.   He -- he had an outstanding warrant, as long

23   -- as well as criminal history.

24   Q.   Okay.  Where was the outstanding warrant from?

25   A.   The outstanding warrant was out of Redwood

1   City.

2   Q.   Okay.  And what information -- what

3   information did you have regarding his -- the

4   criminal history besides the warrant?  Did you have

5   information --

6   A.   Yeah.

7   Q.   -- related to a conviction?

8   A.   Excuse me?

9   Q.   Did you have information related to a

10  conviction?

11  A.   Yes.

12  Q.   Okay.  And did the warrant arise from the

13  conviction?

14  A.   Yes.

15  Q.   And when was the conviction?

16  A.   The conviction, May 23rd of 2006.

17  Q.   When you're making a determination in terms of

18  immigration processing, do you consider criminal

19  history?

20  A.   Yes.

21  Q.   In this particular case, would Mr. Ramos-

22  Zepeda's criminal conviction make him eligible for

23  a voluntary return?

24  A.   No.

25  Q.   Would the outstanding warrant that Mr. Ramos-

1  Zepeda had, would that make him eligible for a

2  voluntary return?

3  A.  No.

4  Q.  Did you receive Mr. Ramos-Zepeda's criminal

5  history?

6  A.  Yes.

7  Q.  And what did -- I'm sorry.  I said -- I meant

8  immigration history.  Did you receive Mr. Ramos-

9  Zepeda's immigration history?

10 A.  Yes.

11 Q.  And what information did you have regarding

12 his immigration history?

13 A.  There was none found.

14 Q.  Okay.  How did -- so he had no immigration

15 history.  Was he eligible for criminal charges?

16 A.  No.

17 Q.  Why not?

18 A.  Because he had no immigration history.

19 Q.  Okay.  What were you considering -- you said

20 from the beginning you did an expedited removal.

21 Why did you consider an expedited removal for

22 Mr. Ramos-Zepeda?

23 A.  Because of his criminal history, he was

24 eligible for expedited removal.

25 Q.  Okay.  Let's talk about that eligibility

 1  requirement.  Okay?

 2  A.   Okay.

 3  Q.   How does a person become eligible for

 4  expedited removal, according -- according to your

 5  process?

 6  A.   He was apprehended within 14 days of entering

 7  the border and within 100 miles.  In addition, he

 8  was -- he entered illegally.

 9  Q.   By "illegally," what are you --

10  A.   He wasn't -- he didn't go through a port of

11  entry.  He wasn't inspected.

12  Q.   And during your processing of him, did

13  Mr. Ramos-Zepeda have any entry documents with him

14  or on him?

15  A.   Did he have any?

16  Q.   Yes.

17  A.   No.

18  Q.   Okay.  So in terms of expedited removal, do

19  you have to be found within a hundred air miles of

20  the border?

21  A.   Yes.

22  Q.   And when the agents made contact with him, did

23  you have information about how the contact was made

24  with Mr. Ramos-Zepeda?

25  A.   On the 826, yes.

1   Q.   Okay.  And what information did you have as to

2   how agents made contact with Ramos-Zepeda on the

3   12th?

4   A.   Do you have the 826 available?

5   Q.   I would ask you to just look at page 4, Bates

6   stamp 54, first paragraph.

7   A.   Agents were performing their border patrol

8   duties east of Sonoita.  They were -- it was via

9   horse patrol and ATV units.

10   Q.   Okay.  So was Mr. Ramos-Zepeda physically in

11   the United States when agents made contact with

12   him?

13   A.   Yes.

14   Q.   And what -- and did you say that the date of

15   entry was the 9th of January?

16   A.   Yes.

17   Q.   And was that the date that Mr. Ramos-Zepeda

18   said he originally came into the United States?

19   A.   Yes.

20   Q.   And was that within 14 days of the encounter

21   with immigration officials for him to qualify for

22   an expedited removal?

23   A.   Yes.

24   Q.   Okay.  Now, when you're doing an expedited

25   removal, do you have to follow a certain process?

1  A.   Yes.

2  Q.   Does that mean you have to take a sworn

3  statement from the individual?

4  A.   Yes.

5  Q.   And would you have to provide them notice of

6  their potential inadmissibility?

7  A.   Yes.

8  Q.   Would you also have to provide them -- provide

9  them information about the potential charges they

10 face?

11 A.   Yes.

12          MR. ROCHA:  Your Honor, I'm not opposed to

13 foundation, but I've allowed the Government to --

14 the last four questions, she's just been leading

15 the witness, and he's just been saying, "Yes," so

16 I'd ask for her to rephrase the question.

17          THE COURT:  They are leading questions, so

18 I'm going to sustain that.

19 BY MS. FURTADO:

20 Q.   So let's talk about the process, then, for

21 doing your immigration -- your expedited removal.

22      First, is an expedited removal a criminal

23 proceeding?

24 A.   No.

25 Q.   What is it?

1   A.   It's administrative.

2   Q.   Okay.  In an administrative proceeding, do you

3   read the person you're processing a Miranda

4   warning?

5   A.   No.

6   Q.   Do you read a warning to the person you're

7   processing if you're processing them

8   administratively?

