1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF ARIZONA

3  United States of America,     )
                                 )
4                  Plaintiff,    )  CR 15-976-CJK-BGM
                                 )
5           vs.                  )
                                 )  Tucson, Arizona
6  Ramon Ramos-Zepeda,           )  March 7, 2016
                                 )  9:00 a.m.
7  _____Defendant._____)

8

                    TRANSCRIPT OF PROCEEDINGS
9                  MOTION HEARING - DAY TWO

10

              BEFORE THE HONORABLE BRUCE G. MACDONALD
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:
        Kathryn C. Furtado
14      Liza Granoff
        U.S. Attorney's Office
15      405 West Congress Street, Suite 4800
        Tucson, AZ 85701
16
    For the Defendant:
17      Juan L. Rocha
        Law Office of Juan L. Rocha
18      P.O. Box 5965
        Mesa, AZ 85211-5965
19
    Interpreters:
20      Ignacio Barrientos and Derek Sully

21  Transcribed by:
        Cindy J. Shearman
22      405 W. Congress, Suite 1500
        Tucson, AZ 85701
23      520-205-4286

24              Proceedings were digitally recorded
              Transcript prepared by transcriptionist
25

1                          I N D E X

2      GOVERNMENT WITNESSES                              PAGE

3      JORGE BORREGO

4      Cross-Examination by Mr. Rocha                      4
       Redirect Examination by Ms. Furtado               63
5
       ADRIAN GOMEZ
6
       Direct Examination by Ms. Furtado                 86
7

8

9
                          E X H I B I T S
10
       IDENTIFIED                 OFFERED        ADMITTED
11
       Gov 4                        101            101
12     Gov 5                         95             95

13

       Def 61                        50             51
14     Def 62                        61             61

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              (Call to order of court, 9:00 a.m.)

3              CLERK:  CR 15-976, United States of America versus

4    Ramon Ramos-Zepeda, is scheduled before this court for

5    continued motions hearing.

6         Counsel, please state your appearances for the record.

7              MS. FURTADO:  Good morning, Your Honor.  Kathryn

8    Furtado and Liza Granoff for the United States.  Also present

9    is our case agent, Adrian Gomez, who is a Border Patrol agent.

10             THE COURT:  Thank you.  And Ms. Granoff as well, good

11   morning, Ms. Granoff.  Good morning, Mr. Gomez.

12             MR. ROCHA:  Good morning, Your Honor.  Juan Rocha on

13   behalf of Mr. Zepeda, Ramos-Zepeda, who is present and in

14   custody.  Sitting with me is my law clerk here at counsel

15   table, Deana Mia.

16             THE COURT:  Thank you.  Good morning, Mr. Rocha, and

17   good morning, Ms. Mia.

18             MS. MIA:  Good morning.

19             THE COURT:  And we are continuing, and I think we were

20   going to begin the cross-examination of Agent Borrego, I

21   believe; is that correct?

