1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3    United States of America,       )
                                     )
4                Plaintiff,          )  CR 15-976-CJK-BGM
                                     )
5          vs.                       )
                                     )  Tucson, Arizona
6    Ramon Ramos-Zepeda,             )  March 8, 2016
                                     )  2:55 p.m.
7                Defendant.          )
     _____)

8

                 TRANSCRIPT OF PROCEEDINGS
9               MOTION HEARING - DAY THREE

10

          BEFORE THE HONORABLE BRUCE G. MACDONALD
11            UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:
          Kathryn C. Furtado
14        Liza Granoff
          U.S. Attorney's Office
15        405 West Congress Street, Suite 4800
          Tucson, AZ 85701
16
     For the Defendant:
17        Juan L. Rocha
          Law Office of Juan L. Rocha
18        P.O. Box 5965
          Mesa, AZ 85211-5965
19
     Interpreters:
20        Ignacio Barrientos and Juan Radillo

21   Transcribed by:
          Cindy J. Shearman
22        405 W. Congress, Suite 1500
          Tucson, AZ 85701
23        520-205-4286

24           Proceedings were digitally recorded
             Transcript prepared by transcriptionist
25

1                        I N D E X

2       DEFENSE WITNESS                              PAGE

3       RAMON RAMOS-ZEPEDA

4       Direct Examination by Mr. Rocha                4
        Cross-Examination by Ms. Furtado              24
5       Redirect Examination by Mr. Rocha             39

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
 1              P R O C E E D I N G S

 2          (Call to order of court, 2:55 p.m.)

 3          CLERK:  CR 15-976, United States of America versus

 4   Ramon Ramos-Zepeda, back before the court, day three motion

 5   hearing.

 6      Counsel, please state your appearances for the record.

 7          MS. FURTADO:  Good afternoon, Your Honor.  Kathryn

 8   Furtado and Liza Granoff for the United States.  Also present

 9   is our case detective -- or case agent, Agent Gomez.

10          THE COURT:  Thank you.  Good afternoon, Ms. Furtado.

11   Good afternoon.  Ms. Granoff, and good afternoon, Mr. Gomez.

12   Thank you.

13          MS. GRANOFF:  Good afternoon, Judge.

14          MR. ROCHA:  Good afternoon, Your Honor.  Juan Rocha on

15   behalf of Mr. Ramos-Zepeda who is present and in custody.

16          THE COURT:  Thank you.  Good afternoon, Mr. Rocha, and

17   good afternoon, Mr. Ramos-Zepeda.

18      The government had rested.  And so, Mr. Rocha, I think --

19          MR. ROCHA:  Yes, Your Honor.  My client would like to

20   testify in this case.

