1           IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3

4   United States of America       CR-15-976-TUC-CKJ(BGM)

5   vs.

6   Ramon Ramos-Zepeda,            February 19, 2016
                                            2:03 p.m.
7               Defendant.          Tucson, Arizona
    _____

8

9      REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

10                  EVIDENTIARY HEARING

11      BEFORE THE HONORABLE BRUCE G. MACDONALD
              UNITED STATES MAGISTRATE JUDGE

12

13              A P P E A R A N C E S

14   For the Government:

15       Kathryn Furtado
         Liza Granoff
16       United State's Attorney's Office
         405 West Congress
17       Tucson, Arizona 85701

18

19   For the Defendant:

20       Juan L. Rocha
         Law Office of Juan L. Rocha
21       PO Box 5965
         Mesa, Arizona 85211

22

23          PROCEEDINGS WERE DIGITALLY RECORDED

24      TRANSCRIBED BY:  ERICA R. McQUILLEN, RDR, CRR
              405 West Congress, Suite 1500
25                  Tucson, Arizona 85701
                      (520) 205-4267

1                    EXAMINATION INDEX

2

ADAM LETAVAY
3        DIRECT BY MS. FURTADO . . . . . . . . . .   13
         CROSS BY MR. ROCHA . . . . . . . . . . .   33
4        REDIRECT BY MS. FURTADO . . . . . . . . .   41

5    CHRISTOPHER WAGNER
         DIRECT BY MS. FURTADO . . . . . . . . . .   44
6        CROSS BY MR. ROCHA . . . . . . . . . . .   54
         REDIRECT BY MS. FURTADO . . . . . . . . .   58

