**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-0976-TUC-CKJ (BGM) |
|---|---|
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Ramon Ramos-Zepeda, | |
| Defendant. | |

Currently pending before the Court is Defendant Ramon Ramos-Zepeda's Motion to Suppress Statements (Doc. 37). The Government has filed its Response (Doc. 53). Govt.'s Response to Def.'s Mot. to Suppress Statements (Doc. 53). No reply has been filed. Also pending is Defendant's Amended Motion to Dismiss Indictment for Unlawful Exclusion Under Title 8 U.S.C. § 1326(d) (Doc. 29). The Government filed its Amended Response (Doc. 31) and Defendant replied (Doc. 33). Defendant is charged with one count of illegal re-entry after deportation in violation of Title 8, United States Code, Section 1326. Indictment (Doc. 6) at 1. Defendant Ramon Ramos-Zepeda seeks

suppression of his statements allegedly obtained in violation of his *Miranda*[1] rights.  *See* Def.'s Mot. to Suppress Statements (Doc. 37).  Defendant additionally seeks dismissal of the Indictment because the previous order of removal against him was allegedly based on an unlawful exclusion.  *See* Def.'s Amended Mot. to Dismiss Indictment for Unlawful Exclusion Under Title 8 U.S.C. §1326(d) (Doc. 29).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On February 19, 2016, an evidentiary hearing was held before Magistrate Judge Macdonald regarding the two motions.  Minute Entry 2/19/2016 (Doc. 49).  The hearing was continued on March 7, 2016 and concluded on March 8, 2016.  Minute Entry 3/7/2016 (Doc. 70); Minute Entry 3/8/2016 (Doc. 74).  The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motions.

## I.     FACTUAL BACKGROUND

### A.  The 2009 Encounter

#### 1.  Initial Stop

On January 9, 2009 at approximately 8:00 a.m., Defendant Ramon Ramos-Zepeda entered the United States from Mexico near Naco, Arizona.  Hr'g Tr. 2/19/2016 (Doc. 79) 79:12–20; Hr'g Tr. 3/7/2016 (Doc. 77) 79:3–21.  On January 12, 2009, United States Border Patrol ("USBP") Agent Jorge Borrego processed Defendant for expedited

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

removal.  Hr'g Tr. 2/19/2016 (Doc. 79) 77:15–78:2, 79:21–23; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 82:19–83:1.  Although Defendant Ramos-Zepeda entered the United States on January 9, 2009, he was not apprehended until January 12, 2009.  Hr'g Tr. 2/19/2016 (Doc. 79) 79:24–80:17; Hr'g Tr. 3/7/2016 (Doc. 77) 79:3–25; *see also* Hr'g Tr. 3/8/2016 (Doc. 78) 6:6–16.  Agent Borrego has worked for the U.S. Border Patrol for just over eight (8) years.  *Id.* at 64:4–7; Hr'g Tr. 3/7/2016 (Doc. 77) 4:9–11.  Agent Borrego completed basic and field training, as well as post-academy training.  Hr'g Tr. 2/19/2016 (Doc. 79) 64:8–66:13; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 4:12–16.  Additionally, Agent Borrego has spoken Spanish since childhood.  Hr'g Tr. 2/19/2016 (Doc. 79) 64:21–65:5.  Agent Borrego has had specialty assignments including a detail in Tucson, Arizona as a processing agent, as well as a case agent.  *Id.* at 66:14–67:1; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 5:11–20.

Agent Borrego described his experience as a processing agent, explaining that when an individual is apprehended, they are then brought to a processing center.  Hr'g Tr. 2/19/2016 (Doc. 79) 67:2–19.  Agent Borrego testified that agents in the field would collect biographical information from an individual and complete a field I-826 reflecting that information.  *Id.* at 67:2–68:1.  The field I-826 is then given to the processing agent.  *Id.* 67:20–68:4, 69:12–15.  At the station agents will run fingerprints and take a photograph of the individual.  *Id.* at 67:14–68:18, 69:16–21, 70:14–24.  Agent Borrego testified that agents consider an individual's criminal history, their immigration history, and whether they have a claim to being admissible to the United States.  *Id.* at 68:11–69:11.  The processing agent then inputs information regarding the individual into an E3.

Hr'g Tr. 2/19/2016 (Doc. 79) 69:70:3; Hr'g Tr. 3/7/2016 (Doc. 77) 51:23–52:1.  Agent Borrego further testified that when entering information into the E3 form, he does so with the individual standing in front him, going through each page of information with them. Hr'g Tr. 2/19/2016 (Doc. 79) 70:4–10.  As part of his processing, Agent Borrego verifies the name and date of birth of the individual, comparing the information with the field I-826.  *Id.* at 70:25–71:9.  Agent Borrego also confirms that the photograph represents the individual standing in front of him.  *Id.* at 71:10–13, 75:14–18.