9   A.   Yeah, there's a -- there's s -- before I take

10  their sworn statement there's a little statement.

11  I have them read it, and if they can't read, I will

12  read it to them.

13  Q.   And if you -- if -- what language are you

14  using when you're reading the statement to a

15  person?

16  A.   Spanish.

17  Q.   And that would --

18  A.   Typically.

19  Q.   Would that be just dependent on what language

20  they spoke?

21  A.   Yes.

22  Q.   Okay.  When you were speaking to Mr. Ramos-

23  Zepeda, what language were you using?

24  A.   I believe it was Spanish.

25  Q.   I would ask you to look at -- well, I'm going

 1   to show you the document.

 2              MS. FURTADO:  May I approach the witness,

 3   Your Honor?

 4              THE COURT:  Sure.

 5              MS. FURTADO:  Thank you.

 6   BY MS. FURTADO:

 7   Q.   I'm going to show you what's been marked as

 8   Government's Exhibit No. 1.  I'd ask you to take a

 9   look at that (inaudible).

10   A.   Okay.

11   Q.   So do you recognize those documents?

12   A.   Yes.

13   Q.   Okay.  What are they?

14   A.   This is a record of the sworn statement and

15   proceedings under Section 235(b)(1) of the Act.

16   Q.   Okay.  What -- is there an indication of who

17   the alien was that you created that record for?

18   A.   Yes.  His name is on here.

19   Q.   Okay.  Who is it?

20   A.   Ramon Ramos-Zepeda.

21   Q.   Is that the record that you created when you

22   did the processing on the 12th of January, 2009?

23   A.   Yes.

24   Q.   Okay.  Is that a fair and accurate reflection

25   of the -- of the conversation you had or the -- the

 1  conversation you had --

 2  A.   Yes.

 3  Q.   -- with Mr. Zepeda on that day?

 4          MS. FURTADO:  Judge, I move to admit

 5  Exhibit No. 1.

 6          THE COURT:  Mr. Rocha, any objection?

 7          MR. ROCHA:  No objection.

 8          THE COURT:  We will go ahead and admit

 9  Government's Exhibit No. 1.  Thank you.

10  BY MS. FURTADO:

11  Q.   Okay.  When looking at that document, Agent,

12  can you see if there's a language indicated?

13  A.   Yes.  It says Spanish language.

14  Q.   In looking at that document, does that help to

15  refresh your memory about the language you used

16  when speaking to Mr. Ramos-Zepeda?

17  A.   Yes.  I spoke to him in Spanish.

18  Q.   And when you were speaking to Mr. Ramos-

19  Zepeda, did he appear to be able to understand you?

20  A.   Yes.

21  Q.   And were you able to understand him in

22  Spanish?

23  A.   Yes.

24  Q.   And at times during your conversation with

25  Mr. Ramos-Zepeda, did he ask you questions that

1   were consistent with what you were talking about?

2   A.   I'm sorry?

3   Q.   Did he ask you questions about what you were

4   doing, the processing?

5   A.   Typically people ask and I'll answer them,

6   whatever questions they have.

7            MR. ROCHA:  I object.  Nonresponsive.  She

8   asked whether he asked questions, not whether

9   generally people -- his response was generally

10  people do.

11           THE COURT:  I'm going to sustain that.  I

12  think -- go ahead and if you'd ask the prior

13  question with regard to specifically this

14  individual.

15           MS. FURTADO:  Okay.

16  BY MS. FURTADO:

17  Q.   When you were speaking with Mr. Ramos-Zepeda,

18  were you -- were you having an exchange where, when

19  he asked you questions, it was appropriate to what

20  you were talking about?

21  A.   Yes.

22  Q.   Okay.  You said you use a system called E3 to

23  do the processing?

24  A.   Yes.

25  Q.   Is that the same system you use when doing an

1  expedited removal?

2  A.   Yes.

3  Q.   And does that system, would it automatically

4  generate forms for you to do the expedited removal?

5  A.   Yes.

6  Q.   Okay.  We've talked a little about the

7  biographical information.  That's information you

8  have to put in.  Is that information you have to

9  put in when doing the expedited removal?

10 A.   Yes.

11 Q.   And did you put that information in when doing

12 this expedited removal for Mr. Ramos-Zepeda?

13 A.   All the questions that I asked him are

14 documented in this record of sworn statement.

15          MS. FURTADO:  Can I have just a second,

16 Your Honor?

17          THE COURT:  Sure.

18 BY MS. FURTADO:

19 Q.   Agent, I want to back up a second.  In the 213

20 there's a photograph.

21 A.   Okay.

22 Q.   And I previously asked you if you verified

23 during processing the photo versus the person

24 you're processing?