22             MR. ROCHA:  That's correct.

23             THE COURT:  Okay.  And would the agent please come up,

24   please?  Why don't you just swear him in?  I was going to have

25   you remind him -- remind the agent that he was under oath but
```

4

1    go ahead and swear him in again.

2            JORGE BORREGO, GOVERNMENT WITNESS, WAS SWORN.

3            CLERK:  Please have a seat.

4            THE COURT:  Mr. Rocha, please.

5                        CROSS-EXAMINATION

6    BY MR. ROCHA:

7    Q.  Good morning, Agent Borrego.

8    A.  Good morning.

9    Q.  You testified that you've been a Border Patrol agent for

10   eight years?

11   A.  Yes, sir.

12   Q.  And part of that eight years -- well, prior to you becoming

13   a Border Patrol agent, you received special training to become

14   a Border Patrol agent?

15   A.  When I got hired as a Border Patrol agent, yes, I did

16   receive training.

17   Q.  And then part of that special training you testified

18   included criminal law and immigration law?

19   A.  Yes, sir.

20   Q.  That training also required you to also understand the Code

21   of Federal Regulations?

22   A.  Yes, sir.

23   Q.  So you know what a notice to appear is?

24   A.  Yes.

25   Q.  You know about expedited removals?

CROSS-EXAMINATION - JORGE BORREGO                              5

1   A.   Yes.

2   Q.   You know about administrative removals?

3   A.   Yes.

4   Q.   You also know about a reinstatement of removal?

5   A.   Yes.

6   Q.   And you know about ordinary removal proceedings; for

7   example, someone who's already here in the country, they commit

8   an offense, and they're placed into proceedings, you know about

9   that process as well?

10   A.   Yes.

11   Q.   And you said that you were involved in prosecutions.  Now,

12   those prosecutions include criminal and immigration

13   prosecutions?  I just wanted to make sure because you said on

14   direct examination that you were involved in prosecutions.  I

15   just wanted to verify or clarify.  Does that include both

16   criminal and immigration prosecutions?

17   A.   Well, there are criminal charges that are immigration

18   charges.

19   Q.   So you've been involved with that aspect of cases?

20   A.   Yes.

21   Q.   Now, just to recap, could you explain to the court what is

22   a notice to appear?

23   A.   They get -- they'll -- the paperwork gets generated and

24   they'll go before a judge and they'll present their case to a

25   judge.

1   Q.  And in that notice to appear, what's actually on the form?

2   A.  I'd have to have the form in front of me.

3   Q.  So there's different notices to appear is what you're

4   saying?

5   A.  I haven't seen one in a while, it's been a while.

6   Q.  Okay.  So would you say that a notice to appear is like a

7   charge, you said, is that your testimony?  It's like a charge,

8   explaining why they want to remove the person?

9   A.  I haven't done an NTA in a while, I'd have to look at the

10  whole file to see.

11  Q.  Can you explain to the court what is an expedited removal?

12  A.  It's an administrative removal and a person is removed from

13  the US.

14  Q.  I just want to verify because you said there's a

15  difference, when I asked you earlier, you know, about expedited

16  removals, you said yes.  When I asked you about an

17  administrative removal, you said yes.  So you're saying an

18  expedited removal and an administrative removal are the same

19  thing?

20  A.  It can be, yes.

21  Q.  Is that a yes?

22  A.  Yes.

23  Q.  So administrative removals and expedited removals are the

24  same thing?

25  A.  Yes.

CROSS-EXAMINATION - JORGE BORREGO                          7

1   Q.  Okay.

2   A.  It can be, yes.

3   Q.  There's no difference between the two?  Is there a

4   difference between the two?

5   A.  There are other removals that you can do that are not

6   expedited removals.

7   Q.  Right.  And you mentioned some of them, right, you talked

8   about administrative removals, right?

9   A.  Yes.

10  Q.  Okay.  Could you explain what an --

11  A.  Like a voluntary return, there's voluntary returns.

12  Q.  I'll ask you about that in a moment but just answer the

13  question.

14      I just want to make sure that we're all clear.  Let me

15  recap.  So you said that there's a difference -- when I asked

16  you there's different types of removals, you said, yes, there's

17  an expedited removal, there's an administrative removal.  But

18  now you're saying that they're actually both the same.  So

19  which is it, are they the same or are they different?  It's

20  okay --

21  A.  For an ER, you can charge criminal charges, but --

22  Q.  I'm not asking what the ER's criminal charge is.  I'm just

23  asking are the administrative removal the same as an expedited

24  removal?  That's all I'm asking.

25  A.  I'm not sure.

CROSS-EXAMINATION - JORGE BORREGO

1  Q.  Okay.  Now, you mentioned earlier that there's something

2  called a voluntary return, right, you said that?

3  A.  Yes.

4  Q.  Okay.  Now, is that the same thing as a voluntary

5  departure?

6  A.  Yes.

7  Q.  So voluntary departure and voluntary return are the same

8  thing?

9  A.  Yes.

10 Q.  Now, there's also something called a voluntary removal,

11 too?

12 A.  Okay.

13 Q.  I'm asking you, is there?

14 A.  Voluntary -- excuse me?

15 Q.  A voluntary removal.

16 A.  I'm not sure.

17 Q.  You're not sure about voluntary removals?

18 A.  No.

19 Q.  Okay.  And as far as a voluntary departure, when can a

20 voluntary departure be granted?

21         MS. GRANOFF:  Objection, foundation, Judge.

22         THE COURT:  Overruled.  If you know.

23         THE WITNESS:  What was the question?

24 BY MR. ROCHA:

25 Q.  When can a voluntary departure be granted?

1    A.   It's upon the discretion of the agency.

2    Q.   Certainly it's a discretion, but when can it be granted?

3    What are the qualifications, the criteria for a voluntary

4    departure?

5    A.   It can be given to people that -- there's different reasons

6    why they would give a voluntary return.

7    Q.   And those would be?

8    A.   No criminal history, no -- there's -- there's different

9    reasons why it would be given.

10   Q.   So is a voluntary departure given for people who are

11   actually in the United States, they're actually here in the US?

12   Like, who qualifies for a voluntary departure?

13   A.   Somebody -- they give it for different reasons, like I just

14   said, and in addition to like maybe a humanitarian reason or

15   something like that.

16   Q.   Okay.  So can a voluntary departure be given to someone --

17   well, I'll get to that question.

18       Can a voluntary departure, is that given to people who are

19   already in the United States who are in removal proceedings?

20   Is that an option for someone?

21             MS. FURTADO:  Objection, Your Honor, lack of

22   foundation.

23             THE COURT:  I'm going to overrule it.  I mean, to the

24   extent the agent knows, I guess he can answer these questions.

25             THE WITNESS:  I don't know.  I haven't really dealt

CROSS-EXAMINATION - JORGE BORREGO

1    with anybody like that.

2    BY MR. ROCHA:

3    Q.  Now, you said that you're familiar with immigration law.

4    So you know that there's a section called 212 section, correct?

5    A.  Yes, sir.

6    Q.  You also know there's a section called 237, correct?

7    A.  Yes, sir.

8    Q.  What is 212?  What is Section 212, what is that about?

9    A.  I'd have to refer it to -- I'd have to -- the right

10   verbiage, I would need to look at it.

11   Q.  Well, in your own words.  You took immigration law, you

12   have special training, and you just told me that there's a

13   difference.

14       What's the difference?  What's a 212?

15   A.  I'd have to look it up.

16   Q.  You don't know?  You can say you don't know if you don't

17   know.

18   A.  I'd have to look it up.

19   Q.  So you don't know?

20   A.  No.

21   Q.  What's a 237?

22   A.  It's the Immigration Nationality Act.

23   Q.  What specifically is Section 237?

24   A.  I'd have to look it up verbatim.

25   Q.  So you don't know.  I'm not asking you verbatim, I'm asking

 1   you based on your experience, what is Section 237?

 2   A.  I don't know.

 3   Q.  Okay.  On your direct examination, you testified about

 4   admissibility and inadmissibility.  Can you explain to the

 5   court what is inadmissibility?

 6   A.  Somebody who is not admissible to the US.

 7   Q.  Could you please elaborate?

 8   A.  So, are we talking in general or to this case?

 9   Q.  I'm asking what is inadmissibility?

10   A.  Somebody who has entered without inspection, they crossed

11   illegally --

12   Q.  Uh-huh.

13   A.  -- within 14 days and within 100 miles, air miles.

14   Q.  And then what's admissibility, what is that?

15   A.  Somebody who -- who -- so if -- somebody who presents

16   themself (sic) to the -- through a port of entry or customs and

17   they have claims to be able to be admissible to the US.

18   Q.  Okay.  Are there any exemptions to someone who's

19   inadmissible?

20   A.  Yes.

21   Q.  And what are those?

22   A.  If they have credible fear or if they have some United

23   States children or somebody who can petition them to have

24   status in the United States.

25   Q.  What about victims of domestic violence?  Are they an

CROSS-EXAMINATION - JORGE BORREGO

1   exemption to --

2   A.  If that's a credible fear, yes, that would be credible

3   fear.

4   Q.  All right.  So you're -- so you're familiar with the

5   Violence Against Women Act?

6        MS. FURTADO:  Objection, relevance.

7        THE COURT:  Why don't you finish the question?  Go

8   ahead and finish the question.

9   BY MR. ROCHA:

10  Q.  You're familiar with the Violence Against Women Act?

11       THE COURT:  Overruled.

12       THE WITNESS:  No.

13  BY MR. ROCHA:

14  Q.  No?  Okay.  Now, could you explain to the court what

15  exactly is an arriving alien?

16  A.  Somebody who's coming to the US.

17  Q.  Where?

18  A.  They can be legal or illegal.

19  Q.  So they're arriving into the US asking for permission to

20  enter.  Is that a fair characterization?

21  A.  I'm not sure of the question.

22  Q.  Okay.  Let me -- what is an arriving alien?

23  A.  I'm not sure.

24  Q.  Okay.  So I guess you won't know the answer to this

25  question.  Is an arriving alien eligible for voluntary

CROSS-EXAMINATION - JORGE BORREGO

 1    departure?

 2    A.  It's possible.

 3    Q.  Is that a yes, is that a no?

 4    A.  It's possible, yes.

 5    Q.  Are you familiar with Immigration Nationality Act

 6    Section 240B(a)(4)?  No?  I can show it to you here.

 7              MR. ROCHA:  Can I have a moment, Your Honor?

 8              THE COURT:  Sure.

 9              MR. ROCHA:  Can I approach the witness, Your Honor?

10              THE COURT:  Sure.

11              MR. ROCHA:  I'm approaching the witness with the

12    Immigration Nationality Act Section 240B(a)(1), it's titled

13    Voluntary Departure, Certain Conditions and General.

14              MS. FURTADO:  Can I see it, Judge?

15              THE COURT:  Yeah.

16              MS. FURTADO:  Okay.  Judge, I object.  Can we

17    approach?

18              THE COURT:  Sure.

19        (A sidebar conference was held.)

20              THE COURT:  You have to make sure you speak into --

21              MS. GRANOFF:  Your Honor, we object to this line of

22    questioning.  Defense counsel is asking the agent about

23    voluntary departure, which is a form of relief that is eligible

24    to aliens which is granted only by a judge.  We believe that

25    this entire line of questioning by defense counsel is being

1   triggered only to confuse the agent since it is clear that he

2   said during his cross-examination that he was not familiar with

3   voluntary departure and so this entire line of questioning, I

4   believe, is completely improper when it's trying to trick the

5   agent to give answers that he's already told the defense that

6   he doesn't know.

7       And so showing him a statute that is relevant only in

8   immigration proceedings, I believe, is unfair, will ask the

9   agent to call for speculation, and is leading him down a path

10  that I think is completely irrelevant since the defendant here

11  is not eligible for voluntary departure since that is a form of

12  relief that can only be granted by an immigration judge.

13          THE COURT:  Mr. Rocha?

14          MR. ROCHA:  Oh, sure.  Your Honor, he testified on

15  direct examination that he wasn't eligible for voluntary

16  departure.  He, himself, made that discretionary decision.  He

17  never said a judge did, he said that.  And he said that he was

18  not eligible for it.  The law says that arriving aliens are not

19  eligible for voluntary departure.

20          THE COURT:  But he did what he did.  I mean, and those

21  are the facts that he's already testified to.

22          MR. ROCHA:  Right, he testified to that.  Excuse me,

23  Your Honor.

24          THE COURT:  No, I'm done.

25          MR. ROCHA:  He testified that he was -- my client was

 1    not eligible for voluntary departure.  He made that decision.

 2    He made that discretion.  So it's not the judge who makes that

 3    decision.

 4              THE COURT:  Why don't you ask him that?  I mean, I

 5    agree.

 6              MR. ROCHA:  He did.  Your Honor, he did.  And I want

 7    to ask him when is someone eligible for voluntary departure,

 8    and the law says the only time they're eligible is when they're

 9    in removal proceedings.  He was not in removal proceedings.  So

10    he's obviously wrong about when voluntary departure applies in

11    this case.

12        And he testified that he's -- he studied immigration law,

13    he's been an agent for eight years, he's a processing, he

14    should know the answer to these questions.

15              MS. GRANOFF:  Your Honor, I believe that the agent did

16    not say that the defendant was not eligible for voluntary

17    departure.  I believe that the agent on direct examination said

18    the defendant was not eligible for voluntary return.  A

19    voluntary return are two completely different legal concepts so

20    a -- in a voluntary return, a defendant is before the agency.

21    For voluntary departure, you have to be placed in immigration

22    proceedings before an immigration judge.

23        So when the agent has not said anything regarding voluntary

24    departure and the defense counsel's questions are being meant

25    to confuse them between a voluntary return and voluntary

CROSS-EXAMINATION - JORGE BORREGO                      16

1    departure I believe is not right.

2              MR. ROCHA:  Your Honor --

3              THE COURT:  Just stop for a second and then you can

4    make a record.  It does -- I mean, he was asked in this

5    particular case:  Is the defendant eligible for voluntary

6    return?  No, so please go ahead.

7              MR. ROCHA:  Sure.  So, Your Honor, you can play back

8    the tape.  I asked him:  Is voluntary return the same as

9    voluntary departure?  He explicitly said yes.

10             THE COURT:  Okay.  I'm going to let you cross -- come

11   on up and make your record.  I'm going to let you cross-examine

12   him to some degree on this.  But I do think to the extent it's

13   calling for a legal conclusion, he may or may not be qualified

14   for this.  And he knows this information and it may have had

15   some impact on the decision he made with regard to

16   Mr. Ramos-Zepeda, I'm going to let you do it but I don't think

17   you necessarily need to show him the statutes.  You know, just

18   ask him some questions about what he knows or doesn't know and

19   what he did in this particular case.

20             MR. ROCHA:  Okay.

21             THE COURT:  Okay?  Thank you.

22        (The sidebar conference was concluded.)

23   BY MR. ROCHA:

24   Q.  To repeat the question, so is an arriving alien eligible

25   for voluntary departure?

1          MS. GRANOFF:  Objection, relevance.  The defendant is

2   not an arriving alien, and so this line of questioning is

3   irrelevant with respect to this particular case.

4          THE COURT:  I'm going to overrule it.

5          THE WITNESS:  What was the question?

6   BY MR. ROCHA:

7   Q.  Is an arriving alien eligible for voluntary departure?

8   A.  I'm not sure.

9   Q.  So would you -- so, so far, I mean, you would agree that

10  immigration law's pretty complicated?

11  A.  Yes.

12  Q.  So let's talk about some of the forms here you filled out.

13  Now, would you agree that your job as a processing agent

14  requires you to be precise?

15  A.  Yes.

16  Q.  That's why you took special training, right?

17  A.  Yes, sir.

18  Q.  'Cause special training requires you to be precise; is that

19  right?

20         MS. GRANOFF:  Objection, asked and answered.

21         THE COURT:  Overruled.

22  BY MR. ROCHA:

23  Q.  So special training requires you to be precise; is that

24  correct?

25  A.  Yes.

1    Q.  Would you agree that filling out forms are very important?

2    A.  Yes, sir.

3    Q.  Because they're used by courts?

4    A.  Yes, sir.

5    Q.  They're used by the government; is that correct?

6    A.  Yes, sir.

7    Q.  They're also used by people who are here who are not US

8    citizens to determine immigration eligibility, correct?

9    A.  They can be, yes.

10   Q.  Now, in this case, you filled out an I-213?

11   A.  Yes, sir.

12   Q.  And you testified on direct examination that you did all

13   the processing in this case?

14   A.  Would I be able to see my transcript?

15   Q.  Sure.

16           MR. ROCHA:  I'm sorry.  May I approach the witness?

17           THE COURT:  Of course, that's fine.  Thank you.

18           MR. ROCHA:  Thank you.

19       I handed the witness a copy of the transcript of his direct

20   testimony.

21   BY MR. ROCHA:

22   Q.  So the question is:  Were you the person who did all the

23   processing on January 12th, 2009?

24   A.  Yes.

25           MR. ROCHA:  May I approach the witness?

CROSS-EXAMINATION - JORGE BORREGO                    19

1          THE COURT:  Sure.

2    BY MR. ROCHA:

3    Q.  Now, on direct examination, you testified that

4    Mr. Ramos-Zepeda was actually standing in front of you as you

5    were doing the processing, correct?

6    A.  Yes.

7    Q.  While he was in front of you, you were inputting the

8    answers as well as questioning him during that time; is that

9    correct?

10   A.  Yes.

11   Q.  And you testified that the information was verbatim,

12   meaning that it was exactly the same that he was giving to you;

13   is that correct?

14   A.  What was the question?

15          MR. ROCHA:  Your Honor, may I approach the witness?

16          THE COURT:  Sure.

17   BY MR. ROCHA:

18   Q.  So I'll repeat the question.  You testified that you took

19   the information down verbatim; is that correct?

20   A.  Yes.

21   Q.  Thank you.

22          MR. ROCHA:  Your Honor, may I approach again?

23          THE COURT:  Yes, thank you.

24   BY MR. ROCHA:

25   Q.  I'm going to show you your I-213 in this case.

 1              MR. ROCHA:  Your Honor, may I approach?

 2              THE COURT:  Yes.

 3    BY MR. ROCHA:

 4    Q.  Do you have your I-213 in front of you, sir?

 5    A.  Yes, sir.

 6    Q.  Okay.  So is that the form you filled out?

 7    A.  Yes.

 8    Q.  Is that your signature at the bottom?

 9    A.  Yes, sir.

10    Q.  And what day is the report filled out?

11    A.  January 12th, 2009.

12    Q.  Now, on direct examination, you testified that

13    Mr. Ramos-Zepeda was apprehended at the port of entry near

14    Naco, Arizona, at 8:00 o'clock in the morning.

15    A.  No, I did not.

16    Q.  You didn't testify to that?

17    A.  I did not say he was at the port of entry.

18    Q.  No, let me re-ask the question.  You testified on direct

19    examination that he was apprehended near the Naco -- near Naco,

20    Arizona?

21    A.  Yes.

22    Q.  Okay.  At 8:00 o'clock in the morning?

23    A.  Yes.

24    Q.  If I could have you take a look at your report where it's

25    about -- where it's located at entry more or less.

 1          Do you see that?

 2               MS. FURTADO:  I'm sorry.  What page are we referring

 3    to?

 4               MR. ROCHA:  It's the first page.

 5               MS. FURTADO:  Is it Bates stamped 51?

 6    BY MR. ROCHA:

 7    Q.  Agent Borrego, could you tell the government what's the

 8    Bates stamp there?  It's the bottom.

 9               THE COURT:  Down at the bottom of the page, just the

10    number.

11               THE WITNESS:  I'm not sure.  Oh, the number is 56.

12    BY MR. ROCHA:

13    Q.  Bates stamp 56.

14          So do you see where it says at or near it says Sahuarita,

15    Arizona?

16    A.  Yes.

17    Q.  And then you see the date and the hour, you see that?

18    A.  Yes, sir.

19    Q.  What date does that say?

20    A.  January 12th, 2009.

21    Q.  And what time is that?

22    A.  0130.

23    Q.  So he was actually apprehended at 1:30 in the morning --

24    A.  Yes.

25    Q.  -- according to your report?  I'm sorry, is that a yes?