21          THE COURT:  Okay.

22          MR. ROCHA:  So --

23          THE COURT:  Mr. Ramos-Zepeda, would you please come

24   forward and the marshals will assist you.  Yeah, I think we may

25   want to, the extent we can, unshackle him, maybe at least a
```

```
 1   hand or two.  Thank you.  Thank you, Kevin.
 2            RAMON RAMOS-ZEPEDA, THE DEFENDANT, WAS SWORN.
 3              CLERK:  Mr. Ramon Ramos-Zepeda; is that correct?
 4              THE DEFENDANT:  Yes.
 5              CLERK:  Thank you, sir.
 6              THE COURT:  Mr. Rocha, please.
 7              MR. ROCHA:  Thank you, Your Honor.
 8                        DIRECT EXAMINATION
 9   BY MR. ROCHA:
10   Q.  Good afternoon, sir.
11   A.  Yes, good afternoon.
12   Q.  Could you please state your name for the record?
13   A.  Ramos-Zepeda, Ramon.
14   Q.  And how old are you, sir?
15   A.  33 years old.
16   Q.  What is your level of education?
17   A.  I got up to third grade, three years.
18   Q.  And what do you do for a living?
19   A.  I was a policeman in Mexico; first as a farm worker and
20   then as a policeman.
21   Q.  Now, prior to January of 2009, had you been living in the
22   United States?
23   A.  Yes.
24   Q.  Where?
25   A.  California.
```

DIRECT EXAMINATION - RAMON RAMOS-ZEPEDA

1   Q.   And when did you return to Mexico?

2   A.   In 2008.

3   Q.   And why did you return to Mexico?

4   A.   My father was ill, seriously ill.

5   Q.   And what did you do -- did your father pass away or did he

6   get better?

7   A.   No, he improved, thank you, thank God.

8   Q.   After he got better, did you come back?

9   A.   Yes.

10  Q.   Do you recall when you came back?

11  A.   In January 2009.

12  Q.   And just to clarify, I think this has already been clear on

13  the record but let me clarify.  You do have a conviction in

14  2006 for lewd and lascivious acts, correct?

15  A.   Yes.

16  Q.   Do you recall what the sentence you received?

17  A.   Yes.

18  Q.   What was that?

19  A.   Six months.

20  Q.   Was there any other penal sanction?

21  A.   No.

22  Q.   And what happened after your case concluded, what happened?

23  A.   Well, I was released there in California.  I got into a

24  program called Ball Four (phonetic) there in San Mateo,

25  California.

1   Q.  So after your criminal case concluded, did ICE, Immigration

2   and Customs Enforcement, apprehend you?

3   A.  No.

4   Q.  So you went home after you were released from custody?

5   A.  Yes.

6   Q.  Okay.  So to go back, when did you say you entered the

7   United States, in January of 2009?

8   A.  Yes.

9   Q.  Now, were you -- who were you with?

10  A.  How do you mean?

11  Q.  When you returned, did you return alone, did you return

12  with other people?

13  A.  There were several of us, maybe about 15 to 20 people.

14  Q.  And do you recall where you crossed?

15  A.  Well, when I was detained, they said it was near Sonoita.

16  From Mexico, it was close to Cananea.

17  Q.  And do you remember what time it was when you were

18  apprehended?

19  A.  Well, roughly 1:00, 1:30 in the morning.

20  Q.  Now, was that everyone in your group was arrested?

21  A.  I think so, yes.

22  Q.  And how many people did you say were traveling with you?

23  A.  15 to 20.

24  Q.  When Border Patrol arrested you, how many agents arrested

25  the group?

1    A.  It was like 10 to 12.  I don't recall.

2    Q.  Ten to 12 Border Patrol agents?

3    A.  Yes.

4    Q.  Can you describe for the court the actual geography, the

5    terrain of where you were arrested?

6    A.  It was like a small hill full of a lot of brush near a

7    highway.

8    Q.  And do you recall -- or what happened when you were

9    arrested?

10   A.  Well, we got arrested and they put handcuffs on us and I

11   remember that one of the agents placed like a bone on me, a

12   bone over here on my left shoulder, and it's a bone that they

13   use for the dogs, and the dog that was there would jump at me

14   near my neck and snap, and he did that for about four or five

15   times.

16   Q.  So one of the Border Patrol agents, what is it, put a dog

17   bone on your shoulder, on your left shoulder, or where was the

18   dog bone?

19   A.  Yes, around here.

20   Q.  And then what kind of dog was it that snatched the bone

21   from your shoulder?

22   A.  A black German Shepherd.

23   Q.  And how many times did you say he did that?

24   A.  Three to four times, until another officer told him to

25   stop, that that wasn't right.

1   Q.  Do you recall who the officer was?

2   A.  Not by name but he was around 45 years old.  He was

3   about -- kind of short and blond.

4   Q.  What did you think when the dog was snatching at your

5   shoulder?

6   A.  I thought he was going to bite my face because he was

7   snapping pretty close.

8   Q.  Did anybody else do anything besides the agent that told

9   him to stop?

10   A.  Not there where we got arrested, no.

11   Q.  And so how long were you out in the desert?

12   A.  When I got arrested, maybe like for half an hour,

13   20 minutes, half an hour.

14   Q.  And after that, what happened?

15   A.  Well, then they took me to this place where they take

16   people.  I think it's Sonoita -- Sonoita.

17   Q.  I just have one more question.  With respect to the dog

18   snapping at your shoulder, did that happen to other people?

19   A.  No, not that I saw, no.

20   Q.  Okay.  So you were taken into a Border Patrol vehicle; is

21   that correct?

22   A.  Yes.

23   Q.  Could you describe what the vehicle -- how many people were

24   in the vehicle?

25   A.  It was a close vehicle, and there were like six to eight of

DIRECT EXAMINATION - RAMON RAMOS-ZEPEDA

1   us in that vehicle.

2   Q.  I just want to go back.  I should have asked you.  Were the

3   agents that arrested you, were they in their green uniforms?

4   A.  Yes.

5   Q.  Did you see their guns?

6   A.  They were wearing a jacket, black jacket.

7   Q.  Excuse me, I'm sorry.  Did you see their guns?

8   A.  Yes.

9   Q.  Did any of them point their guns at any of you?

10  A.  No.

11  Q.  Okay.  So how long was it from the desert when you got in

12  the vehicle to the processing station, how much time had

13  elapsed?

14  A.  Approximately, roughly, about 40 minutes.

15  Q.  And how many people did you say were in the car?

16  A.  About six to eight.  I don't recall exactly.

17  Q.  And you were all handcuffed?

18  A.  Yes.

19  Q.  And just a couple more questions with respect to the

20  initial stop.  Were you asked any questions by Border Patrol?

21  A.  There where they arrested us, no.

22  Q.  Okay.  So you get to the processing station and what

23  happens?

24  A.  They take our information and put it in a computer.

25  Q.  Okay.  So when you get there, you said they take your

1    information and put it in a computer.  Do you recall the agent

2    that did that to you?

3    A.  Yes.

4    Q.  Who was it?

5    A.  Mr. Borrego, Jorge Borrego.

6    Q.  Was that the same gentleman who was here yesterday?

7    A.  Yes.

8    Q.  So you said -- so when you got to the processing station,

9    you spoke with Agent Borrego.  What was the first thing he did?

10   A.  He asked me for my name and where I was from.

11   Q.  What happened next?

12   A.  Well, after he took my information, he told the rest of the

13   people that I was a sex criminal and that they should be

14   careful with me, watch out for me.

15   Q.  Okay.  So let's unpack that for a moment here.  You said

16   that he took your information.  So he took your information.

17   Did he go over with you with some papers?

18   A.  No, at no time.

19   Q.  Do you recall signing any papers?

20   A.  Yes.

21   Q.  Why would you sign papers if you didn't read them?

22   A.  Well, he told me that was part of the processing and that's

23   how it had to be done because I was going to be extradited to

24   California.

25             MR. ROCHA:  Can I approach the witness, Your Honor?

1        THE COURT:  Sure.

2        MR. ROCHA:  I'm approaching the witness with what's

3    already been marked as Exhibit No. 1 and admitted into

4    evidence.

5        THE COURT:  Thank you.

6    BY MR. ROCHA:

7    Q.  Do you have the Exhibit No. 1 in front of you, sir?

8    A.  Yes.

9    Q.  Do you see your name on there?

10   A.  Yes.

11   Q.  Are those your signatures on there?

12   A.  Yes, these over here.

13   Q.  So I'll ask you again, why did you sign that piece of paper

14   if you said that you didn't read it?

15   A.  Well, because he told me that was part of the process to

16   send me back to California.  That's all he said.

17   Q.  Did he read you the entire paper?

18   A.  No.

19   Q.  Did he read you any part of the document?

20   A.  As far as I recall, he didn't read any part of it ever.

21   Q.  You don't recall answering any questions that he asked you?

22   A.  No.  What I recall is he was angry at me because of the

23   problem that I had in California.

24   Q.  The problem you're referring to is your lewd and lascivious

25   act conviction?

1   A.  Uh-huh, yes.

2   Q.  Now, you mentioned earlier that he said something to other

3   people.  What did he say?

4   A.  That I was a very dangerous person, to watch out for me,

5   that I was a rapist.

6   Q.  Who else was in that processing center?

7   A.  Well, the people that they arrested together, myself and

8   maybe about four to three agents.  I don't recall.

9   Q.  Can you describe to the court the size of the room?

10  A.  Well, it was roughly about the size of this room and they

11  had a desk at the side where they were processing people and

12  we're off to the back of the room.

13  Q.  How long were you in that room?

14  A.  Ten hours, eight hours, seven hours.  I don't know.

15  Q.  At the time that you were there, were you handcuffed or

16  were your hands free?

17  A.  My hands were free.

18  Q.  Were you shackled?

19  A.  No.

20  Q.  And did the agents give you something to eat?

21  A.  Yes.

22  Q.  He also gave you water?

23  A.  Yes.

24  Q.  Okay.  So do you recall how long -- do you recall that

25  Agent Borrego taking a picture?

DIRECT EXAMINATION - RAMON RAMOS-ZEPEDA

1   A.  No, I don't recall.

2   Q.  Do you recall who took your fingerprints?

3   A.  Yeah.  Mr. Borrego.

4   Q.  Now, did he take your fingerprints before he asked you

5   questions or after he asked you questions?

6   A.  Before.

7   Q.  So he took your fingerprints and then he asked you

8   questions?

9   A.  Yes.  First he took my fingerprints and then he asked some

10  questions, basically my name, and then he started to get upset

11  with me.

12  Q.  How long did the processing take?

13  A.  For about 15, 20 minutes.

14  Q.  And what happened after you were done?

15  A.  They sat me on some benches that were outside the cells.

16  Q.  Do you recall what time it was?

17  A.  Well, frankly, no, I don't know.  There wasn't any clock or

18  anything, I don't know what time it was.

19  Q.  Did you speak to any other agents that day?

20  A.  No.

21  Q.  Let's see.

22          MR. ROCHA:  I'd like to approach the witness, Your

23  Honor, with what's already been marked as Government's Exhibit

24  No. 2.  It's admitted into evidence.

25          THE COURT:  Sure.

1    BY MR. ROCHA:

2    Q.  You see that in front of you, sir?

3    A.  Yes.

4    Q.  Does that have your name on it?

5    A.  Yes.

6    Q.  Do you recall ever seeing that document on the day that you

7    were processed?

8    A.  No, frankly, no.

9    Q.  Okay.  So after you were processed, you said it took

10   20 minutes, you were taken out and you sat on a bench and you

11   said that you didn't speak to any other agents.

12       What happened next to you?

13   A.  Well, after that, after they had taken information from

14   other people, they placed us in some individual cells.

15   Q.  How long were you in the cell?

16   A.  Well, roughly, about four hours.

17   Q.  And what happened after that?

18   A.  Well, then, a policeman arrived and he took me over to

19   Santa Cruz County.

20   Q.  Before we get to that point, I just want to clarify.  Do

21   you speak English?

22   A.  No.

23   Q.  Do you know how to read in English?

24   A.  No.

25   Q.  What is your native tongue?

1    A.   Spanish.

2    Q.   If you can look back at the report I gave you, I believe

3    it's Exhibit No. 3.  I'm sorry, Exhibit No. 1.  Sorry.  Exhibit

4    No. 1, sorry.

5         You have that in front of you?

6    A.   Yes.

7    Q.   Now, did Agent Borrego ever ask you if you had a credible

8    fear of returning to your country?

9    A.   No.

10   Q.   He never asked you if you had fear of returning to your

11   country?

12   A.   No.

13   Q.   And so I'll ask you again, why is your signatures in those

14   -- initials dated on every page?

15           MS. FURTADO:  Objection, Your Honor, asked and

16   answered.

17           THE COURT:  Overruled.

18           THE WITNESS:  Because he told me it was part of the

19   processing and also to extradite me.

20   BY MR. ROCHA:

21   Q.   Okay.  So let's return back.  So you, the next day you were

22   transferred to another holding facility?

23   A.   Yes.

24   Q.   Do you recall where it was?

25   A.   Nogales, Arizona.

16

1    Q.   Who transferred you there?

2    A.   A police officer.

3    Q.   It wasn't an ICE officer or Border Patrol agent?

4    A.   No.

5    Q.   Now, when you say -- by now was it January 13th, the next

6    day?

7              MS. FURTADO:   Objection, Your Honor, leading.

8              THE COURT:   Sustained.

9    BY MR. ROCHA:

10   Q.   What day was this, sir?

11   A.   Well, on the same day that I had got arrested but later on

12   that morning about 11:00 a.m.

13   Q.   Okay.  So you were transferred by a police officer to

14   Nogales.  Do you recall where you were transferred?

15   A.   To Nogales.  They told me to the Santa Cruz County,

16   Nogales, Arizona.

17   Q.   Was that another processing station?  What was that?

18   A.   It was like a holding station there from the police from

19   the county.

20   Q.   And what happened after you arrived there?

21   A.   Well, they also took down some information and they asked

22   me where I was coming from and I said from immigration.

23   Q.   Who asked you that?

24   A.   One of the officers there that was there at that place, the

25   police station.

DIRECT EXAMINATION - RAMON RAMOS-ZEPEDA

1    Q.  What happened after you spoke to the officer?

2    A.  They placed me in a cell where there was about ten -- I

3    mean, eight to ten people.

4    Q.  And how long were you in the cell?

5    A.  'Til the next day, 'til about 9:00 a.m. when they took me

6    before a judge, around 9:00 a.m.

7    Q.  Do you recall what date it was?

8    A.  No.  To tell you the truth, no, because I wasn't aware of

9    time.  I was locked up all the time.

10   Q.  So you said you saw a judge; is that correct?

11   A.  Yes, a woman judge.

12   Q.  And what happened there in front of the court?

13   A.  She told me that they had talked to California and

14   California didn't want me back so they were going to be sending

15   me back to immigration.

16   Q.  How long did your hearing last?

17   A.  Five minutes.

18   Q.  Now, up to this time, did you at any time speak to an

19   attorney?

20   A.  No.

21   Q.  So after you were returned to your cell -- let me rephrase

22   that.  After the court hearing, what happened?

23   A.  Well, they returned me to my cell for an hour or so and

24   then, I don't know, it was maybe an immigration officer and he

25   took me back to Sonoita.

DIRECT EXAMINATION - RAMON RAMOS-ZEPEDA

1    Q.  Now, up to this time -- okay.  So the officer took you back

2    to Sonoita, was that the processing station where you first

3    started this journey?

4    A.  Yes.

5    Q.  Do you recall the time of the day it was when you arrived

6    back in Sonoita?

7    A.  Well, no, not really.  I mean, I didn't have a watch.  I

8    didn't know.

9    Q.  Just to clarify, the officer that transferred you, do you

10   remember that person's name?

11   A.  No.

12   Q.  So you don't recall what time you got back to Sonoita,

13   correct?

14   A.  No, I really don't.

15   Q.  Okay.  When you arrived there, did you speak to anybody?

16   A.  With an officer.  I don't know his name.

17   Q.  Was his name -- was his name -- did you speak to

18   Agent Borrego again?

19   A.  Yes.

20   Q.  What did you speak to him about?

21   A.  Well, he didn't really take information from me, he just

22   kind of got in conversation with me telling me that he would

23   often go to Mexico for vacations and that he was -- he had his

24   family back in Mexico City.  That's all we talked about.

25   Q.  So you did see him a second time?

1    A.   Yes.

2    Q.   Now, earlier you said you spoke to an agent but you don't

3    recall his name.

4    A.   No, he was a person, he didn't have his uniform on and he

5    had a purple shirt.

6    Q.   What -- did that person ask you any questions?

7    A.   He took down my information again, that was all.

8    Q.   When you say he took down your information, could you be

9    more explicit?

10   A.   Well, he took my name and he says that they're taking my

11   name to send me to Tucson.

12   Q.   Did that person read any documents to you?

13   A.   No.

14   Q.   I'd like to turn your attention back to Exhibit No. 1.  Did

15   that person show you -- did that person that processed you or

16   asked you those questions, did they show you that document?

17   A.   No.

18   Q.   So do you recall him asking if you had a credible fear of

19   returning to your country?

20   A.   No, he didn't ask me.

21   Q.   How long did the processing take?

22   A.   Roughly again 15 to 20 minutes.

23   Q.   So when you said that they processed you, did they take

24   fingerprints again and a picture?  Can you again just elaborate

25   a little more?