7

8    JORGE BORREGO
         DIRECT BY MS. FURTADO . . . . . . . . . .   64

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2          THE CLERK:  CR-15-976, United States of
 3   America v. Ramon Ramos-Zepeda, scheduled before
 4   this Court for a motion hearing.
 5          Counsel, please state your appearances for
 6   the record.
 7          MS. FURTADO:  Good afternoon, Your Honor.
 8   Kathryn Furtado and Liza Granoff for the United
 9   States.
10          THE COURT:  Thank you.  Good afternoon,
11   Ms. Furtado, and good afternoon, Ms. Granoff.
12          MS. GRANOFF:  Good afternoon, Judge.
13          MR. ROCHA:  Good afternoon, Your Honor.
14   Juan Rocha on behalf of Mr. Ramos-Zepeda, who is
15   present and in custody and being assisted by the
16   Spanish court interpreter.
17          THE COURT:  Thank you.  Good afternoon,
18   Mr. Rocha, and good afternoon, Mr. Ramos-Zepeda.
19          Mr. Ramos-Zepeda, my name is Bruce
20   Macdonald.  I'm a magistrate judge, and I'm going
21   to be conducting the proceedings this afternoon.
22          We are here on three matters.  We are here
23   on Mr. Rocha's motion to suppress statements.
24   We're also here on Mr. Rocha's amended motion to
25   dismiss the indictment for unlawful exclusion under
```

 1    Title Eight U.S.C. 1326(d), we're also here on the

 2    Government's motion requesting production of

 3    reciprocal discovery.

 4          I'm hoping to deal with the last one

 5    first, which is probably the easier of the three.

 6    So Ms. Furtado, with regard to the Government's

 7    motion, it's my understanding that you're just

 8    asking for reciprocal discovery.

 9          MS. FURTADO:  I am, Judge.  I'm also

10    asking, with regard to that, that we get disclosure

11    on whatever duress defense the defense has noticed

12    that they intend to provide.

13          We filed our motion pursuant to Rule 16

14    and Rule 26.2, except that we had not received a

15    notice of defenses by that point.  It was after I

16    filed the motion that we received the notice of

17    defense which has now identified duress as the

18    defense.

19          I sent Mr. Rocha an email asking him for

20    specific items.  I've asked for -- I've asked for

21    any reports or documents or statements to support

22    the duress claim.  I've asked for the names and

23    dates of birth of witnesses who will support that

24    claim, what -- a list of anticipated witnesses and

25    what they'll say at trial.  I've also asked for the

1   defendant's wife's name and her date of birth and

2   her A-File number, given the claim that has been

3   made in the motion that Mr. Rocha has put forth to

4   the District Court regarding his request to submit

5   the duress defense to the jury.

6         I think we're entitled to the disclosure,

7   Judge, for a few reasons.  First, the defendant had

8   a previous attorney.  It was Rudy Valenzuela.  And

9   he signed our disclosure agreement back in June of

10   2015.  This agreement, then, would bind any other

11   attorney that appears after Mr. Valenzuela.

12         There was a stipulation signed in which

13   Mr. Rocha substituted in on September -- yeah,

14   September 4th, 2015.  I think Mr. Rocha is bound by

15   this agreement, and everything that I have asked

16   for specific to the duress defense and any other

17   material in Mr. Rocha's possession I think would be

18   covered in this disclosure agreement.

19         Subsequent to that, once Mr. Rocha

20   substituted in in September, he asked me by email

21   to provide him with discovery.  He made that

22   request both on the 29th of September and the 30th

23   of September of last year.  We complied with that

24   request.  By making our request now, I think Rule

25   16 has been triggered, and I believe the defendant

 1  is bound by Rule 16 to give us disclosure.

 2          Moreover, Judge, on January 14th of this

 3  year, District Court Judge Jorgenson published a

 4  scheduling order, and point 4 outlines the

 5  disclosure requirements of the parties, and point

 6  4(a) requires disclosure within the possession,

 7  custody, and control of a party, and it should be

 8  disclosed pursuant to Rule 16 and case law.  Also

 9  point 4(b) requires disclosure to be made within

10  seven days of a party's request.  We made our

11  request for the duress disclosure on the 16th of

12  February of this year.

13          So given all of the information that I

14  provided, the disclosure notice, the scheduling

15  order -- or the disclosure agreement, excuse me,

16  the scheduling order, and Rule 16 itself, I believe

17  the defendant is bound to provide us with the

18  disclosure that we've asked for, and I'd ask the

19  Court order it.

20          THE COURT:  Thank you.  Ms. Furtado, give

21  me a list of that again, if you would, please, I'm

22  sorry, the information you're requesting.

23          MS. FURTADO:  I'm asking for any reports,

24  documents, statements to support the duress claim.

25  I'm asking for names and dates of birth of

 1  witnesses the defendant intends to -- intends to

 2  bring forward at trial to support the duress claim.

 3          I'm asking for a list of witnesses and

 4  what those witnesses would be anticipated to

 5  testify to at trial.  And I'm specifically asking

 6  for the defendant's wife's name, her date of

 7  birth, and her A-File number.

 8          And Judge, if this isn't the only material

 9  that -- whatever other material the defendant

10  intends to provide, you know, to go to trial and

11  introduce in his case in chief, we would be asking

12  for that as well.

13          THE COURT:  Okay.  Thank you.

14          Mr. Rocha?

15          MR. ROCHA:  We'd be happy to provide that.

16  I don't see any problem with that.

17          THE COURT:  Okay.  Thank you.

18          Then I'm going to go ahead and grant the

19  Government's motion requesting production of

20  reciprocal discovery.  It's my understanding

21  Mr. Rocha will provide that information, and if

22  there's any problem, just let me know.

23          MS. FURTADO:  Thank you.

24          THE COURT:  We now have the other two

25  motions, the motion to suppress statements and the

1    amended motion to dismiss the indictment.  I'm

2    going to leave it up to the two of you as to which

3    you think would be appropriate to address first.

4         So why don't -- maybe, Mr. Rocha, they're

5    your motions, so I don't know if you want to --

6         MR. ROCHA:  I think the one that may take

7    the longest would be the 1326(d), the collateral

8    attack, so if it's okay with the Court, we'd like

9    to pursue or start with that one first.

10        THE COURT:  Sure.  So that's the motion to

11   dismiss then, so --

12        MR. ROCHA:  That's correct.

13        THE COURT:  Okay.  So please go ahead

14   then.  Ms. Furtado, go ahead.

15        MS. FURTADO:  Judge, we have -- we have

16   our witnesses on the motion to suppress.  We would

17   be presenting testimony on all of the matters, I

18   mean, both the 1326 --

19        THE COURT:  Yeah.

20        MS. FURTADO:  -- and the motion to

21   suppress, so I was wondering if maybe, and

22   Mr. Rocha, I don't know if you're willing to do

23   this, if we could begin presenting our witnesses

24   and then save our arguments for after the witnesses

25   are presented.

1          THE COURT:  They do sort of dovetail, I

2    understand.

3          Mr. Rocha, do you have any objection to

4    that?

5          MR. ROCHA:  No, that's fine.

6          THE COURT:  Okay.  So then what we're

7    going to do then -- thank you, Ms. Furtado.  So

8    I'll let the Government go ahead and proceed.  Are

9    there any -- other than calling the witnesses, is

10   there any other issues you want to discuss before

11   we begin with the witnesses?

12         MS. FURTADO:  I do.

13         THE COURT:  Please.

14         In regards to the motion to suppress the

15   statements, we will not be offering the second

16   statement in 2009.  So in -- just to talk a little

17   bit about the facts that we believe will by

18   elicited here today --

19         THE COURT:  Okay.

20         MS. FURTADO:  -- in 2009, the defendant

21   was first apprehended on the 12th of January.

22   There was a process that he went through with

23   immigration.  After that process, he was turned

24   over to a local authority for extradition.

25   Ultimately, two days later, the extradition was

 1    declined, and the defendant was returned on the

 2    night of the 14th, the early hours of the

 3    15th, back to border patrol.

 4         At that point the process was redone,

 5    essentially.  There was -- the defendant was

 6    considered for criminal 1326 charges, and he was

 7    given -- he gave a statement.  The agents recorded

 8    that statement again, and they documented all of

 9    this.

10         We would not be -- I do not intend to

11    offer testimony or evidence with regard to that

12    second statement.  If the Court decides to preclude

13    that statement, I am okay with that.  But the first

14    statement that's taken on the 12th, that's the

15    statement that we would be -- we would be

16    ultimately okay with just proceeding on the first

17    statement on the 12th.

18         Judge, I would like to say this though.

19    In my motion and what I believe is that there was

20    no -- there was no violation of the law.  There

21    wasn't a Miranda violation.  There wasn't a McNabb

22    violation.  There was not a voluntariness violation

23    that happened on the 15th.  He ultimately was

24    declined for criminal prosecution on the 15th.

25         So I do not believe that there's a legal

1   violation, but given the way the facts have laid

2   out, we're not proceeding on that particular

3   statement, and we would not intend to use that at

4   trial.

5           THE COURT:  So it's my understanding, I

6   know you're not conceding the legal issues, but in

7   terms of what we're dealing with, it's my

8   understanding that the only statement at issue for

9   2009 is the statement of January 12th, 2009.  And

10  while not conceding whether or not there was any

11  type of a legal violation for the second statement

12  of January 15th, 2009, it's my understanding the

13  Government does not intend to utilize that

14  statement of January 15, 2009, in any way at trial.

15          MS. FURTADO:  That's correct, Judge.

16          THE COURT:  Given that, Mr. Rocha, I'm

17  presuming, then, we will -- given that, I mean, I

18  don't think I need to find, I think there is a

19  representation by the Government they're not going

20  to use that second statement, so that will be -- so

21  it seems to me the evidence should be limited to

22  the statement that was given on January 12, 2009,

23  with that representation.

24          MR. ROCHA:  That's fine, Your Honor.  If

25  the Government wants to stipulate to that, I'm fine

 1  with that.

 2          THE COURT:  Okay.  And we'll so stipulate,

 3  so based upon that stipulation.

 4          Anything else, Ms. Furtado?

 5          MS. FURTADO:  No.

 6          THE COURT:  Mr. Rocha, anything else from

 7  your standpoint before we begin calling the

 8  witnesses?

 9          MR. ROCHA:  No, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          Ms. Furtado?

12          Is there anything else?  Go ahead.

13          MS. FURTADO:  No.  No, Your Honor.  I'm

14  sorry.

15          MS. GRANOFF:  We were just trying to

16  determine which set of witnesses we were going to

17  present first.

18          THE COURT:  Thank you.

19          MS. FURTADO:  Your Honor, the Government

20  will call Adam Letavay to the stand.

21              ADAM LETAVAY, WITNESS, SWORN

22          THE CLERK:  Please have a seat.

23  (Inaudible.)

24          THE WITNESS:  Adam Letavay, L-e-t-a-v-a-y.

25          THE COURT:  Ms. Furtado?

1                    DIRECT EXAMINATION

2    BY MS. FURTADO:

3    Q.   Good afternoon, Agent.  Could you tell us

4    where you work, please.

5    A.   Sure.  Right now I'm detailed at the San Diego

6    sector mobile response team.

7    Q.   And you said you're -- are you a border patrol

8    agent?

9    A.   Yes.

10   Q.   How long have you been a border patrol agent?

11   A.   Approximately eight-and-a-half years.

12   Q.   Does it take specialized training to become a

13   border patrol agent?

14   A.   Yes, it does.

15   Q.   Can you tell us what that specialized training

16   is.

17              THE COURT:  Ms. Furtado, I'm sorry to

18   interrupt, but I should have noted, it's my

19   understanding that there is a representative of the

20   Government here --

21              MS. FURTADO:  Yes, sir.

22              THE COURT:  -- and that -- is that Border

23   Patrol Agent Gomez?

24              MS. FURTADO:  Yes, Your Honor.

25              THE COURT:  Okay.  So for the record, we

 1    should have identified that Border Patrol Agent

 2    Adrian Gomez is also present.  The Rule has not

 3    been invoked as to him because he has been

 4    identified as the Government's representative.

 5            Okay.  I guess the microphone at the

 6    podium works better, so you may want to come up.

 7    It doesn't matter to me, but I think so we can get

 8    you on the record, it's probably a good idea.

 9            So thank you.  I'm sorry to interrupt.

10    Okay.  Thank you.

11            MS. FURTADO:  No problem.

12    BY MS. FURTADO:

13    Q.   Okay.  So let's back up.  I asked you what

14    specialized training it takes to become a border

15    patrol agent.  Take us through that, please.

16    A.   Yeah.  We start with the basic academy, which

17    when I attended was approximately five-and-a-half

18    months in Artesia, New Mexico, live-in academy.

19    Then from there you go to the field training unit

20    and post academy training.

21    Q.   Okay.

22    A.   And from there you're released to the field.

23    Q.   All right.  Tell us what types of things you

24    learn when you're in the basic academy.

25    A.   Arrest techniques, immigration law, applied

 1  authority, use of a firearm, driving.  There's

 2  physical fitness testing, Spanish.

 3  Q.   Do you speak Spanish?

 4  A.   Some.

 5  Q.   Do you speak Spanish well enough that you can

 6  have a conversation?

 7  A.   Conversation, no.

 8  Q.   Do you speak Spanish well enough to give

 9  commands and perhaps do your field questioning?

10  A.   Yes.

11  Q.   Now, you said it takes five months to go

12  through basic training?

13  A.   When I went through, it was approximately

14  five-and-a-half months.

15  Q.   Do you have to successfully complete it before

16  you go to your field training?

17  A.   You do.

18  Q.   So what happens at field training?  What types

19  of things do you learn there?

20  A.   Field training you get area orientation for

21  the area you're going to be working, responsible

22  for.  You get to learn how your sector policies and

23  procedures work, as opposed to what you learned

24  overall in the academy.

25       You go over arrest techniques again, vehicle

1    stops, things that you can really only cover on the

2    job.

3    Q.   Do you have to successfully complete field

4    training in order to become a border patrol agent

5    that's out on your own?

6    A.   Yes.

7    Q.   Were you able to successfully complete basic

8    training and field training?

9    A.   Yes, I was.

10   Q.   You said there's post academy training.  What

11   is that?

12   A.   That's a classroom setting.  So you go over

13   Spanish and law mostly, and there's a six-month and

14   10-month exam that you also need to pass to

15   successfully complete the post academy.

16   Q.   And were you able to complete your six-month

17   and 10-month exam?

18   A.   Yes.

19   Q.   Have you had specialty assignments since

20   becoming a border patrol agent?

21   A.   Yes, I have.

22   Q.   What have been your specialty assignments?

23   A.   I joined the air mobile unit, which is part of

24   the special operations attachment, which just

25   changed name into the mobile response team.  And

 1  that was a two-week selection course, as well as

 2  two weeks of training.  And I had two weeks in

 3  El Paso on mobile response team specialized

 4  training with BORTAC.

 5  Q.  Okay.  What does the training consist of in

 6  order to get to a specialized unit like mobile air

 7  unit or mobile response team?

 8  A.  You've got extra firearms training, physical

 9  fitness training, do a lot of surveillance,

10  intelligence-type gathering.

11  Q.  And as a border patrol agent during your field

12  training, were you making contact with people who

13  were perhaps in the -- in areas that might indicate

14  that you need to ask them questions about their

15  citizenship and documentation?

16  A.  Yes.  My unit actually specializes in arduous

17  terrain and areas that aren't readily accessible.

18  Q.  And how long have you worked in that unit,

19  with that kind of specialty?

20  A.  I've been there for about six-and-a-half

21  years.

22  Q.  So let me ask you, do you recall an incident

23  that occurred the 1st of May, 2015, around

24  midnight, at the Lukeville port of entry?

25  A.  Yes.

1  Q.   What was your assignment that night?

2  A.   That night we were actually pulled back to the

3  field for a quick reactionary force down at the

4  port of entry.

5  Q.   What is a quick reactionary force?

6  A.   They wanted us to be ready because there were

7  reports of some violence further south, and if

8  anything were to come further north, a United

9  States citizen that was injured or anything of the

10 sort, they wanted somebody to be there.

11 Q.   And is that what you've been trained to do and

12 circumstances to respond to?

13 A.   Yes.

14 Q.   All right.  You said there was some reports of

15 violence that night.  On the U.S. side or the

16 Mexico side?

17 A.   On the Mexico side.

18 Q.   And from the position you were in -- let's

19 back up a second.  Where were you around midnight

20 that night?

21 A.   We were in a parking lot just north of the

22 port of entry.

23 Q.   And from your location, were you able to hear

24 anything that would, for you, corroborate the

25 violence that you'd been told about?

1  A.   At one point early in the night we heard what

2  might have been shots southwest of the port of

3  entry, but unconfirmed.

4  Q.   Okay.  Was anybody with you when you were on

5  this assignment?

6  A.   Yes.  Agents Wagner and Swickheimer.

7  Q.   Are they also part of the mobile response

8  team?

9  A.   Yes.

10  Q.   And were they also assigned that night to

11  station themselves at the Lukeville port of entry

12  given these reports of violence?

13  A.   Yes.

14  Q.   All right.  About midnight, did you get a

15  report or a radio call from a mobile surveillance

16  operator?

17  A.   Yes.

18  Q.   And what information did that mobile

19  surveillance operator give you?

20  A.   He indicated that there were two vehicles at

21  the border fence, and they were moving northbound

22  across the border road.

23  Q.   And how did you respond to that information?

24  A.   We ten-foured them on the radio, said that

25  we'd head that way, and we drove in that direction.

1  Q.  Okay.  So help me to get sort of an

2  understanding of your position as it relates to the

3  Lukeville port of entry.  You said earlier that you

4  were at the parking lot outside the Lukeville port

5  of entry?

6  A.  Yeah, almost immediately north, just right off

7  the road.

8  Q.  And so the radio operator giving you this

9  information about two people on the border

10  road, what direction did you go?

11  A.  We had to drive south to the border road and

12  then eastbound along the border fence.

13  Q.  And was the radio operator giving you