Agent Borrego also testified that he inputs information obtained from the individual on an I-213 form.  Hr'g Tr. 2/19/2016 (Doc. 79) 72:4–74:18; Hr'g Tr. 3/7/2016 (Doc. 77) 18:10–11.  Agent Borrego verifies the information received on the I-826 form, confirms that the individual has no credible fear, and confirms that they have a claim which may allow them to be in the United States.[2]  Hr'g Tr. 2/19/2016 (Doc. 79) 71:14–74:6.  These variables, as well as criminal history and immigration history impact the way an individual will be processed.  *Id.*  If an individual refuses to answer a question, Agent Borrego will note that the individual "Failed to respond" or something similar on the form.  *Id.* at 74:19–22.  Other information obtained from the individual includes their height and weight, country of origin, how they entered the United States, and a United States address if they have one.  *Id.* at 75:19–76:9.

Agent Borrego testified that he processed Defendant Ramos-Zepeda pursuant to this procedure on January 12, 2009.  Hr'g Tr. 2/19/2016 (Doc. 79) 77:22–78:2; Hr'g Tr.

---

[2] Such claims may include, but are not limited to, derivative citizenship from the individual's parents or if they have children that are United States citizens.  Hr'g Tr. 2/19/2016 (Doc. 79) 71:14–75:13.

3/7/2016 (Doc. 77) 18:22–19:20, 57:4–16, 82:19–83:1.   Defendant Ramos-Zepeda confirmed that Agent Borrego took his information and put it in the computer system. Hr'g Tr. 3/8/2016 (Doc. 78) 9:22–10:14.   Agent Borrego further testified that he matched the photo with the person being processed and asked Defendant Ramos-Zepeda biographical questions. Hr'g Tr. 2/19/2016 (Doc. 79) 78:14–25, 92:17–93:14.   Defendant Ramos-Zepeda informed Agent Borrego that he was a Mexican national and entered the United States near Naco, Arizona on January 9, 2009 at approximately 8:00 a.m., and was apprehended on January 12, 2009.  *Id.* at 79:3–80:3, 102:10–16; Hr'g Tr. 3/7/2016 (Doc. 77) 20:12–21:24, 31:10–19, 79:3–25.   Agent Borrego testified that the information provided by Defendant Ramos-Zepeda was consistent with the information provided on the field I-826 form.   Hr'g Tr. 2/19/2016 (Doc. 79) 80:4–13, 85:16–86:13.   Agent Borrego further testified that he received a criminal history regarding Defendant Ramos-Zepeda, including an outstanding warrant stemming from a May 23, 2006 conviction in Redwood City, California.   *Id.* at 82:8–83:22; Hr'g Tr. 3/7/2016 (Doc. 77) 30:21–24, 57:14–16.   Agent Borrego also testified that this outstanding warrant would have made Defendant Ramos-Zepeda ineligible for a voluntary return.   Hr'g Tr. 2/19/2016 (Doc. 79) 83:19–22.

Agent Borrego testified that an individual is eligible for expedited removal, when he or she has entered the United States without going through a port of entry and is apprehended within fourteen (14) days of such entry and within one hundred (100) miles of the border.   Hr'g Tr. 2/19/2016 (Doc. 79) 84:13–85:15; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 58:22–25, 79:5–8.  Agent Borrego further testified that the expedited removal

process is an administrative proceeding, during which he obtains a sworn statement from the individual being processed.  Hr'g Tr. 2/19/2016 (Doc. 79) 87:14–15; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 6:11–7:9, 80:15–19.  Prior to obtaining a statement, Agent Borrego testified that he informed Defendant Ramos-Zepeda regarding the expedited removal proceeding, including that Defendant Ramos-Zepeda did not appear to be admissible or have legal papers authorizing his admission into the United States and that as a result he may be denied admission and immediately returned to his home country without a hearing.  Hr'g Tr. 2/19/2016 (Doc. 79) 98:5–99:4.  Agent Borrego further testified that he informed Defendant Ramos-Zepeda that such removal may result in his being barred from reentry for a period of five (5) years or longer, and that Defendant Ramos-Zepeda appeared to understand this.  *Id.* at 98:5–99:4, 103:11–19.  Agent Borrego testified that he spoke with Defendant Ramos-Zepeda in Spanish while processing him for expedited removal.  *Id.* at 88:16–90:18, 97:6–10; Hr'g Tr. 3/7/2016 (Doc. 77) 83:5–20.  Defendant Ramos-Zepeda testified that he only speaks Spanish.  Hr'g Tr. 3/8/2016 (Doc. 78) 14:20–15:1.  Agent Borrego also testified that he confirmed with his supervisor that expedited removal was appropriate for Defendant Ramos-Zepeda.  Hr'g Tr. 2/19/2016 (Doc. 79) 81:21–82:3, 112:21–113:8.  Defendant Ramos-Zepeda declined to speak with a consular representative during his immigration processing.  *Id.* at 94:13–24.  Agent Borrego testified that he informed Defendant Ramos-Zepeda that if he had fear or concern regarding removal from the United States, he would have an opportunity to speak with an officer for a determination regarding whether he should remain in the United States.  Hr'g Tr. 2/19/2016 (Doc. 79) 100:9–101:14, 104:1–14.  Defendant Ramos-Zepeda denies