25 A.   Yes.

1    Q.   In this particular instance, did you -- did
2    you verify, when you were processing Mr. Ramos-
3    Zepeda, that the photo you had on the I-213 was the
4    person you were actually processing?
5    A.   Yes.
6    Q.   And do you see that person in the courtroom
7    today?
8    A.   The appearance is a little different, but they
9    look the same.
10   Q.   Okay.  And can you just point to him and give
11   us an article of clothing that he's wearing, the
12   person that you're referring to that you say
13   appears to look the same in the picture?
14   A.   He's wearing an orange shirt.
15          MS. FURTADO:  Okay.  Your Honor, I would
16   ask that the record reflect that the witness is
17   referring to the defendant.
18          THE COURT:  It will reflect that.  Thank
19   you.
20          MS. FURTADO:  Thank you.
21   BY MS. FURTADO:
22   Q.   When you talked to Mr. Ramos-Zepeda, you said
23   that you took some personal information.  Would you
24   ask Mr. Ramos-Zepeda if he had a United States
25   address?

1    A.   Yes.

2    Q.   And in this particular instance, on the 12th,

3    when you talked to Mr. Ramos-Zepeda, did he give

4    you a U.S. address?

5    A.   No.

6    Q.   What information did he give you?

7    A.   He failed to provide a U.S. address.

8    Q.   When you process a person for immigration

9    issues, do you also let them speak to a consular

10   representative?

11        MR. ROCHA:  Again, Your Honor, it's a

12   leading question.

13        THE COURT:  Well, I think that's a yes or

14   no, but you are leading him a little bit, so I'll

15   sustain that.

16        MS. FURTADO:  Okay.

17   BY MS. FURTADO:

18   Q.   Is there a process by which a person is able

19   to talk to a consular representative during

20   immigration processing?

21   A.   They do have a right to speak to the consulate

22   and --

23   Q.   And in this particular instance with

24   Mr. Ramos-Zepeda, did you give him that

25   opportunity?

1  A.   Yes, and --

2  Q.   Did he take that opportunity to speak to a

3  consular representative?

4  A.   At that time he declined to speak with anyone.

5  Q.   Okay.  When you are offering that opportunity,

6  are you also evaluating or asking questions about

7  whether or not a person is afraid?

8          MR. ROCHA:  Again, objection.  Counsel

9  should re-ask their question like what else do you

10 do, what happens afterwards, but she's leading him

11 exactly to the answer.  He's going to say, yes, I

12 did.

13         THE COURT:  Sustained.

14 BY MS. FURTADO:

15 Q.   What questions do you ask after talking to a

16 consular -- after you let an alien talk to a

17 consular representative?

18 A.   If they don't want to talk, I don't have them

19 -- we just don't -- they don't talk to the

20 consulate.

21 Q.   Okay.  What other -- what other questions are

22 you asking?

23 A.   I ask them if they fear any kind of

24 persecution or torture if they're returned to their

25 country of citizenship.

1  Q.  And in this particular instance, did you ask

2  Mr. Ramos-Zepeda about fear or torture?

3  A.  I did.

4  Q.  And what was his response?

5  A.  He did not fear any persecution or torture.

6  Q.  Okay.  So based on the information you have

7  from Mr. Ramos-Zepeda through the I-213 process,

8  did you believe that you had any form of relief

9  that you should be extending to the defendant?

10 A.  No.

11 Q.  Okay.  And did you believe that Mr. Ramos-

12 Zepeda fit the criteria for expedited removal?

13 A.  Yes, he did.

14 Q.  All right.  Now, when you do an expedited

15 removal, I've shown you Exhibit 1.  That Exhibit

16 does -- is there a provision on there where you are

17 providing some sort of right?

18 A.  I read them this little synopsis.

19 Q.  Okay.  And what is that synopsis?

20 A.  It starts with, "I am an officer of the United

21 States Department of Homeland Security.  I am

22 authorized to administer the immigration laws and

23 to take sworn statements.  I want to take your

24 sworn statement regarding your application for

25 admission to the U.S.  Before I take your

1  statement, I also want to explain your rights and

2  the purpose and consequences of this interview."

3      I do -- there is -- in the computer, there is

4  two boxes to click whether English or Spanish.

5  Right here it's in English, but I would have read

6  it to him in Spanish.  If -- I ask them first if

7  they're able to read and understand it, and if they

8  read and understand it, I'll start my questioning

9  once they're done.

10  Q.  And with Mr. Ramos-Zepeda, did you provide

11  what you have just read to us to Mr. Ramos-Zepeda?

12  A.  Yes.

13  Q.  Did you do that in English or in Spanish?

14  A.  In Spanish.

15  Q.  Okay.  Did you -- while you were observing

16  Mr. Ramos-Zepeda, did he -- did you believe he

17  understood the information you were giving him?

18  A.  I asked him.

19  Q.  And what -- you asked him what?

20  A.  If he understood what I said to him.

21  Q.  And what did he say?

22  A.  Yes.

23  Q.  Do -- what else did you ask him?

24  A.  There's a bunch of questions on here.  Did you

25  want me to go through each one?

1    Q.   Sure.

2    A.   I asked him -- so I am asking the questions in

3    Spanish, and while I'm asking him, I'm inputting

4    them into the computer in English, and I asked him,

5    "Do you understand what I've said to you?"

6         And he stated, "Yes."

7         Then I asked him, "Do you have any questions?"

8         He said, "No."

9    Q.   Now, let me stop you there.

10        Are you -- when you are giving this right, are

11   you giving any information about admissibility or

12   inadmissibility to the person you're processing?