1    A.   Yes.

2    Q.   Okay.  So he actually was apprehended at 1:30 in the

3    morning, not 8:00 o'clock in the morning; is that correct?

4              MS. FURTADO:  Objection, Judge, is defendant -- is the

5    defense impeaching the witness with the statement?

6              THE COURT:  Hang on.

7              MS. FURTADO:  Because I'm not sure what statement he's

8    referring to in terms of impeaching this witness.

9              THE COURT:  Well, I think he's asking him about the

10   report.

11             MS. FURTADO:  Well, he said that -- he's asking

12   questions about what he previously testified to.  So I'm not

13   understanding at this point if we're impeaching him or if he's

14   talking about the form.

15             THE COURT:  I think he's doing both.  So I'll

16   overrule.  I mean, you can ask him on redirect what time --

17             MS. FURTADO:  So if he is impeaching him, Judge, then

18   I would ask that the defense give us the page and line number

19   of the --

20             THE COURT:  I don't think he needs to do that.

21             MS. FURTADO:  -- statement that he's referring to.

22             THE COURT:  I think he can say:  You previously

23   testified to X; is that correct?  And then move on.  I mean, I

24   don't think you necessarily need a page or line of his prior

25   testimony, which you wouldn't have at trial anyway.  And you

 1   generally wouldn't have unless we continued this hearing, so I

 2   think he can ask him the question and then if he's impeaching

 3   him, we'll see.

 4            MS. FURTADO:  Okay.

 5            THE COURT:  So, Mr. Rocha, why don't you just ask him

 6   the question again and then tie it up to the report?

 7            MR. ROCHA:  Yes, Your Honor.

 8   BY MR. ROCHA:

 9   Q.  So, just to summarize, this is your report that you have in

10   front of you, correct, sir?

11   A.  Yes, sir.

12   Q.  Okay.  You filled out that report on January 12th, 2009,

13   right, sir?

14   A.  Yes, sir.

15   Q.  Okay.  And on the report on direct examination you

16   testified that Mr. Ramos-Zepeda was apprehended at 8:00 o'clock

17   in the morning; is that correct?

18   A.  I'd have to look at my --

19   Q.  Okay.  On the report, however, you note that he was

20   actually arrested at what time?  What time does your report

21   say?

22   A.  What time he was arrested?

23   Q.  Yes.

24   A.  That's 0130.

25   Q.  That's 1:30 in the morning, right?

CROSS-EXAMINATION - JORGE BORREGO                                            24

1    A.  Yes, sir.

2    Q.  Okay.  Now, I want you to take a look at the bottom left,

3    it's still on the first page, still the first page, on the

4    bottom left.  Do you see where it says alien last -- or alien

5    has been advised of communication priviliges?  Do you see that?

6    A.  Yes, sir.

7    Q.  What date does that say?

8    A.  1/12/2009.

9    Q.  Is that your signature?

10   A.  My initials.

11   Q.  Those are your initials?  Okay.  If I can have you turn to,

12   it would be, I believe, page 4 of your report.

13        Do you have that in front of you?

14   A.  Yes, sir.

15   Q.  Now, you testified on direct examination that Mr. Ramos,

16   because he had no immigration history, was not eligible for any

17   criminal prosecution, correct?

18   A.  I'd have to see my testimony.

19   Q.  So you don't recall?

20   A.  I don't recall the exact question and answer.

21   Q.  Okay.  On your report -- take a look at your report, take a

22   moment.

23   A.  Okay.

24   Q.  -- is there anything in there that you read him his Miranda

25   rights, anywhere on your report?

1    A.   Repeat the question.

2    Q.   Is there anywhere on your report that you read him his

3    Miranda rights?

4    A.   No.

5    Q.   Okay.  And then just go back to the first page of your

6    report.  Now, you said that -- who was the examining officer,

7    who reviewed your report?

8    A.   Gregory Gibbon.

9    Q.   And who is that?

10   A.   He's a supervisory agent.

11   Q.   Okay.

12         MR. ROCHA:  May I approach the witness to retrieve his

13   report?

14         THE COURT:  Sure.

15         MR. ROCHA:  Your Honor, I want to show the witness

16   here what's been marked as Bates stamp 45, 46, 47, 48, 49, and

17   50.  It's an I-213 report.

18         THE COURT:  I have that as Bates stamped 56.  Am I --

19   that's your Exhibit No. 1?

20         MR. ROCHA:  No, Your Honor.  This isn't an exhibit

21   that I included in the number of exhibits.  If I had to

22   include, this would be No. 60, if I can write this down.  It

23   would be -- and I'm not introducing it, of course, as evidence,

24   it's just an exhibit for identification purposes.  So it would

25   be No. 60.  But it's Bates stamped 45 through 50.

1          THE COURT:  Please show it to Ms. Furtado first.

2          MR. ROCHA:  Sure.

3          MS. FURTADO:  I have a copy, Judge.

4          THE COURT:  Okay.

5          MR. ROCHA:  May I approach the witness, Your Honor?

6          THE COURT:  Yes, you may.

7  BY MR. ROCHA:

8  Q.  You have an I-213 there in front of you, right,

9  Agent Borrego?

10  A.  Yes, sir.

11  Q.  Now, who filled out that I-213?

12          MS. FURTADO:  Judge, I know we're in an evidentiary

13  hearing, I know it's a little looser, but this is an I-213 of

14  an agent that is not Borrego.  So I think there needs to be a

15  little bit of foundation here, if this agent is even familiar

16  with it, if he knows, you know, the circumstances of when it's

17  written.  I'm assuming counsel is going to refresh him or try

18  and refresh his memory using it.  But at this point I'm not

19  sure, so --

20          THE COURT:  Let me see it.  Can I see it?  I'm going

21  to -- I'm going to let Mr. Rocha ask a few questions about it.

22  I guess you need to establish whether he's seen it, whether

23  he's relied upon it, is he using it, to what extent he's

24  familiar with it.

25          MR. ROCHA:  Sure.

CROSS-EXAMINATION - JORGE BORREGO

BY MR. ROCHA:

Q.  Okay.  So do you have the I-213 there in front of you, sir?

A.  Yes, sir.

Q.  Did you fill that I-213 out?

A.  No.

Q.  But you are familiar with an I-213, correct?

A.  Yes.

Q.  'Cause you've filled out one before, correct?

A.  Yes.

Q.  Is the layout the same?

A.  Yes.

Q.  Now, who is the person on that I-213, the alien?

A.  It's Ramon Ramos-Zepeda.

Q.  Now, is that the same person that's here in the courtroom, sir?

A.  Yes, sir.

Q.  Okay.  And what's the date on that I-213?

A.  When it was created?

Q.  Yes.

A.  January 12th, 2009.

Q.  And what time was it created?

A.  It says 2:13.

Q.  But that's not your I-213, correct?

A.  No.

Q.  Now, can I direct your attention back to the place on that

1    I-213 on the first page on the right side where it says at

2    entry date and hour, what hour does that say?

3    A.  When he was apprehended, is that what you're asking?

4    Q.  Yes, sir.

5    A.  He was apprehended, it says here, January 13th, 2009.

6    Q.  At what time?

7    A.  1500.

8    Q.  What time would that be?

9    A.  3:00 p.m.

10   Q.  3:00 p.m., okay.  So can I direct your attention again to

11   the first page down to the left side where it talks about alien

12   provided communication privileges?

13       Do you see that?

14   A.  Yes.

15   Q.  What date does that say?

16   A.  1/15/09.

17   Q.  So that's January 15th, 2009?

18   A.  Yes.

19   Q.  And whose initials are those?

20   A.  I don't know.

21   Q.  So would you agree that January 15th is three days after

22   January 12th?

23   A.  Yes.

24   Q.  Now, can I take -- can I have you turn to page 5 of that

25   I-213?  Do you have that in front of you?

1   A.  Yes.

2   Q.  Now, is there a section there that says Miranda violation?

3   A.  Somebody advised him of his Miranda rights, yes.

4   Q.  And who was that?

5   A.  It says I.M. (phonetic).  I'm not sure.

6   Q.  And the form does say that Mr. Ramos-Zepeda was advised of

7   his Miranda rights, correct?  Is that what that says?

8   A.  Advised the subject of his Miranda rights, yes.

9   Q.  Yes.  And that he says that he agreed to make a statement;

10  is that correct?

11  A.  He understood his rights and was willing to answer

12  questions at this time.

13  Q.  And that was on January 12th, 2009, correct?

14          MS. FURTADO:  Objection, Judge, foundation.  Again,

15  this agent has no idea.

16          THE WITNESS:  I'm not sure.

17          MS. FURTADO:  He didn't do any of this work.

18          THE COURT:  Overruled.  If he can answer the question.

19  I think he just said he didn't know.

20          MR. ROCHA:  Okay.  Can I retrieve the I-213, Your

21  Honor?

22          THE COURT:  Sure.

23  BY MR. ROCHA:

24  Q.  I'm sorry.  Can I just ask you one more question about

25  that?  I just forgot to ask.

1          MR. ROCHA:  May I just approach, just one more

2     question on the I-213?

3          THE COURT:  Sure.

4          MR. ROCHA:  It's a quick question.

5          THE COURT:  Okay.

6     BY MR. ROCHA:

7     Q.  Sir, who is the examining officer that's written at the

8     bottom of the page?

9     A.  It says Jaime Lopez.

10    Q.  Okay.

11         MR. ROCHA:  May I retrieve the I-213, Your Honor?

12         THE COURT:  Yes, thank you.

13    BY MR. ROCHA:

14    Q.  Now, on direct examination, you testified that once you

15    completed the processing of Mr. Ramos-Zepeda, you said that you

16    placed him back into the cell; is that correct?

17    A.  Yes.

18    Q.  So does any -- I'm sorry.  So was -- once you were done,

19    you testified that you put him back because there was a warrant

20    from California for Mr. Ramos-Zepeda?

21    A.  What was the question?

22    Q.  You testified on direct examination that Mr. Ramos-Zepeda

23    had a warrant out of California?

24    A.  Yes.

25    Q.  Okay.  So you placed him back in the cell because he was

 1   being held for extradition because of the warrant, in other

 2   words?

 3   A.  Well, he would have to go back in the cell after the

 4   paperwork anyway, but he was awaiting extradition.

 5   Q.  Sure, that's fine.  Now, would you agree that based on the

 6   information provided to you, the I-213s, would you agree that

 7   Mr. Ramos could not have entered the country on January 15th,

 8   2009?

 9   A.  I'm sorry?

10   Q.  Based on the I-213s that were provided to you, you would

11   agree that Mr. Ramos-Zepeda did not enter the country on

12   January 15th, 2009?

13   A.  No.

14   Q.  No, you wouldn't agree or, yes, you would agree?

15   A.  He did not enter on the 15th.

16   Q.  Okay.  He entered on the 12th, right?

17   A.  On the 9th, I believe.

18   Q.  But he was apprehended on the 12th?

19   A.  Yes.

20   Q.  Okay.  Now, you said that at the beginning of this

21   testimony that you're also familiar with the Code of Federal

22   Regulations; is that correct?

23   A.  Yes.

24   Q.  So you know about 8 CFR which has to do with aliens and

25   nationality, correct?

1    A.   Sorry.   What was the question?

2    Q.   You're familiar with 8 CFR?

3    A.   If there's specific charges, I usually have a book that I

4    refer to.

5    Q.   Okay.   Great.   So if you could follow along in the book

6    I'll provide here to you in a second.   Now, as you said, you

7    just got through saying, you use it because there's a process

8    that you're following to assure you get it right, correct?

9    A.   I use what?

10   Q.   A book.   You just said you use a book to make sure based on

11   certain charges.

12   A.   Not all the time.

13   Q.   Not all the time.   But in this -- but you're familiar with

14   the Code of Federal Regulations?

15   A.   Yes.

16   Q.   Okay.   Now, in this case, you testified on direct

17   examination that Mr. Ramos-Zepeda was inadmissible to this

18   country, right?

19   A.   Yes.

20   Q.   Okay.   And then you created a form to process him; is that

21   right?

22   A.   Several forms.

23   Q.   Now, let me see.

24        MR. ROCHA:   Your Honor, I'm going to show

25   Agent Borrego what's already been admitted as Exhibit No. 2.

1              THE COURT:  Okay.  Thank you.

2              MR. ROCHA:  May I approach?  Sorry.

3              THE COURT:  Yes, yes.  What is the title of that form,

4    sir?

5              THE WITNESS:  Notice and Order of Expedited Removal.

6    BY MR. ROCHA:

7    Q.  What's the number that's associated with that?

8    A.  Which number are you --

9    Q.  Is that an I-860?  What's the number associated with that?

10   What's the form number associated with that?

11   A.  Yes, it's the I-860.

12   Q.  Okay.

13             MR. ROCHA:  Your Honor, may I approach the witness

14   with the CFR here?  And I'll give a copy to the government

15   counsel.

16             THE COURT:  Thank you.  Yes, you may.

17             THE WITNESS:  So what are you referring to?

18   BY MR. ROCHA:

19   Q.  Sir, you have that in front of you?

20   A.  Yes.

21   Q.  So is that 8 CFR 235.3 where it says:  Determination of

22   inadmissibility - record of proceedings?  It would be up

23   probably on the left-hand side of the page.

24             MS. FURTADO:  Objection again, Judge, for foundation.

25   I'm not sure -- being familiar with the CFR does not mean that

1  the agent is familiar with this particular code section, that

2  he's ever seen it before, that he's ever read it before.  I

3  still have the same continuing objection that I've had in terms

4  of laying foundation for this particular line of questioning.

5       THE COURT:  Okay.  I'm going to overrule it but I do

6  think you need to lay some foundation as to his knowledge or

7  lack thereof of these particular -- of this particular section.

8       MR. ROCHA:  Your Honor, if I may proffer, the agent

9  testified that he is familiar with the CFR.

10      THE COURT:  Which are thousands and thousands, if not

11  hundreds of thousands, of pages.

12      MR. ROCHA:  Sure.

13      THE COURT:  So I think if you're going to question him

14  on this specific section, I think in fairness you need to ask

15  him if he's aware of it, has read it before, has relied on it,

16  relied on it in this particular situation or maybe should have

17  and didn't, however.

18      MR. ROCHA:  Okay.

19  BY MR. ROCHA:

20  Q.  So you completed the I-860 in this case?

21  A.  Yes.

22  Q.  And in this case, the I-860 is another way of saying

23  expedited removal?

24  A.  The notice and order of expedited removal.

25  Q.  Okay.  And in an expedited removal there's a process that

1    you have to follow; is that right?

2    A.  Yes.

3    Q.  And you described what that process is during direct

4    examination, correct?

5    A.  Yes.

6    Q.  And about five minutes ago you testified that you're

7    familiar with the 8 CFR, correct?

8    A.  In general.

9    Q.  You're familiar with the 8 CFR, correct?

10   A.  Somewhat.

11   Q.  Is that a yes, is that a no?

12   A.  Yes.

13          THE COURT:  I think he answered.  I mean, he's

14   familiar with it somewhat.

15          MR. ROCHA:  Okay.

16   BY MR. ROCHA:

17   Q.  So, in this case, as you testified, there's a process.  I

18   believe on direct examination you described what that process

19   is, that you have someone, they take their fingerprints, you

20   take their photograph, and then you ask them questions.

21          That was your testimony, right?

22   A.  Yes.

23   Q.  Okay.  So you can agree that there is a process to

24   expeditiously remove someone from the country?

25   A.  Yes.

CROSS-EXAMINATION - JORGE BORREGO

1   Q.  Okay.  Now, I'd like to refer you to the section in the CFR

2   that discusses the same process that you did on January 12th,

3   2009, same process.

4   A.  Okay.

5   Q.  If you look on the second page, about halfway down, it says

6   that the immigration officer -- which you would agree is you,

7   is that right, you're the immigration officer?

8   A.  Yes.

9   Q.  It says that you have to create a record of facts of a case

10  and the statements, which is what you did, you did that, you

11  did exactly what you were told to do, and you followed that

12  because you created a record of sworn statement, correct?

13  A.  Yes.

14  Q.  In fact, you created the 867 form which is -- takes all the

15  facts from what Mr. Ramos-Zepeda told you and you memorialized

16  them onto that document, correct?  You asked him those

17  questions:  Do you have any kids?  Do you have any citizen

18  parents?

19  A.  That's my statement, yes.

20  Q.  Right?  Okay.  So you did exactly what you were told, so

21  you did that, okay.

22      And then it says on there that you shall record the alien's

23  responses, which is what you did on your 867 form; you

24  testified that on direct examination?

25  A.  Yes.

 1    Q.  Okay.  And then you testified on direct examination that

 2    you advised him of the charges, right?

 3    A.  Yes.

 4    Q.  Okay.  And then you also testified, and I recall this

 5    clearly, you testified that when government counsel asked you,

 6    did you give Mr. Ramos-Zepeda an opportunity to respond to the

 7    charges, you testified:  I did.

 8        Is that right?

 9    A.  I don't know.  Can show me the testimony where it says

10    that?

11    Q.  So you don't recall?

12    A.  I -- it's been three weeks, I don't remember every detail.

13            MR. ROCHA:  May I just have a moment here, Your Honor,

14    so I can --

15            THE COURT:  Sure.

16            MR. ROCHA:  Your Honor, may I approach the witness?

17            THE COURT:  Sure.

18    BY MR. ROCHA:

19    Q.  Agent Borrego, you have a copy of the transcript from your

20    testimony two weeks ago?

21    A.  Yes.

22    Q.  Okay.  So in that transcript, you testified that --

23            THE COURT:  You may want to give a page and line as

24    long as we have it.

25            MR. ROCHA:  I'm sorry.

1    BY MR. ROCHA:

2    Q.  Could you please tell the government counsel what page that

3    is at the top?  I'm sorry.

4    A.  This is page 44 of the direct examination.

5    Q.  Okay.  Thank you.  In that you testified that every time,

6    for example, you make a correction to the form, you have

7    Mr. Ramos-Zepeda initial where you have made those corrections,

8    correct?

9    A.  Yes.

10   Q.  Okay.  And that's also part of your -- that's part of the

11   processing that's involved in this case that you -- that when

12   you make corrections, you give the person, the alien, the

13   opportunity to initial where those corrections were made,

14   correct?

15   A.  Those -- you're talking about the initials?

16   Q.  Your testimony, you said that you have him initial each

17   page, right?

18   A.  Yes.

19   Q.  Okay.  That's part of the processing that goes with this?

20   A.  That's -- every time the page is altered, that's when they

21   initial.

22   Q.  Okay.  So you don't -- you just have them sign each page

23   just for the sake of signing each page?

24   A.  To show that we altered the page.

25   Q.  Right.  And then you read him those forms, correct, that's

CROSS-EXAMINATION - JORGE BORREGO

1    your testimony?

2    A.   Yes.

3    Q.   Okay.  So if you could just put your transcript aside and

4    if you could refer back to the book.

5        Now, so far you've followed the process for expedited

6    removals.  Now, if I could direct your attention to the

7    sentence, it's almost on the page 469 on the first column where

8    it starts:  I-860 Notice and Order of Expedited Removal.

9        Do you see that?  It says:  The alien shall be given the

10   opportunity to respond.

11       Do you see that?

12   A.   Yes.

13   Q.   Okay.  So do you see where it says:  In accordance with

14   paragraph (b)(7) of this section -- do you see that?

15   A.   Yes.

16   Q.   Okay.  So do you see where the comma and then "the" starts,

17   do you see that?

18   A.   Comma and "the"?

19   Q.   The examining immigration official.

20   A.   Yes.

21   Q.   Okay.  So it says:  The examining immigration official

22   shall serve the alien with form I-860 and the alien shall sign

23   the reverse of the form acknowledging receipt.

24       Is that what that says?

25   A.   Yes.

CROSS-EXAMINATION - JORGE BORREGO                    40

 1   Q.  You have your I-860 there, sir?

 2   A.  Yes.

 3   Q.  Is that signed by Mr. Ramos-Zepeda?

 4   A.  No.

 5   Q.  Could you take a look at the back?  Is it signed on the

 6   back?

 7   A.  No.

 8   Q.  Now, when was that form filled out?

 9   A.  January 12th, 2009.

10   Q.  And then it says there that there's a -- just to be fair,

11   there's a certificate of service that you say you served the

12   person, correct?

13   A.  Yes.

14   Q.  What date is that?

15   A.  January 12th, 2009.

16   Q.  But nowhere on that form is Mr. Ramos-Zepeda's signature on

17   there acknowledging receipt?

18   A.  His signature is not on here.

19   Q.  So, in other words, you didn't follow the process in that

20   sense?

21   A.  He did not sign, no.

22   Q.  So you didn't follow the process?

23   A.  I did follow the policy with the Border Patrol.

24   Q.  Now, are you familiar with when a person seeks to withdraw

25   their application for admission?