```
 1   A.  Well, they took my name down again.  I don't know if they
 2   got my fingerprints or not.  And then they put me in a cell
 3   again and I was moved out of that cell maybe in the wee hours
 4   of the morn because it was still dark outside when they were
 5   going to be taking me to Tucson.
 6   Q.  I'd like to turn your attention to what's been marked as
 7   Exhibit No. 2.  Do you have that in front of you?  Now, the
 8   agent that processed you, did he go over that form with you?
 9   A.  No, he didn't show me any kind of paperwork.
10   Q.  You didn't sign any other paperwork?
11   A.  Just the ones where my initials appear.  He told me to
12   place my initials again.
13   Q.  He asked you to place your initials again?
14   A.  Yes, to sign.
15   Q.  Why did you sign?
16   A.  Well, because it was part of the processing and from there
17   they would be taking me to Tucson that perhaps I might be able
18   to see an immigration judge.
19   Q.  Did you see an immigration judge?
20   A.  No.
21   Q.  What happened after the processing was complete?
22   A.  Well, they took me to Tucson.  I don't know what time it
23   was; it was dark.  They took me to Tucson.
24   Q.  Who took you to Tucson?
25   A.  An officer.  I don't remember which one but I remember
```

1   there was a large vehicle.

2   Q.  Do you recall what day it was at this point?

3   A.  I really don't because I wasn't really aware of what the

4   date or anything.

5   Q.  What happened after Tucson?

6   A.  Well, they left me locked up and then, I don't know, they

7   just left me there.  They lost my paperwork or something.  I

8   don't know.  Because they would have roll call and they would

9   never call my name.

10  Q.  When you say they lost your paperwork, could you explain

11  what you mean by that?

12  A.  Well, because they couldn't find my paperwork and they had

13  to take everybody out the next day and when they had taken

14  everybody out of there, I was the only one remaining there and

15  one of the officers said:  Well, what are you doing there?  And

16  I said:  Well, I didn't come out because you didn't call my

17  name.  He was looking for my paperwork in his computer and he

18  couldn't find me and he had to ask for my name again so he

19  found me later.

20  Q.  So did he find you then?

21  A.  Yes.

22  Q.  And what did he do?

23  A.  He gave me a release because I was going to be going

24  outside to be released.

25  Q.  When you say "released", what do you mean by "released"?

1    A.   That it was to deport me to Mexico.

2    Q.   Do you recall the day that you were removed to Mexico?

3    A.   Well, no, I really didn't know 'cause, like I say, I wasn't

4    aware of the dates and I just heard the 15th when I heard --

5    when I was outside when I heard the 15th mentioned.

6    Q.   And then what happened, did you -- what happened after

7    that?

8    A.   From the deportation?  Well, they left me in Mexico and

9    that was it.

10   Q.   Okay.  So on January 15th, at least according to your

11   recollection, 2009, that's the day that you were removed to

12   Mexico?

13   A.   Yes.

14   Q.   Okay.  So either you said you were in Mexico this -- you

15   were in Mexico during this time?

16   A.   I spent about seven years in Mexico.

17   Q.   At where?

18   A.   Michoacan; Aguililla, Michoacan, Mexico.

19   Q.   Okay.  But more recently you attempted to enter the country

20   again; is that right?

21   A.   Yes, in 2015.

22   Q.   Do you recall the date?

23   A.   The return date over here?  Well, they arrested me on

24   May 1st.

25   Q.   And were you alone or were you with other people like last

 1  time?

 2  A.  There was another person; there was two of us.

 3  Q.  Okay.  So you said you were arrested on May 1st, 2015?

 4       MS. FURTADO:  Objection, Your Honor, leading.  There's

 5  been a lot of leading.

 6       THE COURT:  I'll sustain that.

 7  BY MR. ROCHA:

 8  Q.  When were you arrested?

 9  A.  On Thursday, about midnight.

10  Q.  Who arrested you?

11  A.  Three officers, but I don't recall their names.

12  Q.  What happened when they arrested you?

13  A.  Well, they placed me in a vehicle and they drove for about

14  500 meters and we got out and they asked me if I was from

15  Mexico or from Central America and I told them that I was

16  Mexican.

17  Q.  When they placed you in the vehicle, did they put any

18  restraints on you?

19  A.  Yes.

20  Q.  And then you said they put you in the vehicle and drove

21  500 meters?

22  A.  Yes.

23  Q.  And that's when they asked you questions?

24  A.  Uh-huh.

25  Q.  Is that a yes?

1   A.  Yes.

2   Q.  And then what happened after that?

3   A.  Well, they asked me if I was from Mexico or from another

4   country.  I told them I was from Mexico, from Michoacan, and

5   that I had problems back there and they said:  Yeah, oh, seems

6   everybody has problems.

7   Q.  Okay.

8          MR. ROCHA:  I have no other questions, Your Honor.  I

9   suppose I could ask him about that, but that's not -- the

10  duress claim is not an issue here.  So I have no other

11  questions, Your Honor.

12         THE COURT:  Thank you.

13      Ms. Furtado?

14                      CROSS-EXAMINATION

15  BY MS. FURTADO:

16  Q.  Good afternoon, Mr. Ramos-Zepeda.

17  A.  Good afternoon.

18  Q.  You're from Mexico, right?

19  A.  Yes.

20  Q.  You were born in Mexico?

21  A.  Yes.

22  Q.  Your parents are from Mexico?

23  A.  Yes.

24  Q.  And actually you're from Michoacan; is that correct?

25  A.  Yes.

CROSS-EXAMINATION - RAMON RAMOS-ZEPEDA                    25

1    Q.  That's south of Mexico City?

2    A.  South, southwest, something like that.

3    Q.  Southwest of Mexico City?

4    A.  I think so.

5    Q.  So if you drove there, it would be like 22 hours of driving

6    from here?

7    A.  Honestly, I don't know.

8    Q.  Okay.  It's a long distance from here; is that correct?

9    A.  I've never driven.  I've gone by plane.  I'd say it's three

10   days.

11   Q.  Okay.  You're not a United States citizen, correct?

12   A.  No.

13   Q.  And you've never had any documents that permitted you to be

14   here legally; is that correct?

15   A.  No.

16   Q.  And in 2005 you have a conviction for lewd and lascivious

17   conduct, we talked about that, right, or you talked about that?

18   A.  Yes.

19   Q.  And around 2005, you were living in a city called Redwood

20   City, California?

21   A.  Yes.

22   Q.  Do you understand English, sir?

23   A.  No.

24   Q.  Because you just responded in English.  Did you understand

25   my question?

CROSS-EXAMINATION - RAMON RAMOS-ZEPEDA                    26

1   A.  No, but it's a word I hear often, "yes".

2   Q.  Prior to 2009, you'd never been deported; is that correct?

3   A.  No.

4   Q.  And you don't have -- you're not married?

5   A.  No.  I'm together with a wife.

6   Q.  But not legally married?

7   A.  No.

8   Q.  And you don't have any children?

9   A.  Yes.

10  Q.  How many children do you have?

11  A.  I have three.

12  Q.  And they live in Mexico?

13  A.  No, here in California.

14  Q.  What are their names?

15  A.  The oldest is called Christian Geovani (phonetic); the

16  second one is not registered, we just call her Leida

17  (phonetic), but there was no time to register her in Mexico

18  because they had to come over.

19  Q.  And you said you had a third child?

20  A.  And another one was born here.

21  Q.  What are their names?

22  A.  Melissa Supe (phonetic).

23  Q.  Can you spell the last name?

24  A.  It's Ramos.

25  Q.  And what are their dates of birth?

1   A.  The little one, Melissa, is April 29th of 2015.

2   Q.  And the other two?

3   A.  Geovani is November 8th of 2010.  Leida, June 4th of 2012,

4   I think.

5   Q.  And these are your natural children?

6   A.  2013.

7   Q.  And these are your natural children?

8   A.  Yes.

9   Q.  You love your children?

10  A.  Of course.

11  Q.  Okay.  Now, you said that the punishment you received for

12  your 2005 conviction was six months in jail; is that correct?

13  A.  Yes.

14  Q.  And you said there was no other consequence besides that

15  six months; is that correct?

16  A.  No.

17  Q.  That's not correct, is it?

18  A.  That I got the six months?  That is correct.

19  Q.  Well, in fact, you were also placed on three years of

20  probation as a result of your conviction; isn't that correct?

21  A.  Yes.

22  Q.  And you were also required to register as a sex offender;

23  isn't that correct?

24  A.  Yes.

25  Q.  And in registering as a sex offender, you have to register

1    with your address and where you're living; isn't that true?

2    A.  Yes.

3    Q.  And you told the Border Patrol that you had served three

4    days in jail followed by four months of jail time in connection

5    with your conviction; is that right?

6    A.  Honestly, I don't recall.  I can't remember if I spoke with

7    them about that.

8    Q.  But you did spend three days in jail followed by four

9    months of jail pursuant to your conviction?

10   A.  Yes.

11   Q.  When did you surrender for your jail time?

12   A.  May 14th of 2006, I think.

13   Q.  And then you spent four months in jail?

14   A.  Yes.

15   Q.  And then you were placed on three years of probation?

16   A.  Yes.

17   Q.  And you didn't successfully complete your probation?

18   A.  No.

19   Q.  In fact, that's the reason the bench warrant was issued for

20   you?

21   A.  Yes.

22   Q.  And you didn't leave for Mexico until two thousand -- you

23   left for Mexico in 2008 because your father was ill?

24   A.  Yes.

25   Q.  So from 2008 to two thousand -- for 2006 to 2008, you

1   didn't comply with the terms of your probation?

2   A.   While I was in California, I did do what I was supposed to

3   but when I left, the probation officer told me that since my

4   father was really ill, I should just go and see him.

5   Q.   The probation officer told you you should break the law?

6   A.   She didn't tell me to break the law.  She just told me that

7   if she was in my place, she would go because you only have one

8   father.

9   Q.   And yet a warrant was issued for your arrest, correct?

10  A.   Yes.

11  Q.   In 2009, you crossed with about 15 people into the United

12  States?

13  A.   More or less, 15, 20.

14  Q.   Okay.  15 to 20 people you crossed with into the United

15  States; is that correct?

16  A.   Yes.

17  Q.   And you knew that that was a crime?

18  A.   Honestly, I wasn't sure.

19  Q.   Weren't you a police officer?

20  A.   Yeah, but about two years, two years, back in 2013, 2013.

21  Q.   So you didn't know that it was a crime to cross illegally

22  into the United States with 15 to 20 people?

23  A.   Initially, I didn't know, but now I realize it, yes.

24  Q.   So why do you think the Border Patrol made contact with

25  you?

1   A.  Because it's their job not to let people in who aren't

2   legal.

3   Q.  And you weren't legal?

4   A.  No.

5   Q.  So you knew it was a crime?

6   A.  I didn't know but I was told later it was a crime.

7   Q.  So, sir, you've never been legal to be in the United States

8   and you're telling us that you did not know it was a crime in

9   2009 to illegally enter the country?

10  A.  No.

11  Q.  All right.  In 2015, then, you crossed into the United

12  States illegally with one other person?

13  A.  Yes.

14  Q.  And you knew that was a crime?

15  A.  Yes, but I was also in fear for my life because I had

16  received death threats in my country.

17  Q.  Let's talk about that.  What kind of death threats did you

18  receive in your country?

19          MR. ROCHA:  Your Honor, what's the relevance of this?

20  The issue of duress is not before the court here.

21          MS. FURTADO:  He opened the door.

22          THE COURT:  Well, what's the relevance?

23          MR. ROCHA:  Your Honor, I didn't ask --

24          THE COURT:  Hang on, hang on.  You made a relevance

25  objection.

1              MS. FURTADO:  I'm asking him if he knew it was a crime

2      and this defendant now is saying that he had an excuse to be

3      here so I want to know what the excuse is.  He's saying he was

4      afraid for his life.  So now I want to know what made him think

5      that he could break the law.

6              THE COURT:  I'm not sure that's what he said

7      necessarily.  You're talking about now in 2015, correct?

8              MS. FURTADO:  Yes.  I asked him if he knew it was a

9      crime and he said that he knows but that he was in fear for his

10     life from Mexico.  And so I'm asking him what that was, what

11     led him to believe that he could break the law because of this

12     fear that he's saying he had.

13             THE COURT:  Well, I don't think he said that gave him

14     a reason to break the law.  He said that's why he broke the

15     law, I believe.

16             MS. FURTADO:  So I'd like to delve into why he thinks

17     he could break the law for this fear.

18             THE COURT:  What is the relevance of that?

19             MS. FURTADO:  Well, he -- the part of the relevance is

20     that we have to do the voluntariness argument with regard to

21     the 2015 statement and the defendant says that the statements

22     weren't actually taken until after he made contact with the

23     Border Patrol agent.  They put him in a car and he was driven

24     500 feet.  He says also before -- during direct that he told

25     the Border Patrol agent something about being afraid.  And now

 1    when I ask him about committing a crime, he's saying that he

 2    had some reason to be afraid.  I think that that goes to his

 3    credibility and I think that it also goes to the voluntariness

 4    of those statements.

 5             THE COURT:  Mr. Rocha?

 6             MR. ROCHA:  The issue of duress is not before the

 7    court, so counsel -- government counsel can ask the questions,

 8    you know, did the agents brandish their weapons, did the agents

 9    give you food, how many people were there, did they ask you

10    questions, they can certainly ask that, that goes to

11    voluntariness, that goes to custody interrogation.  But whether

12    or not he crossed into the US under duress, that's not

13    relevant, Your Honor.

14        The two issues before the court at this hearing are the

15    defective deportation, 1326(d), and the statements made in 2009

16    and the statements made in 2015.  Those are the issues before

17    the court.

18             MS. FURTADO:  Your Honor, credibility is always at

19    issue and the defendant got on the stand --

20             THE COURT:  Hang on.  I'm going to overrule the

21    objection.  Go ahead.

22    BY MS. FURTADO:

23    Q.  Let's talk about your fear.  What was your fear?

24    A.  Because I received a death threat and that if I stayed

25    there, they were going to kill me.

CROSS-EXAMINATION - RAMON RAMOS-ZEPEDA

1    Q.   When did you receive the death threat?

2    A.   More or less March 2015.

3    Q.   Who made the death threat to you?

4    A.   People from there, from the town, from a man called Jose,

5    Jose Ruertos (phonetic).

6    Q.   How did he make the death threat to you?

7    A.   He sent someone to deliver papers to my house.  He stuck

8    some papers under my door.

9    Q.   Did you keep those papers?

10   A.   No, I didn't keep them.

11   Q.   And this is the time when you were a police officer?

12   A.   Yes.

13   Q.   And you worked in a police agency in Michoacan?

14   A.   Yes.

15   Q.   And there were other police officers you worked with in

16   Michoacan?

17   A.   Yes.

18   Q.   Did you tell anybody in Michoacan about your fear?

19   A.   I didn't say anything because they said that they were

20   threatening both me and my family.  And that's why my family

21   came over as well.

22   Q.   So you never made a report to any police agency?

23   A.   No, no.  They don't listen to you over there.  They're all

24   working together.

25   Q.   Did you go to a different city and make a report?