14  information as to where he had last seen the two

15  people?

16  A.  Yes.  He said that he had them across the

17  border road, and he lost them in a small grove of

18  trees.

19  Q.  Okay.  And was he -- he could see you as you

20  were responding to this incident?

21  A.  After -- after a brief drive, yeah.  From

22  where we were parked he couldn't see us, I don't

23  believe.  I've never been up there.  But once we

24  got to the border road he could definitely see us.

25  Q.  All right.  About how long did it take you to

 1  respond to the call that -- to the radio call that

 2  this mobile surveillance operator had made?

 3  A.   We responded as soon as they called us.

 4  Q.   And then did you ultimately find the two

 5  people that the camera operator was referring to?

 6  A.   Yes.

 7  Q.   So between the time that it took you to

 8  respond or first get the call from the mobile

 9  surveillance operator to actually making contact

10  with the two -- these two people, how long did it

11  take?

12  A.   Between five and 10 minutes.

13  Q.   I'm sorry?

14  A.   Between five and 10 minutes, roughly.

15  Q.   All right.  And do all three of you respond to

16  the mobile surveillance operator's call?

17  A.   Yes.

18  Q.   Is it -- where you were, I mean, it's

19  midnight, so I would assume it was dark.

20  A.   Yes, very.

21  Q.   Where you were, were there lights where you

22  could see where you were going and the path that

23  you were taking?

24  A.   Where we started, yes.  The Lukeville port of

25  entry always has -- it's almost like a football

1  stadium.  There's lights all over, so you can see

2  there.  Once you get down on the border road, it's

3  a lot darker.

4  Q.  Were you -- were the two people that were

5  described by the mobile surveillance operator, were

6  they immediately visible?

7  A.  No.

8  Q.  Okay.  So tell me what you do.  So once you

9  get -- once you respond to the call, do you all get

10  in a vehicle?

11  A.  Yes.  We responded in a vehicle.  It wasn't

12  close enough to walk to.

13  Q.  Okay.  And then what happens once you're in

14  the vehicle?

15  A.  We maintain communications with the scope

16  operator, and he wanted to give us coordinates

17  that -- in San Diego we work in a lot of

18  mountainous terrain, so it's just a lot easier to

19  go to a known location by description rather than

20  by coordinates.  So we asked him to put us in in

21  the last place that he had visual, which was at the

22  northern edge of the border road.

23      So he was able to stop us within about 15

24  meters of where he believed they crossed the border

25  road to the north.

1  Q.   Okay.  So once you get to that location -- I

2  assume you drive there.  Once you get there what

3  happens?

4  A.   We get out on foot, and it was dark, so we had

5  to utilize flashlights, and we looked for foot sign

6  from the border fence and along the border road.

7  Q.   Is it lit there that you can see the foot

8  sign?

9  A.   Yeah, not without a flashlight.

10  Q.   So were you using a flashlight to look at the

11  foot sign?

12  A.   Yes.

13  Q.   And what were you able to observe from the

14  foot sign?

15  A.   We were able to find -- I was able to find two

16  sets of prints from the border fence heading kind

17  of north-northeast across the road, into the grove

18  of trees.

19  Q.   Now, the information you had from the mobile

20  surveillance operator, was he -- did he have

21  constant surveillance of these folks throughout

22  your interaction with him on the radio?

23  A.   No.  He lost them at the edge of the road

24  where the trees started.  He was not able to see

25  them.

1  Q.   And how were you able to find them then?

2  A.   I was able to follow the foot sign from the

3  fence across the road into the trees, and that's

4  where the two subjects were concealed.

5  Q.   And were Agents Wagner and Swickheimer with

6  you?

7  A.   Yes.

8  Q.   Were you all entering the grove together, or

9  were you in different positions?

10  A.   We all entered the grove together, almost in a

11  straight line.

12  Q.   Okay.  How were you dressed that night?

13  A.   In full rough duty uniform.

14  Q.   So I'm -- I don't know what that means.  Can

15  you describe that.

16  A.   Green pants, green uniform shirt, name

17  plate, badge, and patches on each shoulder,

18  Homeland Security and Border Patrol.

19  Q.   And when you approach -- when you approach the

20  grove of trees, are you announcing yourselves?

21  A.   Yes.

22  Q.   And how do you do that?

23  A.   Each person does it differently.  I say, "U.S.

24  Border Patrol."  Some of our Spanish speakers,

25  native speakers, will announce in Spanish.  I say,

 1   "U.S. Border Patrol."

 2   Q.   On this particular night, did you identify

 3   yourself when you approached the grove of trees?

 4   A.   Yes.

 5   Q.   And what did you find when you entered the

 6   grove of trees?

 7   A.   Two subjects spaced probably about five feet

 8   apart concealing themselves in some of the lower

 9   brush.

10   Q.   What do you do when you see them concealing

11   themselves?

12   A.   First thing normally in that circumstance is

13   to ask for hands.  You want to make sure you see

14   their hands, make sure, officer safety, obviously,

15   that they don't have any weapons or anything.

16        And then I approached the subject.  Eric

17   approached the other subject, and Chris was kind of

18   brought in between.

19   Q.   What were you and Eric doing?

20   A.   I patted down my subject for immediate weapons

21   in the waist area and then put handcuffs on him.

22   Eric I assume was doing the same thing, but I

23   wasn't -- I was focused on my guy.  And Chris was

24   in the middle of asking the 213 questions.

25   Q.   So what does "the 213 questions" mean?

1  A.   Basically it consists of their country of

2  origin and if they have any documentation to be in

3  the United States.

4  Q.   Did you hear the responses to Chris' -- Agent

5  -- Chris is Agent Wagner?

6  A.   Agent Wagner, yes, I'm sorry.

7  Q.   Did you hear the responses to Agent Wagner's

8  questions?

9  A.   I heard the response, "No," as to if he had

10  any immigration documents to be able to remain in

11  the United States, and I heard him state that he

12  was from Michoacán, which is a state in Mexico.

13  Q.   Now, when you are making contact, you said you

14  were patting down the person you made contact with.

15  Do you -- did you find any weapons?

16  A.   No.

17  Q.   Did you have your weapon drawn at that point?

18  A.   No.

19  Q.   Was there -- did any -- do you recall that any

20  of the other members of your group had their

21  weapons drawn?

22  A.   I don't believe so.

23  Q.   Okay.  When you -- when Chris is asking

24  questions, do you recall seeing if he had a weapon

25  drawn, or do you recall seeing him have a weapon

1  drawn?

2  A.   I do not, and normally, especially being a

3  small team as we are, if one person has their

4  weapon out, usually the whole team does.

5  Q.   And do you recall having your weapon out?

6  A.   I definitely did not, no.

7  Q.   Okay.  So when you -- when Chris is asking the

8  questions -- hold on.  Let me back up here a

9  second.

10      When you're in this grove of trees, are you

11  looking around for other people?

12  A.   Multitasking.  We are looking around.  We had

13  the report of two, and we knew we had two in front

14  of us.  We were addressing them first.  Chris would

15  be looking more, and then Eric arrived because he

16  wasn't hands-on with anybody at the time.

17  Q.   Okay.

18  A.   But you're constantly looking around.

19  Q.   So you had had some information that there was

20  violence across the border.  Did that information

21  change the way you responded to the information

22  that the mobile surveillance operator had given

23  you?

24  A.   No.

25  Q.   All right.  What are you physically observing

1  about the people that you've made contact with,

2  that the three of you made contact with?

3  A.   The first thing I always look at is their

4  hands.  You want to make sure there's nothing in

5  their hands, their hands are visible.  Then just a

6  general impression of the person, what kind of

7  stance they're in, if they're standing, if they

8  appear to be hiding anything, you know, leaning one

9  way or the other.  Just general appearance.  Are

10 they injured?  I am an EMT so that's kind of one

11 thing I just kind of look at on the side.  Just try

12 to get a general feel.

13 Q.   Did you notice that either of the two people

14 you made contact with had any injuries?

15 A.   No.  Neither of them appeared injured.

16 Q.   Were either of the two people combative?

17 A.   No.

18 Q.   Did they seem hostile to you?

19 A.   No.

20 Q.   What was your -- what was your impression of

21 their attitude toward you?

22 A.   They seemed a little grumpy, honestly.

23 Q.   And as an EMT, did I already ask you, did you

24 notice any injuries?

25 A.   Yes, you did, and no, I did not.

1    Q.   All right.   What happens once the field

2    questions are asked?

3    A.   Once we've determined that they're going to be

4    taken into custody, then they are taken to -- we

5    had a marked vehicle at the time which had the cage

6    in it --

7    Q.   Uh-huh.

8    A.   -- and they were put in the back of that.

9    They are searched more thoroughly before they're

10   put in, their belongings are searched, and then

11   there's an apprehension sheet that's filled out,

12   and then they're transported to the station for

13   further processing by the processing team.

14   Q.   On this particular occasion, do you recall who

15   transported the two people?

16   A.   Agent Wagner.

17   Q.   Was one of the two people later identified for

18   you as Ramon Ramos-Zepeda?

19   A.   Yes.

20   Q.   And do you have an independent recollection of

21   that person?

22   A.   I do.

23   Q.   And I would ask you to look through the

24   courtroom, see if you can identify the person that

25   you recall as being Ramon Ramos-Zepeda in the

1  courtroom today.

2  A.    I do.

3  Q.    Can you point him out and just let us know an

4  article of clothing, perhaps --

5  A.    That gentleman right there in the orange.

6  Q.    Now, have you ever had an occasion where

7  somebody expressed fear to you when you first made

8  contact with them out in -- as part of your duties

9  as a border patrol agent?

10  A.    Yes, I have.

11  Q.    And are you familiar, then, with some of the

12  signs or body language that they might exhibit when

13  they are expressing that fear or feeling afraid?

14  A.    Yes.  It's fairly obvious usually.

15  Q.    Did you notice any of those signs or behaviors

16  in Mr. Zepeda on the 1st of May, when you made

17  contact with him?

18  A.    No.

19  Q.    Now, is fear something -- is fear something

20  that you would note and perhaps write on a field

21  826?

22  A.    Yes.

23  Q.    Is it something that you would perhaps

24  communicate to other members of your team or the

25  processing team?

1    A.   Yes, especially the processing team because it

2    takes a different path.

3    Q.   What -- I'm sorry.  Can you explain that?

4    A.   Processing has to go a different route, and

5    different notifications need to be made on their

6    behalf if there is a credible fear.

7    Q.   In this particular instance with

8    Mr. Ramos-Zepeda, did you believe that there was a

9    need for this different path, that there was fear

10   being communicated to you that you needed to then

11   notify the processing team or some other members of

12   your team about?

13           MR. ROCHA:  Your Honor, I object to the

14   line of questioning.  The issue here is

15   suppression.  Government counsel's already trying

16   to go to the issue of duress, which is not before

17   the Court.

18           The agent testified that he was placed in

19   the vehicle and taken to the processing station.

20   Whether or not he was fearful does not go to the

21   issue of suppression at this point, and also the

22   question's compound, by the way.

23           THE COURT:  Ms. Furtado?

24           MS. FURTADO:  Judge, the -- one of the

25   issues in the motion was voluntariness, and so I do

 1  need to prove that the statement that was given or

 2  that was taken from the agent was voluntary in

 3  nature, and so that's the reason why I'm asking the

 4  fear questions, because it is the totality of

 5  circumstances that the Court needs to consider when

 6  considering whether the statements are voluntary.

 7          I mean, the argument that we'll make later

 8  is that these were -- this was a Terry stop

 9  situation where the agents did have the legal

10  ability to ask the questions they have, but the

11  voluntariness question is separate, and I do need

12  to address that as well through the questions that

13  I elicit through this witness.

14          THE COURT:  Mr. Rocha?

15          MR. ROCHA:  Your Honor, according to the

16  Government's discovery, Mr. Ramos actually invoked

17  his Fifth Amendment right after the agents had

18  already processed.  The agent's already testified

19  that they'd taken him to the station where they

20  processed him first.  That's his testimony.

21          The information disclosed by the

22  Government was that he invoked his Fifth Amendment

23  right, so there's nothing else to ask.

24          THE COURT:  Well, he invoked his Fifth

25  Amendment right later, not at the initial stop.

 1  I'm going to let this go a little farther, but I'm

 2  not sure.  I'll let it go a little farther.

 3          So the objection is overruled.

 4  BY MS. FURTADO:

 5  Q.  Agent, was there anything that you noted on

 6  the field 826 that you believe needed to be

 7  communicated to the processing team regarding fear

 8  that the defendant might have had?

 9  A.  No.

10          MS. FURTADO:  Your Honor, I forgot to

11  ask, but I would ask that the record reflect that

12  the witness has identified the defendant.

13          THE COURT:  The record will reflect that.

14  Thank you.

15          MS. FURTADO:  Thank you.  I just need one

16  second.

17          THE COURT:  Sure.

18          MS. FURTADO:  I don't have any other

19  questions for this witness.

20          THE COURT:  Okay.  Thank you.

21          Mr. Rocha?

22          Yeah, thank you for coming to the podium

23  so we can make sure we get you recorded.  Thank

24  you.

25                  CROSS-EXAMINATION

1  BY MR. ROCHA:

2  Q.   Good afternoon, Agent.  I want to ask you a

3  little bit -- so you mentioned that you received a

4  lot of training during your time in the academy.

5  Does that training involve also filling out police

6  reports?

7  A.   There's some basic report writing training.

8  Q.   Can you explain what "basic" means.

9  A.   It's a long time ago, but basically the gist

10  of all of our training as far as paperwork was

11  concerned was you need to be able to write down

12  enough facts to where you're not writing down too

13  much, but you're writing down enough to where you

14  can remember the incident later so that you're not

15  coaching yourself, that it was the gist of

16  everything we did.  It wasn't a whole lot of

17  writing per se.

18  Q.   So part -- so part of your -- you said you

19  were an officer for six years?

20  A.   I've been an agent for eight-and-a-half years.

21  Q.   Eight-and-a-half years.  And during eight-

22  and-a-half years, you've filled out countless

23  reports?

24  A.   Narratives.  I don't know that I'd call them

25  reports.

1   Q.   Can you explain a narrative.

2   A.   A narrative would be our version of what

3   happened.  With my unit, we have processing teams

4   that do the actual casework.  We're normally only

5   writing a narrative of our recollection of the

6   events as pertaining to that case.

7   Q.   And as part of your narrative, you include all

8   the appropriate, important information?

9   A.   As we see fit, yes.

10  Q.   Nothing that's not -- nothing that's important

11  is left out?

12  A.   I wouldn't necessarily say that all the time.

13  At the time what we think is pertinent is what we

14  write down.

15  Q.   And in this case, you did actually fill out a

16  narrative report; is that correct?

17  A.   Yes, I did.

18          MR. ROCHA:  Your Honor, may I approach the

19  witness?

20          THE COURT:  Sure.

21          MR. ROCHA:  I'm approaching the witness

22  with what's -- it's Defense Exhibit I believe 59.

23          It's Agent Letavay -- is that correct?

24          THE WITNESS:  Letavay.

25          MR. ROCHA:  I'm going to call it, for lack

1   of a better word, Your Honor, a police report.

2          THE COURT:  Okay.

3          MS. GRANOFF:  Disclosure page number,

4   counsel, please.

5          MR. ROCHA:  Yes.  Five.

6          MS. GRANOFF:  Thank you.

7   BY MR. ROCHA:

8   Q.   Do you have your report in front of you, sir?

9   A.   I do.

10  Q.   Is that your report?

11  A.   Yes.

12  Q.   Did you fill out your report after the

13  incident?

14  A.   A little while after the incident, yes.

15  Q.   What does that mean?

16  A.   We were already back in San Diego when we were

17  notified that there was a case, and we filled it

18  out at that time.

19  Q.   So is that an hour?  Two days?  Four days?

20  A.   Several days.  I don't remember exactly how

21  long.  Here it looks like six days.

22  Q.   So six days -- six days after the

23  incident, you actually did your narrative?

24  A.   Yes.

25  Q.   Now, can you tell us, according to your

1  report, what time did you respond to the incident?

2  A.   Approximately 12:15 --

3  Q.   Okay.

4  A.   -- on May 1st.

5  Q.   Now, according to your report, it says that

6  there was a camera operator that warned you or

7  notified the agents that there was someone or some

8  persons that had crossed the port of entry, or I'm

9  sorry, the U.S./Mexico border?

10  A.   Correct.

11  Q.   And then you responded to that?

12  A.   Yes.

13  Q.   And did you say I believe on direct it was

14  five minutes, or how long did it take to you

15  respond?

16  A.   It took us about five minutes to get there.

17  We responded immediately.

18  Q.   Okay.  And I just want to make sure, because I

19  believe your testimony was five to 10 minutes, so I

20  just want to make sure it's correct.

21      Okay.  So you said in your report that the

22  scope operator -- so is that a camera?  I'm not

23  sure what that means.

24  A.   Yes.

25  Q.   So the scope operator advised you there were

1  two subjects that had crossed and that they were

2  located north on the border road, is that right,

3  according to your report?

4  A.   They were located -- when he first saw

5  them, they were on the southern end of the border

6  road against the fence.  When he lost them, they

7  were north of the border road in grove trees.

8  Q.   Okay.  But just answer the question, please.

9       He said that they were immediately north of

10  the border road.  Is that what's in your report?

11  It says, "Scope operator advised us there were two

12  subjects that stopped in a small grove of trees."

13  That's in your report.

14  A.   Yes, that's correct.

15  Q.   Okay.  So you knew where they were?

16  A.   Approximately.

17  Q.   Okay.  So then you immediately went out

18  there, and the scope operator, according to your

19  report, says that he could not see that they had

20  actually gone any farther north.

21       Is that right?

22  A.   That is correct.

23  Q.   Now, you said in your report that you saw foot

24  signs.

25  A.   Yes.

1   Q.   And you followed the foot signs to, what is

2   it, the small grove of trees?

3   A.   Uh-huh.

4   Q.   Okay.  And that's where you actually saw the

5   two subjects?

6   A.   That is correct.