that he was ever asked whether he had fear about returning to his country.  Hr'g Tr. 3/8/2016 (Doc. 78) 15:7–12.  Agent Borrego also asked Defendant Ramos-Zepeda if there was anything that he would like to say or add.  Hr'g Tr. 2/19/2016 (Doc. 79) 103:20–25.  Based upon the information obtained from Defendant Ramos-Zepeda, it was determined that he was inadmissible to the United States and ordered removed.  Hr'g Tr. 2/19/2016 (Doc. 79) 110:21–112:20; Hr'g Tr. 3/7/2016 (Doc. 77) 42:8–44:7, 77:9–78:12. Agent Borrego testified that he did not read Defendant Ramos-Zepeda his *Miranda* rights during processing, because USBP was not pursuing criminal prosecution.  Hr'g Tr. 3/7/2016 (Doc. 77) 24:24–25:4, 58:9–16, 82:9–12.  The document finding Defendant Ramos-Zepeda was explained to and served upon him.  Hr'g Tr. 2/19/2016 (Doc. 79) 112:4–115:2; Hr'g Tr. 3/7/2016 (Doc. 77) 70:25–73:22, 84:9–85:20.  Defendant Ramos-Zepeda testified that although he signed the forms, he did not read them because Agent Borrego told him that he was going to be extradited to California.  Hr'g Tr. 3/8/2016 (Doc. 78) 10:15–11:–16.  Defendant Ramos-Zepeda further testified that Agent Borrego did not read anything to him because "he was angry at me because of the problem that I had in California." *Id.* at 11:17–12:1.

Agent Borrego also testified that upon determining that Defendant Ramos-Zepeda had an outstanding warrant, Border Patrol contacted the agency with the outstanding warrant to see if they wanted to seek extradition.  Hr'g Tr. 2/19/2016 (Doc. 79) 113:9–20. Agent Borrego further testified that Redwood City, California indicated that they did wish to seek extradition. *Id.*  After Defendant Ramos-Zepeda was processed, Agent Borrego put the file together and waited for the agency seeking extradition to take

custody.  *Id.* at 115:22–116:11.  Agent Borrego testified that Santa Cruz County, Arizona took custody of Defendant Ramos-Zepeda for the extradition.   *Id.* at 116:3–11. Defendant Ramos-Zepeda testified that he was in a cell for approximately four (4) hours, and then a policeman arrived and took him to Santa Cruz County.  Hr'g Tr. 3/8/2016 (Doc. 78) 14:9–19, 15:11–16:19.  Once Defendant Ramos-Zepeda was transferred to state custody, Agent Borrego sent the file to the file control office.  Hr'g Tr. 2/19/2016 (Doc. 79) 12–14; Hr'g Tr. 3/7/2016 (Doc. 77) 62:2–15.

## 2.  January 14–15, 2009

On January 14, 2009, Defendant Ramos-Zepeda was returned to USBP custody because San Mateo County, California denied extradition.  Hr'g Tr. 3/7/2016 (Doc. 77) 66:1–17; *see also* Hr'g Tr. 3/8/2016 (Doc. 78) 17:1–20.  Defendant Ramos-Zepeda was sent to the Sonoita, Arizona station.  Hr'g Tr. 3/7/2016 (Doc. 77) 60:13–20, 66:1–17; Hr'g Tr. 3/8/2016 (Doc. 78) 17:21–18:4.  The agents on duty were unable to locate the original file.  Hr'g Tr. 3/7/2016 (Doc. 77) 66:1–17.  As such, on January 15, 2009 at 2:00 a.m., the January 12, 2009 I-213, originally created by Agent Borrego was recreated by USBP Agent Anthony Rogers, who also signed on behalf of Agent Gerald Hoyt.  *Id.* at 64:21–65:17.  Agent Rogers confirmed with the San Mateo County Sheriff's Department that they were declining extradition.  *Id.* at 66:1–17.  Agent Rogers then contacted the Tucson sector prosecutions unit to determine whether Defendant Ramos-Zepeda could be prosecuted due to his prior convictions; however, the prosecutions unit confirmed that it was unable to prosecute Defendant Ramos-Zepeda because he was apprehended more than forty-eight (48) hours earlier.  Hr'g Tr. 3/7/2016 (Doc. 77) 67:21–68:6.  As a result,

Defendant Ramos-Zepeda was processed for expedited removal and a new I-860 issued and was signed by acting field operations supervisor David Barker.  *Id.*  Because agents considered prosecuting Defendant Ramos-Zepeda criminally, he was read his *Miranda* rights.  *Id.* at 67:21–68:10.

Defendant Ramos-Zepeda testified that upon his return to the Sonoita station an individual took his information again.  Hr'g Tr. 3/8/2016 (Doc. 78) 19:2–11.  Defendant Ramos-Zepeda further testified that this included his name, but he did not recall being re-fingerprinted or asked whether he had a credible fear of returning to his country.  *Id.* at 19:8–20:5.  Defendant Ramos-Zepeda also testified that no one reviewed the paperwork with him, and he only signed the forms because they were part of the processing.  *Id.* at 20:6–18.  Defendant Ramos-Zepeda thought that he was being sent to Tucson to see an immigration judge, which did not occur.  *Id.* at 20:19–23.  Defendant Ramos-Zepeda was removed to Mexico on January 15, 2009.  *Id.* at 21:5–22:13.