13   A.   I do.  I let them know that it's a removal, an

14   expedited removal.

15   Q.   Is that part of the sworn statement or the

16   record of the sworn statement?

17   A.   Yes.  It's in the blurb that -- that is read

18   to them.

19   Q.   And in English, can you read us at least a

20   portion of that blurb.

21   A.   "You do not appear to be admissible or to have

22   had the required legal papers authorizing your

23   admission to the United States.  This may result in

24   your being denied admission and immediately

25   returned to your home country without a hearing.

1  If a decision is made to refuse your admission into

2  the United States, you may be immediately removed

3  from this country, and if so, you may be barred

4  from reentry for a period of five years or longer."

5  Q.  When you were speaking to Mr. Ramos-Zepeda,

6  did he appear to understand that portion of this

7  I-67 -- 867 form?

8  A.  Yes.

9  Q.  As part of the process, do you also ask a

10 person whether they are willing to speak to you or

11 not?

12 A.  Yes.

13 Q.  Okay.  Is that also a portion of this form?

14 A.  Yes.

15 Q.  Okay.  Can you read to us the portion of the

16 form that applies.

17 A.  "This may be your only opportunity to present

18 information to me and the Department of Homeland

19 Security to make a decision.  It is very important

20 that you tell me the truth.  If you lie or give

21 misinformation, you may be subject to criminal or

22 civil penalties or barred from receiving

23 immigration benefits or relief now or in the

24 future."

25 Q.  Now, during your contact with Mr. Ramos-

1  Zepeda, did he appear to you to understand that

2  section of the I-867 form?

3  A.   Yes.

4  Q.   Now, do you -- did you ask Mr. Ramos-Zepeda if

5  he was willing to answer questions, specifically

6  that question?

7  A.   Excuse me?

8  Q.   Did you ask Mr. Ramos-Zepeda if he was willing

9  to answer your questions?

10 A.   Yes.

11 Q.   And what did he say?

12 A.   Yes.

13 Q.   Now, do you then at this point speak to

14 Mr. Ramos-Zepeda about his immigration status and

15 his biographical information?

16 A.   I do read him the rest -- the whole statement.

17 Q.   Okay.

18 A.   So the rest of the statement, it says, "Except

19 as I will explain to you, you are entitled to a

20 hearing or review.  U.S. law provides protection to

21 certain persons who face persecution, harm, or

22 torture upon return to their home country.  If you

23 fear or have a concern about being removed from the

24 United States" --

25           THE COURT:  Slow down.  Slow down a little

1    bit.  Thank you.

2    A.   -- "removed from the United States or about

3    being sent home, you should tell me during this

4    interview because you may not have another chance.

5         "You will have the opportunity to speak

6    privately and confidentially to another officer

7    about your fear or concern.  That officer will

8    determine if you should remain in the United States

9    and not be removed because of that fear.

10        "Until a decision is reached in your case, you

11   will remain in the custody of the Department of

12   Homeland Security.  Any statement you make may be

13   used against you in this or any subsequent

14   administrative proceeding."

15   Q.   Now, after reading that to Mr. Ramos-Zepeda,

16   did he appear to you to understand what you read to

17   him?

18   A.   Yes, I asked him.

19   Q.   Okay.  Can you take us through that, please.

20   A.   Excuse me?

21   Q.   What did you ask him?

22   A.   So I asked him, "Do you understand what I have

23   said to you?"

24        And he stated, "Yes."

25        And then I asked him, "Do you have any

1  questions?"

2       And he stated, "No."

3       And I asked him, "Are you willing to answer my

4  questions at this time?"

5       And he stated, "Yes."

6            MR. ROCHA:  Your Honor, it's not

7  necessary.  It's already been admitted into

8  evidence, I believe, so the Court can look at that

9  himself.  I just don't think it's necessary for him

10 to go through the list of questions he asked.

11           THE COURT:  Well, I think if Ms. Furtado

12 wants to she can.  It is in evidence.

13 BY MS. FURTADO:

14 Q.  One of the things in this form was about

15 biographical information, so let me ask you about

16 that.

17      When you talked to the defendant in this sworn

18 statement, did he tell you what country he was a

19 citizen of?

20 A.  Yes.  He stated Mexico.

21 Q.  Did he tell you if he had parents in the

22 United States that were U.S. citizens?

23 A.  He stated his parents were both from Mexico.

24 Q.  Did he -- did you ask him if he had any claim

25 to being a U.S. citizen?

1  A.   Yes, and he stated, "No."

2  Q.   Did you ask him what his purpose for entering

3  the United States was?

4  A.   Yes, and he stated he was heading toward

5  Redwood City, California, to find work.

6  Q.   Did you ask him about his previous immigration

7  history?

8  A.   I asked him if he had been deported before and

9  he stated, "No."

10 Q.   Was that consistent with the immigration

11 history information you had?

12 A.   Yes.

13 Q.   Based on Mr. Ramos-Zepeda's fingerprints?

14 A.   Yes.

15 Q.   Did you speak to Mr. Ramos-Zepeda about the

16 five-year period, prohibition period?