```
 1    A.  I'm sorry?

 2    Q.  Are you familiar with the process of withdrawing your

 3    application for admission?

 4    A.  I am not familiar.

 5    Q.  You're not familiar with that process at all?

 6    A.  No.

 7    Q.  No?  You've never actually conducted a withdrawal of an

 8    application for admission whatsoever?

 9    A.  No.

10    Q.  If I can refer you to -- well, I'll just --

11           MR. ROCHA:  Your Honor, may I approach the witness?

12           THE COURT:  Sure.

13           MR. ROCHA:  Well, can I just have a moment here, Your

14    Honor?  I'm sorry.

15           THE COURT:  Sure.

16    BY MR. ROCHA:

17    Q.  Let me just ask one last time.  You're unfamiliar with

18    8 CFR 235.4, withdrawal of application for admission, you're

19    not familiar with that section at all?  I can provide you with

20    a copy if you'd like.

21    A.  I have not done -- I'm not familiar with that.

22    Q.  Okay.  You're not familiar, okay.

23        Now, let's talk about your I-296.  Could you explain to the

24    court what's an I-296?

25    A.  Do you have it available?
```

1    Q.  I do.

2           MR. ROCHA:  Your Honor, I'm showing what's already

3    been admitted into evidence as Exhibit No. 3.

4           THE COURT:  Okay.  You may approach.

5    BY MR. ROCHA:

6    Q.  Do you have that in front of you, sir?

7    A.  Yes, sir.

8    Q.  Now, on direct examination, you testified that Mr. Ramos

9    had been found to be inadmissible to the United States; is that

10   right?

11   A.  He was found to be inadmissible.

12   Q.  And your exact testimony, I believe, you quoted verbatim

13   there, I believe, was that he was inadmissible under

14   Section 212(a) of the Immigration Act; is that correct?  You

15   see that there?

16   A.  Yes.

17   Q.  And I asked you earlier what is the I-296.  Could you --

18   could you explain to the court what that is?

19   A.  It's the notice to the alien ordered removed, departure

20   verification.

21   Q.  So is this -- this is the deportation order, in other

22   words?

23   A.  This --

24   Q.  This was the one that you filled out?  Is this yours?

25   A.  Yes.

1    Q.  It has your name on it?

2    A.  Yes.

3    Q.  What day was it filled out?

4    A.  January 12th, 2009.

5    Q.  Okay.  And what is it?

6    A.  This is the notice to the alien that he's been found

7    inadmissible to the United States.

8    Q.  Okay.  So that means he's going to be removed, correct?

9    Now, I know you didn't fill out the bottom of the form, you

10   already testified to that so I know that.  But I'm asking you,

11   what is the significance of this form?

12   A.  These are the warnings that are given to the alien and then

13   this bottom part gets filled out and immigration will verify

14   his removal.

15   Q.  Okay.  So if you could take a look at Exhibit No. 2, which

16   is your notice of order of expedited removal.  Do you have that

17   in front of you?

18   A.  Yes.

19   Q.  It says on there that Mr. Ramos-Zepeda has been found to be

20   inadmissible under 212(a)(7)(A)(i)(l); is that right?

21   A.  (7)(A)(i)(I).

22   Q.  That's 212, correct?

23   A.  Yes.

24   Q.  Okay.  Now, if you could go back to Exhibit No. 3, your

25   I-296.

1   A.  Okay.

2   Q.  Now, does that form say that Mr. Ramos-Zepeda has been

3   found to be inadmissible under Section 212?

4   A.  Yes.

5   Q.  Or Section 237, correct?

6   A.  Under the provisions of Section 212 or under the provisions

7   of Section 237.

8   Q.  Okay.  It doesn't tell you which one it is, it says either

9   this one or that one --

10  A.  Yes.

11  Q.  -- right?  Now, you testified earlier at the beginning of

12  this testimony that there is a difference between 212 and 237.

13  You testified -- you said there was a difference.

14  A.  Okay.

15  Q.  Is that a yes?

16  A.  Yes.

17          MR. ROCHA:  Your Honor, may I approach the witness?

18          THE COURT:  Sure.

19          MR. ROCHA:  I'm referring to the Code of Federal

20  Regulations still under the same section that Mr. Borrego had

21  discussed, 235, so it's just the same section we discussed

22  earlier.

23  BY MR. ROCHA:

24  Q.  Do you see No. 3 on page 469, sir?

25  A.  Yes.

1   Q.  Where it says:  Additional charges of inadmissibility?  Do

2   you see that?

3   A.  Yes.

4   Q.  And it says:  In the expedited removal proceedings, the

5   service may not charge an alien with additional grounds of

6   inadmissibility.

7       Does it say that?

8   A.  Yes.

9   Q.  It says:  If an alien appears to be inadmissible under

10  other grounds contained in Section 212(a) of the Act, and if

11  the service wishes to pursue such additional grounds of

12  inadmissibility, the alien shall be detained and referred to

13  removal proceedings.

14      Is that what that says?

15  A.  Removal hearing.

16  Q.  Removal hearing before an immigration judge.

17      Is that what that says?

18  A.  Yes.

19  Q.  Now, go back to your I-296, Exhibit No. 3.

20  A.  Okay.

21  Q.  Now, you said that there was two sections there, 212 and

22  237?

23  A.  Yes.

24  Q.  Okay.  So there were additional grounds there based on your

25  report?

1          MS. FURTADO:  Judge, I object.  That misstates the

2     evidence that the witness has already provided.  He read the

3     line and it says "or" not "and".

4          THE COURT:  I think the form does say "or" and the box

5     checked is actually under 235(b)(1) or 240 of the Act.  So I

6     think it does say "or", either 212 or 237.  And then it's more

7     specific in regard to the box that was actually checked for

8     235(b)(1) or 240.

9     BY MR. ROCHA:

10    Q.  What is 235, sir?  What is that section?

11    A.  I don't understand what you're asking.

12    Q.  What is the section?  You said 235, you filled out those

13    forms, your name is on the paper.  What is 235?

14    A.  It's a section.

15    Q.  What is it though?

16    A.  A section of the Immigration Nationality Act.

17    Q.  Right.  What is it?  What specifically does it apply to?

18    It's okay if you don't know.  So I'll take that as you don't

19    know the answer?

20    A.  Yeah, I don't know what you're asking.

21    Q.  Okay.  And that would apply the same for 240, you don't

22    know what that is either, do you?

23    A.  No.

24    Q.  Okay.

25          MR. ROCHA:  Your Honor, I'd like to approach

CROSS-EXAMINATION - JORGE BORREGO                47

 1    Mr. Borrego with what's been marked but not introduced as

 2    evidence yet as Exhibit No. 4, Government's Exhibit No. 4.

 3              THE COURT:  Okay.

 4    BY MR. ROCHA:

 5    Q.  Mr. Borrego, what is that?

 6    A.  That's the I-296 notice to alien ordered removed, departure

 7    verification.

 8    Q.  And whose name is on that list?  What alien's name is on

 9    that?

10    A.  Ramon Ramos-Zepeda.

11    Q.  And who is the agent that actually generated that form?

12    A.  It looks like -- I'm not sure 'cause this isn't my report,

13    but it looks like Anthony Rogers.

14    Q.  What's the date on the report?

15    A.  January 12th, 2009.

16    Q.  Is that your signature at the bottom where it says

17    certificate of service?

18    A.  No.

19    Q.  What's the date on that one?

20    A.  The certificate of service -- the date for the document

21    itself?  Is that what you're asking?

22    Q.  What's the date on the certificate of service?  What date

23    does it say on that form?  It says:  I personally served the

24    original of this notice upon the above-named person on.  And

25    what's the date on that?

CROSS-EXAMINATION - JORGE BORREGO                    48

1           MS. FURTADO:  Are we looking at 4?

2           THE WITNESS:  Yeah, this is -- I don't see where

3    you're looking at.

4           MR. ROCHA:  May I approach, Your Honor?

5           THE COURT:  Sure.

6           MR. ROCHA:  I'm sorry, Your Honor.  I was referring to

7    the incorrect form.  I apologize to the government on that.

8    That's my bad.

9           MS. FURTADO:  What's the number that we're looking at

10   now?

11          THE COURT:  No. 2 I think is what you're looking at,

12   right?

13          MR. ROCHA:  Yeah.  So, it's been marked as Government

14   No. 4, so I'll come back.

15   BY MR. ROCHA:

16   Q.  So if you'd go back to that one, sir, Exhibit No. 4.  Yeah.

17   So I apologize; that was my fault.

18   A.  Okay.

19   Q.  So I apologize for confusing you there.  So you have that

20   in front of you, right, Exhibit No. 4, right?

21   A.  Yes.

22   Q.  And you said it was Anthony Rogers?

23   A.  Yes.

24   Q.  And at the bottom of the form, what date was the person on

25   that form removed from the country?

1   A.  It says January 15th, 2009.

2   Q.  Okay.

3              MR. ROCHA:  May I retrieve the exhibits, Your Honor?

4              THE COURT:  Sure.

5              MR. ROCHA:  Your Honor, I'd like to show Mr. Borrego

6   what's been stamped -- Bates stamped No. 12.  It's the notice

7   and order of expedited removal.

8              THE COURT:  Okay.

9   BY MR. ROCHA:

10  Q.  Do you have that in front of you, sir?

11             MR. ROCHA:  Your Honor, I would mark that as defense

12  counsel's exhibit No. 61 for identification purposes.

13             THE COURT:  And, I'm sorry, what is that again?

14             MR. ROCHA:  Notice and order of expedited removal.

15             THE COURT:  What is the number at the bottom?

16             MR. ROCHA:  12.

17             THE COURT:  So it's form 12?

18             MR. ROCHA:  Yeah, it's Bates stamped No. 12.

19             THE COURT:  No.  What form number, like an I-287, what

20  is it?

21             MR. ROCHA:  It's an I-860.

22             THE COURT:  Thank you.

23             MR. ROCHA:  Form I-860.

24             THE COURT:  Thank you.  Thank you.  Okay.

25

UNITED STATES DISTRICT COURT

1    BY MR. ROCHA:

2    Q.  What day is on that form, sir?

3    A.  The --

4    Q.  On the top right-hand corner, what's the date on that?

5    A.  January 12th, 2009.

6    Q.  And whose name is on this report -- on this form, I'm

7    sorry?

8    A.  It says Anthony Rogers.

9    Q.  And at the bottom of that, the certificate of service, what

10   date is on that?

11   A.  January 15th, 2009.

12   Q.  Now, it was your testimony during direct examination and

13   during cross-examination that you were the only person

14   processing Mr. Ramos-Zepeda; is that right?

15   A.  That I knew of, yes.

16   Q.  Right.  You said you were the only person, okay.

17          MR. ROCHA:  May I retrieve the documents, Your Honor?

18          THE COURT:  Yes, let's mark it.

19       So this is Exhibit 61, correct, Beth?

20          CLERK:  Yes.

21          THE COURT:  Okay.  Thank you.  Thank you.

22       Thank you, Mr. Rocha.

23          MR. ROCHA:  And, Your Honor, I'd actually like to move

24   this exhibit into evidence.

25          THE COURT:  Any objection?

1          MS. FURTADO:  For the record, Judge, I would say that

2     the foundation hasn't been laid; this particular agent did not

3     create this form.  But for purpose of this hearing, to simplify

4     things, I don't object to it.

5          THE COURT:  Okay.  So we'll go ahead and admit

6     Defendant's Exhibit No. 61.  Thank you.

7          MR. ROCHA:  May I just have a moment, Your Honor?

8          THE COURT:  Sure.  Mr. Rocha, would you give us

9     61 then because it's been admitted so I can have a copy?  Thank

10    you.  Thank you.

11         MR. ROCHA:  Okay.  Your Honor, I'd like to approach

12    with what's been marked as Government's Exhibit 1.  It's

13    already been introduced as evidence.

14         THE COURT:  Sure.

15    BY MR. ROCHA:

16    Q.  Now, is that -- officer -- Agent Borrego, that's your 867

17    form?

18    A.  867A, yes.

19    Q.  Okay.  Did you fill that one out?

20    A.  Yes.

21    Q.  And the date on there is January 12, 2009?

22    A.  Yes.

23    Q.  Now, on direct examination, you testified that when you

24    process someone, that there is an E-3 and I believe you said

25    that was in some type of a computer?

1    A.  It's an online computer based for us, yes.

2    Q.  Okay.  And you testified that on that computer there are

3    two boxes to click for English and Spanish; is that right?  Do

4    you remember that testimony?

5    A.  Yes.

6    Q.  Okay.  And you said that you clicked on the English one and

7    not the Spanish one?

8    A.  No.

9    Q.  You didn't say that?

10   A.  I'll have the person read it in Spanish, if they are able

11   to read and understand it.

12   Q.  Read what in Spanish?

13   A.  That statement.

14   Q.  What statement?

15   A.  For the sworn statement, that little synopsis blurb.

16   Q.  Okay.  But you testified that you didn't click on the

17   Spanish one, you clicked on the English one.  That was your

18   testimony.  You have your transcripts there.

19   A.  Okay.

20   Q.  You can turn to, I believe, to page 31.  You see it or no?

21   A.  No.

22          MR. ROCHA:  May I approach, Your Honor?

23          THE COURT:  Sure.

24          MR. ROCHA:  It was actually page 36.  31 was where he

25   talked about the E-3 computer.