```
 1    A.  Nothing.

 2    Q.  So, then you just left Michoacan, your job, your family,

 3    and you came to the United States?

 4    A.  My family came over first.

 5    Q.  Who's your family?

 6         MR. ROCHA:  Again, Your Honor, I object.  What's the

 7    relevance of this, Your Honor?

 8         THE COURT:  Yeah, I'm going to sustain that.

 9         MR. ROCHA:  What's the relevance of this?

10         THE COURT:  I'm going to sustain that.

11    BY MS. FURTADO:

12    Q.  When did they come?

13    A.  In about March is when they came.

14    Q.  And did they report what had been going on?

15    A.  Over here in the border, I think so.

16    Q.  You think they did?

17    A.  I don't think -- they didn't tell the Mexican police but I

18    think they told the immigration that they had received death

19    threats over there.

20    Q.  So the family member that you said came to the United

21    States was Irma Rosales-Martinez; is that correct?

22    A.  My wife.

23    Q.  And she left Mexico because of the threats that were made

24    to your family?

25    A.  Against her and me.
```

```
 1    Q.  And that's the reason why you came to the United States?

 2    A.  Yes.

 3    Q.  And you believe she told agents that this is what was

 4    happening to you and your family?

 5    A.  Yes.

 6    Q.  Would you be surprised to learn that in her asylum claim,

 7    she never mentions you or any threats that were made to you or

 8    your family?

 9              MR. ROCHA:  Your Honor, again, I object.  This is

10    going to the issue of duress.  It's not relevant.  It's beyond

11    the scope of what was asked on direct examination.

12              MS. FURTADO:  It goes to his credibility, Judge.

13              MR. ROCHA:  Your Honor, she's already attacked his

14    credibility with respect to the lewd and lascivious acts so I'm

15    not sure how this is relevant to this.

16              THE COURT:  I'm going to sustain it.

17              MS. FURTADO:  Judge, just for the record, I'm entitled

18    to attack the defendant's credibility in any manner and form,

19    not just on his conviction.

20              THE COURT:  To the extent that I allow it.  I'm not

21    going to allow it.

22              MS. FURTADO:  That's true.

23              THE COURT:  Thank you.

24    BY MS. FURTADO:

25    Q.  Now, you said that in 2009 you talked to Agent Borrego and
```

CROSS-EXAMINATION - RAMON RAMOS-ZEPEDA

1    he processed you?

2    A.  Yes.

3    Q.  And he spoke to you in Spanish?

4    A.  Yes.

5    Q.  And you were able to understand his Spanish?

6    A.  Yes.

7    Q.  And he was able to understand your Spanish?

8    A.  Yes, I think so.

9    Q.  And during your processing, you remained uncuffed?

10   A.  No.

11   Q.  On direct you said that you were uncuffed.

12   A.  I was not cuffed.

13   Q.  Okay.  You did not have handcuffs on, that's correct?

14   A.  No.

15   Q.  Okay.  That you were given food?

16   A.  Yes.

17   Q.  And you were given water?

18   A.  Yes.

19   Q.  And you said that after you were brought back from Nogales,

20   you saw Agent Borrego again?

21   A.  Yes.

22   Q.  And that would have been about on the 15th of January?

23   A.  Yes, could be.  I wasn't aware of the time or date.

24   Q.  And this is a person that you said on the 15th

25   Agent Borrego talked to you about his family?

1    A.   No.

2    Q.   On direct you said that Agent Borrego told you about his

3    family and that he had some family in Mexico City.

4    A.   Oh, about his family, yes.   I thought you meant my family.

5    Q.   Okay.   So Agent Borrego talked to you about his family when

6    you came back from Nogales?

7    A.   Yes, he told me his family was from the federal district of

8    Mexico City.

9    Q.   And this is the same agent you said who believed that you

10   were a dangerous person, a rapist?

11   A.   Yes.

12   Q.   And this is -- Agent Borrego is the person who yelled out

13   that you were a dangerous person to those who were in the room,

14   in the processing room?

15   A.   Yes.

16   Q.   Yet he gave you food?

17   A.   He didn't give me the food, somebody else did.   They did

18   give me food.

19   Q.   And you remained uncuffed?

20   A.   Yes, no cuffs.

21   Q.   And he talked to you about his family?

22   A.   Uh-huh.

23   Q.   Okay.   In 2009, you spoke to a consular representative?

24   A.   No.

25   Q.   And you were never asked any questions about being afraid

 1    to return to Mexico?

 2    A.  No, never.

 3    Q.  Okay.  But you were returned to Mexico on January 15th,

 4    2009?

 5    A.  Yes.

 6    Q.  And you never reported the snapping dog incident?

 7    A.  No.

 8    Q.  Even after you became a police officer?

 9    A.  No.

10    Q.  And you never reported the paperwork that was lost that

11    kept you in a cell?

12    A.  No.

13    Q.  Even after you became a police officer?

14    A.  No.

15    Q.  And over the past few days you've been able to listen -- or

16    the past two hearings you've been able to listen to all the

17    government witnesses?

18    A.  Yes.

19    Q.  You've been able to speak to your lawyer?

20    A.  Yes.

21    Q.  And you've been able to review all the evidence in this

22    particular case?

23    A.  Well, what evidence are you talking about?

24    Q.  Well, everything that's been submitted before this court

25    today, all of those documents that are in front of you.

1   A.  I haven't seen them.  I've spoken with my attorney about

2   them.

3   Q.  And you see them now?

4   A.  Yes.

5   Q.  Okay.  And today's the first time that you've reported the

6   snapping dog incident?

7   A.  Here, yes, but I'd only spoken about it with my attorney.

8   Q.  And the lost paperwork?

9   A.  That, too.  With my attorney I'd already spoken about that.

10  Q.  And the fact that the agent yelled out that you were a very

11  dangerous man?

12  A.  I'd also spoken about that with him.

13       MS. FURTADO:  I don't have any other questions for the

14  witness, Your Honor.

15       THE COURT:  Thank you.

16     Mr. Rocha, any redirect?

17       MR. ROCHA:  Just two questions.

18                    REDIRECT EXAMINATION

19  BY MR. ROCHA:

20  Q.  Mr. Ramos, why didn't you report the dog snapping incident?

21  A.  Well, because I thought nobody was going to pay any

22  attention to that since all those agents were already watching.

23  Q.  And why didn't you report the incident where Agent Borrego

24  told everyone about your past?

25  A.  Because -- I don't know, maybe once afraid.

1          MR. ROCHA:  I have no other questions, Your Honor.

2          THE COURT:  Thank you.

3      Mr. Ramos-Zepeda, you may step down, sir.  Thank you.

4      Mr. Rocha, do you have any other witnesses?

5          MR. ROCHA:  I have no other witnesses.

6          THE COURT:  Okay.  Why don't we take just a brief,

7   five-minute break.  I'll let you guys prepare to argue and then

8   we'll argue.  Thank you.

9      (A break was taken.)

10     (Proceedings commenced prior to the digital recording

11  system being engaged.)

12         THE COURT:  Just so I'm clear and we're all on the

13  same page, as I understand it, and correct me if I'm not, with

14  regard to the motion to suppress, we're talking about two

15  things.  We're talking about the first statement to

16  Agent Borrego on January 12th of 2009?

17         MS. FURTADO:  Yes.

18         THE COURT:  We're talking about the first statement to

19  Agent Wagner on May 1st, 2015?

20         MR. ROCHA:  That's correct.

21         THE COURT:  And with regard to the motion to dismiss,

22  the issue is whether or not there was an adequate legal

23  predicate removal to support a claim under 8 USC 1326, correct?

24         MR. ROCHA:  Yes, that's right.  It's a lack of due

25  process in other words, yes.