7   Q.   Okay.  Now, when you saw the two subjects,

8   according to your report, you said in there that

9   they were taken into custody at 12:20.

10  A.   Correct.

11  Q.   So that's the word you used, "custody"?

12  A.   Correct.

13  Q.   Now, in your report, does it say that you

14  heard the other agent advise him of some warnings

15  or asked him about their nationality?

16  A.   In the report, no.

17  Q.   And in that report, did you ask any of the two

18  subjects about where they were from, where they

19  were coming from, where they were going?

20  A.   I did not.

21  Q.   And so when you said they're taken into

22  custody, you then loaded them on -- I'm sorry.  You

23  transported them onto a vehicle; is that right?

24  A.   They were walked to the vehicle.

25  Q.   They were walked to the vehicle, and then they

 1    were taken inside the vehicle; right?

 2    A.   There was an app sheet filled out, there was

 3    the rest of the searching, and then they were put

 4    in the vehicle and transported to the station.

 5    Q.   And in your report it says it's without

 6    incident.

 7    A.   Yes.

 8    Q.   So there was no quarreling, no wrestling?

 9    A.   No.

10    Q.   The subjects were cooperative?

11    A.   Correct.

12    Q.   Now, you said that it was dark out there?

13    A.   Yes.

14    Q.   That you had to use your flashlight to find

15    the footprints?

16    A.   That's correct.

17    Q.   And there were three agents?

18    A.   Three.

19         MR. ROCHA:  Your Honor, I have no further

20    questions.

21         THE COURT:  Okay.  Thank you.

22         Ms. Furtado?

23         MR. ROCHA:  I'm sorry.  May I retrieve the

24    report?

25         THE COURT:  Yes, please.  Thank you very

1  much.  Thank you.  Thank you, Mr. Rocha.

2                    REDIRECT EXAMINATION

3  BY MS. FURTADO:

4  Q.   Agent Letavay, do you write a report for every

5  apprehension that you do?

6  A.   No.

7  Q.   When do you write reports?

8  A.   When there's going to be an associated case

9  where there are criminal charges.

10 Q.   Do you have access to your field 826?

11 A.   Yes.

12 Q.   When you write a report?

13 A.   Not always.

14 Q.   In this particular instance, did you have

15 access to the field 826 that was created for this

16 incident?

17 A.   I did not.

18 Q.   And so was this report written based on --

19 what?

20 A.   My vast recollection.

21 Q.   And do you -- when you write these reports,

22 are you writing every detail?

23 A.   No.

24 Q.   Why not?

25 A.   One, it's hard to remember several days later.

1  Also, you don't want to write things that you're
2  not a hundred percent sure about, so anything I
3  write is I'm 100 percent sure, and it's to jog my
4  memory later if needed.
5  Q.  Were you able to review your report before
6  testifying today?
7  A.  Yes.
8  Q.  And was it -- did it jog your memory of the
9  events from May 1st, 2015?
10 A.  Yes.
11 Q.  And what do you recall after reading the
12 report about -- about what the scope operator told
13 you he saw about the two aliens, with regard to the
14 two aliens?
15 A.  When he first saw them -- because there's
16 quite a bit of talking back and forth as you drive
17 in there trying to figure it out, especially
18 because it's not our area.  I recall him telling us
19 that he first spotted them at the fence on the
20 south side of the road.  They crossed the road
21 north into the trees, and he lost them.
22      And from there he said that he's pretty sure
23 he would have seen them continue north, so he
24 thought they were somewhere in that area.
25 Q.  And were you able to immediately see them

1  whenever you got to that area?

2  A.   No.  We had to ask the scope operator what his

3  best idea was once he could see us to put us in the

4  area where he thinks they crossed the road, and

5  that's where we looked for foot sign.

6  Q.   Was your previous testimony that you had to

7  use the foot sign to ultimately find the two

8  aliens?

9  A.   That's correct.  That's how we found them.

10 Q.   All right.  Now, defense counsel asked you

11 about the custody at 12:20 a.m.  Do you --

12          MS. FURTADO:  May I approach the

13 witness, Your Honor?

14          THE COURT:  Sure.

15 BY MS. FURTADO:

16 Q.   I'm going to show you what's been disclosed on

17 page four.

18      Is that your report?

19 A.   I'm sorry?

20 Q.   Is that your report?

21 A.   Yes.

22 Q.   Okay.  I'd ask you to look at the sentence

23 with regard to the 12:20 a.m. custody.

24      Could you find that in the paragraph?

25 A.   Yes.

1  Q.  Okay.  Now, with regard to custody at

2  12:20 a.m., did that occur before or after the

3  field questions happened?

4  A.  After.

5          MS. FURTADO:  I don't have any other

6  questions for this witness, Your Honor.

7          THE COURT:  Okay.  Thank you.  May this

8  witness be excused?

9          MS. FURTADO:  Yes, sir.

10          THE COURT:  Okay.  Thank you very much for

11  your time.

12          THE WITNESS:  Thank you.

13          MS. FURTADO:  The Government calls Agent

14  Christopher Wagner.

15          THE COURT:  Okay.  Thank you.

16          CHRISTOPHER WAGNER, WITNESS, SWORN

17          THE CLERK:  (Inaudible).

18          THE WITNESS:  Christopher

19  Wagner, W-a-g-n-e-r.

20          THE CLERK:  Thank you, sir.

21                    DIRECT EXAMINATION

22  BY MS. FURTADO:

23  Q.  Good afternoon.  Could you tell us where you

24  work, please, sir.

25  A.  I work out of San Diego sector, specifically

1   the air mobile unit or San Diego strike team now.

2   Q.   Are you a border patrol agent?

3   A.   I am.

4   Q.   How long have you been a border patrol agent?

5   A.   Just over eight years, eight-and-a-half years.

6   Q.   How long have you been on the San Diego strike

7   team?

8   A.   I've been with them for just under six.

9   Q.   Does it take specialized training to become a

10  border patrol agent?

11  A.   Yes.

12  Q.   Can you tell me what that specialized training

13  is.

14  A.   You have to go to the academy, a 12-week

15  academy, plus an additional eight weeks of Spanish,

16  and then post academy training, things of that

17  nature.

18  Q.   Did you, when you went through that basic

19  academy, do what you described with the Spanish?

20  A.   Yes, the basic academy is the 12-week basic

21  academy.

22  Q.   And did you have to learn Spanish?

23  A.   I had to take a an eight-week course at the

24  basic academy.  I was still in Artesia.

25  Q.   Do you speak Spanish then?

1   A.   I speak enough Spanish for work, where I can

2   give commands, ask specific questions.  If I'm

3   going to get into an in-depth conversation, I would

4   turn that over to somebody else.

5   Q.   But do you speak enough Spanish that you can

6   ask and understand the field questions?

7   A.   Yes.

8   Q.   And after basic training, you said you go to

9   field training?

10  A.   Yes.  When you get to your station, you go on

11  to field training where, depending on the station,

12  some are six or eight weeks, some are 12 or even

13  longer, but I believe Brown Field station was about

14  12 weeks.

15  Q.   Brown Field station, is that in California?

16  A.   It is, San Diego sector.

17  Q.   Is that where you're stationed now?

18  A.   That's my home station is Brown Field station.

19  That's where I went through the FTU, the field

20  training.

21  Q.   And is the field -- during your field

22  training, what kind of things are you doing?

23  A.   Your field training officers are taking you

24  through your area of operation.  You're learning

25  the trails, different canyons, different terrain,

 1  sensor locations, learning how to follow foot sign,

 2  follow various types of sign, broken branches, this

 3  and that, learning how to use FLIR scopes, things

 4  of that nature, basically on-the-job training.

 5  Q.  Were you able to successfully complete your

 6  basic training and your field training?

 7  A.  Yes.

 8  Q.  Do you have post academy training that you

 9  have to do as well?

10  A.  There is.

11  Q.  Were you able to successfully complete that

12  training as well?

13  A.  Yes.

14  Q.  Okay.  I'd like to direct you to an incident

15  that happened the 1st of May, 2015, about midnight,

16  near the Lukeville port of entry.

17      Do you recall that event?

18  A.  I do.

19  Q.  Who were you with?

20  A.  I was with Agents Swickheimer and Letavay.

21  Q.  And what was your assignment that night?

22  A.  We'd been asked to stand by near the Lukeville

23  POE because they had no mobile or the Ajo station

24  had no mobile agents during that time frame, so

25  they asked us to stand by.

1   Q.   And where -- did you get a call over the radio

2   about two people that had -- that were crossing the

3   border road?

4   A.   Yes.

5   Q.   Can you tell me what information you received.

6   A.   One of the scope operators for the Ajo station

7   said he observed two subjects approximately 400

8   meters to the east of the Lukeville POE.  He had

9   them at the fence and asked if there was anybody in

10  the area that could respond.  We said we were, and

11  he said for us to start coming eastbound.

12       He said they had them walking right across the

13  border road and -- laid up, meaning they stopped

14  and hid, in a small grove of trees immediately over

15  the border road.

16  Q.   When -- when you got this information, did the

17  three of you, so you, Agent Swickheimer, and Agent

18  Letavay, did you respond to that information?

19  A.   Yes.  We immediately started driving on the

20  border road.  Once we were in the scope operator's

21  picture, he told us to stop where he felt they

22  crossed.

23  Q.   And were two people immediately visible to

24  you?

25  A.   Not immediately visible.  As soon as we

1    stopped, we located the foot sign, actually located

2    the foot sign, I believe it was right behind the

3    truck, but located the foot sign.  We followed it

4    right into the grove of trees that was immediately

5    north of the border road, and there were two

6    subjects sitting there whose shoes matched the sign

7    on the border road.

8    Q.   Okay.  When you see the two subjects sitting

9    there, what did you do?

10   A.   We approached them immediately.  There was

11   no -- they didn't try to run.  They didn't try to

12   fight.  There was no issue.  So we walked up to

13   them.  Adam went to one, Swickheimer went to the

14   other, asked them real quick what country they were

15   born in, if they had immigration documents.  They

16   said Mexico.  They had no immigration documents.

17        They both got cuffed.  Then we took them in

18   our vehicle and went back to the other side of

19   Lukeville.

20   Q.   Okay.  What were you wearing when you made

21   contact with the two individuals?

22   A.   Full rough duty border patrol uniform.

23   Q.   Can you explain what rough duty border patrol

24   uniform is, please.

25   A.   Yes.  Rough duty uniform is a ripstop

 1  material, all green.  Badge here where I have this

 2  MRT logo.  Badge here.  Name plate.  Full just

 3  standard rough duty uniform.  Gun belt.

 4  Q.   Okay.  When you -- you said after Letavay

 5  found the foot sign, you --

 6  A.   Yes.

 7  Q.   -- found the two aliens.  When you approached

 8  these two people, do you announce yourself?

 9  A.   Yes.  In this case I believe -- I know I did.

10  I don't recall if Swick did, but I think Adam said

11  "Border Patrol" as well, walked up to them.  And

12  again, nobody ran.  No one tried to do anything.

13  Just sat there.  And we walked up to them and did a

14  quick immigration inspection, hooked them up and

15  put them in the vehicle.

16  Q.   Did you have any guns drawn when you were

17  approaching them or speaking to them?

18  A.   No.

19  Q.   Did you notice in this case about their

20  demeanor?

21  A.   They actually seemed annoyed that we found

22  them.  You get different responses from people when

23  you locate them out and about in the brush or here

24  just north off the border road, but they actually

25  seemed annoyed that we had found them.

1  Q.  Now, the exchange that you had, you said you

2  asked them the field questions about citizenship

3  and paperwork.  Did you ask that in English or

4  Spanish?

5  A.  We ended up doing both.  I usually go to

6  English immediately.  If it's not understood, I'll

7  go to Spanish.  Both subjects spoke some

8  English, so we were able to ask in English, and

9  then when we asked again in Spanish.  It was the

10 same answer.

11 Q.  Okay.  And did you feel when you were asking

12 in Spanish that they were understanding the

13 questions you were asking?

14 A.  Yes.

15 Q.  And were you able to understand the response

16 that you got?

17 A.  Yes.

18 Q.  And was the response the same as you've

19 testified before, Mexico and no documents?

20 A.  Yes.

21 Q.  Okay.  Now, the two people that you made

22 contact with, was one later identified as Ramon

23 Ramos-Zepeda?

24 A.  Yes.

25 Q.  And were you able to observe him on the 1st of

1    May, seeing his facial features and the way he

2    looked?

3    A.   Yes.

4    Q.   And I would ask you to look around the

5    courtroom today.  Do you see the person you

6    encountered on May 1st identified as Ramon Ramos-

7    Zepeda?

8    A.   Yes.

9    Q.   Okay.  Can you point him out and just tell us

10   an article of clothing that he's wearing.

11   A.   The gentleman in orange.

12          MS. FURTADO:  Your Honor, I would just ask

13   that the record reflect that this witness is

14   referring to the defendant.

15          THE COURT:  The record will reflect that.

16   Thank you.

17          MS. FURTADO:  Thank you.

18   BY MS. FURTADO:

19   Q.   Agent, you said that what you observed was

20   annoyance in the two people you made contact with,

21   including the defendant.

22          Did you notice anything -- have you ever

23   encountered anybody who was afraid when you made

24   contact with them on the border or out in the

25   desert?

1  A.  Yes.

2  Q.  Did you observe any of those signs or physical

3  behaviors in the defendant that indicated to you he

4  was afraid?

5  A.  I did not.

6         MS. FURTADO:  Can I have a second, Your

7  Honor?

8         THE COURT:  Sure.

9  BY MS. FURTADO:

10 Q.  Ultimately, after he made contact and you said

11 they were handcuffed, were they -- were the two

12 people, including the defendant, transported?

13 A.  Yes.  We initially put them in my vehicle.  We

14 drove back to where we were on the west side of

15 Lukeville.  There's a parking lot immediately on

16 the west side of Lukeville.

17     We stood by there, filled out the apprehension

18 sheets, and called for transport.  It turned out

19 transport was going to be quite extended, so I

20 drove them myself to the Ajo station.

21 Q.  And during transportation, were there any

22 other questions or any other statements that were

23 made?

24 A.  No.

25         MS. FURTADO:  I don't have any other

1  questions for this witness, Your Honor.

2            THE COURT:  Thank you.

3            Mr. Rocha?

4                    CROSS-EXAMINATION

5  BY MR. ROCHA:

6  Q.  Good afternoon, Agent Wagner.

7      Do you recall filling out a memorandum of

8  investigation report?

9  A.  The G-166?

10  Q.  That's right.

11  A.  Yes.

12  Q.  Do you recall when you actually completed that

13  report?

14  A.  It was completed on May 7th, I believe.

15  Q.  When did the incident take place?

16  A.  May 1st.

17  Q.  How long, if we do the math?  One week after?

18  A.  More or less.

19  Q.  And you said you have been a border patrol

20  agent for eight years?

21  A.  Yes.

22  Q.  And part of your training, again, you fill out

23  police reports?  Is that part of your training when

24  you're at the academy?

25  A.  Yes.  Yeah, yeah, filling out reports.  A lot

1   of that's done on the FTU, but yes.

2   Q.   That includes this G-166C?

3   A.   Yes.

4   Q.   And I believe you said on direct examination

5   that -- well, before I ask you that question, I

6   think it's safe to say that you include all the

7   important information in this memorandum of

8   investigation.  Would that be safe to say?

9   A.   Yes.

10  Q.   You don't leave out anything that's not

11  important, or that's important, I should say?

12  A.   Correct.

13  Q.   And during direct examination, you testified

14  that -- maybe I misunderstood you to say that you

15  read the field questions to the two subjects.

16  A.   No, no.  I asked field interview questions,

17  specifically what country are you a citizen of or

18  what country were you born in.

19  Q.   So you were the one that asked them that

20  question?

21  A.   Yes.

22  Q.   That's obviously very important because you

23  don't want to take an American citizen into

24  custody, obviously; right?

25  A.   Correct.

1  Q.  Because as we all know, border patrol doesn't

2  have jurisdiction over American citizens; right?

3  A.  In what sense?  If you have a U.S. citizen

4  smuggling narcotics, we absolutely do.

5  Q.  Oh, well, for reentry.  I should say reentry,

6  to clarify.

7  A.  Again, that's incorrect.

8  Q.  Okay.

9  A.  If you have a U.S. citizen entering illegally

10  in between ports without inspection, we're still

11  going to take them into custody.  They're not going

12  to get charged with illegal entry --

13  Q.  Okay.

14  A.  -- the way someone from another country would,

15  but we would still take them into custody.

16  Q.  But we can agree illegally entering the

17  country is a crime?

18  A.  Yes.

19  Q.  Would you agree?  Right?

20  A.  Yeah.

21  Q.  Otherwise we wouldn't be here?

22  A.  Correct.

23  Q.  Okay.  So may I approach you with your report?

24  A.  Sure.

25          MR. ROCHA:  Your Honor?

1              THE COURT:  Absolutely.

2    BY MR. ROCHA:

3    Q.   Do you have your report in front of you?

4    A.   I do.

5    Q.   Now, can you tell us where in your report you

6    actually say -- you write that you asked those

7    field questions to the two subjects?

8    A.   It appears that I probably did not.  I don't

9    have that in the report.

10   Q.   Would you agree that that's an important fact?

11   A.   In terms of taking them into custody?

12   Yeah, you want to make sure that they were, in

13   fact, an illegal alien.  However, if I am going to

14   take them into custody --

15   Q.   But that's not in your report, right, that you

16   asked them field questions?

17   A.   Correct.

18   Q.   Now, at the end of your report, it said that

19   you took the two subjects into custody; correct?

20   A.   Correct.

21   Q.   And then the incident -- what time was the

22   incident, according to your report?

23   A.   I believe we were advised via radio about

24   12:15, and we took them in custody at 12:20.

25   Q.   And it was also without incident?

1  A.   Yes.

2          MR. ROCHA:   Your Honor, I have no other

3  questions.

4          THE COURT:   Thank you.

5          Ms. Furtado?

6          MS. FURTADO:   Thank you.

7          MR. ROCHA:   Your Honor, may I approach --

8          THE COURT:   Yes.   Thank you very much.

9  Thank you.   Thank you, Mr. Rocha.

10         Ms. Furtado?

11         MS. FURTADO:   Thank you.

12                 REDIRECT EXAMINATION

13  BY MS. FURTADO:

14  Q.   Agent Wagner, do you write a report in every

15  -- in every case?

16  A.   No.

17  Q.   When do you write reports?

18  A.   We -- I write a report when it turns out

19  there's a 1326 or a 24 or a case that actually

20  requires a first-person narrative.

21  Q.   And when you write reports, were you trained

22  to write down every single detail of what happened?

23  A.   Important details.

24  Q.   Okay.   What's the purpose of your report for

25  you?

1   A.   To remind me of what occurred during the

2   event.

3   Q.   Okay.  Were you able to take a look at your