**B.    *The Current Charged Offense***

**1.  The 2015 Encounter**

At approximately midnight on May 1, 2015, United States Border Patrol ("USBP") Agents Adam Letavay and Christopher Wagner were on duty near the Lukeville, Arizona port of entry. Hr'g Tr. 2/19/2016 (Doc. 79) 17:22–18:4, 47:14–25. Agent Letavay was assigned for a quick reactionary force at the port of entry, because there had been reports of violence further south on the Mexico side of the border, and a team of agents were assigned to be prepared if anything came north.  *Id.* at 18:1–17. Agent Wagner indicated that he and the other agents were asked to stand by because the

- 9 -

Ajo station had no mobile agents at that time. *Id.* at 47:21–25. Agents Letavay, Wagner, and Swickheimer were in a parking lot just north of the port of entry. *Id.* at 18–18–19:13.

Agent Letavay has been a USBP agent for approximately eight and one-half (8 1/2) years. *Id.* at 13:10–11, 34:18–20. He is currently detailed at the San Diego sector mobile response team. *Id.* at 13:3–6. Agent Letavay completed basic and field training prior to becoming a USBP agent, as well as post academy training. Hr'g Tr. 2/19/2016 (Doc. 79) 15:11–16:18, 34:1–17. Agent Letavay has also had specialty assignments as a border patrol agent, including the mobile response team. *Id.* at 16:19–17:10. His current unit specializes in arduous terrain and areas that are not readily accessible. *Id.* at 17:11–21.

Agent Wagner has also been a USBP agent for approximately eight and one-half (8 1/2) years. *Id.* at 45:3–5, 54:19–21. He is currently working out of the San Diego sector, with the air mobile unit or San Diego strike team. *Id.* at 44:23–45:1. Agent Wagner has been on the San Diego strike team for just under six (6) years. *Id.* at 45:6–8. Agent Wagner also received basic training and field training prior to becoming a USBP agent, as well as specialized training after graduating from the academy. Hr'g Tr. 2/19/2016 (Doc. 79) 45:9–47:13.

Agent Letavay testified that early in the evening of May 1, 2015, he and Agents Wagner and Swickheimer heard what might have been shots southwest of the port of entry, but they were unconfirmed. *Id.* at 19:1–6. At approximately midnight, Agents Letavay, Wagner, and Swickheimer received a radio call from a mobile surveillance operator indicating that there were two vehicles at the border fence moving northbound

across the border road.  *Id.* at 19:14–22, 37:5–12, 48:1–15.  Agents Letavay and Wagner testified that the three of them acknowledged the radio call and drove south to the border road and then eastbound along the border fence.  Hr'g Tr. 2/19/2016 (Doc. 79) 19:23–20:12, 22:8–12, 36:25–37:12, 48:16–22.  The mobile operator informed the agents as to where he had last seen the two individuals cross the border road and subsequently lost them in a small grove of trees.  *Id.* at 20:13–18, 23:19–25, 37:25–38:22, 42:11–24.

Agent Letavay testified that it took approximately five (5) to ten (10) minutes for the agents to reach the two suspects.  *Id.* at 21:7–14, 37:13–17.  Agent Letavay further testified that while driving to the individuals' last location, the agents maintained radio communication with the mobile operator, and stopped within approximately fifteen (15) meters of where the operator believed the individuals crossed the border road.  *Id.* at 22:13–25, 42:11–24.  Agent Wagner confirmed Agent Letavay's testimony.  *Id.* at 48:16–22.  Once at the location the mobile operator directed them to, the agents got out of the vehicle and used flashlights to look for foot signs from the border fence and along the border road.  *Id.* at 23:1–12, 42:25–9, 48:23–49:7.  Agent Letavay testified that he was able to find two (2) sets of prints running from the border fence, north-northeast across the road, into the grove of trees.  Hr'g Tr. 2/19/2016 (Doc. 79) 23:13–18, 38:23–39:3.  Agent Letavay further testified that the agents followed the foot signs across the road and into the trees, where the two subjects were concealed.  *Id.* at 24:1–11, 39:1–6.  Agents Letavay and Wagner testified that they were wearing rough duty uniforms, which includes green pants, green uniform shirt, name plate, badge, and Homeland Security and Border Patrol patches on each shoulder.  *Id.* at 24:12–18, 49:20–50:3.  Agent Letavay

also testified that as he approached the grove of trees he announced his presence as a USBP agent. *Id.* at 24:19–25:4. Agent Letavay further testified that upon entering the grove of trees, the agents discovered two (2) subjects, approximately five (5) feet apart, hiding in the lower brush. *Id.* 25:5–9. Defendant Ramos-Zepeda confirmed that he was arrested on May 1, 2015 with one other person. Hr'g Tr. 3/8/2016 (Doc. 78) 22:19–23:2.