17 A.   I asked him, "Do you understand that, if you

18 are removed from the United States today, you may

19 not ask to enter the United States for a period of

20 five years without the permission of the United" --

21 "the permission of the Attorney General of the

22 United States?"

23      And he stated, "Yes."

24 Q.   Now, did you give Mr. Ramos-Zepeda an

25 opportunity to ask you questions during the sworn

1  statement?

2  A.   I did.  I asked him if there was anything he

3  would like to say or add or for me to add, and he

4  stated, "No."

5  Q.   As part of the process of the sworn statement,

6  are you required to ask questions about fear or

7  harm?

8  A.   Yes.  It's on that fourth -- the fourth page.

9  Q.   And what kinds of questions are you asking?

10 A.   I asked him if he has any fear or concern

11 about being returned to his home country or being

12 removed from the United States.

13 Q.   And what did he say?

14 A.   He stated, "No."

15      I asked him, "Would you be harmed if you were

16 returned to your home country or country of last

17 residence?"

18      And he stated, "No."

19 Q.   And then do you give him an opportunity to ask

20 you questions or add something else to that

21 statement?

22 A.   I do.  I asked him, "Do you have any question

23 or anything else you would like to add?"

24      And he stated, "No."

25 Q.   What are you required to do once you've

 1  completed the sworn statement with an alien that

 2  you've processed?

 3  A.   I print the sworn statement, and each time I

 4  make a correction, I have -- I explain to them they

 5  have to initial where we alter the page.

 6  Q.   Okay.  And in terms of Exhibit 1, I would ask

 7  you to look at what has been Bates-stamped page 77,

 8  and we see some markings on that page.  Can you

 9  tell us what those are.

10  A.   So from the top, those are his initials

11  showing that we altered the page.  The second one

12  is the same, his initials showing we made markings

13  on the page, and then his signature is next to his

14  name.

15       I also signed next to my name, and there was

16  also an agent who witnessed the signing.

17  Q.   Why do you -- did you -- did you -- as part of

18  this process, did you ask the defendant to sign

19  this page that's marked -- that's Bates-stamped 77?

20  A.   Yes.

21  Q.   And why would you ask him to sign that page?

22  A.   I explain to them, these are the questions

23  that I have asked them regarding the removal and to

24  put his signature next to his name.

25  Q.   Okay.  And is this something you're explaining

1   to him in English or Spanish?

2   A.    In Spanish.

3   Q.    Now, I'd ask you to just look at that

4   paragraph there.  What is that paragraph right

5   above his signature referring to?

6   A.    That he has read or have had read to me this

7   statement consisting of four pages, including this

8   page.  "I state that my answers are true and

9   correct to the best of my knowledge and that this

10  statement is a full, true, and correct record of my

11  interrogation on the date indicated by the

12  above-named officer of the Department of Homeland

13  Security.

14      "I have initialed each page of this statement

15  and the corrections noted on pages 1, 2, 3 and 4."

16  Q.    Okay.  Now, is this something that you would

17  have read to Mr. Ramos-Zepeda on the 12th of

18  January, 2009?

19  A.    Yes.

20  Q.    And did he -- did you believe he understood

21  what you were explaining to him or reading to him?

22  A.    Yes, I make sure they understand.

23  Q.    Now, the total affidavit that you created for

24  Mr. Ramos-Zepeda on the 12th, is that four pages

25  long?

1   A.   Yes.

2   Q.   And what markings do we see on the bottom of

3   the pages Bates-stamped 75, 76, -- 75 and 76 and

4   74?   Excuse me.

5   A.   Those are -- those are his initials.   When I

6   -- when I am making the correction, they're

7   standing in front of me, and I'm telling them I'm

8   making this correction and to initial it.

9   Q.   What does that initial signify to you?

10  A.   That he understood what I'm telling him.

11  Q.   And the signature that's on page 77, what did

12  that signify to you, Mr. Ramos-Zepeda's signature?

13  A.   That he understood the whole -- the whole

14  statement.

15  Q.   Now, in terms of fear, is fear something

16  significant for you?   If somebody expresses fear,

17  is that significant for you in your work?

18  A.   Yes, because they will see somebody in

19  addition to me that will interview him for -- for

20  their credible fear.

21  Q.   Throughout the course of your interaction with

22  Mr. Zepeda, did you notice or observe anything that

23  indicated to you that he was afraid?

24  A.   No.

25  Q.   Did you note anything in the documents that

 1  indicated that Mr. Zepeda was afraid?

 2  A.   Yes, I did, that he was not afraid.

 3  Q.   Thank you.

 4       Now, once you've had Mr. Ramos-Zepeda initial

 5  and acknowledge the signatures, what's the next

 6  step in the process that you need to do for the

 7  expedited removal?

 8  A.   We serve him with the I-860.

 9            MS. FURTADO:  May I approach the witness

10  again, Your Honor?

11            THE COURT:  Sure.

12  BY MS. FURTADO:

13  Q.   I'm showing you what's been marked as

14  Government's Exhibits 2, 3, and 4, and I'd ask you

15  to take a look at that, those.

16       Do you recognize those documents?

17  A.   Yes.

18  Q.   Okay.  So let's start with No. 2.  What is it?

19  A.   That's the I-860, the notice and order of

20  expedited removal.