```
 1   BY MR. ROCHA:
 2   Q.  So see that page 36?
 3   A.  Yes.
 4   Q.  Now, you said that you, just to extrapolate here, you
 5   testified that you clicked on the English one, not the Spanish
 6   one, but you just testified that you would have had him read
 7   the Spanish one.
 8       So which is it?
 9   A.  I said -- I said:  Right here on the paper it's in English
10   but I would have read it to him in Spanish.  So you can click
11   it into English or Spanish.
12   Q.  You knew prior to that that he was not an English speaker,
13   correct?
14   A.  Yes.
15   Q.  And so you said that you actually read him the form?
16   A.  I don't remember if he actually read it or if I read it to
17   him.
18   Q.  But if you provided it to him in English, he doesn't speak
19   English.
20   A.  I didn't provide it to him in English.
21   Q.  You just said --
22   A.  I did not say that.
23   Q.  Okay.  What is your testimony?
24   A.  What I said is:  In the computer there are two boxes to
25   click whether English or Spanish.  Right here it's in English.
```

1    Q.  What is "right here"?

2    A.  But I would have read it to him in Spanish.

3    Q.  We don't know what "right here" is?

4    A.  Well, right here on the paper.

5    Q.  Okay.  The 867?  We want to make sure we're talking about

6    the same thing.

7    A.  Yes, yes.

8         THE COURT:  Exhibit No. 1.

9    BY MR. ROCHA:

10   Q.  Okay.  So proceed.  You were saying?

11   A.  I'll ask them first if they're able to read and understand

12   it and if they read and understand it, I'll start my

13   questioning once they're done.

14   Q.  Okay.  But you didn't click on the Spanish one, so he could

15   not have read that form himself because he doesn't speak

16   English.  That was your testimony.

17   A.  No, it was not.

18   Q.  Okay.  So what did you do then?

19   A.  I would have either had him read it or I would have read it

20   to him in Spanish.

21   Q.  Okay.  So let's stop there.  You said you would have had

22   him read it.  Okay.  But you clicked on the English one.

23   A.  I don't think you're -- I'm telling you no, I would have

24   read it to him in Spanish or he would have read it in Spanish.

25   Q.  Okay.  Your testimony, I believe, on direct examination,

1    and then it says right there in front of you that you -- there

2    are two boxes, one's for English and one's for Spanish, and you

3    clicked on the English one.

4    A.  I did not say that.

5    Q.  What does it say on that?

6            MS. FURTADO:  Objection, Your Honor, asked and

7    answered.

8            THE COURT:  Yeah.  His testimony is that he -- while

9    this form is in English, that he clicked on the Spanish version

10   and would have either read it or had Mr. Ramos-Zepeda read it.

11       Is that your testimony?

12           THE WITNESS:  Yes.  It's right here in English but I

13   would have clicked the Spanish one.

14   BY MR. ROCHA:

15   Q.  But you didn't click the Spanish.

16           THE COURT:  Hang on.  "Right here" being Exhibit

17   No. 1?

18           THE WITNESS:  Yes.

19           THE COURT:  Go ahead, please.

20   BY MR. ROCHA:

21   Q.  But you didn't click the Spanish one, right?

22   A.  Yes, I did.

23   Q.  You did, and you had him read it?

24   A.  I don't remember if he read it or I read it to him in

25   Spanish.

1   Q.  So if I understand the syntax, the order here, you had him

2   read it first and then you generated the form?  I just want to

3   make sure I understand the order here of what happened.

4   A.  I don't remember if I read it to him or he read it himself.

5   Q.  He read it on the computer screen?

6   A.  In Spanish.  Yes, so we can just turn the computer around

7   and they can read it themself (sic).

8   Q.  But you said you clicked on the English one, not the

9   Spanish one.

10  A.  I did not say that.

11          MS. FURTADO:  Objection, Your Honor, asked and

12  answered.

13          THE COURT:  Hang on, hang on.

14          MS. FURTADO:  And it's argumentative.

15          MR. ROCHA:  Okay.  I withdraw -- I withdraw my

16  question, Your Honor.

17          THE COURT:  Hang on.  Okay.

18  BY MR. ROCHA:

19  Q.  Now, during direct examination, you said that you read the

20  entire form to Mr. Ramos.

21  A.  The only thing that gets read, if they don't understand it,

22  is the statement for the 867.  Everything else I explain to

23  them.

24  Q.  Okay.  So you didn't read every single line, every single

25  word on that form to Mr. Ramos?

1    A.  Which form are you talking about?

2    Q.  867.

3    A.  Yes, I did.

4    Q.  You read the whole thing to him line by line, word by word?

5    A.  Yes.

6    Q.  Now, you testified that you asked him about his parents; is

7    that right?

8    A.  Yes.

9    Q.  You asked him about his children or if he had any children?

10   A.  Yes.

11   Q.  But you never asked him whether he had a girlfriend in the

12   US?  Did you ask him that question?

13   A.  No.

14   Q.  Now, you said that you ran a criminal background check on

15   him; is that right?

16   A.  Yes.

17   Q.  And it came back that he had a prior offense for lewd and

18   lascivious acts with a minor; is that right?

19   A.  Yes.

20   Q.  Now, did you tell anyone else about that?  Did you tell

21   anyone else that he had that conviction or did you keep it to

22   yourself?

23   A.  No, I would have to tell the supervisor at that time.

24   Q.  Okay.  That's the only other person you told, right?

25   A.  I don't remember.  That was a long time ago.

1  Q.  Okay.  So you don't remember if you told other people

2  besides your supervisor?

3  A.  There's other agents that are in the processing area.

4  Q.  There were other people there, too, right?

5  A.  I don't -- I don't remember.

6  Q.  Would you agree that's pretty sensitive information,

7  wouldn't you agree?

8  A.  Yes.

9  Q.  Now, you said, despite that, you said that he wasn't

10  eligible for any criminal prosecution, is that right, despite

11  having that offense and having entered the country illegally,

12  he wasn't eligible for criminal prosecution?  You testified to

13  that on direct examination.

14  A.  At that time, no, he did not.

15  Q.  He was not eligible for criminal prosecution?

16  A.  We didn't pursue prosecution at that time.

17  Q.  Now, you said that you asked him about equities and you

18  said that it's on your I-213 form what you asked him.  But did

19  you ask him about equities when you were filling out that

20  I-867?

21  A.  No.

22  Q.  And just to be clear, you said that he was also for

23  expedited rule because he was apprehended within 14 days and

24  then within 100 aeronautical miles of the US/Mexico border.

25  A.  And he entered without inspection.

1    Q.  Entered without inspection.  And after obtaining this

2    information, did you have -- after you processed the 867, did

3    you have any other contacts with Mr. Ramos-Zepeda?

4    A.  After all the forms, is that what you're asking?  What are

5    you asking?

6    Q.  After you completed all your forms, did you have any other

7    contacts with Mr. Zepeda?

8    A.  Not until these proceedings.

9    Q.  Not until today?

10   A.  No, the last -- when they contacted me that I had to come

11   testify.

12   Q.  Okay.  So on January 12th, that was the only time you had

13   contact with Mr. Ramos-Zepeda until today or until two weeks

14   ago when we started this process?

15   A.  Yes.

16   Q.  Okay.

17          MR. ROCHA:  Your Honor, I just have one more exhibit

18   to show Agent Borrego.

19          THE COURT:  Okay.

20          MR. ROCHA:  I'm going to show him what's been marked

21   as Government's Exhibit No. 13.  I'm sorry.  Let me rephrase

22   that.  It's Bates stamped No. 13, and I will, for

23   identification purposes, it will be criminal defense counsel's

24   Exhibit No. 62.

25          THE COURT:  And what is it so we can identify it?

1              MR. ROCHA:  It's another 867A, it's another one.

2              THE COURT:  Show it -- make sure -- and I'm sure

3    Ms. Furtado has it but make sure she sees it.

4              MS. FURTADO:  I have a copy.  Thank you.

5              THE COURT:  Okay.  Thank you.

6              MS. FURTADO:  Thank you.

7    BY MR. ROCHA:

8    Q.  You have that in front of you, sir?

9    A.  Yes.

10   Q.  Now, what day is on that form?  Does it say January 12,

11   2009?

12   A.  Yes.

13   Q.  And who's the alien on that -- listed on that form?

14   A.  The alien --

15   Q.  Yeah.

16   A.  -- is Ramon Ramos-Zepeda.

17   Q.  And does it say that he was apprehended or, I'm sorry,

18   processed at Sonoita, Arizona, Border Patrol station?  It's on

19   the first page at the very top.

20   A.  Yes.

21   Q.  Now, who filled out that form?  It says before -- whose

22   name is on that?

23   A.  It says Anthony Rogers.

24   Q.  Okay.  And if you go through the report, does Anthony

25   Rogers' name appear on that throughout the -- throughout this

 1  report?

 2  A.  Yes.

 3  Q.  Now, would that also include the jurat record of sworn

 4  statement?

 5  A.  Yes.

 6  Q.  Now, is this the same form that you completed the same day?

 7  A.  I'm not sure.

 8  Q.  The one that you just got through testifying to the court

 9  about, the one that you filled out?

10  A.  What was your question?

11  Q.  Is this 867A exactly the same as the one that you

12  completed?

13  A.  No, it's got somebody else did this report.

14  Q.  Okay.  That's the only difference.  Okay.

15          MR. ROCHA:  Your Honor, I'd like to move into evidence

16  defense counsel's Exhibit No. 62.

17          MS. FURTADO:  Again, same objection as before but for

18  purposes of this hearing, I don't object.  It was a

19  foundational objection, Judge; he didn't create this.

20          THE COURT:  Okay.  So we'll go ahead and admit Defense

21  Exhibit No. 62.  Oh, I'm sorry, sorry, Beth.  Sorry.

22  BY MR. ROCHA:

23  Q.  And then just one last question.  Who is the -- on page --

24  Bates stamped No. 16, sir, if you look down at the bottom it

25  says witnessed by.  Who is the agent that witnessed this?

CROSS-EXAMINATION - JORGE BORREGO

1   A.   For No. 16?   Jose Carreon.

2   Q.   Okay.   And just to -- I want to ask you again just to make

3   sure.   You said that on -- well, you said in testimony during

4   direct examination that once you completed the file, that it

5   was sent to -- it was closed away; is that right?   I forgot the

6   exact words that you used.

7   A.   I don't -- I'm not sure exactly where the file went but I'm

8   assuming it went to the file control office.

9   Q.   File control office, that's correct.   So did you take it

10  there personally?

11  A.   No.

12  Q.   Or how does that --

13  A.   So I don't remember exactly what happened but when the

14  extraditing agency picks him up, the file goes to the -- it

15  should go to the control office.

16  Q.   Okay.

17  A.   But I don't know.

18  Q.   But you didn't send it there personally, right?

19  A.   No.

20  Q.   But that's where it goes, that's the process?

21  A.   Yes.

22  Q.   Okay.

23         MR. ROCHA:   Can I retrieve my exhibits, Your Honor?

24         THE COURT:   Of course, except for 62 which we will --

25  because that was admitted.   I'll take that.   Thank you very

 1    much.  I'm going to go ahead and staple this, Mr. Rocha, is

 2    that okay?

 3              MR. ROCHA:  Yes, Your Honor, that's fine.

 4              THE COURT:  Thank you.

 5              MR. ROCHA:  Your Honor, I have no other questions.

 6              THE COURT:  Okay.  Why don't we take about a

 7    ten-minute break and then, Ms. Furtado, we'll have the

 8    redirect.  Thank you.

 9              MS. FURTADO:  Thank you.

10              THE COURT:  So we're going to stand at recess for a

11    few minutes.  Thank you.

12       (A break was taken.)

13              CLERK:  Judge, we are back on the record in CR 15 case

14    number 976, United States of America versus Ramon Ramos-Zepeda.

15              THE COURT:  Okay.  Thank you.

16              CLERK:  You're welcome.

17              THE COURT:  Ms. Furtado, redirect of Agent Borrego?

18              MS. FURTADO:  Thank you.

19                        REDIRECT EXAMINATION

20    BY MS. FURTADO:

21    Q.  Agent Borrego, at some point during cross-examination you

22    were asked to look at an I-213 of Agent Hoyt; is that correct?

23    A.  Yes.

24    Q.  Okay.  I'm going to show you that now and ask you some

25    questions about that.

1    A.   Okay.

2            MS. FURTADO:   May I approach, please, Your Honor?

3            THE COURT:   Sure.   Would you identify, please,

4    Ms. Furtado?

5            MS. FURTADO:   Yes.   These papers are Bates stamped

6    pages 45 through 50.

7            THE COURT:   Right.   I think that was marked as Exhibit

8    No. 60, I believe?

9            MR. ROCHA:   Yes, it was, yes.

10           THE COURT:   Thank you.

11   BY MS. FURTADO:

12   Q.   So, Agent Borrego, there's been some talk about the dates,

13   so I'd ask you to take a look at page 3, so Bates stamp 47,

14   middle of the page, above the all caps lettering, preparing

15   officer/receiving officer.   And I'd ask you to read the

16   paragraph prior to that information and tell us if you can help

17   us out with understanding the dates here.

18   A.   It says --

19   Q.   Wait and let me ask you a question.

20   A.   Sorry.

21   Q.   Does page 47 give you some information as to what happened

22   with the dates?

23   A.   Yes.

24   Q.   Can you tell us?

25   A.   It says right here:   The preparing officer/receiving

1   officer and preparation dates.  Times cannot be changed in

2   ENFORCE, thus the following agents will be signing for the

3   original preparing and receiving officer at the corrected

4   times.

5   Q.  Does it go on, then, to give us some information about what

6   the actual date this particular I-213 for Gerald Hoyt was

7   created?

8   A.  Yes.

9   Q.  What date?

10  A.  January 15th, 2009, at 0200 hours.

11  Q.  Okay.  And who was the preparing officer?

12  A.  Anthony Rogers.

13  Q.  Okay.  Now, I know the bottom of this I-213 says Gerald

14  Hoyt.  Do you have any experience with why there would be two

15  different names?

16  A.  So it says -- it says that they weren't able to change it

17  so Rogers signed and he put for Hoyt.

18  Q.  Okay.  Now, do you know the events that happened that led

19  up to Rogers preparing the I-213 on January 15th, 2009?  And

20  you can look on pages 46 and 47, the bottom of the page on 46

21  and the top of the page on 47.

22  A.  It explains.

23  Q.  Do you know -- after reading this, do you now know the

24  events that led up to Rogers preparing this on the 15th?

25  A.  Yes.

1    Q.  And what were those events?

2    A.  The agents have not -- they were unable to locate the

3    original file.  The original narrative remains unchanged.  An

4    active warrant exists for the subject, Ramos-Zepeda, Ramon, for

5    a probation violation.  Extradition was approved by the

6    originating agency and the subject was turned over to the Santa

7    Cruz County Sheriff's Department on January 12th, 2009.

8         The originating -- the originating agency, San Mateo

9    County, California, later denied extradition after review by

10   DDA Morley Pitt.  The subject was transferred back into Border

11   Patrol custody on January 14th, 2009, and subsequently sent to

12   the Sonoita station for recreation of the alien file.

13        I, Anthony Rogers, contacted Mary Kaye at the San Mateo

14   County Sheriff's Department records division at 0130 hours on

15   January 15th, 2009.  She sent me a fax confirming the

16   declination to extradite the subject.  And then in parentheses

17   it has "attached".

18   Q.  Now, the information as you're looking through pages 47,

19   48, 49, and 50, in terms of the criminal history, is that

20   information that you -- that you investigated or that you --

21   A.  Yes.

22   Q.  -- obtained?  And are you required to communicate this kind

23   of information in your reporting when you create reports?

24   A.  I'm sorry?

25   Q.  Are you required to communicate criminal history

1  information in your reports?

2  A.  Yes, 'cause he had an outstanding warrant, so I had to

3  contact that agency with the warrant.

4  Q.  In your experience, agent, one of the questions -- well,

5  one of the questions that was asked you today was about who you

6  told about the defendant's criminal history, the lewd and

7  lascivious acts with a minor.

8      Is it your practice, agent, that when you have this kind of

9  criminal history, that you would yell it out into your -- into

10  the area where you work?

11  A.  No.

12  Q.  Would you communicate that kind of information to other

13  potential defendants or people who are being processed for

14  immigration proceedings?

15  A.  No.

16  Q.  Okay.  On the 15th when Anthony Rogers created this report,

17  did he give some information about criminal prosecution or

18  criminal charges?  And I would direct you to look at page 47,

19  top of the page, first paragraph.

20  A.  What was the question?  Sorry.

21  Q.  Did Anthony Rogers provide some information in the I-213