```
1              THE COURT:  Okay.  So those are the issues, as I
2    understand them.  So, please.  And however you want to address
3    it, please.  You want to do the motion -- I'm sorry.
4    Ms. Furtado, did you want to do the motion to suppress?
5              MS. FURTADO:  Because I didn't file the original
6    motions --
7              THE COURT:  Right.
8              MS. FURTADO:  -- I don't know if defense wants to go
9    first, or if he wants us to go first, that's fine.
10             THE COURT:  Right.  That's a good question.
11             MR. ROCHA:  So I just want to make sure.  Does the
12   court want to hear closing arguments on Miranda, have the
13   government respond, and then go into the 1326(d) challenge?
14             THE COURT:  However you want to do it.  And I think --
15   procedurally, I think Ms. Furtado is right.  I mean, if we were
16   just here on the motion to suppress the statements, the
17   government would go first.  But because we're here on the
18   motion to dismiss as well, I mean, that's your motion.
19             MR. ROCHA:  Sure.
20             THE COURT:  You have the right to go.  So however you
21   guys want to do it is fine with me, whatever you think would be
22   best.
23             MR. ROCHA:  That's fine, Your Honor.  I can -- it's
24   just argument.
25             THE COURT:  Okay.  So, please, why don't you go ahead?
```

1              MR. ROCHA:  May I approach?

2              THE COURT:  Yes, please.

3              MR. ROCHA:  Your Honor, the -- we'll begin with the

4    January -- I'm sorry, the May 2015 incident, okay?  So it's

5    clear that Mr. Ramos -- let's be clear about one thing.

6    Mr. Ramos invoked his right to remain silent.  There's an I-214

7    that's here.  And the agents read him the report.  It clearly

8    states that you have a right to remain silent, anything can be

9    used against you in an immigration, administrative, or other

10   court proceeding.  Mr. Ramos invoked his right to remain

11   silent.  So I don't think there's a dispute as to that.

12       I think the dispute is whether or not the agents questioned

13   him actually when they arrested him that evening, that's the

14   issue before the court.  And I argue, Your Honor, that they

15   never did.  They never once asked him any questions when they

16   initially arrested him, based on the testimony Mr. Ramos gave.

17       The agents did ask him questions in the field.  But those

18   questions were asked after he was already handcuffed, after he

19   was placed in the van.  So it's clear that he's in custody.

20   It's clear that it's interrogation because the questions are

21   likely to elicit incriminating responses, namely, what country

22   of origin are you from.  Those are the elements of a 1326

23   offense, okay?  So I think to the extent that he made any

24   statements on the field, at that point, he was already in

25   custody and he was being interrogated.

1          Now, the agents testified that -- one testified when I

2   asked on cross-examination, he said that they asked the

3   questions after he had been placed in custody with handcuffs.

4   On redirect, he slightly changed his story and said we were

5   asking him questions as we were handcuffing him.

6          And I asked him about -- both the agents about their

7   reports.  And I asked them if that's such an important fact,

8   which is what one agent testified that that was an important

9   fact.  Neither of those agents in their reports alluded to the

10  fact that they had asked any questions at all, let alone

11  questions after he was already arrested.

12         So, Your Honor, I think that, based on the testimony here,

13  based on the agents, as well as Mr. Ramos, I think the May 2015

14  reports or statements cannot be used.

15         Now, in my brief, I quoted or cited to US versus

16  Mata-Abundiz, and in that case, it was the case in which INS at

17  the time, the legacy of ICE, made the argument that because the

18  person was in civil proceedings, the person did not have a

19  right to have Miranda warnings read to him.  And so I feel that

20  that's the case here, that the government may argue that, well,

21  it was a civil proceeding, it was this, it was that.  That

22  doesn't excuse the fact that they still have to Mirandize the

23  individual.

24         And, as the court knows, this year is the 50th anniversary

25  of Miranda, and it should have still some sway as to how a

1   person is questioned, and here there's no doubt, no doubt that

2   he invoked his right once they did read him his Miranda rights.

3       Now, with respect to the January 9th, 2009, incident, Your

4   Honor, we argue that the McNabb-Mallory Rule applies here.  He

5   was arrested at 1:30 in the morning on June -- I'm sorry,

6   January 9th, 2009, that's when he was arrested.  What happened

7   next is -- seems like a Ping-Pong of some sorts.  He's taken to

8   this facility, he's taken to that facility, he's taken to

9   another port, then he's bounced back and forth before he's

10  finally removed.  During that time, Mr. Ramos testified that

11  not once did he have a chance to speak to an attorney.

12      Now, the government wants to have it both ways.

13  Agent Borrego testified that Mr. Ramos didn't qualify because

14  of his immigration history for any criminal charges.  I would

15  add that that's bogus because this court's familiar with

16  Operation Streamline.  Even people who come in for the first

17  time can be subject to a 1325 prosecution.

18      In fact, when presented with Agent Hoyt's report, which is

19  dated January 12th, 2009, Agent Hoyt says that he read him his

20  Miranda rights.  And I argue that Mr. Ramos testified that he

21  did not speak to any other agents that day, okay?  Yet

22  Agent Hoyt's saying that he Mirandized him because they were

23  anticipating prosecution.

24      In his report later on, it actually says that once he was

25  transferred back into federal custody, they actually contacted

1    the US Attorney's Office to contemplate prosecution.  And they

2    said they couldn't do it because 48 hours had elapsed.  So I

3    think it's nonsense to say:  Well, he wasn't eligible for

4    criminal prosecution.  Therefore, we didn't have to read him

5    his Miranda rights.  That just doesn't make sense.  The

6    testimony actually just says the exact opposite.

7         So we argue that the McNabb-Mallory Rule will apply in this

8    case.  But let's set that aside.

9              THE COURT:  Right.  'Cause let me ask you a question.

10   That would not necessarily apply to the first statement.  I

11   mean --

12             MR. ROCHA:  That's correct, yes.

13             THE COURT:  Okay.

14             MR. ROCHA:  So that aside, what are the facts that

15   show involuntariness here on the January 9, 2009?  Well, you

16   heard testimony from Mr. Ramos himself that one of the agents

17   placed a dog bone on his shoulder four times for the German

18   Shepherd to snatch it from his shoulder.  Now, we both -- I

19   think everyone can agree that you can take judicial notice that

20   German Shepherds are pretty big dogs.  They're not poodles,

21   they're not Chihuahuas, those are pretty big dogs.  And they

22   didn't do it once, they didn't do it twice, they did it several

23   times.

24        Now, when asked on redirect why he didn't report it, I

25   think he said something that's very telling.  He said:  Well,

why would I report it when you have several officers standing

around who didn't do anything about it?

So then he's taken -- he's handcuffed, he's taken to the

station, okay?  And at the station, he's there with other

people.  It's clearly he's not free to leave.

And then the agent, Agent Borrego, he said that he doesn't

recall telling anyone else besides the supervisor whether he

broadcast his criminal convictions but it's clear that he did.

Mr. Ramos testified that he told other people:  That guy's a

rapist.  That guy's a child molester.  You don't want to hang

out with that person.  That's a form of actual psychological

coercion.

So I would add that that -- those factors, the dog, the

humiliation, the fact that he can't leave, all that goes to

voluntariness.  And not to mention Miranda.  I mean, he's

clearly in custody, and I already said the government was

already contemplating prosecution 'cause Agent Hoyt in his

report says he was contemplating prosecution and we read him

his Miranda rights.  Yet, they have no proof of that.  He says

he agreed to make a statement, yet there's no I-214 in this

case.

So, Your Honor, if the court doesn't find at least a

Miranda violation on the June 9th, 2009, statements, I think

that there's enough there for involuntariness based on the

testimony and the facts of this case.

1      So, Your Honor, based on those, we think that the court

2  should suppress the statements from June 9th, 2009, based on

3  those incidents as well as the June -- I'm sorry, the May 1st,

4  2015, incident because there he clearly invoked his Miranda

5  rights, and I think finding otherwise is a way to get around

6  Miranda.

7      And if we're going to do that, then why have Miranda

8  violations if the government's going to be able to use

9  something to a civil nature to say:  Well, he made that in the

10  context of a civil proceeding.  And Mata-Abundiz is exactly on

11  point on that, that they cannot get around Miranda by simply

12  invoking a civil proceeding.

13      So we ask that the court suppress the statements with

14  respect to January 9th, 2015 -- I'm sorry, January 9th, 2009,

15  and May 1st, 2015.

16          THE COURT:  Let me just stop you there.  On the

17  May 1st, 2015, if I was to presume that the facts are as

18  Agent Letavay and Agent Wagner indicated, if I'm just going to

19  presume that, that it was Wagner in the desert meets

20  Mr. Ramos-Zepeda and asks the two 213 questions, so to speak,

21  are you a citizen of what country and do you have legal basis

22  to be here, whatever he said, if that's the case -- and I

23  understand that there's a difference as to what -- factually,

24  what Mr. Ramos-Zepeda says and what the agents say, but if I'm

25  solely to presume what the agents say is the facts, which I

1   know are not completely accurate from your standpoint, would

2   Miranda still be invoked?

3           MR. ROCHA:  Yes, he would still because he's in

4   custody.

5       So, I asked him to describe what's the terrain.

6           THE COURT:  Not in handcuffs.

7           MR. ROCHA:  There's three officers, it's the middle of

8   the night, they're in the desert, right?  And remember, the

9   agents testified that there was a camera that was following

10  them to a bush that led them to them.  So they're clearly not

11  free to move around -- I mean, they're in custody, you would

12  say.  I mean, it's a police state out there.  So I would argue

13  that, yes, the Miranda would still apply at that moment but,

14  again, I disagree that that happened.

15          THE COURT:  I understand.

16          MR. ROCHA:  But, yes.

17          THE COURT:  Okay.  And then with regard to the

18  statement January 9th, 2009, Mr. Ramos-Zepeda, whether they

19  were going to and because of the extradition didn't and then

20  because it was too late to actually charge him with something

21  else, regardless of why it was done, it's my understanding that

22  your argument is that then six years later that statement

23  should still not come into evidence in a completely different

24  proceeding where he was never charged?

25          MR. ROCHA:  Yes, that's right.  Because even if he