4   report prior to testifying today?

5   A.   I was.

6   Q.   Was it able to remind you of the events that

7   happened on May 1st, 2015?

8   A.   Yes.

9   Q.   And the information that you provided about

10  taking into custody, I'm going to ask you some

11  questions about that, but I want to --

12  A.   Sure.

13  Q.   -- show you something.

14          MS. FURTADO:  Your Honor, may I approach?

15          THE COURT:  Yes.

16  BY MS. FURTADO:

17  Q.   I'm showing you number two.

18       I'd ask you to take a look at that.  Can you

19  locate the sentence that relates to 12:20 a.m.?

20  A.   Are you talking about, "Both subjects were

21  taken into custody without incident at

22  approximately 12:20 a.m.?"

23  Q.   Yes, that's it.

24  A.   Yes.

25  Q.   Okay.  Did that custody at 12:20 a.m. happen

1  before or after you asked the field questions, the

2  field questions about citizenship and

3  documentation?

4  A.   When I was asking the questions, both Agents

5  Letavay and Swickheimer were handcuffing the two

6  subjects.

7  Q.   Okay.  That line about custody at 12:20 a.m.,

8  is that related to your determination before or

9  after you had the questions about whether or not

10  they were --

11  A.   Once they're --

12        MR. ROCHA:  Your Honor, I believe --

13  objection.  I believe that the witness has already

14  answered the Government's question, which is were

15  the questions asked before custody or after

16  custody.  The agent's testimony was that he asked

17  the questions as they were being handcuffed.

18  That's his testimony.

19        THE COURT:  You can go ahead and ask the

20  question.

21  BY MS. FURTADO:

22  Q.   The line where it says custody happened at

23  12:20 a.m., does that time refer to custody before

24  you asked the questions about citizenship and

25  paperwork, or does it refer to after those

1    questions were asked?

2              MR. ROCHA:  Objection again.  That's

3    already been asked and answered by the agent, Your

4    Honor.

5              THE COURT:  I'm going to let him answer

6    it.  Overruled.

7    A.   That time for me would refer to when I'm

8    taking him, putting him in the vehicle at the end

9    of the incident, or at the end of the -- of making

10   contact with him.

11             MS. FURTADO:  Thank you.  I don't have any

12   other questions for this witness.  Thank you.

13             THE COURT:  Thank you.  May this witness

14   be excused?

15             MR. ROCHA:  Yes, Your Honor.

16             THE COURT:  Okay.  Thank you.  Thank you

17   very much for your time.

18             Does anyone need a break or anything?  If

19   you do, just let me know at any time, anyone.  So

20   just let me know.  Okay?  Thank you.

21             MS. GRANOFF:  Thank you.

22             MS. FURTADO:  We're ready to move away

23   from the 2015 statement and move to the 2009

24   statements.

25             THE COURT:  Okay.

 1             MS. FURTADO:  Mr. Rocha had let us know

 2    that he wanted one of the agent potentially as a

 3    defense witness, and we're just asking if he wants

 4    to call that agent now, or if we can release them

 5    all.

 6             MR. ROCHA:  We can release the other

 7    witness, which is Mr. Swickheimer.  I forgot how

 8    you say his last name.

 9             THE COURT:  Right.  Okay.  Yes, that's

10    Mr. Swickheimer, I think.  Okay.  So we'll go ahead

11    and release him.

12             MS. GRANOFF:  Now, as to Agents Wagner and

13    Letavay, are you done with them?

14             MR. ROCHA:  Yes.

15             MS. GRANOFF:  Okay.  So --

16             THE COURT:  So we can let the three of

17    those individuals go.

18             MR. ROCHA:  That's fine.

19             THE COURT:  Okay.  Great.  Thank you.

20             MS. FURTADO:  That's our out-of-town

21    witnesses.

22             THE COURT:  Right.  That's great.

23             MS. GRANOFF:  Okay.  So I'll go ahead and

24    I'll take the time and just release them and just

25    let them know that we're done with them for the

1  day.

2          THE COURT:  Yes.

3          MS. GRANOFF:  Your Honor, do you want to

4  hear argument right now on this set of statements

5  for the motion to suppress, or do you want to take

6  argument for all of them once we do the testimony?

7          THE COURT:  I think I'd like to hear the

8  witnesses, hopefully, so that we can get them done

9  and then --

10         MS. GRANOFF:  Okay.

11         THE COURT:  Unless that's a real

12 inconvenience for you.

13         MS. GRANOFF:  No.

14         THE COURT:  Mr. Rocha?

15         MR. ROCHA:  I'd rather wait until the end.

16         THE COURT:  Yeah, I think it probably

17 makes sense.  Okay.  Great.  Thank you.

18         MS. GRANOFF:  All right.  Then I'll line

19 up the next set of witnesses up, Judge.

20         THE COURT:  Okay.  Thank you.

21             JORGE BORREGO, WITNESS, SWORN

22         THE WITNESS:  My name is Jorge Borrego.

23 My last name is B-o-r-r-e-g-o.

24         THE COURT:  Thank you.

25         Ms. Furtado?

1          MS. FURTADO:  Thank you.

2                   DIRECT EXAMINATION

3    BY MS. FURTADO:

4    Q.   Sir, can you tell us where you work.

5    A.   The U.S. Border Patrol.

6    Q.   And how long have you worked there?

7    A.   Been there just over eight years.

8    Q.   Does it take special training to become a

9    border patrol agent?

10   A.   Yes.

11   Q.   Can you tell us about that special training

12   and what you had to do.

13   A.   I went to a -- the academy in Artesia, New

14   Mexico, and there we received training.  We learned

15   immigration law, criminal law, firearms, defensive

16   tactics, flying watch duties, patrol -- how to

17   patrol the border.

18   Q.   Okay.  When you finish basic training, do you

19   have to go to field training?

20   A.   Yes.

21   Q.   Is there a portion of basic training where you

22   can learn Spanish?

23   A.   Yes.

24   Q.   Did you have to do that portion?

25   A.   No.

1  Q.   Is that -- why is that?

2  A.   I was able to test out of speaking -- of the

3  Spanish course.

4  Q.   Did you grow up speaking Spanish?

5  A.   Yes.

6  Q.   Okay.  Once you finished -- did you

7  successfully complete your basic training?

8  A.   Yes.

9  Q.   Did you then go to field training?

10 A.   Yes.

11 Q.   Where did you do your field training?

12 A.   I received my field training in my duty

13 station, which is Sonoita, Arizona.

14 Q.   And how long did you have to do field

15 training?

16 A.   It was approximately 12 weeks.

17 Q.   And what types of things did you do while on

18 field training?

19 A.   We did -- we interacted with people trying to

20 attempt to enter the country illegally or smuggle

21 contraband.  We learned this under supervision of

22 another agent.

23 Q.   Do you have to be -- do you have to

24 successfully complete your field training to be let

25 out to be a border patrol agent on your own?

1   A.   Yes.

2   Q.   Do you have to do post-academy training as

3   well?

4   A.   Yes.

5   Q.   What is that?

6   A.   It's -- we received our training -- it's

7   online, a series of tests and exams, and you have

8   to pass those exams.

9   Q.   Were you able to pass those?

10  A.   Yes.

11  Q.   So were you able to then successfully complete

12  basic field and post-academy training?

13  A.   Yes.

14  Q.   After that did you receive specialty training?

15  A.   Yes.

16  Q.   Or specialty assignments?

17  A.   Yes.

18  Q.   Okay.  Can you take us through what specialty

19  assignments you've had.

20  A.   I did a detail in Tucson, Arizona, as a

21  processing agent, so I did various processing,

22  notice to appears, ERs, expedited removals,

23  reinstatements of prior order of removals.

24       And I've also done prosecutions, and that was

25  also in Tucson, and there I was -- worked as a case

1  agent.

2  Q.   All right.  Let's talk about your time process

3  -- in the processing assignment.  How did you

4  generally do your processing?  I mean, how is it

5  generally laid out, from what you have experienced?

6  A.   Somebody -- somebody gets apprehended, and

7  then they get brought back to where they're going

8  to get processed, and most -- in my case I did it

9  both in Sonoita and Tucson.

10      And they get fingerprinted.  They'll get a --

11  before they get fingerprinted, they'll get -- it's

12  called a field I-826, and that's where they'll take

13  biographical information from an individual.

14  Q.   Who's "they?"

15  A.   Agents in the field.  And after they get --

16  after they get their biographical information,

17  they're taken to the station and fingerprint --

18  they'll run the fingerprints and take a photograph

19  of the individual.

20  Q.   That field 826, is that something that you

21  would get as a processing agent?

22  A.   Yes.

23  Q.   And what kind of information does it have on

24  it?

25  A.   It'll have all the information, biographical

 1  information of the individual.

 2  Q.   Okay.  And do you look at that information as

 3  a processing agent?

 4  A.   Yes.

 5  Q.   Do you look at the form for other information

 6  that might be provided on there?

 7  A.   Yes.  If there's -- it'll help you determine

 8  what kind of -- what kind of file to do on the

 9  individual, how to -- how you're going to proceed

10  with the individual.

11  Q.   What kinds of things are you taking into

12  consideration when you're deciding how to process

13  an individual that you're presented with?

14  A.   Once they're -- once they're fingerprinted and

15  rolled, we'll take a look at their criminal history

16  and their immigration history, and in addition to

17  that, if somebody states -- has some kind of claim

18  to being admissible to the U.S. also.

19  Q.   Those are things that you would take into

20  consideration?

21  A.   Yes.

22  Q.   Is that what you're saying?  Okay.

23       When you're processing, what types of

24  questions are you asking?

25  A.   It's -- it's biographical information, and --

1  and if you -- sorry.  Repeat the question.

2  Q.  Well, maybe I'll ask a better question.

3      You said there's biographical information

4  provided on the field 826.

5  A.  Yes.

6  Q.  When you process a person, so they come with

7  their 826, what types of questions are you asking

8  that person?

9  A.  I'm determining to make sure to see if they're

10  admissible or inadmissible, so I will take a sworn

11  statement if I determine they're inadmissible.

12  Q.  Okay.  The first steps though, you said, with

13  processing are what?  You get the field 826; is

14  that correct?

15  A.  Yes.

16  Q.  All right.  From there, would you run their

17  criminal history?

18  A.  After we fingerprint.  With the fingerprints

19  and the picture being taken, we'll -- that will get

20  run through our databases, and it'll tell us their

21  -- reveal their criminal or immigration history.

22  Q.  Okay.  Once you have that information, do --

23  do you use a computer system then to process the

24  person before you?

25  A.  Yes.

1   Q.   Okay.

2   A.   It's called the E3.  That's where we input all

3   our information.

4   Q.   And what types of steps do you have to go

5   through when you're using the E3?

6   A.   I'll bring the individual up to me with their

7   826, and I'll have them standing in front of me,

8   and I'll go through each page with the individual.

9   Q.   Each page of?

10  A.   An E3, the pages that you go through.

11  Q.   The field 826, when they come with that, is

12  there a photo of the person on the field 826?

13  A.   No.

14  Q.   Okay.  Where would the photo -- you said

15  there's a photo taken.  Where would the photo of

16  the person be?

17  A.   That's something I would do if I'm taking the

18  fingerprints and the photo.

19  Q.   And do you always take the fingerprints and

20  the photo when you're processing someone?

21  A.   Not always.

22  Q.   Is it -- is it information that you get at

23  some point during your processing?

24  A.   Yes.

25  Q.   Okay.  And when you're processing, do you ask

1  again biographical information?

2  A.   Yes.  I'll verify with the name or the -- and

3  the date of birth to make sure the correct person

4  is standing in front of me.

5  Q.   Okay.  So help me to understand.  Are you

6  asking the person in front of you their date of

7  birth and their name?

8  A.   With the 826, just to make sure it's that

9  person.

10  Q.   Okay.  Do you also look at the photo that's

11  been provided to see if that's the person in front

12  of you as well?

13  A.   Yes.

14  Q.   Before you begin processing, do you consider

15  the criminal history and the immigration history of

16  the person before you?

17  A.   Yes.

18  Q.   Okay.  Does that information factor into the

19  decisions you make in terms of how you're going to

20  process?

21  A.   Yes.

22  Q.   Now, what type of biographical information do

23  you ask a person as you're processing them?

24  A.   I'll verify the information off the 826, and

25  then if the person has no credible fear or they're

 1   -- they have some kind of claim of being

 2   inadmissible into the U.S., I'll be asking these

 3   questions.

 4   Q.   Okay.  One second.

 5        Do you fill out a form when you're doing

 6   processing, the I-213 form?

 7   A.   Yes.

 8            MS. FURTADO:  Judge, may I approach the

 9   witness?

10            THE COURT:  Sure.

11            MS. FURTADO:  Thank you.

12   BY MS. FURTADO:

13   Q.   I'm going to show you this document, and I

14   would ask you to take a look at it and see if you

15   recognize it.

16   A.   Vaguely.

17   Q.   Okay.  Is it an I-213 form?

18   A.   Yes.

19   Q.   Is that the form you would use when you

20   process a person?

21   A.   Yes.

22   Q.   Does it include the questions that you would

23   ask a person while processing them?

24   A.   Yes.

25   Q.   Okay.  Are you familiar with this type of

1  form?

2  A.   Yes.

3  Q.   Okay.  Are you familiar with the layout of

4  this form?

5  A.   Yes.

6  Q.   And is that an accurate reflection of the

7  layout of an I-213 form?

8  A.   Yes.

9  Q.   So when doing a processing of an alien and

10  you're filling out I-213 form, what are the types

11  of biographical questions that you might ask a

12  person?

13  A.   Their -- I'll ask them -- I'll verify their

14  name, date of birth.  I'll ask them their address,

15  if they have any children.  I will ask them their

16  parent -- verify their parents' name.

17  Q.   Are you asking to -- about their parents in

18  terms of where their parents were born or where

19  their parents live?

20  A.   Both.

21  Q.   Okay.  Why do you ask the question about

22  children?

23  A.   If they are able to -- if they have a claim, I

24  can do a different kind of file.  If it's -- in

25  this case it was an expedited removal, but if it

1    was -- if he had United States children, I would do

2    a different kind of file.

3    Q.   Does United -- does having United States

4    children affect your decision on how you process a

5    person?

6    A.   Yes.

7    Q.   Okay.  Are you noting -- when you are filling

8    out the I-213 form, are you noting the responses

9    that a person you're processing is giving you?

10   A.   Yes.

11   Q.   How are you noting those responses?

12   A.   So this individual is standing in front of me,

13   and I'm going -- in the computer there is page-by-

14   page.  I'm inputting his information as I'm asking

15   him.

16   Q.   Is it a verbatim documentation of what they're

17   saying to you?

18   A.   Yes.

19   Q.   If a person tells you they're not going to

20   answer a question, what is your process for

21   documenting that response?

22   A.   "Failed to respond," something like that.

23   Q.   Why are you asking questions about where a

24   person's parents live?

25   A.   Because if they can get citizenship from their

1  parents, it would be a different file also.

2  Q.  And their responses to where their parents

3  live, is that something you're documenting in the

4  I-213 form?

5  A.  I -- I ask them their name and then their

6  nationality, but in the sworn statement I take from

7  them, I'll get more information from them.

8  Q.  You're asking their name.  Does that mean

9  you're asking the person that you're processing,

10  you ask their parents' name and their parents'

11  nationality?

12  A.  Yeah, I'll ask them what their parents' names

13  are.

14  Q.  Okay.  Does the I-213 form have a photo on it?

15  A.  Yes.

16  Q.  And is that the photo that you are comparing

17  to the person you are processing?

18  A.  Yes.

19  Q.  Okay.  Do -- does the person you're processing

20  give you sort of height and weight information?

21  A.  We take that from them.  We have a scale and

22  height measurement.

23  Q.  Okay.  Does the -- do you ask the person when

24  you're completing the I-213 form during the

25  processing where that person's country of

1  citizenship is?

2  A.   Yes.

3  Q.   Okay.  Do you ask them if they have a United

4  States address?

5  A.   Yes.

6  Q.   Do you ask them about their entry into the

7  United States, if they are not from the United

8  States?

9  A.   Yes.

10 Q.   And is that something you document on the 213

11 form?

12 A.   Yes.  In this instance --

13 Q.   Hold on.  We'll get there.

14 A.   Okay.

15 Q.   We'll get there.  Okay.  All right.

16      How long does it generally take you to do the

17 processing for the I-213 form?

18 A.   Typically the 214 (sic) -- I'm not -- I don't

19 -- I'm not sure.  Maybe -- maybe 20 minutes.  I

20 mean, like, this is an expedited removal.  It takes

21 -- I do it from start to finish, so that's

22 typically like an hour.  So the 213 is maybe --

23 maybe around 20 minutes, around that time.

24 Q.   Okay.  During that time are you making

25 observations about the person you're processing?

1    A.   Yes.

2    Q.   Are you -- are you noting if they have any

3    injuries?

4    A.   Yes.

5    Q.   Have you ever had somebody tell you they were

6    afraid when you were doing processing?

7    A.   Yes.

8    Q.   And when they tell you that, what do you do

9    with that information?

10   A.   I will notate it in the 213.

11   Q.   Does that cause an alternative process to have

12   to happen?

13   A.   There is an additional form that gets

14   generated, and it's a credible fear form.

15   Q.   So I'm going to ask you, then, about an

16   expedited removal.  Do you recall doing an

17   expedited removal on January 9th, 2009?

18   A.   With this report, yes.

19   Q.   Okay.  And did that process refer to a Ramon

20   Ramos-Zepeda?

21   A.   Yes.

22   Q.   And did you make contact with Mr. Zepeda and

23   were you the -- well, let me -- let me back up.

24        Were you the person that did all the

25   processing for Mr. Zepeda on the 12th of January,

1    2009?

2    A.   Yes.

3    Q.   Now, when you began the processing with

4    Mr. Zepeda, what information did you have?  Were

5    you given any forms?

6    A.   The I-826, the -- that's the form that the

7    agent provides when he brings it individually.

8    Q.   Is that the field 826, the field processing

9    form?

10   A.   Yes, the field 826.

11   Q.   Now, on January 9th, 2009, do you recall if

12   you took the picture of Mr. Ramos-Zepeda?

13   A.   I do not.

14   Q.   Do you recall looking at the photo that you

15   were provided and comparing it to the person in

16   front of you?

17   A.   Yes, I do.

18   Q.   And did the photo and the person before you,

19   did that match?

20   A.   Yes.

21   Q.   Okay.  Now, when you do this I-213 process,

22   did you follow the same process we've talked about?

23   Did you ask Mr. Zepeda questions, biographical

24   questions?

25   A.   Yes.

 1  Q.   And let's talk about those.

 2  A.   Okay.

 3  Q.   What information did he -- did Mr. Zepeda give