Agent Letavay approached one subject, while Eric Swickheimer approached the second subject. Hr'g Tr. 2/19/2016 (Doc. 79) 25:10–18, 49:8–19, 60:4–6. Agent Letavay testified that he patted down his subject, checking for weapons, and then placed him in handcuffs. *Id.* at 25:19–24. Meanwhile, Agent Wagner, who was standing between the two subjects, asked the 213 questions consisting of inquiring as to the subjects' country of origin and whether they have any documentation to be in the United States. *Id.* at 25:19–26:12, 55:13–21, 60:4–6. Agent Wagner testified that the subjects were asked regarding their citizenship and paperwork in both English and Spanish. *Id.* at 51:1–17. Agent Letavay testified that he heard the subject respond that he did not have immigration documents to remain in the United States and that he was from Michoacán, a state in Mexico. *Id.* at 26:7–12. Agent Wagner confirmed that the subjects stated that they were from Mexico. *Id.* at 49:8–19, 51:18–20. Agent Letavay further testified that he did not find any weapons on the person he made contact with. *Id.* at 26:13–16. Agent Letavay testified that he did not have his weapon drawn, and to his knowledge neither did the other agents. Hr'g Tr. 2/19/2016 (Doc. 79) 26:17–27:6. Agent Wagner also testified that he did not have his weapon drawn. *Id.* at 50:16–18. Defendant Ramos-Zepeda

testified that he was placed in a vehicle, driven for approximately 500 meters, got out, and then agents questioned him regarding where he was from. *Id.* at 23:12–24:7.

Agent Letavay testified that once it was determined that the individuals were to be taken into custody, they were searched more thoroughly, placed in a marked vehicle with a cage, their belongings were searched, an apprehension sheet was completed by USBP agents, and the individuals were transported to the station for further processing. *Id.* at 29:1–13, 39:21–40:4, 53:10–20.   On this occasion, Agent Wagner transported the individuals, one of whom, Defendant Ramon Ramos-Zepeda, Agents Letavay and Wagner identified in court. *Id.* at 29:17–30:5, 51:21–52:16, 53:10–20.

## II.   ANALYSIS

Defendant seeks suppression of his 2009 statement to federal officers, arguing that they were obtained in violation of *McNabb-Mallory*, as well as *Miranda*.[3]  Def.'s Mot. to Suppress Statements (Doc. 37) at 4–9.  Defendant also seeks suppression of his 2015 statements made at the time of his initial encounter with border patrol, because they were allegedly obtained in violation of his *Miranda* rights. *Id.* at 9–10.  Defendant also seeks dismissal of the indictment predicated on Defendant's 2009 exclusion allegedly violating his due process rights. *See* Def.'s Mot. to Dismiss (Doc. 29).

### A.  *McNabb-Mallory*

Rule 5(a), Federal Rules of Criminal Procedure provides that "[a] person

---

[3] The Government averred at oral argument that it does not intend to use Defendant's January 15, 2009 statement at trial.  Hr'g Tr. 2/19/2016 (Doc. 79) 10:10–12:3.  As such, the only statement from 2009 currently at issue is that made on January 12, 2009.

making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A).  In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the Supreme Court of the United States established "the rule known simply as *McNabb-Mallory* [which] 'generally render[s] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a).'"  *Corley v. United States*, 556 U.S. 303, 309, 129 S.Ct. 1558, 1563, 173 L.Ed.2d 443 (2009) (2d and 3d alteration in original) (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994)).

In 1968, Congressed "enacted 18 U.S.C. § 3501 in response to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to the application of *McNabb-Mallory* in some federal courts."  *Corley*, 556 U.S. at 309, 129 S.Ct. at 1563. Section 3501(c), 18. U.S.C. provides:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention:  *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or

- 14 -

other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c).   In *Corley*, the Court considered the impact of § 3501(c) on the *McNabb-Mallory* rule, holding that:

> [Section] 3501[, 18 U.S.C.,] modified *McNabb-Mallory* without supplanting it.  Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]").  If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and . . . the weight to be given [it] is left to the jury."  *Ibid*.  If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.

*Corley*, 556 U.S. at 322, 129 S.Ct. at 1571 (alterations 3–5 in original).

Here, Defendant Ramos-Zepeda entered the United States from Mexico on January 9, 2009 near Naco, Arizona.  Hr'g Tr. 2/19/2016 (Doc. 79) 79:3–80:3, 102:10–16; Hr'g Tr. 3/7/2016 (Doc. 77) 20:12–21:24, 31:10–19, 79:3–21.  He was apprehended by United States Border Patrol agents at approximately 1:30 a.m. on January 12, 2009 and processed by USBP Agent Borrego.  Hr'g Tr. 2/19/2016 (Doc. 79) 77:15–78:2, 79:3–80:17; Hr'g Tr. 3/7/2016 (Doc. 77) 20:12–21:24, 31:10–19, 79:3–25, 82:19–83:1; Hr'g Tr. 3/8/2016 (Doc. 78) 6:6–16.  As part of processing, Defendant Ramos-Zepeda was fingerprinted and photographed.  Hr'g Tr. 2/19/2016 (Doc. 79) 77:22–78:25, 92:17–93:14; Hr'g Tr. 3/7/2016 (Doc. 77) 18:22–19:20, 57:4–16, 82:19–83:1.  Defendant Ramos-Zepeda informed Agent Borrego that he was a Mexican national and entered the