21  Q.   Okay.  And who is the person that that refers

22  to, that document refers to?

23  A.   Ramon Ramos-Zepeda.  The charges -- the

24  charges of the Government are on here.

25  Q.   And what's the date associated with that

1  document?

2  A.   January 12th, 2009.

3  Q.   Okay.  Is that a fair and accurate copy of the

4  document you would have completed with Mr. Ramos-

5  Zepeda during the processing you did?

6  A.   Yes.

7  Q.   Okay.

8       MS. FURTADO:  Move to admit Government 2,

9  Your Honor.

10      THE COURT:  Any objection?

11      MR. ROCHA:  No objection.

12      THE COURT:  It will be admitted.  Thank

13  you.

14  BY MS. FURTADO:

15  Q.   I'd ask you to take a look at Exhibit 3.

16       Do you recognize that document?

17  A.   Yes.

18  Q.   What is it?

19  A.   The I-296.  This is notice to alien ordered

20  removed/departure verification.

21  Q.   Okay.  Now, in terms of this document, who is

22  it referring to?

23  A.   Ramon Ramos-Zepeda.

24  Q.   Okay.  What's the date?

25  A.   January 12th, 2009.

 1  Q.   Okay.  Is your signature on this document?

 2  A.   Yes.

 3  Q.   Okay.  Is this a fair and accurate copy of the

 4  document you would have completed on the 12th with

 5  Mr. Ramos-Zepeda?

 6  A.   Yes.

 7          MS. FURTADO:  Okay.  I move to admit

 8  Government's 3.

 9          THE COURT:  Mr. Rocha, any objection?

10          MR. ROCHA:  No objection, Your Honor.

11          THE COURT:  We'll go ahead and admit

12  Exhibit No. 3.  Thank you.

13          MS. FURTADO:  Okay.

14  BY MS. FURTADO:

15  Q.   I'm going to take back No. 4 from you.

16      All right.  Now, Mr. -- Agent, when you speak

17  to the -- when you were speaking to Mr. Ramos-

18  Zepeda regarding Exhibit No. 2 and 3, what language

19  were you using?

20  A.   Spanish.

21  Q.   Okay.  And when you were speaking to him, did

22  you have any indication that he was not

23  understanding you?

24  A.   No.

25  Q.   Okay.  Let's talk about Exhibit No. 2.

1      What's the purpose of this form, sir?

2   A.   This is to notify him of the charges.

3   Q.   And in this particular instance, what were the

4   charges against Mr. Ramos-Zepeda?

5   A.   "You did not then possess or present a valid

6   immigration visa, reentry permit, border crossing

7   identification card, or other valid entry document,

8   to wit:  You have entered into the United States

9   illegally with the intent to reside in the United

10  States."

11  Q.   Now, were these charges based on your

12  investigation or the information that you had?

13  A.   In the sworn statement.

14  Q.   Okay.  And then what's -- is there a different

15  bottom section to the I-860 form?

16  A.   Yes.

17  Q.   And what is that section?

18  A.   A certificate of service.  It says, "I

19  personally served this original" -- "served the

20  original of this notice upon the above-named person

21  on January 12, 2009."

22  Q.   And what does that section signify to you,

23  sir?

24  A.   That I explained these charges to the

25  individual.

1    Q.   Which individual?

2    A.   Ramon Ramos-Zepeda.

3    Q.   Okay.  And when you did that, when you served

4    this notice on Mr. Ramos-Zepeda, do you recall

5    having a belief that he wasn't understanding what

6    you were serving on him?

7    A.   He understood.

8    Q.   Okay.  Is there also a section above the

9    certificate of service?

10   A.   Yes.

11   Q.   What is that section?

12   A.   This is the order of removal under Section

13   235(b)(1) of the Act.

14   Q.   And what does this section signify?

15   A.   "Based upon the determination set forth above

16   and evidence presented during inspection or

17   examination, pursuant to Section 235 of the Act and

18   by the authority contained in Section 235(b)(1) of

19   the Act, you are found to be inadmissible as

20   charged and ordered removed from the United

21   States."

22   Q.   Okay.  Is that a portion that you would have

23   explained to Mr. Ramos-Zepeda?

24   A.   Yes.

25   Q.   Okay.  There are a few signatures there.  What

1  do those signify?

2  A.   I signed and so did the supervisor at that

3  time.

4  Q.   The supervisor's signature, what is -- what's

5  that for?  Why do you need that?

6  A.   Because he's the designated official to

7  approve the document.

8  Q.   Did you say "to approve the document"?

9  A.   Yes.

10  Q.   And what does his signature then signify to

11  you?

12  A.   That the notice was served.

13  Q.   Okay.  On the 12th of January, you had

14  information that there was an outstanding warrant.

15  You testified that there was an outstanding

16  warrant.

17     What did you do with that information?

18  A.   We -- we contact the agency that has the

19  outstanding warrant and see if they want to seek

20  extradition.

21  Q.   Okay.  Prior to you -- and so in Mr. Ramos-

22  Zepeda's instance, did they -- did they indicate

23  they wanted to seek extradition?