22  about criminal charges that were contemplated?

23  A.  Yes.

24  Q.  What did he -- what information did he provide?

25  A.  He contacted the Tucson sector prosecutions unit to ask if

1   it was still possible to prosecute the subject due to his prior

2   convictions.  It was confirmed that they were unable to

3   prosecute as the subject was apprehended more than 48 hours

4   ago.  The subject was processed for expedited removal, I-860.

5   The new I-860 was issued and signed by acting field operations

6   supervisor David Barker.

7   Q.  Now, in your experience, agent, because criminal

8   prosecution was contemplated, would that explain why Miranda

9   rights were given on page -- and documented on page 49?

10  A.  Yes.

11  Q.  Were you part of any processing of Mr. Ramos-Zepeda on

12  January 15, 2009?

13  A.  No.

14  Q.  The information that you've described in terms of what

15  Anthony Rogers, Agent Anthony Rogers has provided on page 46

16  and 47 of the -- of Hoyt's I-213, do you have personal

17  knowledge of that?

18  A.  No.

19  Q.  Do you have personal knowledge of the recreation of any of

20  the forms, specifically the I-860 that was created by Rogers

21  and I think it was shown to you?  It's defense Exhibit 62 or

22  63.

23  A.  No.

24  Q.  It's 63 --

25          CLERK:  There is no 63.

1          MS. FURTADO:  Oh, 62, then.

2          THE COURT:  62.

3   BY MS. FURTADO:

4   Q.  What about the I-867A that was created by Anthony Rogers,

5   do you have any personal information as to the creation of that

6   document?

7   A.  No.

8   Q.  Let me ask you about a certificate of service.  So I'm

9   showing you what's been previously marked and admitted as

10  Government's Exhibit 2.  Would you take a look at this, please?

11  Do you recognize that document?

12  A.  Yes.

13  Q.  Is that a document you created?

14  A.  Yes.

15  Q.  In what context did you create that document?

16  A.  I'm not sure of the question.

17  Q.  When did you create that document?

18  A.  January 12th, 2009.

19  Q.  And was it related to a specific defendant?

20  A.  Yes, Ramon Ramos-Zepeda.

21  Q.  Is that person seated here in the courtroom today?

22  A.  Yes.

23  Q.  Now, that particular document, at the bottom of it, there

24  is a certificate of service --

25  A.  Yes.

REDIRECT EXAMINATION - JORGE BORREGO

1  Q.  -- is that correct?

2  A.  Yes.

3  Q.  Can you talk to us a little bit about that?  Tell us the

4  process that you use as an agent when you complete that section

5  of the form.

6  A.  So once that document is printed, I'll put the file

7  together and when this page is available, I'll explain it to

8  the individual.

9  Q.  Okay.  So let's back up here a second.  Available.  What

10  does that mean?

11  A.  After it's been printed out.

12  Q.  All right.  So how does it get printed?

13  A.  I have to print it from the computer.

14  Q.  All right.  How does the information get placed into the

15  document so that it can be printed?

16  A.  I have to put information in there.

17  Q.  All right.  In this particular case, the information that

18  is on that Exhibit 2, how did that -- from whom did you get the

19  information to put into that form, the I-860?

20  A.  I generated it in the computer.

21  Q.  During --

22  A.  During the processing of --

23  Q.  Which processing?

24  A.  Of Ramon Ramos-Zepeda.

25  Q.  All right.  Now, what's the top part of that form say?

1   A.  Notice and order of expedited removal.

2   Q.  Okay.  And what is the form for?

3   A.  It's letting the -- Ramon Ramos-Zepeda, pursuant of the

4   nationality act, that he has been determined inadmissible.

5   Q.  Do you tell him that information?

6   A.  Yes.

7   Q.  And how do you tell him that information?

8   A.  In Spanish.

9   Q.  And on this particular day -- what day did you tell him

10  this information?

11  A.  January 12th, 2009.

12  Q.  And on this particular day, what language were you using to

13  explain this to Mr. Ramos-Zepeda?

14  A.  Spanish.

15  Q.  And on the top part of the form, does it have your name as

16  the name and title of the immigration officer?

17  A.  In the middle.

18  Q.  Okay.  Okay.  So the top portion.  We'll talk about the top

19  portion of the form, the top half of that form.

20  A.  Okay.

21  Q.  Is that your name as the immigration officer?

22  A.  Yes.

23  Q.  And is that your signature?

24  A.  Yes.

25  Q.  What does that signature signify?

REDIRECT EXAMINATION - JORGE BORREGO

1    A.  That I explained this document to him and served him with

2    it.

3    Q.  Okay.  Did you, at the time that you were explaining this

4    document to him, have any indication that Mr. Ramos-Zepeda did

5    not understand what you were explaining to him?

6    A.  No.

7    Q.  Now, the bottom half of the form, what is that?

8    A.  This is the order of removal.

9    Q.  And what does it mean?  What does it signify?

10   A.  That I served this to the individual, and supervisor

11   approved the document.

12   Q.  And because -- what's the title of that second -- the

13   bottom half of that form?

14   A.  Order of removal under Section 235(b)(1) of the act.

15   Q.  Now, does this -- what does this order now enable you to

16   do?

17   A.  Order the -- Ramon Ramos-Zepeda removed.

18   Q.  Okay.  And so who has to sign that order?  Who has signed

19   the order?

20   A.  David Barker.

21   Q.  And who else?

22   A.  And I did also.

23   Q.  Okay.  And are you required to get your supervisor's

24   signature?

25   A.  Yes.

REDIRECT EXAMINATION - JORGE BORREGO

1    Q.  As a Border Patrol agent, are you an immigration officer?

2    A.  Yes.

3    Q.  Now, the certificate of service, the very bottom, the box

4    at the bottom of this --

5    A.  Yes.

6    Q.  -- what does that portion signify?

7    A.  That I served Ramon Ramos-Zepeda with this document.

8    Q.  Now, you used the word "served".  What does that mean?

9    A.  I explained to him the -- that he was inadmissible and the

10   reasons why.

11   Q.  Were you having a conversation with Mr. Ramos-Zepeda when

12   you served this on him?

13   A.  No, I just -- I just explained this to him.

14   Q.  Did he understand what you were explaining to him?

15   A.  Yes.

16   Q.  And by signing, what does that signify?  Is that your

17   signature down on the bottom in the box?

18   A.  Yes, that I explained that to him.

19   Q.  Now, what does that signature signify?

20   A.  That he understood and I explained it to him.

21   Q.  Okay.  And what is the date?

22   A.  January 12th, 2009.

23   Q.  Okay.  One of the things that we discussed -- that was

24   discussed with you during cross-examination is your knowledge

25   of immigration law.  So your previous testimony is that you

1   have received training in immigration law and perhaps

2   immigration criminal charges; is that correct?

3   A.   Yes.

4   Q.   And were you able to obtain that training when you were in

5   basic training and advanced training?

6   A.   Yes.

7   Q.   In that training and now in your work, are you able to cite

8   passages out of the CFR?

9   A.   I have not done that, no.

10  Q.   If I said to you 8 USC 1324, are you familiar with that

11  charge?

12  A.   Yes.

13  Q.   What is that charge?

14  A.   Alien smuggling.

15  Q.   If I said 8 USC 1326, are you familiar with that charge?

16  A.   Yes.

17  Q.   What's the charge?

18  A.   Illegal reentry.

19  Q.   Are those criminal charges?

20  A.   Yes.

21  Q.   Is that something that you routinely work on during your

22  work as a Border Patrol agent?

23  A.   Yes.

24  Q.   When you do processing, how is it done?

25  A.   You want -- from start to finish, is that --

1   Q.  I guess that's too general of a question.  Do you use a

2   tool to complete your processing of an alien?

3   A.  Yes.

4   Q.  What do you use?

5   A.  I use the computer.

6   Q.  Okay.  Do you have -- while you're doing processing, do you

7   have a CFR like the ones that have been provided to you that

8   you're checking off?

9   A.  I don't -- I have one but I don't use it all the time.

10  Q.  All right.  The system that you use, are forms generated

11  based on answers that you are inputting?

12  A.  Yes.

13  Q.  If the answers change, would that sometimes impact the

14  forms that might be generated?

15  A.  Yeah -- there's -- for every different file that we do,

16  there's different -- there's charges already associated and

17  each file is different, yes.

18  Q.  All right.  Does your system automatically generate what

19  you have termed an NTA?

20  A.  There is a slot for a notice to appear, yes.

21  Q.  Okay.  Now, when does that -- what is that slot?  I guess

22  I'm not understanding that term.  What does "slot" mean?

23  A.  There's -- so you have your voluntary return, your -- I

24  take that back; it's the full VR.  And then --

25  Q.  VR, is that a voluntary return?

1   A.  Voluntary return.

2   Q.  Okay.

3   A.  And then you have an expedited removal and a reinstatement

4   of priority of removal and a notice to appear.  And you can

5   click on different drop-down boxes, too.  And it will have

6   information in there that's already in the computer.

7   Q.  Information --

8   A.  For that kind of -- type of file.

9   Q.  Would that mean -- does that mean information that

10  qualifies a person for that particular section or does that

11  mean information that the alien has given you?

12  A.  Based on the information that the alien gives, it'll -- we

13  can do those different types of files.

14  Q.  In Mr. Ramos-Zepeda's case, your previous testimony was

15  that he did not qualify for a voluntary return; is that

16  correct?

17  A.  Yes.

18  Q.  Did the box for NTA or full voluntary removal or return,

19  did that come up?

20  A.  I did not select it.

21  Q.  And why didn't you select it?

22  A.  Because he was -- he was -- he was amenable for expedited

23  removal.

24  Q.  What qualified him for an expedited removal?

25  A.  He -- he entered without inspection within 14 days and

REDIRECT EXAMINATION - JORGE BORREGO

1   within 100 air miles.

2   Q.  Did he -- is there another -- is there another criteria in

3   terms of documents?

4   A.  If they have a -- you mean, like a passport or something?

5   If they have a entry documents, yeah, that would change.

6   Q.  In this particular -- in Mr. Ramos-Zepeda's case, did he

7   have entry documents?

8   A.  No.

9   Q.  Now, are there questions that you may ask during the I-213

10  process that would require you to give an NTA or do a voluntary

11  return?

12  A.  Yes.

13  Q.  What types of questions might result in an NTA?

14  A.  Whether they can derive citizenship from their parents,

15  their children, if they have entry documents, if they have some

16  kind of credible fear.

17  Q.  All right.  So we've already -- you've already stated that

18  there was no entry documents.  But you said credible fear.  So

19  I'm just going to write this down:  credible fear, parents that

20  would allow you to derive citizenship, or children.

21      Is that correct?

22  A.  Yes.

23  Q.  Now, in Mr. Ramos-Zepeda's case, did he have any credible

24  fear issues that you documented?

25  A.  No.

REDIRECT EXAMINATION - JORGE BORREGO

78

Q.  Did he have any parents that would permit him to derive

citizenship to the United States?

A.  No.

Q.  Did he indicate that he had any children that would permit

him to derive citizenship to the United States?

A.  No.

Q.  Would simply having a girlfriend permit you to derive

citizenship to the United States?

A.  No.

Q.  Did he give you any information as to a house or an address

in the United States?

A.  No.

Q.  When an NTA is issued, what's the next step for the alien?

A.  They'll be given a date to see a judge.

Q.  At that point, are you, as an immigration officer, involved

in that process?

A.  No.

Q.  When you did your review of Mr. Ramos-Zepeda's information,

did he qualify for a notice of appearance -- notice to appear?

A.  No.

Q.  Now, why do you run somebody's criminal history?

A.  To see what kind of criminal history they have.

Q.  In this particular instance, did Mr. Ramos-Zepeda -- we've

established Mr. Ramos-Zepeda has some criminal history.  That

criminal history, would that qualify him for a voluntary

1   return?

2   A.  No.

3   Q.  Now, you've talked about an expedited removal.  And you

4   said the person had to be here within 14 days and 100 air

5   miles.

6       What date did Mr. Ramos-Zepeda enter with regard to the

7   expedited removal that you did?

8   A.  January 9th, 2009.

9   Q.  What date was he apprehended?

10  A.  January 12th, 2009.

11  Q.  Where did you get the January 9th date?

12  A.  This is -- this is some information he would have given us.

13  Q.  He who?

14  A.  Ramon Ramos-Zepeda.

15  Q.  The defendant?

16  A.  Yes.

17  Q.  And is that information that you would have considered when

18  deciding to go forward on an expedited removal?

19  A.  Yes.

20  Q.  Now, where was he -- where did he say he entered?

21  A.  Near Naco, Arizona.

22  Q.  Ultimately where was he apprehended?

23  A.  Near Sonoita, Arizona.

24  Q.  Was that on the 12th?

25  A.  Yes.

REDIRECT EXAMINATION - JORGE BORREGO

1    Q.   And is that location within 100 air miles of the border?

2    A.   Yes.

3    Q.   Would that, then, qualify him for the expedited removal?

4    A.   Yes.

5    Q.   Now, one of the things we've talked about or you talked

6    with defense counsel is administrative proceedings versus

7    expedited removal.  What's an administrative proceeding?

8    A.   There's no criminal charges involved.

9    Q.   Are there various types of administrative proceedings?

10   A.   Yes.

11   Q.   What are the various types that you can think of just

12   sitting there off the top of your head?

13   A.   Voluntary returns, expedited removals, reinstatement, prior

14   order of removals.

15   Q.   So one of the things that defense counsel asked you about

16   is if expedited removal and an administrative removal are all

17   the same thing.  Would it be fair to say that an expedited

18   removal is a type of administrative proceeding?

19   A.   Yes.

20   Q.   Do you know what a voluntary departure is?

21   A.   Yes.

22   Q.   Is it different than a voluntary return or, excuse me, I'm

23   using the wrong phrase.  Excuse me.

24       Is a voluntary departure different than a voluntary

25   removal?

1  A.  Yes.

2  Q.  Who makes the determination on a voluntary departure, do

3  you know?

4  A.  We're able to do that.

5  Q.  Okay.  In your -- in your experience, then, based on what

6  you knew of Mr. Ramos-Zepeda, would he have qualified for a

7  voluntary departure?

8  A.  No.

9  Q.  Why -- so I'm going to ask you to look at Government's

10  Exhibit No. 2.  You made a determination of inadmissibility for

11  Mr. Ramos-Zepeda.  Why was he inadmissible?

12  A.  He was inadmissible, he didn't have any valid entry

13  document and he entered the US illegally with the intent to

14  reside in the United States.

15  Q.  And how did you come to that decision?

16  A.  It was in the sworn statement I took from Mr. Ramon

17  Ramos-Zepeda.

18  Q.  And as an immigration officer, are you able to make this

19  determination of inadmissibility?

20  A.  Yes.

21  Q.  Was your previous testimony that you didn't read Miranda

22  because Mr. Ramos-Zepeda was processed for an immigration -- an

23  administrative violation or administrative proceeding?  If you

24  don't know, let me direct you to that page and location.  Give

25  me one second.

REDIRECT EXAMINATION - JORGE BORREGO                              82

1          MS. FURTADO:  May I approach, Your Honor?

2          THE COURT:  Yes.

3    BY MS. FURTADO:

4    Q.  I'd ask you to look at page 27.  I'd ask you to look at --

5    sorry, page 27.  Okay.  I have a bunch of pages listed, give me

6    one second.  I'm sorry.  All right.  Page 27, forgive me, page

7    27, lines two through five.

8    A.  Okay.

9    Q.  So why didn't you read Mr. Ramos-Zepeda a Miranda warning?

10   A.  It was an administrative proceeding.

11   Q.  Is that different than a criminal proceeding?

12   A.  Yes.

13   Q.  So I want to go through the documents again that have been

14   admitted.  I'll show you what's been admitted as 1 and 3 -- you

15   already have 2 up there -- and I'd ask you to take a look at 1,

16   2, and 3.

17        Do you recognize those documents?

18   A.  Yes.

19   Q.  Are those documents that are related to your processing of

20   Ramos-Zepeda?

21   A.  Yes.

22   Q.  What date was the processing done?

23   A.  January 12th.

24   Q.  Did you complete those with -- while doing your processing

25   for Mr. Ramos-Zepeda?

REDIRECT EXAMINATION - JORGE BORREGO

1    A.  Yes.

2    Q.  Would you have spoken to Mr. Ramos-Zepeda about those

3    documents?

4    A.  Yes.

5    Q.  What language did you speak to Mr. Ramos-Zepeda in when

6    reviewing those documents?

7    A.  Spanish.

8    Q.  And did you review each one of those documents with

9    Mr. Ramos-Zepeda?

10   A.  Yes.

11   Q.  And did he give you any indication that he did not

12   understand what you were reviewing with him?

13   A.  No.