```
1    wasn't charged, it doesn't mean that Miranda shouldn't apply.
2    And, again, the government this afternoon talked about, you
3    know that crossing the country is an illegal act, it's a crime.
4    So they're well aware that it is an offense.  So there's no law
5    that says simply because you're never charged, you're not
6    required to Mirandize a person.  I think the reports that are
7    in evidence clearly show that they contemplated prosecution,
8    yet they never actually Mirandized him, or at least there's no
9    proof that they did.  But there is proof there's a proffer
10   there from an agent that says we contemplated prosecution so we
11   Mirandized him.  So I think, yeah, even if it's six years
12   later, yes, we still should move to suppress that because he
13   didn't have the opportunity to invoke his right to an attorney
14              THE COURT:  Okay.  And then -- thank you very much.
15        So now, please, if there's anything else on the statements.
16              MR. ROCHA:  Not the statements.
17              THE COURT:  And I don't know if you want to address
18   the motion --
19              MR. ROCHA:  I think, just for the record, it would be
20   cleaner that they respond.
21              THE COURT:  Okay.  I agree.
22              MR. ROCHA:  Just because I know if there's a record,
23   it would be cleaner and easier to follow.
24              THE COURT:  Okay.  I agree.
25        So, Ms. Furtado?
```

1          MS. FURTADO:  Thank you, Your Honor.

2      Clearly, Judge, you're going to gauge the credibility of

3   the witnesses that have come before you.  I would submit that

4   the defendant has very little credibility in terms of what he

5   said and the explanations that he gave.

6      What we heard from Wagner and Letavay that when they made

7   contact with the defendant in 2015, that they had some

8   information from a camera operator.  They went to that

9   location, in fact, they took the two people in the grove of

10  trees.  They asked them the two field questions, which is, you

11  know, where are you from and what's your country of

12  citizenship.  They got responses.  At the same time, for

13  reasons that are, I guess, inherent to the job that they do,

14  they decided to put handcuffs on these two people and then

15  ultimately transported them where they did more investigation.

16     Those are the two statements that I -- those are the two

17  responses that I think are at issue in the 2005 (sic) case.

18          THE COURT:  Right.

19          MS. FURTADO:  I don't believe Miranda applies to those

20  two statements and I don't think it's supported by any of the

21  case law.  I think the fact that we have for the 2005

22  statements -- I'm going to refer to them as FIC, field

23  interrogatories or field investigative questions -- those two

24  questions are Terry stop questions.  They are atypical Terry

25  stop questions.  These are questions that enable these agents

1      to begin the work that they are -- that they are -- that

2      they're entitled to do, that they are vested, have the power

3      vested in them to do.  And this starts their process.

4          So, I mean, and what we heard -- I remember Wagner said,

5      you know, if they're US citizens, they're still going to ask.

6      I mean, they still have to ask these kinds of questions,

7      because jurisdiction arises for various reasons.  But, I mean,

8      I don't think that that necessarily indicates that we live in a

9      police state, and that necessarily Miranda applies.  When you

10     look at all of the case law, it says that what those agents did

11     in the field on May 1st, 2015, was Terry stop, classic Terry

12     stops, and they were entitled to do it.

13         I looked at Mata-Abundiz and I think that this case

14     differentiates, especially the 2015 stop is very different than

15     Mata-Abundiz.  So Mata-Abundiz was in custody on some state

16     criminal charges, and I guess there was an immigration officer

17     that went to talk to Mata-Abundiz while he was in custody, and

18     I guess the reason given was that they wanted to figure out

19     some immigration information.  But what the court said was the

20     agents knew that what they were doing was likely to elicit

21     incriminating response.

22         And that's a wholly different scenario than we have with --

23     with -- with Agents Wagner and Letavay and what they were doing

24     in 2015.  They had information from a camera operator.  They

25     immediately respond.  They asked two simple questions in terms

1   of field investigation, and they needed to do that in order to

2   establish their jurisdiction and establish that they were, you

3   know, properly -- that they could properly begin to do their

4   work if there was work necessary to be done.  And I think they

5   were entitled to do that.  I don't think that there was a

6   Miranda violation, and I'm asking the court to deny the

7   defendant's motion.

8           THE COURT:  Let me stop you there with regard to the

9   statement, the May 1st statement, and I know there's a factual

10  dispute.  But if, in fact, Mr. Ramos-Zepeda was handcuffed

11  either simultaneously or shortly before or after those

12  questions, does that make it different from a Terry stop?  And

13  I know there's a dispute factually about what happened.

14          MS. FURTADO:  I don't believe so, Judge.  In fact,

15  there's some case law that I cited in my case, and it's in the

16  footnote, and what it says, and I'm just going to read from it.

17  It says:  Handcuffing a suspect doesn't necessarily dictate a

18  finding of custody.  And in this particular case, I would say

19  that they were not -- they were not arrested just by nature --

20  just by virtue of being handcuffed.

21      So, you know, where a suspect threatens physical danger or

22  flight, the officers may use handcuffs in the course of a Terry

23  stop.  And the courts have approved using handcuffs in Terry

24  stop situations while doing -- by -- while doing questioning.

25  And so I don't think that just the handcuffs by itself turned

1    that stop into an arrest whereby Miranda may be triggered.

2         THE COURT:  And you were citing US versus Booth,

3    correct?

4         MS. FURTADO:  Yes, Your Honor.

5         THE COURT:  Okay.  Thank you.  Please.

6         MS. FURTADO:  In terms of the 2009 statements, so I

7    guess what we're talking about and what we've always been

8    talking about is the statement to Borrego.

9         THE COURT:  Right, that's my understanding.

10        MS. FURTADO:  On January 12th, 2009.

11        THE COURT:  Right.

12        MS. FURTADO:  So that statement clearly, Judge, even

13   there's case law out there that says that agents don't have to

14   anticipate that at some point in the future that a statement

15   may be used in a criminal context and, therefore, retroactively

16   should have read Miranda.  And I think I've cited that in my

17   brief.

18      When -- you know, when Agent Borrego testified, what he

19   said was this defendant had no criminal history -- well, had no

20   immigration history, had criminal history, which would not

21   qualify him for a voluntary return but it didn't qualify him

22   for criminal charges.

23      Now, I know defense counsel keeps referring to Hoyt and the

24   Miranda that was read.  But that wasn't until the 15th, and the

25   contemplation of criminal charges didn't actually happen until

1   the 15th, and because we're not actually talking about that,

2   that's all I'm going to say on that issue.

3       What Borrego testified to was that there was not a

4   contemplation of criminal charges on the 12th because of the

5   defendant's, both his immigration and criminal history.

6   Therefore, the statement that was obtained was for purely

7   administrative purposes.  And in that -- in that fashion,

8   Miranda was not applicable to what happened.

9       Now, what we see from all the documents that have been

10  submitted to this court and have been admitted is that there

11  were a bunch of rights that were given.  Now, the defendant

12  says none of those statements were ever -- none of those

13  documents were ever --

14          THE COURT:  You might want to slow down a bit for the

15  interpreters.

16          MS. FURTADO:  Sorry.

17          THE COURT:  Thank you.

18          MS. FURTADO:  None of those documents were ever read

19  to him, they weren't gone over with him.  But, again, clearly,

20  this court has to assess the credibility.  And I think that

21  what we can take from the agent -- from Borrego's testimony is

22  that he did, in fact, go through those documents with the

23  defendant, that he talked to him in the Spanish language, that

24  he -- that he did what he was tasked to do, which was to

25  process this defendant, and he did it in what appears to be a

1    humane fashion.

2        So I know that there are factual disputes, Judge, but the

3    credibility, I think -- well, the defendant's credibility

4    seems, I would submit to the court, is very lacking.  So the

5    facts that I'm relying on and that I would rely on are the

6    facts that were brought to us through Agent Borrego's testimony

7    that the court has clearly heard.

8        In terms of the -- in terms of the voluntariness of the

9    statements --

10        THE COURT:  Let me stop you there first.  I mean,

11   isn't really what you're saying with regard to the

12   January 12th, 2009, statement that this situation is more like

13   US versus Salgado, isn't that what you're saying?

14        MS. FURTADO:  Yes.  So let me just go back to that.

15   Salgado -- did I cite that case, Judge?

16        THE COURT:  You did, you cited it on page 10 at

17   line 9.  And then it goes through sort of the bottom of page 10

18   up to page 11, excuse me.

19        MS. FURTADO:  And again, I think in my notes, what

20   I've indicated here is that this, Salgado, in terms of what

21   they've done here, this is, again, not the same to

22   Mata-Abundiz, where you've got a defendant who's in custody and

23   they're asking questions.  If we were talking about the second

24   statement that was taken on the 12th, then perhaps we would

25   have a different argument to make.  But we're really talking

1  about just the first statement that was taken on the 12th by

2  Agent Borrego before he was transferred, before he was taken to

3  Nogales.

4      I would note that the extradition hearings I think are

5  actually civil, they're not even criminal in nature.  So given

6  the circumstances, because of the defendant's criminal history,

7  because of the defendant's lack of immigration history, there

8  was nothing other than an administrative process that the

9  Border Patrol agents were going to do, at least that's what

10 Borrego testified to.  Given that, Miranda warnings are not

11 required, given that this was an administrative civil

12 proceeding.

13          THE COURT:  In terms of the constitutional violation,

14 isn't really the argument that you can't anticipate that a

15 constitutional violation in 2009 is somehow going to be used

16 later to incriminate someone in 2015?

17          MS. FURTADO:  I agree.  And that's the -- I believe

18 that that is what the case law says, is that you cannot go back

19 and anticipate this.  There was -- you know, when we first

20 started these motions hearings, I had a lot of trouble because

21 we are in a 2015 case.  I mean, that's the status of the case.

22 And there's a motion to suppress statements of a 2009 statement

23 of a case that's -- of facts of a case that really is not

24 instant, for lack of a better term.

25      And so what I thought originally was that, really, what

1    this was was a motion to preclude evidence, preclude the 2009

2    statements for the constitutional violations, meaning the

3    Miranda violation here, or at least that's what the defense is

4    proffering.

5        I don't believe there was a Miranda violation in 2009.  And

6    even if there was, I'm not sure that the case law says that

7    there wasn't -- there's no reason to retroactively go back and

8    fix that kind of situation if they had no reason to forecast

9    that it would be later used in a criminal context.

10       But I don't even think you need to get to that analysis

11   because I don't think there was a -- in 2009, I don't believe

12   there was a Miranda violation.

13           THE COURT:  Thank you.  So now I interrupted you.

14   Voluntariness you were going to address.

15           MS. FURTADO:  Voluntariness clearly is based on the

16   totality of all the facts and circumstances.  That's where

17   credibility clearly comes into play a lot more than I think

18   some of the other stuff that we've been talking about.

19       You know, the agents, when they talked about what happened

20   and the contact that they had, they did -- they did what they

21   were tasked to do, what they were required to do, what they

22   were entitled to do, but they didn't treat the defendant

23   inhumanely.

24       They didn't -- the incident with the dog I don't think is

25   credible at all.  I don't believe that that's factual at all.

1   It's not supported by anything other than the defendant, who

2   has a reason to say that kind of thing now given this context

3   when he's never said that before.

4       The 15 other folks that would have been with him in 2009,

5   we have no evidence to show that any of those folks reported

6   it, any of those folks came forward and said:  Here, there's

7   this bad thing that happened to this other dude and we want to

8   say something about that.  None of that exists.  None of that

9   exists in the record and that claim is not supported by

10  anything that we've heard or that is before the court today.

11      The totality of the circumstances is really meant to allow

12  the court to look at all the factors.  In 2009, the defendant

13  was with 15 other people.  He is brought into processing.  He

14  gives a statement, not once, but twice.  He is given his

15  administrative rights not once, but twice.  He gives the same

16  statement twice.

17      If just for 2009, just the first statement in 2009, he's

18  given a meal, he's allowed to talk to his consular

19  representative, he's permitted to do all of these things.  And

20  what we don't hear in the facts that were presented from at

21  least the agents was that he ever said he was afraid, that he

22  ever said he was forced, that he ever said that he felt like he

23  was being pressured to do any of the things that he claims.

24      What's interesting about the defendant's testimony is that

25  at times he will say:  I have no recollection of time, I didn't