 4  you in terms of his nationality?

 5  A.   His nationality was Mexico.

 6  Q.   Okay.  And I see that you're referring to the

 7  report, the I-213.

 8  A.   Yes.

 9  Q.   Is that helping you to refresh your memory on

10  this event?

11  A.   Yes.

12  Q.   Okay.  Now, did he tell you about a place and

13  time of entering into the United States?

14  A.   Yes.

15  Q.   And what did he tell you?

16  A.   He entered January 12th, approximately -- I

17  take that back.  January 9th of 2009, and it was

18  near Naco, Arizona.

19  Q.   Okay.  About what time on January 9th?

20  A.   0800, eight o'clock in the morning.

21  Q.   Okay.  So did you do the processing on the

22  12th of January?

23  A.   Yes.

24  Q.   Okay.  And so the information you were

25  provided as the date and time of the defendant's

1  entry was the 9th of January?

2  A.   He answered on the 9th and he was apprehended

3  on the 12th.

4  Q.   Okay.  The information about time and place of

5  entry and -- was that provided by Mr. Ramos-Zepeda

6  to you?

7  A.   I double-checked, but it is also on the field

8  826.

9  Q.   By "double-check," does that mean you asked

10 Mr. Ramos --

11 A.   Yes.

12 Q.   -- Zepeda?

13 A.   I do.

14 Q.   And the information that you're referring to

15 on your report, was that something that you would

16 have obtained from Mr. Ramos-Zepeda himself?

17 A.   Yes.

18 Q.   Now, did you ask Mr. Ramos-Zepeda about his

19 parents?

20 A.   Yes.

21 Q.   Did you ask him where -- the nationality of

22 his mother and father?

23 A.   Yes.

24 Q.   What did he tell you about their nationality?

25 A.   They were nationals of Mexico.

1  Q.   Okay.  Would that response have triggered you

2  to think that there was any form of relief

3  available to Mr. Ramos-Zepeda?

4  A.   No.

5  Q.   Did you ask Mr. Ramos-Zepeda about children

6  that he might have?

7  A.   Yes.

8  Q.   And what was his response?

9  A.   He claimed none.

10 Q.   Okay.  If he had claimed United States citizen

11 children, would that have affected your processing

12 of Mr. Ramos-Zepeda?

13 A.   Yes.

14 Q.   Would -- what would you have done had he had

15 United States or indicated to you that he had

16 United States citizen children?

17 A.   I might have -- I might have -- so we take it

18 to the supervisor, and I would have asked him if he

19 was -- if I should do a notice to appear on the

20 individual.

21 Q.   Okay.  But since there were none claimed, did

22 that mean you didn't take this information to the

23 supervisor?

24 A.   I still take it just to make sure that he --

25 the expedited removal was okay.

1  Q.  Okay.  And were you advised that the expedited

2  removal would be okay?

3  A.  Yes.

4  Q.  Okay.  Now, when you began -- began this

5  process, did you -- had Mr. Ramos-Zepeda's

6  fingerprints been taken?

7  A.  Yes.

8  Q.  And did you receive results of his -- from his

9  fingerprints being run?

10  A.  Yes, yes.

11  Q.  And did you receive criminal history with

12  regard to Mr. Ramos-Zepeda?

13  A.  Yes.

14  Q.  What information did you receive regarding

15  Mr. Ramos-Zepeda's criminal history?

16  A.  He -- he had an outstanding warrant, as long

17  -- as well as criminal history.

18  Q.  Okay.  Where was the outstanding warrant from?

19  A.  The outstanding warrant was out of Redwood

20  City.

21  Q.  Okay.  And what information -- what

22  information did you have regarding his -- the

23  criminal history besides the warrant?  Did you have

24  information --

25  A.  Yeah.

1    Q.   -- related to a conviction?

2    A.   Excuse me?

3    Q.   Did you have information related to a

4    conviction?

5    A.   Yes.

6    Q.   Okay.  And did the warrant arise from the

7    conviction?

8    A.   Yes.

9    Q.   And when was the conviction?

10   A.   The conviction, May 23rd of 2006.

11   Q.   When you're making a determination in terms of

12   immigration processing, do you consider criminal

13   history?

14   A.   Yes.

15   Q.   In this particular case, would

16   Mr. Ramos-Zepeda's criminal conviction make him

17   eligible for a voluntary return?

18   A.   No.

19   Q.   Would the outstanding warrant that

20   Mr. Ramos-Zepeda had, would that make him eligible

21   for a voluntary return?

22   A.   No.

23   Q.   Did you receive Mr. Ramos-Zepeda's criminal

24   history?

25   A.   Yes.

 1    Q.   And what did -- I'm sorry.  I said -- I meant
 2    immigration history.  Did you receive Mr. Ramos-
 3    Zepeda's immigration history?
 4    A.   Yes.
 5    Q.   And what information did you have regarding
 6    his immigration history?
 7    A.   There was none found.
 8    Q.   Okay.  How did -- so he had no immigration
 9    history.  Was he eligible for criminal charges?
10    A.   No.
11    Q.   Why not?
12    A.   Because he had no immigration history.
13    Q.   Okay.  What were you considering -- you said
14    from the beginning you did an expedited removal.
15    Why did you consider an expedited removal for
16    Mr. Ramos-Zepeda?
17    A.   Because of his criminal history, he was
18    eligible for expedited removal.
19    Q.   Okay.  Let's talk about that eligibility
20    requirement.  Okay?
21    A.   Okay.
22    Q.   How does a person become eligible for
23    expedited removal, according -- according to your
24    process?
25    A.   He was apprehended within 14 days of entering

1   the border and within 100 miles.  In addition, he

2   was -- he entered illegally.

3   Q.  By "illegally," what are you --

4   A.  He wasn't -- he didn't go through a port of

5   entry.  He wasn't inspected.

6   Q.  And during your processing of him, did

7   Mr. Ramos-Zepeda have any entry documents with him

8   or on him?

9   A.  Did he have any?

10  Q.  Yes.

11  A.  No.

12  Q.  Okay.  So in terms of expedited removal, do

13  you have to be found within a hundred air miles of

14  the border?

15  A.  Yes.

16  Q.  And when the agents made contact with him, did

17  you have information about how the contact was made

18  with Mr. Ramos-Zepeda?

19  A.  On the 826, yes.

20  Q.  Okay.  And what information did you have as to

21  how agents made contact with Ramos-Zepeda on the

22  12th?

23  A.  Do you have the 826 available?

24  Q.  I would ask you to just look at page 4, Bates

25  stamp 54, first paragraph.

1  A.   Agents were performing their border patrol

2  duties east of Sonoita.  They were -- it was via

3  horse patrol and ATV units.

4  Q.   Okay.  So was Mr. Ramos-Zepeda physically in

5  the United States when agents made contact with

6  him?

7  A.   Yes.

8  Q.   And what -- and did you say that the date of

9  entry was the 9th of January?

10  A.   Yes.

11  Q.   And was that the date that Mr. Ramos-Zepeda

12  said he originally came into the United States?

13  A.   Yes.

14  Q.   And was that within 14 days of the encounter

15  with immigration officials for him to qualify for

16  an expedited removal?

17  A.   Yes.

18  Q.   Okay.  Now, when you're doing an expedited

19  removal, do you have to follow a certain process?

20  A.   Yes.

21  Q.   Does that mean you have to take a sworn

22  statement from the individual?

23  A.   Yes.

24  Q.   And would you have to provide them notice of

25  their potential inadmissibility?

1   A.   Yes.

2   Q.   Would you also have to provide them -- provide

3   them information about the potential charges they

4   face?

5   A.   Yes.

6        MR. ROCHA:  Your Honor, I'm not opposed to

7   foundation, but I've allowed the Government to --

8   the last four questions, she's just been leading

9   the witness, and he's just been saying, "Yes," so

10  I'd ask for her to rephrase the question.

11       THE COURT:  They are leading questions, so

12  I'm going to sustain that.

13  BY MS. FURTADO:

14  Q.   So let's talk about the process, then, for

15  doing your immigration -- your expedited removal.

16       First, is an expedited removal a criminal

17  proceeding?

18  A.   No.

19  Q.   What is it?

20  A.   It's administrative.

21  Q.   Okay.  In an administrative proceeding, do you

22  read the person you're processing a Miranda

23  warning?

24  A.   No.

25  Q.   Do you read a warning to the person you're

 1  processing if you're processing them

 2  administratively?

 3  A.   Yeah, there's a -- there's s -- before I take

 4  their sworn statement there's a little statement.

 5  I have them read it, and if they can't read, I will

 6  read it to them.

 7  Q.   And if you -- if -- what language are you

 8  using when you're reading the statement to a

 9  person?

10  A.   Spanish.

11  Q.   And that would --

12  A.   Typically.

13  Q.   Would that be just dependent on what language

14  they spoke?

15  A.   Yes.

16  Q.   Okay.  When you were speaking to

17  Mr. Ramos-Zepeda, what language were you using?

18  A.   I believe it was Spanish.

19  Q.   I would ask you to look at -- well, I'm going

20  to show you the document.

21          MS. FURTADO:  May I approach the witness,

22  Your Honor?

23          THE COURT:  Sure.

24          MS. FURTADO:  Thank you.

25  BY MS. FURTADO:

1   Q.   I'm going to show you what's been marked as

2   Government's Exhibit No. 1.  I'd ask you to take a

3   look at that (inaudible).

4   A.   Okay.

5   Q.   So do you recognize those documents?

6   A.   Yes.

7   Q.   Okay.  What are they?

8   A.   This is a record of the sworn statement and

9   proceedings under Section 235(b)(1) of the Act.

10  Q.   Okay.  What -- is there an indication of who

11  the alien was that you created that record for?

12  A.   Yes.  His name is on here.

13  Q.   Okay.  Who is it?

14  A.   Ramon Ramos-Zepeda.

15  Q.   Is that the record that you created when you

16  did the processing on the 12th of January, 2009?

17  A.   Yes.

18  Q.   Okay.  Is that a fair and accurate reflection

19  of the -- of the conversation you had or the -- the

20  conversation you had --

21  A.   Yes.

22  Q.   -- with Mr. Zepeda on that day?

23          MS. FURTADO:  Judge, I move to admit

24  Exhibit No. 1.

25          THE COURT:  Mr. Rocha, any objection?

1          MR. ROCHA:  No objection.

2          THE COURT:  We will go ahead and admit

3    Government's Exhibit No. 1.  Thank you.

4    BY MS. FURTADO:

5    Q.   Okay.  When looking at that document, Agent,

6    can you see if there's a language indicated?

7    A.   Yes.  It says Spanish language.

8    Q.   In looking at that document, does that help to

9    refresh your memory about the language you used

10   when speaking to Mr. Ramos-Zepeda?

11   A.   Yes.  I spoke to him in Spanish.

12   Q.   And when you were speaking to

13   Mr. Ramos-Zepeda, did he appear to be able to

14   understand you?

15   A.   Yes.

16   Q.   And were you able to understand him in

17   Spanish?

18   A.   Yes.

19   Q.   And at times during your conversation with

20   Mr. Ramos-Zepeda, did he ask you questions that

21   were consistent with what you were talking about?

22   A.   I'm sorry?

23   Q.   Did he ask you questions about what you were

24   doing, the processing?

25   A.   Typically people ask and I'll answer them,

1   whatever questions they have.

2          MR. ROCHA:  I object.  Nonresponsive.  She

3   asked whether he asked questions, not whether

4   generally people -- his response was generally

5   people do.

6          THE COURT:  I'm going to sustain that.  I

7   think -- go ahead and if you'd ask the prior

8   question with regard to specifically this

9   individual.

10          MS. FURTADO:  Okay.

11   BY MS. FURTADO:

12   Q.   When you were speaking with Mr. Ramos-Zepeda,

13   were you -- were you having an exchange where, when

14   he asked you questions, it was appropriate to what

15   you were talking about?

16   A.   Yes.

17   Q.   Okay.  You said you use a system called E3 to

18   do the processing?

19   A.   Yes.

20   Q.   Is that the same system you use when doing an

21   expedited removal?

22   A.   Yes.

23   Q.   And does that system, would it automatically

24   generate forms for you to do the expedited removal?

25   A.   Yes.

1    Q.   Okay.  We've talked a little about the

2    biographical information.  That's information you

3    have to put in.  Is that information you have to

4    put in when doing the expedited removal?

5    A.   Yes.

6    Q.   And did you put that information in when doing

7    this expedited removal for Mr. Ramos-Zepeda?

8    A.   All the questions that I asked him are

9    documented in this record of sworn statement.

10            MS. FURTADO:  Can I have just a second,

11   Your Honor?

12            THE COURT:  Sure.

13   BY MS. FURTADO:

14   Q.   Agent, I want to back up a second.  In the 213

15   there's a photograph.

16   A.   Okay.

17   Q.   And I previously asked you if you verified

18   during processing the photo versus the person

19   you're processing?

20   A.   Yes.

21   Q.   In this particular instance, did you -- did

22   you verify, when you were processing

23   Mr. Ramos-Zepeda, that the photo you had on the

24   I-213 was the person you were actually processing?

25   A.   Yes.

1   Q.   And do you see that person in the courtroom

2   today?

3   A.   The appearance is a little different, but they

4   look the same.

5   Q.   Okay.  And can you just point to him and give

6   us an article of clothing that he's wearing, the

7   person that you're referring to that you say

8   appears to look the same in the picture?

9   A.   He's wearing an orange shirt.

10          MS. FURTADO:  Okay.  Your Honor, I would

11  ask that the record reflect that the witness is

12  referring to the defendant.

13          THE COURT:  It will reflect that.  Thank

14  you.

15          MS. FURTADO:  Thank you.

16  BY MS. FURTADO:

17  Q.   When you talked to Mr. Ramos-Zepeda, you said

18  that you took some personal information.  Would you

19  ask Mr. Ramos-Zepeda if he had a United States

20  address?

21  A.   Yes.

22  Q.   And in this particular instance, on the 12th,

23  when you talked to Mr. Ramos-Zepeda, did he give

24  you a U.S. address?

25  A.   No.

1  Q.   What information did he give you?

2  A.   He failed to provide a U.S. address.

3  Q.   When you process a person for immigration

4  issues, do you also let them speak to a consular

5  representative?

6         MR. ROCHA:  Again, Your Honor, it's a

7  leading question.

8         THE COURT:  Well, I think that's a yes or

9  no, but you are leading him a little bit, so I'll

10  sustain that.

11         MS. FURTADO:  Okay.

12  BY MS. FURTADO:

13  Q.   Is there a process by which a person is able

14  to talk to a consular representative during

15  immigration processing?

16  A.   They do have a right to speak to the consulate

17  and --

18  Q.   And in this particular instance with

19  Mr. Ramos-Zepeda, did you give him that

20  opportunity?

21  A.   Yes, and --

22  Q.   Did he take that opportunity to speak to a

23  consular representative?

24  A.   At that time he declined to speak with anyone.

25  Q.   Okay.  When you are offering that opportunity,

 1  are you also evaluating or asking questions about

 2  whether or not a person is afraid?

 3          MR. ROCHA:  Again, objection.  Counsel

 4  should re-ask their question like what else do you

 5  do, what happens afterwards, but she's leading him

 6  exactly to the answer.  He's going to say, yes, I

 7  did.

 8          THE COURT:  Sustained.

 9  BY MS. FURTADO:

10  Q.  What questions do you ask after talking to a

11  consular -- after you let an alien talk to a

12  consular representative?

13  A.  If they don't want to talk, I don't have them

14  -- we just don't -- they don't talk to the

15  consulate.

16  Q.  Okay.  What other -- what other questions are

17  you asking?

18  A.  I ask them if they fear any kind of

19  persecution or torture if they're returned to their

20  country of citizenship.

21  Q.  And in this particular instance, did you ask

22  Mr. Ramos-Zepeda about fear or torture?

23  A.  I did.

24  Q.  And what was his response?

25  A.  He did not fear any persecution or torture.

1  Q.  Okay.  So based on the information you have

2  from Mr. Ramos-Zepeda through the I-213 process,

3  did you believe that you had any form of relief

4  that you should be extending to the defendant?

5  A.  No.

6  Q.  Okay.  And did you believe that

7  Mr. Ramos-Zepeda fit the criteria for expedited

8  removal?

9  A.  Yes, he did.

10  Q.  All right.  Now, when you do an expedited

11  removal, I've shown you Exhibit 1.  That Exhibit

12  does -- is there a provision on there where you are

13  providing some sort of right?

14  A.  I read them this little synopsis.

15  Q.  Okay.  And what is that synopsis?

16  A.  It starts with, "I am an officer of the United

17  States Department of Homeland Security.  I am

18  authorized to administer the immigration laws and

19  to take sworn statements.  I want to take your

20  sworn statement regarding your application for

21  admission to the U.S.  Before I take your

22  statement, I also want to explain your rights and

23  the purpose and consequences of this interview."

24      I do -- there is -- in the computer, there is

25  two boxes to click whether English or Spanish.

1  Right here it's in English, but I would have read
2  it to him in Spanish.  If -- I ask them first if
3  they're able to read and understand it, and if they
4  read and understand it, I'll start my questioning
5  once they're done.
6  Q.   And with Mr. Ramos-Zepeda, did you provide
7  what you have just read to us to Mr. Ramos-Zepeda?
8  A.   Yes.
9  Q.   Did you do that in English or in Spanish?
10  A.   In Spanish.
11  Q.   Okay.  Did you -- while you were observing
12  Mr. Ramos-Zepeda, did he -- did you believe he
13  understood the information you were giving him?
14  A.   I asked him.
15  Q.   And what -- you asked him what?
16  A.   If he understood what I said to him.
17  Q.   And what did he say?
18  A.   Yes.
19  Q.   Do -- what else did you ask him?
20  A.   There's a bunch of questions on here.  Did you
21  want me to go through each one?
22  Q.   Sure.
23  A.   I asked him -- so I am asking the questions in
24  Spanish, and while I'm asking him, I'm inputting
25  them into the computer in English, and I asked him,

1    "Do you understand what I've said to you?"

2         And he stated, "Yes."

3         Then I asked him, "Do you have any questions?"

4         He said, "No."

5    Q.   Now, let me stop you there.

6         Are you -- when you are giving this right, are

7    you giving any information about admissibility or

8    inadmissibility to the person you're processing?

9    A.   I do.  I let them know that it's a removal, an

10   expedited removal.

11   Q.   Is that part of the sworn statement or the

12   record of the sworn statement?

13   A.   Yes.  It's in the blurb that -- that is read

14   to them.

15   Q.   And in English, can you read us at least a

16   portion of that blurb.

17   A.   "You do not appear to be admissible or to have

18   had the required legal papers authorizing your

19   admission to the United States.  This may result in

20   your being denied admission and immediately

21   returned to your home country without a hearing.

22   If a decision is made to refuse your admission into

23   the United States, you may be immediately removed

24   from this country, and if so, you may be barred

25   from reentry for a period of five years or longer."

1    Q.   When you were speaking to Mr. Ramos-Zepeda,

2    did he appear to understand that portion of this

3    I-67 -- 867 form?

4    A.   Yes.

5    Q.   As part of the process, do you also ask a

6    person whether they are willing to speak to you or

7    not?

8    A.   Yes.

9    Q.   Okay.  Is that also a portion of this form?

10   A.   Yes.

11   Q.   Okay.  Can you read to us the portion of the

12   form that applies.

13   A.   "This may be your only opportunity to present

14   information to me and the Department of Homeland

15   Security to make a decision.  It is very important