United States near Naco, Arizona.  Hr'g Tr. 2/19/2016 (Doc. 79) 79:3–80:3, 102:10–16; Hr'g Tr. 3/7/2016 (Doc. 77) 20:12–21:24, 31:10–19, 79:3–25.  During processing, Agent Borrego discovered that Defendant had an outstanding warrant stemming from a May 23, 2006 conviction in Redwood City, California.  Hr'g Tr. 2/19/2016 (Doc. 79) 82:8–83:22; Hr'g Tr. 3/7/2016 (Doc. 77) 30:21–24, 57:14–16.  Agent Borrego testified that he spoke Spanish to Defendant Ramos-Zepeda and that he explained the expedited removal process to him.  Hr'g Tr. 2/19/2016 (Doc. 79) 88:16–90:18, 97:6–10, 98:5–99:4; Hr'g Tr. 3/7/2016 (Doc. 77) 83:5–20.  Defendant Ramos-Zepeda declined to speak with a consular representative and did not indicate any fear about returning to his country.  Hr'g Tr. 2/19/2016 (Doc. 79) 94:13–24, 100:9–101:14, 104:1–14.  Despite Defendant's testimony to the contrary, the Court finds Agent Borrego credible.  After processing, Santa Cruz County, Arizona took custody of Defendant Ramos-Zepeda for extradition to California. Hr'g Tr. 2/19/2016 (Doc. 79) 116:3–11.

Defendant was never charged with a criminal violation.  As such, *McNabb-Mallory* does not apply.  Even if the Court were to accept that it is applicable, Defendant Ramos-Zepeda's statement was given within the first six (6) hours after his arrest and was voluntarily made.  As such, there can be no *McNabb-Mallory* violation.

### B.  Miranda

#### 1.  In General

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  The Supreme Court of the United States has "recognized that custodial

- 16 -

interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420, 96 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)).  "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420, 96 S.Ct. at 1140.  Specifically, the Court has found the Constitution requires "that a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

### 2.  In Custody

"Custodial" means taken into custody or otherwise deprived of freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)  ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant

way.").  "Two discrete inquiries are essential to the ["in custody"] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).  The Ninth Circuit Court of Appeals has further delineated that "[t]o determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 144 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

### 3.  Interrogation

"Not every question asked in a custodial setting constitutes 'interrogation.'"  *United States v. Mata-Abundiz*, 717 F.2d 1277, 1278 (9th Cir. 1983) (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981)).  "The test is whether 'under all of the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'''  *Mata-Abundiz*, 717 F.2d at 1278–79 (quoting *Booth*, 669 F.2d at 1237; *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)).

"'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301, 100

S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).  As such, "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689.

"Ordinarily, the routine gathering of background biographical data will not constitute interrogation." *Booth*, 669 F.2d at 1238 (citations omitted).  "If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the exception does not apply." *Mata-Abundiz*, 717 F.2d at 1280 (citing *Booth*, 669 F.2d at 1238).  As such, the Ninth Circuit Court of Appeals has held "that in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response." *Id.*  Subsequently, the Ninth Circuit Court of Appeals recognized that where "an INS agent's purely administrative interview of the defendant was . . . for the 'sole purpose' of determining whether the defendant was subject to an administrative action for deportation[,]" *Miranda* warnings were not required.  *United States v. Chen*, 439 F.3d 1037 (9th Cir. 2006) (citing *United States v. Salgado*, 292 F.3d 1169 (9th Cir. 2002)).  The *Salgado* court recognized that there was no evidence that the interviewing agent "could (or did) reasonably believe that [the defendant] could be incriminating himself on account of the likelihood that he would reenter illegally and commit more crimes a year later." *Salgado*, 292 F.3d at 1173.

Here, Agent Borrego processed Defendant Ramos-Zepeda for possible extradition to California and an expedited removal from the United States because he had entered the United States without going through a port of entry and was apprehended within fourteen (14) days of such entry and within one hundred (100) miles of the border.  Hr'g Tr.

2/19/2016 (Doc. 79) 84:13–85:15, 113:9–20; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 58:22–25, 79:5–8.  Agent Borrego could not predict that Defendant would violate the law six (6) years later.  As such, the Court finds this case is more similar to *Salgado* than *Mata-Abundiz*.  Agent Borrego processed Defendant Ramos-Zepeda administratively, and no criminal charges were brought based on Defendant's 2009 entry.  *See* Hr'g Tr. 3/7/2016 (Doc. 77) 24:24–25:4, 58:9–16, 67:21–68:6, 82:9–12.  Accordingly, Agent Borrego's interview was not an interrogation, and there was no *Miranda* violation.  *Salgado*, 292 F.3d at 1174.

### C.    Terry Stop

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).  For the police to conduct a valid stop, they must "have a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotes and citation omitted).  "[T]he level of suspicion required for a *Terry* stop[, however,] is obviously less demanding than that for probable cause."  *Id.* at 8, 109 S.Ct. at 1585 (internal citations omitted).  "Officers on roving border patrols . . . may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may

be afoot.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (citations omitted).

"Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc)). "The reasonable-suspicion standard is not a particularly high threshold to reach." *Valdes-Vega*, 738 F.3d at 1078. Furthermore, although "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744) (citations and internal quotation marks omitted).

When making a reasonable-suspicion determination, the reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted); *see also United States. v. Alvarez*, 899 F.2d 833, 836 (9th Cir. 1990). In so doing, officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51. (citations omitted); *see also Valdes-Vega*, 738 F.3d at 1078. Moreover, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when considering the totality of the circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent

explanation.  *Arvizu*, 534 U.S. at 273-75,  122 S.Ct. at 750-51; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances.").   Furthermore, "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Valdes-Vega*, 738 F.3d at 1078-79 (citing *Arvizu*, 534 at 277, 122 S.Ct. 744) (alterations in original).

"In the context of border patrol stops, the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *Valdes-Vega*, 738 F.3d at 1079 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).   "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079 (citations omitted).

Furthermore, in executing a *Terry* stop, an officer may ask questions "reasonably related in scope to the justification for their initiation." *Terry*, 392 U.S. at 29, 88 S.Ct. 1868.  "An 'officer may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.'"   *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005) (alterations in original) (quoting *Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. 2574),

overruled in part on other grounds by *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)).

Here, USBP agents discovered Defendant Ramos-Zepeda hiding in a grove of trees with another individual.  Hr'g Tr. 2/19/2016 (Doc. 79) 25:5–9.  Agents tracked Defendant to that location based on the information obtained from a mobile operator who had seen the two individuals cross the border road.  *Id.* at 20:13–18, 23:13–24:11, 37:25–39:6, 42:11–24.  Agents Letavay, Wagner, and Swickheimer had reasonable suspicion that criminal activity was afoot and were justified in their questioning of Defendant Ramos-Zepeda and the individual hiding with him.  *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585.  The Court finds the agents' testimony that they questioned Defendant Ramos-Zepeda immediately upon encountering him credible.  The Court does not credit Defendant's testimony that they drove 500 meters, got out of the vehicle, and then questioned him.  The Court finds that the brief questioning that occurred regarding Defendant Ramos-Zepeda's citizenship and immigration status upon agents' discovery of him hiding in the bushes is not custodial interrogation and does not violate of *Miranda*. *See Cervantes-Flores*, 421 F.3d at 829–30.  As such, Defendant's 2015 statements should not be suppressed.

### D.    Due Process in Prior Removal

"To convict an alien criminal defendant of illegal reentry under 8 U.S.C. § 1326, the government must prove that the alien left the United States under order of exclusion, deportation, or removal, and then illegally reentered."  *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1079 (9th Cir. 2011).  A defendant charged under Section 1326

"may not challenge the validity of the deportation order . . . unless the alien demonstrates that – (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair."  8 U.S.C. § 1326(d).  "To satisfy the third prong—that the order was fundamentally unfair—the defendant bears the burden of establishing both that the 'deportation proceedings violate[d] [his] due process rights' and that the violation caused prejudice.  *United States v. Raya-Vaca*, 771 F.3d 1195, 1201–02 (9th Cir. 2014) (citations omitted) (alterations in original).

"The regulations governing expedited removal proceedings codify, in mandatory terms, the immigration officer's duty to inform the alien of the charge against him and to allow the alien to review the sworn statement prepared in his name."  *Id.* at 1204 (citing 8 C.F.R. §235.3(b)(2)(i).  Section 235.3(b)(2)(i), Code of Federal Regulations, provides in relevant part:

> In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to his section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.  This shall be accomplished by means of a sworn statement using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.  The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A.  Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction.  The examining immigration officer shall advise the alien of the charges against him or her on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an

1
2
3
4

      opportunity to respond to those charges in the sworn statement.   After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt.  Interpretative assistance shall be used if necessary to communicate with the alien.

5
6

8 C.F.R. § 235.3(b)(2)(i).

7
8
9
10

      As an initial matter, the Court finds Agent Borrego's testimony credible.  Agent Borrego testified that he processed Defendant Ramos-Zepeda pursuant to the standard procedure for processing on January 12, 2009.  Hr'g Tr. 2/19/2016 (Doc. 79) 77:22–78:2;

11
12
13
14

Hr'g Tr. 3/7/2016 (Doc. 77) 18:22–19:20, 57:4–16, 82:19–83:1.  Agent Borrego further testified that he matched the photo with the person being processed and asked Defendant Ramos-Zepeda biographical questions.  Hr'g Tr. 2/19/2016 (Doc. 79) 78:14–25, 92:17–

15
16
17
18
19

93:14.   Defendant Ramos-Zepeda informed Agent Borrego that he was a Mexican national and entered the United States near Naco, Arizona on January 9, 2009 at approximately 8:00 a.m., and was apprehended on January 12, 2009.  *Id.* at 79:3–80:3, 102:10–16; Hr'g Tr. 3/7/2016 (Doc. 77) 20:12–21:24, 31:10–19, 79:3–25.   Agent