24  A.   They did.

25  Q.   Okay.  Prior to going forward with the

1  extradition process, do you also talk to Mr. Ramos-

2  Zepeda about Exhibit 3?

3  A.   Yes.

4  Q.   And what is that document?

5  A.   This is a notice to the alien ordered

6  removed/departure verification.

7  Q.   Okay.  The top section of that form, what is

8  that?  What is that about?

9  A.   It's notifying Ramon Ramos-Zepeda that he was

10  -- he's been found to be inadmissible to the United

11  States under the provisions of Section 212(a) of

12  the Immigration and Nationality Act or deportable

13  under the provisions of Section 237 of the Act as a

14  visa waiver pilot program violator.

15       "In accordance with the provisions of Section

16  212(a)(9) of the Act, you are prohibited from

17  entering, attempting to enter, or being in the

18  United States for a period of five years from the

19  date of your departure from the United States as a

20  consequence of your having been found inadmissible

21  as an arriving alien in proceedings under Section

22  235(b)(1) or 240 of the Act."

23  Q.   Is this something that you would have

24  explained to Mr. Ramos-Zepeda?

25  A.   Yes.

1   Q.   What language would you have been speaking?

2   A.   It would have been Spanish.

3   Q.   And at the time, do you recall having any

4   indication that Mr. Ramos-Zepeda did not understand

5   what you were explaining to him from this form?

6   A.   No.

7   Q.   Now, the bottom portion of that form, what is

8   it?

9   A.   The verification of removal.

10  Q.   Is that something you complete?

11  A.   No.

12  Q.   When does that section get completed?

13  A.   When they physically get removed from the

14  United States.

15  Q.   What happens when a person is physically

16  removed from the United States?  Is there some

17  acknowledgment that needs to happen?

18  A.   Yeah, all this -- everything here gets filled

19  out, and somebody actually takes them to the -- to

20  a port of entry and physically watches them leave

21  the country.

22  Q.   Okay.  But as a processing agent, would this

23  be your responsibility, this verification of

24  removal section?

25  A.   No.

1  Q.   Once you're done -- once you were done

2  processing Mr. Ramos-Zepeda, what did you do?

3  A.   I put the file together and put Mr. Ramon

4  Ramos-Zepeda in his cell and waited for the agency

5  that was seeking extradition to take custody of

6  Mr. Ramon Ramos-Zepeda.

7  Q.   So does the extraditing agency come or is

8  there --

9  A.   There's a -- so he was -- the extradition was

10  out of California, but we have a local Santa Cruz

11  County that will come and pick him up.

12  Q.   In this particular case, what happened with

13  Santa Cruz County as far as your involvement was

14  concerned?

15  A.   They picked him up.

16  Q.   What did you do with the file once -- once

17  Mr. Ramos-Zepeda was picked up?

18  A.   It gets sent to the file control office.

19  Q.   Do you -- do you talk to Mr. Ramos-Zepeda

20  regarding ties or equity in the country?

21  A.   Yes.  I -- it's not in the sworn statement but

22  I will ask.

23  Q.   Okay.  What in this particular instance on the

24  12th did you ask Mr. Ramos-Zepeda regarding equity

25  in the United States?

1  A.   I don't remember.

2  Q.   Okay.  I'd ask you to look at your I-213, and

3  I'd ask you to look at the last page.

4  A.   "Ramos claims to have no close family ties or

5  equity in the United States."

6  Q.   Okay.  Did your I-213 help you to remember

7  that?

8  A.   Yes, it did.

9  Q.   And was there anything else that was provided

10 to Mr. Ramos-Zepeda during this -- during your

11 processing?

12 A.   He was given a meal and a drink.  He claimed

13 no fear of returning to Mexico.

14 Q.   Were you making observations about his general

15 appearance?

16 A.   He appeared to be in good health.

17 Q.   Do you know -- in the end, do you know what

18 happened with the extradition of Mr. Ramos-Zepeda

19 at the time?

20      So around the time of these events, the 12th,

21 did you know what happened with the extradition?

22 A.   No.

23           MS. FURTADO:  Okay.  I just need a second,

24 Your Honor.

25           THE COURT:  Sure.

1           MS. FURTADO:  So -- a couple more

2    questions.

3    BY MS. FURTADO:

4    Q.   This incident, the original contact with

5    Mr. Ramos-Zepeda, you said that you had run his

6    criminal history?

7    A.   Yes.

8    Q.   Do you know what the conviction, the 2005

9    conviction, was for?

10   A.   Yeah.  It was counts of lewd, lascivious acts

11   with a child under 14.

12           MS. FURTADO:  Can I have just one minute,

13   Your Honor?

14           THE COURT:  Sure.

15           MS. FURTADO:  Okay.  I don't have any

16   other questions for this witness.

17           THE COURT:  Thank you.

18           Mr. Rocha?

19           MR. ROCHA:  Your Honor, can we take a

20   short break?

21           THE COURT:  Absolutely.  We'll take a

22   break.  Thank you.  And once again, if at any time

23   you need that, let me know.  So we'll take a five-

24   minute break or so.