14   Q.  Did he give you any indication that he did not understand

15   that you had found him inadmissible and were ordering him

16   removed?

17   A.  No.

18   Q.  Did he give you any indication that he did not understand

19   why you were taking a record of his statement?

20   A.  No.

21   Q.  Did he -- did those statements also correspond to some

22   other information that you had while doing the I-213?  So I'd

23   ask you to look at Exhibit 1, the I-867.  So there are

24   statements that are contained in there; is that correct?

25   A.  Yes.

REDIRECT EXAMINATION - JORGE BORREGO

1    Q.  When looking at those statements, do those statements also

2    correspond to information you had previously taken during your

3    I-213?

4    A.  Yes.

5    Q.  Now, the back page, it's Bates stamped 16, but it's the

6    fourth -- the last page of Exhibit 1.  There are signatures on

7    that page.  Whose signatures exist?

8    A.  Ramon Ramos-Zepeda, myself, and James Rowe.

9    Q.  What does Ramos-Zepeda's signature signify to you?

10   A.  That I read him the statement and the answers were true and

11   correct to the best of his knowledge.

12   Q.  And when do you ask him -- do you ask him to sign that

13   form?

14   A.  Yes.

15   Q.  And when do you ask him to sign that form?

16   A.  Once we're completed with the statement.

17   Q.  Now, do you sign that form as well?

18   A.  Yes.

19   Q.  Why do you sign that form?

20   A.  That I -- I did the statement.

21   Q.  And the witness signature?

22   A.  That he witnessed the signing.

23   Q.  Okay.

24           THE COURT:  I've got that Bates stamped as 77.  You

25   said 16.

1          MS. FURTADO:  I have multiple copies of a lot of the

2     documents.

3          THE COURT:  I think the exhibit is Bates stamped 77.

4     Does -- the last page on that does say 77?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Thank you.

7          MS. FURTADO:  Thank you for the correction, Your

8     Honor.

9     BY MS. FURTADO:

10    Q.  Now, in your process of serving a person with all of these

11    documents, what's your practice?  How do you generally do it?

12    A.  Once the file's complete, I'll go through page by page.

13    Q.  Do people have an opportunity to ask you questions if they

14    don't understand what's happening?

15    A.  Yes.

16    Q.  In this particular case, did Mr. Ramos-Zepeda, first,

17    indicate that he didn't know what was happening?

18    A.  No.

19    Q.  Did he indicate that he didn't understand?

20    A.  No.

21          MS. FURTADO:  Okay.  I just need one second, Your

22    Honor.

23          THE COURT:  Sure.

24          MS. FURTADO:  I don't have any other questions for

25    this witness, Your Honor.

1          THE COURT:  Thank you.  May this witness be excused?

2          MS. FURTADO:  Yes, sir.

3          THE COURT:  Mr. Rocha?

4          MR. ROCHA:  Yes, Your Honor.  I have no recross.

5          THE COURT:  Thank you.  Thank you very much for your

6   time.  You may be excused.

7       Does the government have any additional witnesses?

8          MS. FURTADO:  I do, Your Honor.

9          THE COURT:  Okay.

10          MS. FURTADO:  The government calls Border Patrol Agent

11   Adrian Gomez.

12          THE COURT:  Okay.  Thank you very much.

13          ADRIAN GOMEZ, GOVERNMENT WITNESS, WAS SWORN.

14          CLERK:  Please state your name.

15          THE WITNESS:  Border Patrol Agent Adrian Gomez,

16   G-o-m-e-z.

17          CLERK:  Thank you.

18                          DIRECT EXAMINATION

19   BY MS. FURTADO:

20   Q.  Good morning, Agent Gomez.  Could you please state --

21   you've already stated your name.  Can you tell us how long

22   you've been a Border Patrol agent?

23   A.  Just shy of eight years.

24   Q.  Does it take special training to become a Border Patrol

25   agent?

1    A.   It does.

2    Q.   Can you take us through that training, please?

3    A.   We attend an academy at the Federal Law Enforcement

4    Training Center in Artesia, New Mexico, for an academy of

5    20 weeks.

6    Q.   Okay.  What types of things do you learn while you're at

7    the training?

8    A.   Criminal law, immigration law, driving techniques, firearm

9    training, defense tactics, applied authorities, which include

10   line watch and different operations of Border Patrol duties.

11   Q.   Okay.  Once you complete basic training, what other

12   training do you need?

13   A.   At the station we have to attend field training unit and a

14   post academy training.

15   Q.   Okay.  What is the field training unit?

16   A.   Field training unit includes -- it's a group training of

17   on-the-job training for line watch operations and area

18   orientation.

19   Q.   What's post academy training?

20   A.   Post academy training is classroom-based training just to

21   touch up on the stuff you learned at the academy and to test

22   for those subjects.

23   Q.   Okay.  Were you able to successfully complete your basic

24   field and post academy training?

25   A.   I was.

1  Q.  Now, as a Border Patrol agent, have you had specialty

2  assignments?

3  A.  I have.

4  Q.  Can you tell us what they've been?

5  A.  I've worked for the intelligence unit at the Sonoita Border

6  Patrol station.  I've worked for the ASID unit, which is Alien

7  Smuggling Identification Deterrence unit, for two and a half

8  years, and I currently am assigned to the Tucson sector

9  prosecutions unit, been there for about a year and a half.

10  Q.  I have a question that's going to sound very silly but is

11  Sonoita, Arizona, and/or Naco, Arizona, are they here in the

12  District of Arizona?

13  A.  They are.

14  Q.  Thank you.  So you said you have a prosecutions unit.

15  That's a specialty assignment that you had; is that correct?

16  A.  It is.

17  Q.  Tell us what your assignments are, what you do as a

18  prosecutions agent.

19  A.  As a case agent, we review cases that are generated

20  throughout the Border Patrol stations in the Tucson sector and

21  we review cases and we help the agents in the field present the

22  cases to the US Attorney's Office.

23  Q.  Do you interface with other Border Patrol agents?

24  A.  We do.

25  Q.  And in terms of what you would do on a specific case that

1    you were assigned to, what types of information are you

2    gathering, what types of work are you doing?  So I guess

3    there's two parts.  What type of information are you gathering?

4    A.   Information, we're gathering the reports and reviewing the

5    reports for completeness and guidelines that they should be

6    able to meet for the criminal cases I'm presenting.

7    Q.   What type of work do you do when you're a case agent?

8    A.   Run records, collect evidence, things of that nature.

9    Q.   All right.  Now, do you review A-files?

10   A.   We do.

11   Q.   What's an A-file?

12   A.   An A-file is an administrative file created for all aliens.

13   Q.   Is this a file that's routinely kept?

14   A.   Yes.

15   Q.   Is the -- are the documents in there generated as a course

16   of doing business as a Border Patrol?

17   A.   Yes.

18   Q.   And are those documents, depending on what type of

19   proceeding, are those documents consistent across the board for

20   the A-files that you've reviewed?

21   A.   I'm sorry.  What was the question?

22   Q.   It was a long question.

23        Okay.  Have you reviewed A-files that have -- multiple

24   A-files that might be for an expedited removal?

25   A.   Yes.

1    Q.  When you look at those files, are the documents that are

2    contained within that for the expedited removal, are they

3    consistent?

4    A.  I would say so.

5    Q.  So are you familiar with the I-867A and B, the record of

6    the sworn statement?

7    A.  I am.

8    Q.  Are you familiar with the I-860, which is the notice and

9    order of expedited removal?

10   A.  I am.

11   Q.  And are you familiar with the I-296, which is a notice to

12   alien ordered removed departure verification?

13   A.  I am.

14   Q.  And are these documents that are routinely kept by the

15   Border Patrol when processing an alien for expedited removal?

16   A.  Yes.

17   Q.  Okay.  In this particular case, were you asked to review

18   the documents related to a Ramos-Zepeda, Ramon Ramos-Zepeda?

19   A.  I was.

20   Q.  Are you the case agent assigned to that particular alien's

21   case?

22   A.  I am.

23   Q.  Okay.  Have you personally met Mr. Ramos-Zepeda?

24   A.  No.

25   Q.  Okay.  Were you able to review his A-file,

1    Mr. Ramos-Zepeda's A-file?

2    A.  I was.

3    Q.  And in reviewing his A-file, can you tell us, is he facing

4    current charges?

5    A.  He is.

6    Q.  What are those charges?

7    A.  He's facing an illegal reentry charge.

8    Q.  Okay.  What -- is there immigration history that you've

9    been able to see in that file?

10   A.  Yes.

11   Q.  What is that immigration history?

12   A.  The arrests and the ER or expedited removal in 2009.

13   Q.  Okay.  Were you able to review the documents for that 2009

14   expedited removal?

15   A.  I was.

16   Q.  Does that record contain I-867A and B?

17   A.  It does.

18   Q.  And I-296?

19   A.  Yes.

20   Q.  And an I-860?

21   A.  Yes.

22   Q.  All right.  Now, as you said before, are those -- well, you

23   might have said this.  But are those documents that are

24   routinely kept as part of an expedited removal?

25   A.  Yes.

 1   Q.  All right.  Now, are there multiple of those forms that

 2   I've said, all those I number forms, are there multiple copies

 3   of those forms in the A-file for Mr. Ramos-Zepeda?

 4   A.  Usually three copies, yes.

 5   Q.  Okay.  In Mr. Ramos-Zepeda's case, are there different

 6   agents who've done versions of those I forms?

 7          MR. ROCHA:  Objection, Your Honor.  She's leading the

 8   witness.

 9          THE COURT:  Sustained.

10   BY MS. FURTADO:

11   Q.  When you reviewed the A-file for Mr. Ramos-Zepeda, what did

12   you find?

13   A.  I found basically two A-files with the same apprehension

14   date from different agents with multiple copies with different

15   preparing officers for the same removal.

16   Q.  And based on your training and experience, can you tell us

17   what happened with and why there are multiple A-file -- I mean,

18   multiple documents by multiple agents?

19   A.  By just reading the documents, it seemed that he was

20   processed on the date of his apprehension and then transferred

21   over to another agency and then returned to immigration

22   services a couple of days later and recreated an A-file to be

23   able to remove him on the 15th of January.

24   Q.  All right.  I'm going to ask you to be more specific.  I'm

25   going to give you some documents.

 1            MS. FURTADO:  Judge, I know that we've admitted some

 2   defense exhibits.

 3        Mind if I use those?

 4            MR. ROCHA:  I don't think I have them --

 5            THE COURT:  I've got them.  It's Exhibit 60 --

 6            MS. FURTADO:  Okay.  Judge, I guess we'll use these.

 7   So I'm going to show the agent pages 45 through 50 and I'll

 8   also show him pages 50 through 55.

 9            THE COURT:  I'm presuming those are all part of

10   Exhibit No. 62; is that correct?

11            MS. FURTADO:  40 through 50 I believe is part of

12   Exhibit 62, Defense 62.

13            THE COURT:  Okay.  And for the record, the Bates

14   numbers on Exhibit 62, the one that was actually admitted are

15   13, 14, 15, 16.

16            MS. FURTADO:  We can use those.

17            THE COURT:  So the Bates numbers are a little

18   different.  That's okay.

19            MS. FURTADO:  How many pages are there in Exhibit 62?

20            THE COURT:  I've got one, two, three, four.

21            MS. FURTADO:  So that's Exhibit 62.

22            THE COURT:  Why don't I just show it to you so you're

23   on the same page, so to speak.  That's what we have as

24   Exhibit 62.

25            MS. FURTADO:  I'm looking for the I-213 for Gerald

 1   Hoyt.

 2            CLERK:  It's document 60 and it was not admitted.

 3            THE COURT:  It was not admitted.

 4            MS. FURTADO:  Okay.

 5   BY MS. FURTADO:

 6   Q.  I'm going to show you pages 45 through 50.  I'd ask you to

 7   take a look at that.

 8        Are you familiar with that document?

 9   A.  I am.

10            MS. FURTADO:  Judge, I think I'm going to admit this

11   document just to avoid some confusion.  I'd mark it Exhibit 5.

12        So Exhibit 5, Government's Exhibit 5, pages Bates stamped

13   pages 45 through 50, they are the I-213 of Gerald Hoyt,

14   H-o-y-t.

15            CLERK:  Are you marking it and asking for it to be

16   admitted or just marking it?

17            MS. FURTADO:  At this point I'm just marking it.

18            CLERK:  Okay.

19   BY MS. FURTADO:

20   Q.  Agent, I want to ask you some questions about this

21   document.  I want to be a little bit more specific.  You said

22   you're familiar with this document; is that correct?  That's

23   what I heard.

24   A.  I am.

25   Q.  Okay.  Is this a document that you reviewed as part of the

1    A-file?

2    A.  I did.

3    Q.  And is it a fair and accurate copy of what you have in the

4    A-file?

5    A.  Yes.

6    Q.  Okay.

7            MS. FURTADO:  And now I would move for the admission

8    of Government's 5.

9            THE COURT:  Mr. Rocha, any objection?

10           MR. ROCHA:  No objection.

11           THE COURT:  Okay.  So Exhibit No. 5 will be admitted.

12   Thank you.

13   BY MS. FURTADO:

14   Q.  So I'd like you to take us back through your narrative.

15   You said that there was processing -- apprehension and then

16   given over to an agency and all of that stuff.  So I'd like you

17   to take us through dates, please.

18      What was the date that the defendant was apprehended in

19   2009?  Let's be specific.

20   A.  January 12th, 2009.

21           MR. ROCHA:  Your Honor, may I have a sidebar?

22           THE COURT:  Sure.

23           MR. ROCHA:  Can I just have a sidebar?

24           THE COURT:  Sure.

25      (A sidebar conference was held.)

 1          MR. ROCHA:  I just wanted to know what's the purpose

 2   of this witness, because it seems to me that he's going to talk

 3   about chain of custody because it seems there might be a chain

 4   of custody here.  But that was -- it's not an issue that was

 5   briefed before the court.  We're just talking about whether he

 6   was removed from the country or not.  And I believe they're

 7   trying to show that the documents are consistent and whatnot.

 8   But it seems to me this is going to a different issue than the

 9   one we briefed the court.  So I wanted to make sure.

10          THE COURT:  Okay.  The exhibit's been admitted.  So, I

11   mean, whatever's in the exhibit, it's been admitted.  I mean, I

12   don't know if you intend to walk him through what's in the

13   exhibit; the exhibit's been admitted.  I know he didn't

14   complete it.  I know either Rogers or Hoyt completed it.

15          MS. FURTADO:  For purposes of the record, Judge, I

16   know it's been admitted but I like my witnesses to explain

17   what's happening, the stuff they reviewed in terms of the

18   process.  It's a public document.

19       The second issue is I need to admit the verification of

20   removal and I'm going to do it through this agent, which I

21   guess is the last step in the ER.  So I can skip over the

22   process where, you know, he explains the dates but I think

23   that -- the reason I think it's important is because there's

24   been so much confusion over the dates, and defense counsel

25   brought out with Borrego that, you know, Borrego's testimony

1    was that no other agent processed him on the 12th, which is

2    correct.  No other agent -- oh, so no other agent did process

3    him on the 12th so I want to make that -- make it clear on the

4    record what happened and why what Agent Borrego said is true

5    and nobody else processed him but that there was a separate

6    processing that happened on the 15th.

7            MR. ROCHA:  And they could bring the other agent --

8            THE COURT:  Rogers or Hoyt.

9            MR. ROCHA:  -- Rogers to explain that.  So he has no

10   personal knowledge on that.  He even started by saying:  It

11   seems to me.  That's pure speculation of what happened so he

12   can discuss it.

13       Now, I have plans to actually have my client testify and he

14   was actually there.  He was the person going through that.  So

15   obviously they're free to cross-examine my client and ask him

16   about those questions.  He personally has personal knowledge of

17   that situation.

18       But I just feel like the issue of removal, that's the issue

19   for trial.  And the issue of chain of custody and whatnot, that

20   also goes to the weight of the evidence at trial.  So I just

21   don't think that's an issue that we should discuss 'cause we

22   didn't brief that issue, Your Honor.

23           THE COURT:  Well, and with regard to the timing, there

24   may be some confusion.  I don't think I'm confused.  I think he

25   was apprehended on January 9th or he entered on January 9th,