```
 1   know where I was, I didn't know what was going on.  Yet he
 2   seems to be able to recall dates and times when it suits him.
 3       I think that when we look at the credibility of these
 4   witnesses and when we look at what Agent Borrego said about
 5   what happened in 2009, it's clear that the defendant was not
 6   forced in any way to give the statement that he gave.
 7       And in that regard, the defendant's motion should be
 8   denied.
 9       And in 2015, when we look at what Agent Letavay and what
10   Agent Wagner said is perhaps there was -- I mean, they are
11   dressed as Border Patrol agents, they are placing the folks
12   into handcuffs, but beyond that, there was no unnecessary force
13   or violence or threats or coercion that happened at any point
14   during that interaction that would make the defendant feel
15   compelled to say the things that he said.
16       And in that regard, in terms of voluntariness, the
17   defendant's motion should be denied.
18       So I'm asking the court to deny the defendant's motion to
19   suppress in all regards.
20           THE COURT:  Thank you.
21           MS. FURTADO:  Thank you.
22       Okay.  Mr. Rocha?
23           MR. ROCHA:  Your Honor, we ask that the court dismiss
24   the indictment for a violation of 1326(d).  There's a process
25   that we use here in the court systems to ensure that due
```

process is followed.  For example, Rule 35(c), a rule of

appellate procedure, allows the district court to correct a

sentence for clear error or other arithmetical errors within

14 days.  After that, the district court is divested of

jurisdiction to do anything about that.  Or if there's an

appeal filed, the district court is divested of jurisdiction

because only the Ninth Circuit can actually look at those

issues.  Similarly, Rule 16 tells the parties they have a

certain amount of time to submit motions before the court.

Otherwise, they're seen as untimely.  So in all our processes,

there's rules and regulations and procedures that we follow.

    In this case, it's beyond clear that those rules were not

followed at all.  Agent Borrego -- as government counsel noted,

the credibility of the witnesses count.  It's my belief that he

has very little credibility.  For being an ICE agent for eight

years, taking special training in immigration and criminal law,

he absolutely knows nothing about it.  I asked him two simple

questions, the difference between Section 212 and Section 237.

Any law student who takes an immigration course can tell you

the difference between the two.  He didn't know.

    Okay.  So we're dealing with someone here who was charged

with the process of doing an expedited removal.  And we got

caught up here a lot in the weeds about voluntary departures,

voluntary returns, and voluntary removals.  In my motion to

dismiss the indictment, however, I never alleged that those

1    were the infirmity here.  What I have said was that under US

2    versus Raya-Vaca, Mr. Ramos should have been given the

3    opportunity, given that he had mitigation, to withdraw his

4    application for admission.  And when I asked Agent Borrego:  Do

5    you know what that is?  He said:  No, I have no clue what that

6    is, so I couldn't ask him questions about that.

7         So the 8 CFR is clear that says:  Any alien -- it's not

8    tethered to any alien except those that have a criminal

9    conviction.  It says:  Any alien is allowed to withdraw his

10   admission.  Of course, it's discretionary, so I do -- full

11   candor to the court, that's what it says.  But that's the issue

12   here, whether or not he was allowed to withdraw his application

13   for admission.  It wasn't the issue of whether he was subject

14   to voluntary departure or voluntary removals.  So that wasn't

15   followed in this case, Your Honor.  I mean, I think the

16   testimony is clear about how this actually started from

17   beginning to end.

18        Agent Borrego testified that he was the only one that

19   actually had processed Mr. Ramos.  Mr. Ramos corroborated that

20   he was the only one.  Yet we have about half a dozen people

21   involved in this process.  And when I confronted Agent Borrego

22   about the notice for him to respond to charges, it's clear that

23   he followed most of the procedures but he didn't follow all of

24   the procedures that were required which, among other things,

25   was to have the alien sign that he received the notice.  It's

1    in the CFR, yet he didn't do that.

2         And, as I explained in my motion, Your Honor, there's a lot

3    of evidence, or at least there's literature out there that in

4    these expedited removals, a lot of times the processing agents

5    do not even read the 867s.  They're signed 100 percent of the

6    time, but they're not read to the alien whatsoever.  And that's

7    exactly what happened in this case.

8         And what's really interesting about this, Your Honor, is

9    that the government had a second chance to get this right, or

10   so it seemed that way, and yet they failed the second time to

11   get it right.

12        So they lose the paperwork.  It's not clear what happens.

13   Mr. Ramos is wandering around in different courts and different

14   jurisdictions, and before you know it, he's right back to where

15   he started.

16        Now, it's unclear how Agent Hoyt's involved in this, how

17   other agents are involved in this because Mr. Ramos is clear

18   that he spoke to a gentleman with a purple shirt before he was

19   sent to Tucson for removal.  We don't know who that person was

20   'cause he doesn't recall his name.  But even that person did

21   not read him the 867.  That person did not read him the jurat.

22   That person did not serve him with the order.  That person did

23   not sign it.  That person did not ask him if he had a credible

24   fear.

25        Now, he explained why did he sign a document that has his

1    initials?  He explained because they told me it was part of the

2    extradition process.  That's misleading, Your Honor.  He not

3    only said that once, he said that twice.  This is part of the

4    extradition process.  He never -- Mr. Ramos testified that the

5    agents never reviewed the information.  In fact, Mr. Borrego

6    testified that he gave him a summary or a synopsis of that.

7    But he testified that he didn't read it line by line, word by

8    word.  Nevertheless, Mr. Ramos says that that never happened.

9    So, Your Honor, this case is full of constitutional due process

10   violations here.

11        Now, the government will come up and say, well, he wasn't

12   eligible for this, he wasn't eligible for that.  And let me

13   make clear what's the relief that we were requesting in our

14   motion and that's the holding of Raya-Vaca.  The holding is

15   that the alien had the opportunity to withdraw his application

16   for admission.

17        Now, why is that important here, Your Honor?  Well, as the

18   government has noted, Mr. Ramos had no immigration history.

19   Why is that important?  Because if Mr. Ramos had been allowed

20   to withdraw his admission, irrespective of any criminal

21   history, he's not subject to three-year bars, he's not subject

22   to ten-year bars, he's not subject to five years of

23   deportation.  It's like it never happened.  If he wants to

24   petition the United States Citizenship and Immigration Services

25   to come or the state department, he doesn't have that bar for

1    admission.  That's the significance here.

2        It's not that he -- his wife is a US citizen, they can file

3    petitions and whatnot.  But the agent never asked him any of

4    those questions 'cause he never asked him any questions.  He

5    just told him:  Sign here, sign here, sign here.

6        And so, Your Honor, what's the mitigation that Mr. Ramos

7    had?  Well, we know that he'd been living in the United States

8    and we know that because it's corroborated because he has a

9    criminal history.  And I know the government has made a lot of

10   issue of that, that this destroys his credibility and whatnot.

11   Your Honor, if you look at the body of his work, that should

12   not destroy any credibility.  That's certainly a blemish and

13   that's an issue that, if this case goes to sentencing, there

14   will be arguments made with respect whether or not that's an

15   aggravated felony and whatnot.  So he has been in the US, lived

16   in Redwood City.  He had a long-time girlfriend.  You know, all

17   these factors were never asked by the agent.  And in Raya-Vaca,

18   US versus Raya-Vaca, the agent never asked him any of those

19   questions either and the Ninth Circuit said that was a

20   violation because Mr. Raya-Vaca had mitigation to withdraw his

21   application.

22       So, Your Honor, we didn't have that situation here.  What

23   we have is a host of constitutional due process violations,

24   Your Honor.  We have an agent that doesn't seem to know at

25   least the basics of immigration law.  He says voluntary

1   departures are voluntary returns, this and that.  And, again,

2   if the issue here is the credibility of the witnesses, I think

3   Mr. Borrego has clearly failed that test.

4        I just want to underscore one last thing, Your Honor.  As I

5   said, the government had twice, had two chances to get this

6   right.  And they didn't do that.  And I think, Your Honor, that

7   goes to show how this process is done incorrectly.  The

8   literature supports that, Mr. Ramos' testimony supports that,

9   and the case law supports that in US versus Raya-Vaca, and we

10  ask that the court actually grant the motion to dismiss the

11  indictment, Your Honor, based on those reasons.

12       Your Honor, we have rules, we have due -- I'm sorry -- we

13  have rules, we have regulations, and anytime somebody doesn't

14  follow those, there are consequences, and the only other actor

15  in this judicial process that can hold anyone accountable is

16  this court because if we allow this or we condone this sort of

17  behavior, Mr. Borrego or other agents like him will continue to

18  act that way.  And so we ask that the court to be that arbiter,

19  to be that person to sanction, hold them accountable for what

20  they're doing.

21       And I underscore that simply because the court dismisses

22  the indictment doesn't mean that Mr. Ramos will get to remain

23  in the US.  But it certainly will mean that the agents are now

24  on notice that this kind of behavior isn't acceptable.  Thank

25  you.

1          THE COURT:  Thank you.

2      Ms. Furtado?

3          MS. FURTADO:  Your Honor, Ms. Granoff is actually

4  going to address that motion.  Thank you.

5          THE COURT:  Okay.  Ms. Granoff?  Ms. Granoff, thank

6  you.

7          MS. GRANOFF:  Good afternoon, Your Honor.  With

8  respect to the defendant's 1326(d) motion, Your Honor, we

9  believe that that motion should also be denied.

10      Counsel states that Agent Borrego has little credibility

11  because, for an ICE agent, he certainly knows a whole lot of