16   that you tell me the truth.  If you lie or give

17   misinformation, you may be subject to criminal or

18   civil penalties or barred from receiving

19   immigration benefits or relief now or in the

20   future."

21   Q.   Now, during your contact with

22   Mr. Ramos-Zepeda, did he appear to you to

23   understand that section of the I-867 form?

24   A.   Yes.

25   Q.   Now, do you -- did you ask Mr. Ramos-Zepeda if

1  he was willing to answer questions, specifically

2  that question?

3  A.   Excuse me?

4  Q.   Did you ask Mr. Ramos-Zepeda if he was willing

5  to answer your questions?

6  A.   Yes.

7  Q.   And what did he say?

8  A.   Yes.

9  Q.   Now, do you then at this point speak to

10  Mr. Ramos-Zepeda about his immigration status and

11  his biographical information?

12  A.   I do read him the rest -- the whole statement.

13  Q.   Okay.

14  A.   So the rest of the statement, it says, "Except

15  as I will explain to you, you are entitled to a

16  hearing or review.  U.S. law provides protection to

17  certain persons who face persecution, harm, or

18  torture upon return to their home country.  If you

19  fear or have a concern about being removed from the

20  United States" --

21         THE COURT:  Slow down.  Slow down a little

22  bit.  Thank you.

23  A.   -- "removed from the United States or about

24  being sent home, you should tell me during this

25  interview because you may not have another chance.

1        "You will have the opportunity to speak

2   privately and confidentially to another officer

3   about your fear or concern.  That officer will

4   determine if you should remain in the United States

5   and not be removed because of that fear.

6        "Until a decision is reached in your case, you

7   will remain in the custody of the Department of

8   Homeland Security.  Any statement you make may be

9   used against you in this or any subsequent

10  administrative proceeding."

11  Q.   Now, after reading that to Mr. Ramos-Zepeda,

12  did he appear to you to understand what you read to

13  him?

14  A.   Yes, I asked him.

15  Q.   Okay.  Can you take us through that, please.

16  A.   Excuse me?

17  Q.   What did you ask him?

18  A.   So I asked him, "Do you understand what I have

19  said to you?"

20        And he stated, "Yes."

21        And then I asked him, "Do you have any

22  questions?"

23        And he stated, "No."

24        And I asked him, "Are you willing to answer my

25  questions at this time?"

 1          And he stated, "Yes."

 2          MR. ROCHA:  Your Honor, it's not

 3    necessary.  It's already been admitted into

 4    evidence, I believe, so the Court can look at that

 5    himself.  I just don't think it's necessary for him

 6    to go through the list of questions he asked.

 7          THE COURT:  Well, I think if Ms. Furtado

 8    wants to she can.  It is in evidence.

 9    BY MS. FURTADO:

10    Q.   One of the things in this form was about

11    biographical information, so let me ask you about

12    that.

13          When you talked to the defendant in this sworn

14    statement, did he tell you what country he was a

15    citizen of?

16    A.   Yes.  He stated Mexico.

17    Q.   Did he tell you if he had parents in the

18    United States that were U.S. citizens?

19    A.   He stated his parents were both from Mexico.

20    Q.   Did he -- did you ask him if he had any claim

21    to being a U.S. citizen?

22    A.   Yes, and he stated, "No."

23    Q.   Did you ask him what his purpose for entering

24    the United States was?

25    A.   Yes, and he stated he was heading toward

1  Redwood City, California, to find work.

2  Q.  Did you ask him about his previous immigration

3  history?

4  A.  I asked him if he had been deported before and

5  he stated, "No."

6  Q.  Was that consistent with the immigration

7  history information you had?

8  A.  Yes.

9  Q.  Based on Mr. Ramos-Zepeda's fingerprints?

10  A.  Yes.

11  Q.  Did you speak to Mr. Ramos-Zepeda about the

12  five-year period, prohibition period?

13  A.  I asked him, "Do you understand that, if you

14  are removed from the United States today, you may

15  not ask to enter the United States for a period of

16  five years without the permission of the United" --

17  "the permission of the Attorney General of the

18  United States?"

19      And he stated, "Yes."

20  Q.  Now, did you give Mr. Ramos-Zepeda an

21  opportunity to ask you questions during the sworn

22  statement?

23  A.  I did.  I asked him if there was anything he

24  would like to say or add or for me to add, and he

25  stated, "No."

1   Q.   As part of the process of the sworn statement,

2   are you required to ask questions about fear or

3   harm?

4   A.   Yes.  It's on that fourth -- the fourth page.

5   Q.   And what kinds of questions are you asking?

6   A.   I asked him if he has any fear or concern

7   about being returned to his home country or being

8   removed from the United States.

9   Q.   And what did he say?

10  A.   He stated, "No."

11       I asked him, "Would you be harmed if you were

12  returned to your home country or country of last

13  residence?"

14       And he stated, "No."

15  Q.   And then do you give him an opportunity to ask

16  you questions or add something else to that

17  statement?

18  A.   I do.  I asked him, "Do you have any question

19  or anything else you would like to add?"

20       And he stated, "No."

21  Q.   What are you required to do once you've

22  completed the sworn statement with an alien that

23  you've processed?

24  A.   I print the sworn statement, and each time I

25  make a correction, I have -- I explain to them they

1  have to initial where we alter the page.

2  Q.   Okay.  And in terms of Exhibit 1, I would ask

3  you to look at what has been Bates-stamped page 77,

4  and we see some markings on that page.  Can you

5  tell us what those are.

6  A.   So from the top, those are his initials

7  showing that we altered the page.  The second one

8  is the same, his initials showing we made markings

9  on the page, and then his signature is next to his

10  name.

11      I also signed next to my name, and there was

12  also an agent who witnessed the signing.

13  Q.   Why do you -- did you -- did you -- as part of

14  this process, did you ask the defendant to sign

15  this page that's marked -- that's Bates-stamped 77?

16  A.   Yes.

17  Q.   And why would you ask him to sign that page?

18  A.   I explain to them, these are the questions

19  that I have asked them regarding the removal and to

20  put his signature next to his name.

21  Q.   Okay.  And is this something you're explaining

22  to him in English or Spanish?

23  A.   In Spanish.

24  Q.   Now, I'd ask you to just look at that

25  paragraph there.  What is that paragraph right

1  above his signature referring to?

2  A.   That he has read or have had read to me this

3  statement consisting of four pages, including this

4  page.  "I state that my answers are true and

5  correct to the best of my knowledge and that this

6  statement is a full, true, and correct record of my

7  interrogation on the date indicated by the above-

8  named officer of the Department of Homeland

9  Security.

10      "I have initialed each page of this statement

11  and the corrections noted on pages 1, 2, 3 and 4."

12  Q.   Okay.  Now, is this something that you would

13  have read to Mr. Ramos-Zepeda on the 12th of

14  January, 2009?

15  A.   Yes.

16  Q.   And did he -- did you believe he understood

17  what you were explaining to him or reading to him?

18  A.   Yes, I make sure they understand.

19  Q.   Now, the total affidavit that you created for

20  Mr. Ramos-Zepeda on the 12th, is that four pages

21  long?

22  A.   Yes.

23  Q.   And what markings do we see on the bottom of

24  the pages Bates-stamped 75, 76, -- 75 and 76 and

25  74?  Excuse me.

1   A.   Those are -- those are his initials.  When I

2   -- when I am making the correction, they're

3   standing in front of me, and I'm telling them I'm

4   making this correction and to initial it.

5   Q.   What does that initial signify to you?

6   A.   That he understood what I'm telling him.

7   Q.   And the signature that's on page 77, what did

8   that signify to you, Mr. Ramos-Zepeda's signature?

9   A.   That he understood the whole -- the whole

10  statement.

11  Q.   Now, in terms of fear, is fear something

12  significant for you?  If somebody expresses fear,

13  is that significant for you in your work?

14  A.   Yes, because they will see somebody in

15  addition to me that will interview him for -- for

16  their credible fear.

17  Q.   Throughout the course of your interaction with

18  Mr. Zepeda, did you notice or observe anything that

19  indicated to you that he was afraid?

20  A.   No.

21  Q.   Did you note anything in the documents that

22  indicated that Mr. Zepeda was afraid?

23  A.   Yes, I did, that he was not afraid.

24  Q.   Thank you.

25       Now, once you've had Mr. Ramos-Zepeda initial

 1   and acknowledge the signatures, what's the next

 2   step in the process that you need to do for the

 3   expedited removal?

 4   A.   We serve him with the I-860.

 5          MS. FURTADO:  May I approach the witness

 6   again, Your Honor?

 7          THE COURT:  Sure.

 8   BY MS. FURTADO:

 9   Q.   I'm showing you what's been marked as

10   Government's Exhibits 2, 3, and 4, and I'd ask you

11   to take a look at that, those.

12          Do you recognize those documents?

13   A.   Yes.

14   Q.   Okay.  So let's start with No. 2.  What is it?

15   A.   That's the I-860, the notice and order of

16   expedited removal.

17   Q.   Okay.  And who is the person that that refers

18   to, that document refers to?

19   A.   Ramon Ramos-Zepeda.  The charges -- the

20   charges of the Government are on here.

21   Q.   And what's the date associated with that

22   document?

23   A.   January 12th, 2009.

24   Q.   Okay.  Is that a fair and accurate copy of the

25   document you would have completed with

1  Mr. Ramos-Zepeda during the processing you did?

2  A.   Yes.

3  Q.   Okay.

4           MS. FURTADO:  Move to admit Government 2,

5  Your Honor.

6           THE COURT:  Any objection?

7           MR. ROCHA:  No objection.

8           THE COURT:  It will be admitted.  Thank

9  you.

10 BY MS. FURTADO:

11 Q.   I'd ask you to take a look at Exhibit 3.

12      Do you recognize that document?

13 A.   Yes.

14 Q.   What is it?

15 A.   The I-296.  This is notice to alien ordered

16 removed/departure verification.

17 Q.   Okay.  Now, in terms of this document, who is

18 it referring to?

19 A.   Ramon Ramos-Zepeda.

20 Q.   Okay.  What's the date?

21 A.   January 12th, 2009.

22 Q.   Okay.  Is your signature on this document?

23 A.   Yes.

24 Q.   Okay.  Is this a fair and accurate copy of the

25 document you would have completed on the 12th with

 1    Mr. Ramos-Zepeda?

 2    A.    Yes.

 3          MS. FURTADO:  Okay.  I move to admit

 4    Government's 3.

 5          THE COURT:  Mr. Rocha, any objection?

 6          MR. ROCHA:  No objection, Your Honor.

 7          THE COURT:  We'll go ahead and admit

 8    Exhibit No. 3.  Thank you.

 9          MS. FURTADO:  Okay.

10    BY MS. FURTADO:

11    Q.    I'm going to take back No. 4 from you.

12          All right.  Now, Mr. -- Agent, when you speak

13    to the -- when you were speaking to

14    Mr. Ramos-Zepeda regarding Exhibit No. 2 and 3,

15    what language were you using?

16    A.    Spanish.

17    Q.    Okay.  And when you were speaking to him, did

18    you have any indication that he was not

19    understanding you?

20    A.    No.

21    Q.    Okay.  Let's talk about Exhibit No. 2.

22          What's the purpose of this form, sir?

23    A.    This is to notify him of the charges.

24    Q.    And in this particular instance, what were the

25    charges against Mr. Ramos-Zepeda?

1  A.   "You did not then possess or present a valid

2  immigration visa, reentry permit, border crossing

3  identification card, or other valid entry document,

4  to wit:  You have entered into the United States

5  illegally with the intent to reside in the United

6  States."

7  Q.   Now, were these charges based on your

8  investigation or the information that you had?

9  A.   In the sworn statement.

10  Q.   Okay.  And then what's -- is there a different

11  bottom section to the I-860 form?

12  A.   Yes.

13  Q.   And what is that section?

14  A.   A certificate of service.  It says, "I

15  personally served this original" -- "served the

16  original of this notice upon the above-named person

17  on January 12, 2009."

18  Q.   And what does that section signify to you,

19  sir?

20  A.   That I explained these charges to the

21  individual.

22  Q.   Which individual?

23  A.   Ramon Ramos-Zepeda.

24  Q.   Okay.  And when you did that, when you served

25  this notice on Mr. Ramos-Zepeda, do you recall

 1  having a belief that he wasn't understanding what

 2  you were serving on him?

 3  A.   He understood.

 4  Q.   Okay.  Is there also a section above the

 5  certificate of service?

 6  A.   Yes.

 7  Q.   What is that section?

 8  A.   This is the order of removal under Section

 9  235(b)(1) of the Act.

10  Q.   And what does this section signify?

11  A.   "Based upon the determination set forth above

12  and evidence presented during inspection or

13  examination, pursuant to Section 235 of the Act and

14  by the authority contained in Section 235(b)(1) of

15  the Act, you are found to be inadmissible as

16  charged and ordered removed from the United

17  States."

18  Q.   Okay.  Is that a portion that you would have

19  explained to Mr. Ramos-Zepeda?

20  A.   Yes.

21  Q.   Okay.  There are a few signatures there.  What

22  do those signify?

23  A.   I signed and so did the supervisor at that

24  time.

25  Q.   The supervisor's signature, what is -- what's

1  that for?  Why do you need that?

2  A.  Because he's the designated official to

3  approve the document.

4  Q.  Did you say "to approve the document"?

5  A.  Yes.

6  Q.  And what does his signature then signify to

7  you?

8  A.  That the notice was served.

9  Q.  Okay.  On the 12th of January, you had

10 information that there was an outstanding warrant.

11 You testified that there was an outstanding

12 warrant.

13      What did you do with that information?

14 A.  We -- we contact the agency that has the

15 outstanding warrant and see if they want to seek

16 extradition.

17 Q.  Okay.  Prior to you -- and so in

18 Mr. Ramos-Zepeda's instance, did they -- did they

19 indicate they wanted to seek extradition?

20 A.  They did.

21 Q.  Okay.  Prior to going forward with the

22 extradition process, do you also talk to

23 Mr. Ramos-Zepeda about Exhibit 3?

24 A.  Yes.

25 Q.  And what is that document?

1  A.   This is a notice to the alien ordered

2  removed/departure verification.

3  Q.   Okay.  The top section of that form, what is

4  that?  What is that about?

5  A.   It's notifying Ramon Ramos-Zepeda that he was

6  -- he's been found to be inadmissible to the United

7  States under the provisions of Section 212(a) of

8  the Immigration and Nationality Act or deportable

9  under the provisions of Section 237 of the Act as a

10  visa waiver pilot program violator.

11       "In accordance with the provisions of Section

12  212(a)(9) of the Act, you are prohibited from

13  entering, attempting to enter, or being in the

14  United States for a period of five years from the

15  date of your departure from the United States as a

16  consequence of your having been found inadmissible

17  as an arriving alien in proceedings under Section

18  235(b)(1) or 240 of the Act."

19  Q.   Is this something that you would have

20  explained to Mr. Ramos-Zepeda?

21  A.   Yes.

22  Q.   What language would you have been speaking?

23  A.   It would have been Spanish.

24  Q.   And at the time, do you recall having any

25  indication that Mr. Ramos-Zepeda did not understand

1   what you were explaining to him from this form?

2   A.   No.

3   Q.   Now, the bottom portion of that form, what is

4   it?

5   A.   The verification of removal.

6   Q.   Is that something you complete?

7   A.   No.

8   Q.   When does that section get completed?

9   A.   When they physically get removed from the

10  United States.

11  Q.   What happens when a person is physically

12  removed from the United States?  Is there some

13  acknowledgment that needs to happen?

14  A.   Yeah, all this -- everything here gets filled

15  out, and somebody actually takes them to the -- to

16  a port of entry and physically watches them leave

17  the country.

18  Q.   Okay.  But as a processing agent, would this

19  be your responsibility, this verification of

20  removal section?

21  A.   No.

22  Q.   Once you're done -- once you were done

23  processing Mr. Ramos-Zepeda, what did you do?

24  A.   I put the file together and put Mr. Ramon

25  Ramos-Zepeda in his cell and waited for the agency

 1   that was seeking extradition to take custody of

 2   Mr. Ramon Ramos-Zepeda.

 3   Q.   So does the extraditing agency come or is

 4   there --

 5   A.   There's a -- so he was -- the extradition was

 6   out of California, but we have a local Santa Cruz

 7   County that will come and pick him up.

 8   Q.   In this particular case, what happened with

 9   Santa Cruz County as far as your involvement was

10   concerned?

11   A.   They picked him up.

12   Q.   What did you do with the file once -- once

13   Mr. Ramos-Zepeda was picked up?

14   A.   It gets sent to the file control office.

15   Q.   Do you -- do you talk to Mr. Ramos-Zepeda

16   regarding ties or equity in the country?

17   A.   Yes.   I -- it's not in the sworn statement but

18   I will ask.

19   Q.   Okay.   What in this particular instance on the

20   12th did you ask Mr. Ramos-Zepeda regarding equity

21   in the United States?

22   A.   I don't remember.

23   Q.   Okay.   I'd ask you to look at your I-213, and

24   I'd ask you to look at the last page.

25   A.   "Ramos claims to have no close family ties or

1    equity in the United States."

2    Q.   Okay.  Did your I-213 help you to remember

3    that?

4    A.   Yes, it did.

5    Q.   And was there anything else that was provided

6    to Mr. Ramos-Zepeda during this -- during your

7    processing?

8    A.   He was given a meal and a drink.  He claimed

9    no fear of returning to Mexico.

10   Q.   Were you making observations about his general

11   appearance?

12   A.   He appeared to be in good health.

13   Q.   Do you know -- in the end, do you know what

14   happened with the extradition of Mr. Ramos-Zepeda

15   at the time?

16        So around the time of these events, the 12th,

17   did you know what happened with the extradition?

18   A.   No.

19           MS. FURTADO:  Okay.  I just need a second,

20   Your Honor.

21           THE COURT:  Sure.

22           MS. FURTADO:  So -- a couple more

23   questions.

24   BY MS. FURTADO:

25   Q.   This incident, the original contact with

1    Mr. Ramos-Zepeda, you said that you had run his

2    criminal history?

3    A.   Yes.

4    Q.   Do you know what the conviction, the 2005

5    conviction, was for?

6    A.   Yeah.  It was counts of lewd, lascivious acts

7    with a child under 14.

8              MS. FURTADO:  Can I have just one minute,

9    Your Honor?

10             THE COURT:  Sure.

11             MS. FURTADO:  Okay.  I don't have any

12   other questions for this witness.

13             THE COURT:  Thank you.

14             Mr. Rocha?

15             MR. ROCHA:  Your Honor, can we take a

16   short break?

17             THE COURT:  Absolutely.  We'll take a

18   break.  Thank you.  And once again, if at any time

19   you need that, let me know.  So we'll take a five-

20   minute break or so.

21             MS. FURTADO:  Thank you very much.  Thank

22   you.

23             THE COURT:  Thank you.

24             (Off the record from 4:11 p.m. to

25             4:22 p.m.)