20
21
22
23
24

Borrego testified that the information provided by Defendant Ramos-Zepeda was consistent with the information provided on the field I-826 form.  Hr'g Tr. 2/19/2016 (Doc. 79) 80:4–13, 85:16–86:13.   Agent Borrego further testified that he received a criminal history regarding Defendant Ramos-Zepeda, including an outstanding warrant

25
26
27
28

stemming from a May 23, 2006 conviction in Redwood City, California.  *Id.* at 82:8– 83:22; Hr'g Tr. 3/7/2016 (Doc. 77) 30:21–24, 57:14–16.  Agent Borrego also testified that this outstanding warrant would have made Defendant Ramos-Zepeda ineligible for a

voluntary return.  Hr'g Tr. 2/19/2016 (Doc. 79) 83:19–22.

Agent Borrego testified that the expedited removal process is an administrative proceeding, during which he obtains a sworn statement from the individual being processed.  Hr'g Tr. 2/19/2016 (Doc. 79) 87:14–15; *see also* Hr'g Tr. 3/7/2016 (Doc. 77) 6:11–7:9, 80:15–19.  Prior to obtaining a statement, Agent Borrego testified that he informed Defendant Ramos-Zepeda regarding the expedited removal proceeding, including that Defendant Ramos-Zepeda did not appear to be admissible or have legal papers authorizing his admission into the United States and that as a result he may be denied admission and immediately returned to his home country without a hearing.  Hr'g Tr. 2/19/2016 (Doc. 79) 98:5–99:4.  Agent Borrego further testified that he informed Defendant Ramos-Zepeda that such removal may result in his being barred from reentry for a period of five (5) years or longer, and that Defendant Ramos-Zepeda appeared to understand this.  *Id.* at 98:5–99:4, 103:11–19.  Agent Borrego testified that he spoke with Defendant Ramos-Zepeda in Spanish while processing him for expedited removal.  *Id.* at 88:16–90:18, 97:6–10; Hr'g Tr. 3/7/2016 (Doc. 77) 83:5–20.  Agent Borrego also testified that he confirmed with his supervisor that expedited removal was appropriate for Defendant Ramos-Zepeda.  Hr'g Tr. 2/19/2016 (Doc. 79) 81:21–82:3, 112:21–113:8.  Defendant Ramos-Zepeda declined to speak with a consular representative during his immigration processing.  *Id.* at 94:13–24.  Agent Borrego testified that he informed Defendant Ramos-Zepeda that if he had fear or concern regarding removal from the United States, he would have an opportunity to speak with an officer for a determination regarding whether he should remain in the United States.  Hr'g Tr. 2/19/2016 (Doc. 79)

100:9–101:14, 104:1–14.   Agent Borrego also asked Defendant Ramos-Zepeda if there was anything that he would like to say or add.   Hr'g Tr. 2/19/2016 (Doc. 79) 103:20–25. Based upon the information obtained from Defendant Ramos-Zepeda, it was determined that he was inadmissible to the United States and ordered removed.   Hr'g Tr. 2/19/2016 (Doc. 79) 110:21–112:20; Hr'g Tr. 3/7/2016 (Doc. 77) 42:8–44:7, 77:9–78:12.   The document finding Defendant Ramos-Zepeda was explained to and served upon him. Hr'g Tr. 2/19/2016 (Doc. 79) 112:4–115:2; Hr'g Tr. 3/7/2016 (Doc. 77) 70:25–73:22, 84:9–85:20.   Defendant Ramos-Zepeda did not, however, sign the back of the form acknowledging receipt.   As such, there was a technical violation of 8 C.F.R. § 235.3(b)(2).

"To succeed in demonstrating that the [2009] expedited removal order was fundamentally unfair, [Defendant Ramos-Zepeda] must also establish that he suffered prejudice as a result of the entry of the order . . . [by] show[ing] that he had 'plausible grounds for relief' from the removal order."   *Raya-Vaca*, 771 F.3d at 1206.   Defendant Ramos-Zepeda has not met his burden.   At the time of his 2009 removal, Defendant Ramos-Zepeda did not have any legal status in the United States, he was not eligible for cancellation of removal, he did not have any family here, he was not eligible for temporary protected status due to his prior felony conviction, and he did not indicate any fear of returning to Mexico.   Moreover, withdrawal of an application for admission is at the discretion of the Attorney General.   8 U.S.C. § 1225(a)(4).   Accordingly, Defendant has failed to show prejudice as a result of his 2009 removal order.

## III.    CONCLUSION

The Court finds that there were no violations of *McNabb-Mallory* or *Miranda* in this case, and as such, Defendant's statements should not be suppressed.  The Court further finds that Defendant's 2009 removal was proper.

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge DENY Defendant Ramon Ramos-Zepeda's Motion to Suppress Statements (Doc. 37) and Amended Motion to Dismiss Indictment for Unlawful Exclusion Under Title 8 U.S.C. § 1326(d) (Doc. 29).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-15-0976-TUC-CKJ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 29th day of April, 2016.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge

- 28 -