25           MS. FURTADO:  Thank you very much.  Thank

1  you.

2          THE COURT:  Thank you.

3          (Off the record from 4:11 p.m. to

4          4:22 p.m.)

5          THE COURT:  And before we move on, just

6  for housekeeping, I don't think we're going to

7  finish today, and I don't want you to rush.  I

8  don't want you to feel like you're rushed, so I was

9  hoping we could come back on Monday.  It's my

10  understanding that you're not available on Monday.

11          Unfortunately, I'm on duty the next two

12  weeks, and it looks like the next time that we can

13  return when I'm not on duty is March 7th at nine

14  o'clock a.m.

15          I know you have a March 8th trial date and

16  a plea deadline of today, so those will probably

17  have to -- someone will have to move to continue

18  those.

19          So let me hear from you, Mr. Rocha, first.

20          MR. ROCHA:  Well, I can certainly move to

21  continue the trial and the plea deadline.  That's

22  not a problem.  I can file a formal motion if the

23  Court would like, so that's not a problem.

24          THE COURT:  Right, you'll have to do that.

25          MR. ROCHA:  Yeah, I can do that.  So I

1    certainly will be able to --

2              THE COURT:  And I apologize --

3              MR. ROCHA:  Oh, no worries, Your Honor.

4              THE COURT:  So it looks like -- and so

5    Monday, I wish we could do it Monday.  I understand

6    you can't.  So -- and I don't want any of you to

7    feel rushed, so I think what we'll do is hopefully

8    we can get through Agent Borrego, and if not, then

9    we'll probably end up having to reconvene on March

10   7th.

11             MR. ROCHA:  Your Honor, if it's okay with

12   the Court, we could recess now, because I doubt

13   that my -- I hate for my testimony or cross to be

14   broken.

15             THE COURT:  I --

16             MR. ROCHA:  And we're going to come back

17   in two weeks, and I hate to then rehash everything

18   just to get us up to speed.  So if the Court is

19   inclined, I -- and then the marshals tell me that

20   my client's the last one on the bus --

21             THE COURT:  Right, and that actually will

22   probably help everybody, frankly, so that's okay

23   with me.

24             Ms. Furtado, is that okay with you?

25             MS. FURTADO:  Yes, Your Honor.

 1              THE COURT:  Okay.  That's fine then.  So I
 2    think what we're going to do, I'm presuming the
 3    agent is going to be available on March 7th.  I
 4    mean --
 5              MS. FURTADO:  I didn't ask.
 6              THE COURT:  Well, why don't we ask.
 7              MS. FURTADO:  I thought that we would
 8    continue going through Borrego, but -- are you
 9    available?
10              AGENT BORREGO:  Is that, March 7th, a
11    Monday, you said?
12              MS. FURTADO:  It's a Monday.
13              THE CLERK:  It's a Monday.
14              THE COURT:  Well, here's what we're going
15    to do.  If that's a problem, just let us know.
16              AGENT BORREGO:  Okay.
17              THE COURT:  Okay?  So what we're going to
18    do -- and I appreciate what Mr. Rocha's saying, and
19    also I think it's probably better for the marshals.
20    It's probably better for Mr. Ramos-Zepeda, and I
21    know it's certainly better for the interpreters.
22              So what we're going to do, just for the
23    record, right now we have admitted Government's
24    Exhibits 1, 2, and 3.  Those are the only exhibits
25    that have been admitted.

```
 1            We will reconvene beginning with
 2   Mr. Rocha's cross-examination of Agent Borrego on
 3   Monday, March 7th, at nine o'clock a.m.  And I
 4   really apologize for breaking this up.  I know it's
 5   not the best way to do it.
 6            Ms. Granoff, is there anything --
 7            MS. GRANOFF:  Yeah, just one more
 8   housekeeping matter, Your Honor.
 9            THE COURT:  Sure.
10            MS. GRANOFF:  Since there's going to be
11   such a lengthy break in between the testimony of
12   direct and cross-examination, can we just ask the
13   Court to order the transcript so that both -- all
14   the parties, actually --
15            THE COURT:  Yeah.
16            MS. GRANOFF:  -- will have an opportunity
17   to refresh their recollection of that testimony
18   that was laid so far in order to pick up where
19   we're leaving off, since it'll be almost two to
20   three weeks?
21            THE COURT:  Beth?
22            We'll figure it out.  We'll figure it out.
23            MS. GRANOFF:  Thank you, Judge.
24            THE COURT:  So if, in fact, we do order
25   one, we'll certainly -- that will be available.
```

1            So I think that's it.  Thank you very much

2     for your time.  I appreciate it.

3            MR. ROCHA:  Thank you, Your Honor.

4            MS. FURTADO:  Thank you, Your Honor.

5            THE COURT:  Have a good weekend.

6            (Proceedings concluded in this matter at

7            4:26 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Erica R. McQuillen, do hereby certify

4     that the preceding pages of typewritten matter are

5     a true, correct, and complete transcription of the

6     digital recording of proceedings in the above-

7     entitled matter.

8           Dated this 29th day of February, 2016.

9

10                              s/Erica R. McQuillen
                       Erica R. McQuillen, RDR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25