```
 1    allegedly at 8:00 o'clock, allegedly near Naco.  He was

 2    apprehended on January 12th at 1:30 a.m. allegedly near

 3    Sonoita.  They thought he was going to be extradited to

 4    California, they denied prosecution, so that's why events of

 5    the 14th and the 15th occurred.

 6        It's my understanding that maybe Borrego didn't know that

 7    necessarily because -- why it was reprocessed but I don't think

 8    there's much confusion about that.

 9            MS. FURTADO:  Okay.  The 14th and the 15th, then,

10    Judge, is also something that we're not talking about?

11            THE COURT:  That was my understanding as well.

12            MS. FURTADO:  So I think that --

13            MS. GRANOFF:  At this point, Your Honor, it's not a

14    chain of custody issue because chain of custody deals really

15    with admissibility of physical evidence as opposed to

16    documents.  It's just a matter of making clear that the actual

17    physical removal document will be the one that was filled out

18    based on the processing on the 15th.

19            THE COURT:  15th.

20            MS. GRANOFF:  And so all Agent Gomez is here for is

21    just to sort of take off where Borrego left off in terms of the

22    executed removal because that is the basis of the prosecution.

23            THE COURT:  Right.  And Mr. Rocha cross-examined

24    Agent Borrego on that document on the verification, so I'm

25    going to let you get into this a little bit but, I mean, to
```

1    some degree, he is just reading what's in the document.  I know

2    you're trying to clear up the dates.

3              MS. FURTADO:  I agree, Judge.  So did Borrego.  I

4    mean, Borrego got to testify to Hoyt's document.  He just read

5    out of it as well both by defense and us as well.

6              THE COURT:  Right, it's the same document.

7              MS. FURTADO:  Yeah, it's the same document.  So I'm

8    not trying to get all of that in.  I mean, true, it's been

9    admitted and I agree that it's not -- we're not here to do

10   chain of custody but I do need to have the verification of the

11   envoy (phonetic) admitted at this point because I think that's

12   important for the ER that that process be completed and

13   finalized.  And, unfortunately, because of the chain of events,

14   because Borrego wasn't the person to ultimately -- his form

15   wasn't used to do the verification of removal.

16             THE COURT:  Correct.

17             MS. FURTADO:  Because of the intervening event.

18             THE COURT:  Right.

19             MS. FURTADO:  I do think we need to have Gomez testify

20   to that fact sequence.

21             MR. ROCHA:  Just to make a record, we're not disputing

22   that he was removed.  That would be an issue for trial.  If the

23   agent -- you know, if that's how that comes in.  So we're not

24   disputing he was removed.  I mean --

25             MS. FURTADO:  You can stipulate to No. 4, then.

1          THE COURT:  Well, we'll let whatever you need.  If

2     that exhibit needs to come in and there's no objection, I think

3     that deals with it.

4        But it's my understanding -- let me just make sure.  It's

5     my understanding that with regard to the statements, you're not

6     going to -- the statements of January 14th and 15th are not at

7     issue and the statement of May 2nd, 2015, is not at issue,

8     correct?

9          MS. FURTADO:  There is something on the motion to

10    suppress about the January 2nd statement that --

11         MR. ROCHA:  From 2015?

12         MS. FURTADO:  Right.  Oh, I'm sorry.

13         THE COURT:  Yeah, that's the May 2nd.  I mean, that

14    was May 2nd, I thought.

15         MR. ROCHA:  No, it was -- I thought it was January.

16         THE COURT:  Anyway, it doesn't matter.  Let me just

17    make sure.  With regard to, talking about 2015, is the second

18    statement at issue or not?  It's my understanding it's just the

19    first statement.

20         MS. FURTADO:  It's just the first statement.

21         THE COURT:  And I believe it's May 1st.  I may have my

22    dates wrong.

23         MR. ROCHA:  Yeah, okay.

24         MS. FURTADO:  Yeah.

25         THE COURT:  Okay.  Well, we'll let you -- to some

1    degree, it's in evidence.  If Mr. Rocha is going to stipulate

2    to Exhibit No. 4, which I think closes the door on that issue

3    for you, I think, and I know it's not an issue necessarily for

4    this proceeding but it does sort of finalize the events.

5            MR. ROCHA:  That's fine.

6            THE COURT:  Is that okay?

7            MR. ROCHA:  No, that's fine.

8            MS. FURTADO:  No.

9            MS. GRANOFF:  Thank you.

10        (The sidebar conference was concluded.)

11           MS. FURTADO:  So, Your Honor, based on what I've

12   discussed at sidebar, I believe that the defense and the

13   government have entered a stipulation for the admission of

14   Government's Exhibit No. 4.

15           THE COURT:  Mr. Rocha, it's my understanding you have

16   no objection?

17           MR. ROCHA:  I have no objection.

18           THE COURT:  Okay.  So we'll go ahead and admit the

19   Government's Exhibit 4.

20   BY MS. FURTADO:

21   Q.  So, agent, I know we've discussed and we've heard a lot

22   about the intervening events of January 14th and 15th.

23   Government's Exhibit No. 4, was that signed by a Border Patrol

24   agent?

25   A.  It was.

1    Q.  Who was that?

2    A.  Anthony Rogers.

3    Q.  And is he the agent that reconducted the expedited removal

4    on January 14th and 15th?

5    A.  It was.

6    Q.  Okay.  What type of conviction is Mr. Ramos-Zepeda's

7    conviction?

8    A.  His -- from his criminal record?

9    Q.  Yes.

10   A.  Sex with a minor.

11   Q.  Okay.  Is there a category of conviction?  Is that a type

12   of conviction, category conviction for you as a Border Patrol

13   agent?

14   A.  Felony, you mean?

15   Q.  Would that 2005 conviction for lewd and lascivious conduct,

16   would that qualify as an aggravated conviction for

17   administrative purposes?

18            MR. ROCHA:  Objection, Your Honor.  That's a legal

19   conclusion whether the conviction is an aggravated felony.

20            THE COURT:  I'm going to sustain that.

21            MS. FURTADO:  I don't have any other questions for

22   this witness, Your Honor.

23            THE COURT:  Okay.  Thank you.

24      Mr. Rocha?

25            MR. ROCHA:  I have no questions for this witness.

1          THE COURT:  Okay.  Thank you.

2      Agent Gomez, thank you very much for your time.  You're the

3  government's representative so you're welcome to stay in the

4  courtroom, so --

5          MS. FURTADO:  I'm really sorry, Judge, I do have

6  another question.

7          THE COURT:  That's okay.  That's okay.  No need to

8  apologize.

9      Agent Gomez, why don't you come up?  I think they have one

10  more question for you.  And obviously you're still under oath.

11  Thank you.

12  BY MS. FURTADO:

13  Q.  Agent Gomez, I have some questions related to some

14  cross-examination that was asked of Borrego.  Are you --

15          MR. ROCHA:  Objection, Your Honor.  How is this

16  relevant?

17          THE COURT:  Why don't you ask the question?  Let her

18  ask the question.

19  BY MS. FURTADO:

20  Q.  Do you have any familiarity with what a voluntary departure

21  is?  Do you have training and experience on a voluntary

22  departure?

23  A.  I do.

24  Q.  Do you have training and experience on a voluntary removal?

25  A.  I do.

UNITED STATES DISTRICT COURT

1    Q.  Are they the same?

2    A.  It is in the fact that it's voluntary but it's not issued

3    by the same official.

4    Q.  Okay.  Can you explain, then, how are those issued?

5    A.  In my knowledge, voluntary return or removal is -- can be

6    granted by an immigration official or, say, a Border Patrol

7    agent in my case.  Or a voluntary departure would be done by an

8    immigration judge, if I'm not mistaken.

9    Q.  What's the process for an alien to be taken before an

10   immigration judge?

11   A.  Well, it could be several things but if -- in our case, if

12   we apprehend somebody and they are claiming, for instance,

13   credible fear or there's any equity or anything that might make

14   them admissible to the United States, he would go in front of

15   an immigration judge.

16   Q.  Is there a form that you -- that gets generated in order

17   for a person to go before an immigration judge?

18              MR. ROCHA:  Your Honor, I still ask --

19              THE COURT:  Go ahead.

20              MR. ROCHA:  My objection, it's just -- this seems

21   cumulative.  This was already asked of Agent Borrego.  So I'm

22   not sure how his testimony -- he wasn't there the day that he

23   was processed so I'm not sure how he has any personal knowledge

24   of what happened that day.

25              THE COURT:  And, Ms. Furtado, I don't know exactly

```
 1    where you're going, but it's my understanding in terms of the

 2    criminal history, at least the significance maybe for these

 3    proceedings is that it did not qualify Mr. Ramos-Zepeda for an

 4    expedited removal.  I don't know if that's where you're going.

 5              MS. FURTADO:  No.  I just need to clear up the

 6    difference between a voluntary removal and a voluntary

 7    departure.  They are different, Judge, and I wanted to have the

 8    agent explain if there is a voluntary departure, what a Border

 9    Patrol agent would issue in terms of the forms.

10              THE COURT:  Then why don't -- and I think there's, to

11    some degree, this has been asked and answered of the other

12    witnesses, but what we'd ask, why don't you just answer that

13    question.

14         What's your understanding of the difference between a

15    voluntary removal and a voluntary departure and how do they

16    differ?

17         Is that okay?

18              MS. FURTADO:  I think he did answer that question,

19    Judge, he said from my --

20              THE COURT:  Let him answer that.  And then --

21              MS. FURTADO:  Go okay.

22              THE COURT:  Go ahead and answer that.

23              THE WITNESS:  The difference is, from my understanding

24    and knowledge, would be that a voluntary departure would be

25    something that has to be granted from an immigration judge.
```

1          THE COURT:  Okay.  Then go ahead, Ms. Furtado.  I'll

2    let you follow up on that.

3    BY MS. FURTADO:

4    Q.  In order for an alien to go see an immigration judge,

5    what's the form that needs to be generated?

6    A.  The file for that would be a notice to appear.

7    Q.  Okay.

8          MS. FURTADO:  I don't have any other questions.

9          THE COURT:  Okay.

10      Mr. Rocha, I don't know if that gave rise to any questions.

11         MR. ROCHA:  I have no questions.

12         THE COURT:  Okay.  Thank you very much.  You may step

13   down.  Thank you for your time, Agent Gomez.

14      You know, I really apologize.  We're not going to finish

15   today and I still have things this afternoon.  We can finish

16   next Monday.  I'm on Streamline in the afternoon, but if we

17   start at 9:00, do you think three hours will be enough time to

18   complete this?  And I guess it depends upon your schedules

19   also.  So let me start -- I'll start with --

20         MS. GRANOFF:  If you can just give me a minute to pull

21   up my calendar for next week.

22         THE COURT:  Please.

23         MR. ROCHA:  Your Honor, I'm not available.  I'll be in

24   the Western District of Texas.

25         THE COURT:  Okay.  Why don't you look at your

```
 1    calendar, Mr. Rocha.
 2            MR. ROCHA:  I am available Tuesday, a week from
 3    tomorrow, if the court has --
 4            THE COURT:  We're going to have to just make it
 5    available, I think.  Let me see, 'cause I'd really like to
 6    finish.
 7            MR. ROCHA:  And I'm also available the rest of this
 8    week if Your Honor --
 9            THE COURT:  Well, let me see.  And, once again, I'm
10    not -- this is not -- how long -- I know that there's still
11    some more testimony and Ms. Furtado and --
12            MS. FURTADO:  The government rests, Judge.
13            THE COURT:  Okay.  And so -- thank you.  Anticipated
14    my question.
15        So, Mr. Rocha, it's my understanding you're going to have
16    your client testify?
17            MR. ROCHA:  Yes.
18            THE COURT:  And then do you have any other witnesses?
19            MR. ROCHA:  Just him.
20            THE COURT:  So we'll probably -- I mean, if we
21    schedule a couple of hours, that should be enough.  I don't
22    want to rush anyone.
23            MR. ROCHA:  Oh, no, I think two hours is enough.  And
24    that's my --
25            THE COURT:  Let me check something.  Let me ask the
```

```
 1    marshals.  Clarabell, if we went from 2:45, I guess, to
 2    5:00-ish tomorrow, is that going to give you enough time to get
 3    Mr. Ramos-Zepeda?
 4              MARSHAL:  Yes, sir.
 5              THE COURT:  How about, Mr. Rocha, does that work for
 6    you?
 7              MR. ROCHA:  That's fine, Your Honor.
 8              THE COURT:  Ms. Furtado?
 9              MS. FURTADO:  Yes, Your Honor.
10              THE COURT:  Okay.  So why don't we do this, why don't
11    we reconvene then and we will begin again tomorrow at 2:45 and
12    we'll just finish.
13              MR. ROCHA:  Yes.
14              THE COURT:  And then, Beth, is there something else?
15    Yeah, why don't we -- we have a change of plea at 2:30 but it's
16    with a Mixteco interpreter; that may take a little longer.  Why
17    don't we say 3:00 o'clock?  And it sounds like if we intend to
18    go to 5:00 o'clock, once again, I don't want to rush you in any
19    way, but that should give you enough time.
20              MR. ROCHA:  Yes.
21              THE COURT:  Okay.  So we'll then -- we're going to --
22    we'll stand at recess.  We'll reconvene tomorrow at
23    3:00 o'clock and we'll finish, and I really appreciate your
24    working with us.
25         And for the record now, we have admitted for exhibits 1 --
```

1  Government's 1, 2, 3, 4, and 5.  And the defendant's exhibits

2  we have admitted 61 and 62.  So thank you very much.  I

3  appreciate your time.  And I'll see you tomorrow at 3:00

4  o'clock.

5          MR. ROCHA:  Thank you, Your Honor.

6          MS. FURTADO:  Thank you, Your Honor.

7          MS. GRANOFF:  Thank you.

8          THE COURT:  Thank you.

9      (Whereupon, the matter was concluded at 11:56 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, Cindy J. Shearman, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


  s/Cindy J. Shearman                        March 18, 2016
Cindy J. Shearman, RDR, CRR