12  nothing regarding immigration.  Agent Borrego is not an ICE

13  agent, Your Honor, he's a Border Patrol agent.

14      Counsel states that Mr. Borrego didn't even know the basics

15  of what a first-year law student would know regarding

16  immigration and that that portrays what little credibility he

17  has before the court.  Well, Agent Borrego never proclaimed to

18  be a law student.

19      So I don't think that someone's credibility should be

20  gauged when compared to somebody else's job when it comes to

21  being an immigration agent within Immigration and Customs

22  Enforcement, not Border Patrol, and I don't think that

23  somebody's credibility or knowledge should be gauged when

24  compared to a first-year law student who is studying to be a

25  lawyer and being very well aware of what the laws and

1    regulations are with respect to immigration.

2         That said, Your Honor, I don't believe the defendant has

3    met his burden in terms of showing that there has been any type

4    of due process violations when the expedited removal was done

5    in this case.  The defense is right about one thing, and that

6    is that any alien is allowed to withdraw his application for

7    admission at the discretion of the agency.  This is wholly a

8    discretionary process.  And I don't think the defendant is able

9    to point out to anything specific where Agent Borrego violated

10   any due process here.

11        Agent Borrego is a native Spanish speaker.  The defendant

12   was spoken to in his native language.  At no time did the

13   defendant ever convey to Agent Borrego that he didn't

14   understand the process.  At no time did Agent Borrego think

15   that the defendant didn't understand either the Spanish

16   language or the actual process that Agent Borrego was going

17   through when going through the expedited removal paperwork.

18        The defendant was first asked questions regarding his

19   equities in this country -- another fancy word for does he have

20   any claim to being here in the United States legally.  Well,

21   Agent Borrego went through all of the factors, as stated in

22   Raya-Vaca, you know.  He was physically present in the United

23   States without having been admitted or paroled.  He was

24   discovered within 100 air miles.  He was physically present in

25   the United States for 14 days prior to the encounter with

1   immigration authorities.  Agent Borrego, as the immigration

2   inspector, did determine that he was inadmissible because he

3   did not possess valid entry documents.  All of that is in the

4   defendant's administrative statement.  Agent Borrego did

5   exactly what he was supposed to do.

6       When making a finding of inadmissibility, the examining

7   immigration officer must create a record of the facts of the

8   case and statements made by the alien.  He did that.  We even

9   have the written proof of that.  That is being acknowledged by

10  the defendant on every page with his initials and with his

11  signature at the end.

12      The officer shall have the alien read or have read to him

13  or her the statement.  Agent Borrego stated that he did that.

14      The officer shall advise the alien of the charges against

15  him or her on the 860 form.  Agent Borrego did do that.  No, he

16  didn't have the defendant acknowledge on the back page that he

17  did actually go through that.  But what he did do is he did

18  acknowledge in that certificate of service at the bottom that

19  he personally served the alien with that notice.

20      The alien shall be given an opportunity to respond to those

21  charges in the sworn statement.  Well, if you notice at the

22  very end of the sworn statement, Agent Borrego even asked the

23  defendant:  Do you have anything else that you would like to

24  tell me at this time?  The defendant said:  No.

25      In the last page, in the jurat of the sworn statement, he

1    again concludes that with, "Is there anything else you would

2    like to tell me" when they go through the whole fear factors,

3    and the defendant says he has no fear of return to his home

4    country.  At the end, Agent Borrego still asks him:  Do you

5    have anything that you would like to tell me at this time?  And

6    the defendant stated:  No.

7        Then, if the officer determines that the alien is

8    inadmissible, the officer shall order the alien removed from

9    the United States without further hearing or review unless the

10   alien indicates either an intention to apply for asylum or a

11   fear of prosecution -- persecution.  Neither of those occurred

12   here in this case.

13       So when you're talking about what is actually in the CFRs,

14   what is actually in the INA, it clearly states all of the steps

15   that the agency has to go through to determine what kind of

16   alien do we have in front of us, what eligibility does he have

17   to stay in this country, and they go through the check boxes,

18   and that is exactly what happened here.  Agent Borrego went

19   through all of the check boxes here.  The only thing that he

20   didn't do was to have the defendant acknowledge on the back of

21   the 860 that he had read that to him.  What he did instead was

22   sign the certificate of service that he did, indeed, personally

23   serve the defendant with that.

24       Agent Borrego was on the stand and he told the court that

25   he went through this form with the defendant and explained to

1    him that he was, in fact, being removed and his eligibility

2    factors.  And Agent Borrego, after taking the totality of all

3    of the facts that he gathered from the alien and of what he

4    knew from the alien's lack of immigration history but having

5    had that felony conviction for lewd and lascivious conduct on a

6    child, Agent Borrego was well within his discretion not to

7    allow the defendant to withdraw his application for admission.

8        This very much, in light of the fact that he also knew that

9    the defendant had an outstanding warrant out of California for

10    the very same sex offense conviction.

11        So, you know, was he in the wrong in denying the defendant

12    the opportunity to withdraw his application?  Based on all of

13    the facts, we believe that the agency was well within its

14    rights to exercise its discretion with an alien who's a

15    previously convicted sex offender, who has an outstanding

16    warrant for his arrest, not to allow that alien to withdraw his

17    application for admission.

18        To say that the agency should not be allowed to exercise

19    the very discretion that the regulations give them does not

20    even of itself make this a due process violation.  And I don't

21    think that there is any evidence except for the defendant's own

22    self-serving statements here in court today to negate any of

23    the due process that the defendant was, in fact, afforded in

24    this case not once, but twice.

25        So we don't believe that the defendant has met his burden

1    in showing that there has indeed been a due process violation,

2    according to Raya-Vaca.  And for those reasons, Your Honor, we

3    believe that his motion should be denied.  Thank you.

4            THE COURT:  Thank you, Ms. Granoff.

5        Mr. Rocha?  You get the last word on the motion.

6            MR. ROCHA:  Your Honor, you don't get to pick and

7    choose which regulations you get to follow.  Learned government

8    counsel discussed what the processes were that Agent Borrego

9    did follow and she does concede that that part where he's

10   supposed to sign didn't happen.  But we don't get to pick and

11   choose which ones we like and which ones we don't like.  The

12   8 CFR, you know, there's Congressional intent behind that.  And

13   for us to just cherry pick which rules and which regulations we

14   want to follow on that date, it doesn't seem like that's fair.

15   It doesn't seem like there's something that this court should

16   allow.

17       And that's why we believe that this case doesn't even get

18   to the issue of withdrawing the application.  Why, Your Honor?

19   Because Agent Borrego didn't follow any of the procedures.  He

20   didn't read him the 867, he didn't show him the 860, he just

21   simply told him sign here, sign here, and sign here.  He didn't

22   ask him whether or not he had credible fear.  He didn't ask him

23   a lot of those questions that Agent Borrego testified.  And so,

24   the issue of whether he was allowed to withdraw his

25   application, unfortunately, never actually came up because he

1    never followed the procedures.  And that's what the due process

2    violation is in this case, Your Honor.

3         And so, with that, we ask that the court grant the motion

4    to dismiss the indictment.

5              THE COURT:  And let me just ask you, I think you've

6    addressed it in your reply, but what about the prejudice issue,

7    whether or not --

8              MR. ROCHA:  Yes.

9              THE COURT:  -- Mr. Ramos-Zepeda was prejudiced?

10             MR. ROCHA:  So, yes, the prejudice I mentioned.  Had

11   he been allowed -- since he had no prior order of removal, had

12   he been allowed to withdraw his application, that would have at

13   least allowed him to petition United States Citizenship and

14   Immigration Services for some form of relief, whether it's

15   through a spouse, a child, or something else, a B1/B2 visa to

16   come shopping, so it would have allowed him to do those things.

17   But once he denied and removed him expeditiously, that relief

18   was unavailable to him for at least five years.  So that's the

19   prejudice.

20        And one last thing, Your Honor, Raya-Vaca, even that

21   defendant had a criminal history.  I believe his underlying

22   offense was an aggravated assault and he had probably something

23   else in addition to that, yet the court found that there was a

24   due process violation even though he had those convictions.

25   Thank you.

1        THE COURT:  Okay.  Thank you very much.  I'm going to

2   take the matters under advisement.  I appreciate the

3   thoroughness and how well you presented everything.  So I will

4   take the matter under advisement.  We will confirm in a moment

5   that the plea deadline right now is April 22nd of 2016.  Trial

6   is scheduled to begin on May 10th, 2016, before District Judge

7   Jorgenson beginning at 9:30 a.m.  So thank you very much for

8   all your hard work.  I'll take it under advisement.

9        MR. ROCHA:  Thank you, Your Honor.

10        MS. FURTADO:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12     (Whereupon, the matter was concluded at 5:07 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4          I, Cindy J. Shearman, court-approved transcriber,

 5   certify that the foregoing is a correct transcript from the

 6   official digital sound recording of the proceedings in the

 7   above-entitled matter.

 8

 9

10     s/Cindy J. Shearman                    March 18, 2016
     Cindy J. Shearman, RDR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```