```
 1            THE COURT:  And before we move on, just
 2   for housekeeping, I don't think we're going to
 3   finish today, and I don't want you to rush.  I
 4   don't want you to feel like you're rushed, so I was
 5   hoping we could come back on Monday.  It's my
 6   understanding that you're not available on Monday.
 7            Unfortunately, I'm on duty the next two
 8   weeks, and it looks like the next time that we can
 9   return when I'm not on duty is March 7th at nine
10   o'clock a.m.
11            I know you have a March 8th trial date and
12   a plea deadline of today, so those will probably
13   have to -- someone will have to move to continue
14   those.
15            So let me hear from you, Mr. Rocha, first.
16            MR. ROCHA:  Well, I can certainly move to
17   continue the trial and the plea deadline.  That's
18   not a problem.  I can file a formal motion if the
19   Court would like, so that's not a problem.
20            THE COURT:  Right, you'll have to do that.
21            MR. ROCHA:  Yeah, I can do that.  So I
22   certainly will be able to --
23            THE COURT:  And I apologize --
24            MR. ROCHA:  Oh, no worries, Your Honor.
25            THE COURT:  So it looks like -- and so
```

 1  Monday, I wish we could do it Monday.  I understand

 2  you can't.  So -- and I don't want any of you to

 3  feel rushed, so I think what we'll do is hopefully

 4  we can get through Agent Borrego, and if not, then

 5  we'll probably end up having to reconvene on March

 6  7th.

 7          MR. ROCHA:  Your Honor, if it's okay with

 8  the Court, we could recess now, because I doubt

 9  that my -- I hate for my testimony or cross to be

10  broken.

11          THE COURT:  I --

12          MR. ROCHA:  And we're going to come back

13  in two weeks, and I hate to then rehash everything

14  just to get us up to speed.  So if the Court is

15  inclined, I -- and then the marshals tell me that

16  my client's the last one on the bus --

17          THE COURT:  Right, and that actually will

18  probably help everybody, frankly, so that's okay

19  with me.

20          Ms. Furtado, is that okay with you?

21          MS. FURTADO:  Yes, Your Honor.

22          THE COURT:  Okay.  That's fine then.  So I

23  think what we're going to do, I'm presuming the

24  agent is going to be available on March 7th.  I

25  mean --

1           MS. FURTADO:  I didn't ask.

2           THE COURT:  Well, why don't we ask.

3           MS. FURTADO:  I thought that we would

4  continue going through Borrego, but -- are you

5  available?

6           AGENT BORREGO:  Is that, March 7th, a

7  Monday, you said?

8           MS. FURTADO:  It's a Monday.

9           THE CLERK:  It's a Monday.

10           THE COURT:  Well, here's what we're going

11  to do.  If that's a problem, just let us know.

12           AGENT BORREGO:  Okay.

13           THE COURT:  Okay?  So what we're going to

14  do -- and I appreciate what Mr. Rocha's saying, and

15  also I think it's probably better for the marshals.

16  It's probably better for Mr. Ramos-Zepeda, and I

17  know it's certainly better for the interpreters.

18           So what we're going to do, just for the

19  record, right now we have admitted Government's

20  Exhibits 1, 2, and 3.  Those are the only exhibits

21  that have been admitted.

22           We will reconvene beginning with

23  Mr. Rocha's cross-examination of Agent Borrego on

24  Monday, March 7th, at nine o'clock a.m.  And I

25  really apologize for breaking this up.  I know it's

1    not the best way to do it.

2           Ms. Granoff, is there anything --

3           MS. GRANOFF:  Yeah, just one more

4    housekeeping matter, Your Honor.

5           THE COURT:  Sure.

6           MS. GRANOFF:  Since there's going to be

7    such a lengthy break in between the testimony of

8    direct and cross-examination, can we just ask the

9    Court to order the transcript so that both -- all

10   the parties, actually --

11          THE COURT:  Yeah.

12          MS. GRANOFF:  -- will have an opportunity

13   to refresh their recollection of that testimony

14   that was laid so far in order to pick up where

15   we're leaving off, since it'll be almost two to

16   three weeks?

17          THE COURT:  Beth?

18          We'll figure it out.  We'll figure it out.

19          MS. GRANOFF:  Thank you, Judge.

20          THE COURT:  So if, in fact, we do order

21   one, we'll certainly -- that will be available.

22          So I think that's it.  Thank you very much

23   for your time.  I appreciate it.

24          MR. ROCHA:  Thank you, Your Honor.

25          MS. FURTADO:  Thank you, Your Honor.

1              THE COURT:  Have a good weekend.

2          (Proceedings concluded at 4:26 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3          I, Erica R. McQuillen, do hereby certify

 4   that the preceding pages of typewritten matter are

 5   a true, correct, and complete transcription of the

 6   digital recording of proceedings in the above-

 7   entitled matter.

 8          Dated this 22nd day of March, 2016.

 9

10                       s/Erica R. McQuillen
                    Erica R. McQuillen, RDR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```